Docket No. 23-3697

In the

# United States Court of Appeals

For the

# Eighth Circuit

---

Turtle Mountain Chippewa, et al.

Plaintiffs – Appellees,

v.

North Dakota Legislative Assembly

Requested Intervener - Appellant.

---

Appeal from Decision of the Unites States District Court
Court for the District of North Dakota
In Case No. 3:22-cv-00022

---

### NORTH DAKOTA LEGISLATIVE ASSEMBLY'S EMERGENCY MOTION FOR EXTENSION OF DEADLINE TO SUBMIT REMEDIAL REDISTRICTING PLAN

Scott K. Porsborg (ND State Bar ID No. 04904)
sporsborg@smithporsborg.com
Brian D. Schmidt (ND State Bar ID No. 07498)
bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460
Bismarck, ND 58501
(701) 258-0630

Attorneys for Appellant.

## STATEMENT OF THE REQUESTED RELIEF

The North Dakota Legislative Assembly ("Assembly") requests expedited and emergency relief in the form of an extension of the district court's December 22, 2023 deadline to adopt a remedial redistricting plan. On December 13, 2023, the district court declared it lacked jurisdiction to amend its remedial order and adjust any deadlines set therein. (App241.)[1] The Assembly has no other means of relief in light of the district court's determination.

As explained herein, the Assembly has made extensive efforts to develop a remedial redistricting plan, but needs additional time to perform its constitutional duties as recognized by the United States Supreme Court. The Assembly simply requests it be afforded a "reasonable opportunity" to develop a remedial redistricting plan as required by Wise v. Lipscomb, 437 U.S. 535, 539 (1978) and Williams v. City of Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994).

The Assembly requests the December 22, 2023 deadline be extended until **February 9, 2024**, to afford the Assembly a reasonable opportunity to adopt a remedial redistricting plan.

---

[1] "App" refers to the bates numbers filed in the attached appendix which includes the "*Accompanying Documents*" specified in Fed. R. App. 27(a)(2)(B).

Appellate Case: 23-3697    Page: 2    Date Filed: 12/17/2023 Entry ID: 5345207

# I. FACTS RELEVANT TO MOTION FOR EXTENSION

## A. Procedural Background to Judgment.

Appellees' Complaint sought injunctive relief against the Secretary in his official capacity pursuant to 42 U.S.C. § 1983 and § 2 of the VRA. (App4-App34.) The Complaint alleged the Assembly's redistricting legislation passed subsequent to the 2020 Census - and signed into law by the Governor – violated the VRA because it did not combine the Turtle Mountain and Sprit Lake Reservations into a single legislative district. (Id.) The Complaint included a map that shows the significant distance between these two reservations:



Appellate Case: 23-3697    Page: 3    Date Filed: 12/17/2023 Entry ID: 5345207

(App13.)

The Secretary defended the validity of the redistricting statute at the District Court's June 12-15, 2023 trial. (<u>See</u> App38-App42.) More than five months after conclusion of trial, the District Court issued its "Findings of Fact and Conclusions of Law" and entered Judgment.[2] (<u>See</u> App42-App83.) After noting this case presented a "closer decision than suggested by the Tribes" (App80), the Court entered Judgment on November 17, 2023, which provides the following:

> It is evident that, during the redistricting process…the…Assembly sought input from the Tribes and other Native American representatives. It is also evident…the…Assembly did carefully examine the VRA and believed [its enacted redistricting plan] would comply with the VRA. But unfortunately…those efforts did not go far enough to comply with section 2….The Secretary and…**Assembly** shall have **until December 22, 2023**, **to adopt** a plan to remedy the violation of Section 2.

(App83) (emphasis added.)

## B. Legislative Management Quickly Takes Action Based on the District Court's Judgment.

The Assembly is a part-time citizen legislative body, which is limited to meeting in regular session for no more than 80 natural days during the biennium. <u>See</u> N.D. Const. Art. IV § 7. Between November 17 and November 28, 2023 - which

---

[2] Throughout the litigation, the Secretary made clear time was of the essence in obtaining a decision, based on his interest in having sufficient time to administer the 2024 election in the event the district court decided against him. (App37.)

-3-

included the Thanksgiving holiday - a series of meetings occurred between members of North Dakota's executive and legislative branches of government with respect to the district court's Findings and Judgment. (App351 at ¶ 2.) In an attempt to comply with the district court's directive, Representative Lefor, Chairman of Legislative Management, called a meeting of Legislative Management, for which the Legislative Council posted the required Notice on November 30, 2023.[3] (App135.)

On December 4, 2023, the Secretary filed a Notice of Appeal from the district court's Judgment. (App84 – 87.) The Secretary's appeal is filed as Docket No. 23-3655[4]. The Secretary also filed a December 4, 2023 Motion for Stay of Judgment Pending Appeal with the district court. (App88-91 and App92-119.)

Legislative Management met on December 5, 2023. (App136-153.) At that meeting, Chairman Lefor appointed an interim redistricting committee and

---

[3] Legislative Management is an interim committee consisting of the majority and minority leaders of the House and Senate, the Speaker of House, and six Senators and six Representatives chosen before the close of each regular session N.D.C.C. § 54-35-01(1). Legislative Management has various powers to act during the interim period in furtherance of the Assembly's interests. N.D.C.C. § 54-35-02.

[4] The Assembly seeks to intervene in that appeal and will be contemporaneously submitting a motion to do so in Case No. 23-3655. The basis of intervention is explained in that motion as the Secretary and Assembly no longer have the same interests in this litigation. Moreover, the Assembly attempted to intervene at the district court; however, the district court found it lacked jurisdiction and denied the motion on December 12, 2023. (App237-242.) The Assembly's appeal of the district court's December 12 Order is the basis of filings in this docket. Both appeals relate to the same underlying district court Case No. 3:22-cv-00022.

-4-

Legislative Management approved an RFP to retain an expert statistical consultant to aid in development of a remedial plan. (App137.) Legislative Management also passed a motion to intervene in this litigation to protect its constitutional duty to perform redistricting functions. (App136.)

In an apparent response to Legislative Management's actions, Appellees filed a "Motion to Amend Remedial Order" and "Motion to Expedite" approximately six and a half hours after Legislative Management adjourned. (App120-126; App127-129; and App136-153.) The Appellees acknowledged the Assembly must be afforded an opportunity to enact a remedial plan through its normal legislative process, but requested the District Court order its "Demonstrative Plan 1" into effect as the remedial plan by December 22, 2023. (App121-122). The District Court ordered a response be filed to the Appellees' motion by December 8, 2023. (App130-131.)

On December 7, Legislative Council posted notice that the interim redistricting committee would meet on December 13, 2023. (App351 at ¶ 5; App156.) On December 8, 2023, Legislative Management issued an RFP to retain a redistricting consultant for the Redistricting Committee.

Also on December 8, the Assembly filed a "Motion to Intervene, Joinder in the Secretary's Motion for Stay of Judgment Pending Appeal and Response to the Plaintiffs' Motion to Amend Remedial Order" with the District Court. (App132-134

and App219-236.)  Subsequent to full briefing on the Motion to Amend and Motion for Stay (App219-236; App154-162, App163-189; App190-199; App200-209; App210-218.), the district court issued its December 12, 2023 Order.  (App237-242.)

### C.    The District Court's Order.

The district court denied the Secretary's Motion for a Stay of Judgment Pending Appeal. (App238-239.)  It reasoned "there is no imminent election, little risk of voter confusion, and the final judgment was not issued on the 'eve' of any election."  (Id.)  The district court further observed:

> …the deadlines cited by the Secretary concern the <u>opening</u> date for candidate signature gathering – for elections that are still months away. Indeed, the Secretary's concern is not as to voter confusion but rather the administrative burden of correcting the Section 2 violation. Because there is no imminent election…it does not support granting a stay pending appeal.

(Id.) (emphasis in original.)

The district court further explained "[c]oncerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights. This factor also weighs against a stay pending appeal."  (App241.)

The district court also held the Secretary's Notice of Appeal (App84-87) "divests the district court of jurisdiction over this case, and the district court cannot reexamine or supplement the order being appealed." (App241.)  In sum, the district court concluded the Secretary's "notice of appeal divested this Court of jurisdiction over this case, the Plaintiffs' motion to amend or correct the remedial order

-6-

(App120-126) and the Legislative Assembly's motion to intervene (App132-134) and motion to stay (App219-236) are also **DENIED.**"  (App242.)

### D. The Redistricting Committee's December 13, 2023, Meeting.

The Redistricting Committee met on December 13, 2023, to continue the process of developing a remedial plan to satisfy the requirements of the VRA. (App351 at ¶ 7; and App359-382.) The Committee heard testimony by Scott Davis "on behalf of the members of the Turtle Mountain Band of Chippewa Indians" who noted the Tribe "never wished for their reservation to be combined into one voting district with Spirit Lake Reservation."  (App360.)  Davis expressed a preference for the "consideration of other options over the alternative plans provided by the plaintiffs and the district court."  (Id.) Further, the Elections Director from the Secretary's office presented a timeline which provides "April 8th is the hard deadline for the state and counties to be able to successfully administer an election."[5] (App382.)

---

[5] The Assembly understands the Secretary has previously represented December 31st is the date after which he will have significant difficulties administering the election if a map is not in place.  The District Court labelled these concerns "not as to voter confusion but rather the administrative burden of correcting the Section 2 violation." (App238-239).  Most of the Secretary's early deadlines are established by state statute.  The Assembly has the ability to pass legislation when it adopts the remedial plan to adjust for this unique situation. There is precedent for this procedure.  See S.B. 2456, Section 6 (2001) https://www.ndlegis.gov/assembly/57-2001/special/session-law/chpt691.pdf (accessed Dec. 17, 2023).

-7-

### E. Further Filings with This Court.

On December 13, 2023, the Secretary moved to stay the district court's judgment in Docket No. 23-3655. (App243-348.) The basis of the Secretary's motion asserted the "State needs finality on what election map will be used for the 2024 elections no later than Sunday, December 31, 2023…" (App243.) The Secretary correctly disclaimed he did "not purport to speak for or on behalf of the Legislative Assembly" in his motion. (App253 at n. 6.) This Court denied the Secretary's Motion for Stay of Judgment Pending Appeal on December 15, 2023. (App349.)

### F. The Redistricting Committee Will Meet Again This Week.

On December 15, 2023, Legislative Council published a Notice for Redistricting Committee's December 20, 2023, meeting. (App352 at ¶ 8; and App383.) At that meeting, the Redistricting Committee will discuss the "directive to adopt a remedial redistricting plan and consideration of legislative redistricting proposals." (App348.) The Redistricting Committee will also take public comment from "interested persons" and engage in further discussion on a redistricting plan. (Id.) Further, Legislative Council invited the chairs of both the Turtle Mountain

---

That being said, the Assembly does not purport to speak for or on behalf of the Secretary.

Appellate Case: 23-3697     Page: 9     Date Filed: 12/17/2023 Entry ID: 5345207

Band of Chippewa Indians and the Spirit Lake Nation to attend the December 20, 2023, meeting of the Redistricting Committee. (App352 at ¶ 9; and App385-386.)

Even if the Redistricting Committee is able to complete the lofty goal of thoughtfully considering any additional public comment received, potentially incorporating those comments into a plan, and agreeing on a proposed remedial plan on December 20, 2023, additional steps are needed before the Assembly can "adopt" a map as required by the district court's judgment. (App352 at ¶10.) First, Legislative Council staff must prepare a proposed bill draft to translate the map image approved by the Redistricting Committee to the metes and bounds descriptions required for codification. (Id. at ¶10(a).) Legislative Management will need to meet to review the Redistricting Committee's report and consider whether to approve the recommended bill draft for introduction during a legislative session. (Id. at ¶10(b)-(c).) Legislative leadership will then need to request the Governor call a special session.[6] (App353 at ¶ 10(d).) Only the Governor can call a special session of the Assembly[7]. N.D. Const. Art. V § 7. Based on recent precedent, there will

---

[6] Alternatively, Legislative Management may reconvene the Assembly to serve its 5 remaining days of regular session. N.D.C.C. § 54-03-02(3); see also App352 at ¶10(d)(i). However, any laws enacted during a regular session do not become effective for a substantial period of time unless two-thirds the members elected to each house declare an emergency measure and includes such declaration in the Act. See N.D. Const. Art. IV § 13.

[7] Notably, there is recent precedent for this happening. On October 13, 2023 leadership asked the Governor to call a special session after the North Dakota

likely be a delay for discussions between the Governor's office and leadership as to the scope of the special session. (Id. at ¶10(e)-(f); App387-390.) Further, recent precedent shows there will be a delay from date the Governor's calls for a special session and its commencement. (App353 at ¶10(f), App389-390.) This is because the Assembly is comprised of 141 citizens who live across the State and serve in the Assembly on a part-time basis. (App354 at ¶ 11); N.D. Const. Art. IV § 5 ("An individual may not serve in the legislative assembly unless the individual lives in the district from which selected").

In short, the December 22nd date as provided in the District Court's order does not provide the Assembly with a reasonable opportunity to develop a remedial plan. Under the North Dakota Constitution, this is a role held exclusively by the Assembly. N.D. Const. Art. IV § 2. While even the Assembly's proposed timeline is tight, it believes it can be accomplished if it is given this time.

## II.    LAW AND ARGUMENT

---

Supreme Court invalidated S.B. 2015 when it found the legislation contained multiple subject matters in violation of Art. IV § 13 of the North Dakota Constitution. See Bd. of Trustees of the N.D. Public Employees' Retirement System v. N.D. Legislative Assembly, 2023 ND 185, ¶ 1, 996 N.W.2d 873; App353 ¶ 10(e). That special session was held from October 23 to October 27, 2023. (App389-390.) The primary purpose of the request was to separate bills for another vote so as to not violate the single subject matter clause of the North Dakota Constitution. (App353 at ¶ 10(e).)

-10-

The Assembly understands the district court's judgment is the law unless it is reversed and further understands the federal court's reluctance to enter a stay in these circumstances. However, the Assembly requests an extension of the December 22, 2023 deadline to adopt a remedial redistricting plan. (App83.) Since the district court declared it lacked jurisdiction to amend its judgment (App237-242), the Assembly has no other means of obtaining relief.

The Assembly - not the Secretary - is solely vested with the power to establish legislative districts under the North Dakota Constitution. (N.D. Const. IV at § 2.) The Supreme Court recognizes redistricting "is primarily the duty and responsibility of the State through its legislature…rather than of a federal court." <u>Voinovich v. Quilter</u>, 507 U.S. 146, 156 (1993). Moreover, the Court explained that "of course…States retain broad discretion in drawing districts to comply with the mandate of § 2." <u>League of United Latin American Citizens v. Perry</u>, 548 U.S. 399, 429 (2006). This is why it "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." <u>Wise v. Lipscomb</u>, 437 U.S. 535, 539 (1978). Accordingly, it "is therefore appropriate, whenever practicable, to afford a **reasonable opportunity** for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." <u>Id</u>. at 540 (Emphasis added).

-11-

This Court recognized the importance of the Assembly's "reasonable opportunity" because if it "offers a remedial plan, the court must defer to the proposed plan unless the plan does not completely remedy the violation or the proposed plan itself constitutes a section two violation." Williams v. City of Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994). However, "the district court must fashion a remedial plan" only if the Assembly declines to propose a remedy. Id.

The Assembly wants to propose a remedy. The Redistricting Committee will continue to perform its due diligence to create a plan it believes satisfies both State and Federal law. This is why it created an interim Redistricting Committee. This is why that committee heard and considered testimony on December 13, 2023. Notably, this included a presentation from Scott Davis who "presented testimony on behalf of members of the Turtle Mountain Band of Chippewa Indians" and explained they "never wished for their reservation to be combined into one voting district with Spirit Lake…." (App360.) Davis requested "consideration of other options over the alternatives provided by the plaintiffs and the district court" which include eliminating the subdistrict in District 9 and creating a subdistrict in District 15. (Id.)

The Redistricting Committee desires to evaluate these options – and others - to determine whether an alternative compliant plan can be adopted for the Court's review. Further, the Redistricting Committee will meet again on December 20, 2023

-12-

to hear additional public comment and evaluate the potential options. (App352 at ¶¶ 8-9.) Legislative Management would not take these affirmative steps, invest the time to perform its due diligence, and make this request if it were simply to decline the opportunity to adopt a remedial plan. Unfortunately, as explained above, the December 22, 2023, deadline is impracticable and does not afford the Assembly a "reasonable opportunity" to do so.

The Supreme Court has made it clear redistricting is a legislative duty and should be developed through the legislative process and not imposed by judicial fiat. See Voinovich, 507 U.S. at 156; Perry, 548 U.S. at 429; Wise, 437 U.S. at 539; see also Williams, 32 F.3d at 1268. To date, the legislative process has been fruitful as the Redistricting Committee heard testimony on behalf of Turtle Mountain requesting alternatives be considered. (App359-382.) It also received information from the Secretary of State's Office that "April 8th is the hard deadline for the state and counties to be able to successfully administer an election." (App382.) While the Assembly understands the Secretary's previously stated desire to meet all statutory deadlines (App243), the Assembly's interest in its constitutional duty to establish legislative districts outweighs administrative hurdles. In this situation, it is no doubt "practicable" to afford the Assembly a "reasonable opportunity" to adopt a remedial plan.

-13-

The Assembly requests an opportunity to develop a plan for the Court's review and approval in a reasonable timeframe in advance of the 2024 Election. In light of the circumstances, the Assembly requests the December 22, 2023, deadline be extended to February 9, 2023. To remain consistent with the briefing schedule set for the Appellees, the Appellees shall submit their objections by February 23 and the Assembly and Secretary shall file a response by March 1. This will provide the Court five weeks to evaluate the plan and issue a decision prior to the Secretary's April 8, 2023, "hard deadline." More importantly, this will provide the Assembly a "reasonable opportunity" to perform its constitutional duty to prepare a redistricting plan.

## III. CONCLUSION

For the aforementioned reasons, the Assembly requests the December 22, 2023, deadline to adopt a remedial plan be extended to February 9, 2024. This will afford the Assembly a "reasonable opportunity" to adopt a remedial redistricting plan.

Dated this 17th day of December, 2023.

SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER & SMITH

By  /s/ Scott K. Porsborg
    Scott K. Porsborg (ND Bar ID #04904)
    sporsborg@smithporsborg.com
    Brian D. Schmidt (ND Bar ID #07498)

-14-

bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
(701) 258-0630

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) as it uses the proportionally spaced typeface of Times New Roman in 14-point font.

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) as it contains 3137 words, excluding parts of the motion exempted by Fed. R. App. P. 27(d)(2).

The electronic version of the foregoing Brief submitted to the Court pursuant to Eighth Circuit Local Rule 28(A)(d) was scanned for viruses and that the scan showed the electronic version of the foregoing is virus free

Dated this 17th day of December, 2023.

By  /s/ *Scott K. Porsborg*
SCOTT K. PORSBORG

-16-

Appellate Case: 23-3697     Page: 17     Date Filed: 12/17/2023 Entry ID: 5345207

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2023, I electronically submitted the foregoing **NORTH DAKOTA LEGISLATIVE ASSEMBLY'S EMERGENCY MOTION FOR EXTENSION OF DEADLINE TO SUBMIT REMEDIAL REDISTRICTING PLAN** to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit for review by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

By /s/ Scott K. Porsborg
SCOTT K. PORSBORG

-17-

# Docket No. 23-3697

## In the

# United States Court of Appeals

## For the

# Eighth Circuit

---

Turtle Mountain Chippewa, et al.

Plaintiffs – Appellees,

v.

North Dakota Legislative Assembly

Requested Intervener - Appellant.

---

Appeal from Decision of the Unites States District Court
Court for the District of North Dakota
In Case No. 3:22-cv-00022

---

## APPELLANT'S APPENDIX

Scott K. Porsborg (ND State Bar ID No. 04904)
sporsborg@smithporsborg.com
Brian D. Schmidt (ND State Bar ID No. 07498)
bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460
Bismarck, ND 58501
(701) 258-0630

Attorneys for Appellant.

# TABLE OF CONTENTS

Page #

Doc # 1 Complaint for Declaratory and Injunctive Relief ......................... App4 - 35

Doc # 33 Clerk's Minutes ...................................................................... App36 - 37

Doc # 112 Bench Trial Minutes .............................................................. App38 - 42

Doc # 125 Findings of Fact and Conclusions of Law ............................. App43 - 81

Doc # 126 Judgment in a Civil Case....................................................... App82 - 83

Doc # 130 Notice of Appeal .................................................................. App84 - 87

Doc # 131 Motion for Stay of Judgment Pending Appeal........................ App88 - 91

Doc # 132 Brief in Support of Motion for Stay of Judgment
      Pending Appeal........................................................................ App92 - 119

Doc # 134 Plaintiffs' Motion to Amend Remedial Order .................... App120 - 126

Doc # 135 Motion to Expedite.............................................................. App127 - 129

Doc # 136 Order.................................................................................. App130 - 131

Doc # 137 North Dakota Legislative Assembly's Motion
      to Intervene ...........................................................................App132 – 134

Doc # 139-1 Meeting Notice.................................................................App135

Doc # 139-2 Meeting Minutes ............................................................ App136 - 153

Doc # 140 Secretary Howe's Response to Plaintiffs' Motion to
      Amend Remedial Order ........................................................ App154 - 162

Doc # 142 Plaintiffs' Opposition to Defendant's Motion for Stay
      of Judgment Pending Appeal ............................................... App163 - 189

Appellate Case: 23-3697    Page: 20    Date Filed: 12/17/2023 Entry ID: 5345207

Doc # 144 Plaintiffs' Reply in Support of Motion to Amend
Remedial Order ................................................................. App190 - 199

Doc # 147 Reply Brief in Support of Motion for Stay of
Judgment Pending Appeal .............................................. App200 - 209

Doc # 148 North Dakota Legislative Assembly's Brief in Reply
to Motion for Stay of Judgment Pending Appeal ............................ App210 - 218

Doc # 150 North Dakota Legislative Assembly's Brief in
Support of Motion to Intervene, Joinder in the Secretary's
Motion for Stay of Judgment Pending Appeal, and Response
to the Plaintiffs' Motion to Amend Remedial Order ..................... App 219 - 236

Doc # 153 Order ................................................................. App237 - 242

Entry ID 5344314 Secretary Howe's Motion for Stay of Judgment
Pending Appeal and Motion to Expedite ........................................ App243 - 348

Entry ID 5345026 Amended Order ................................................. App349

Affidavit of Emily Thompson in Support of North Dakota
Legislative Assembly's Emergency Motion for
Extension of Deadline to Submit Remedial Redistricting Plan ....... App350 - 390

Dated this 17th day of December, 2023.

SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER & SMITH


By  /s/ Scott K. Porsborg
Scott K. Porsborg (ND Bar ID #04904)
sporsborg@smithporsborg.com
Brian D. Schmidt (ND Bar ID #07498)
bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460

App2

Bismarck, ND 58502-0460
(701) 258-0630

Attorneys for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2023, I electronically submitted the foregoing **APPELLANT'S APPENDIX** to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit for review by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

By /s/ Scott K. Porsborg
      SCOTT K. PORSBORG

Appellate Case: 23-3697    Page: 22    Date Filed: 12/17/2023 Entry ID: 5345207

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

Turtle Mountain Band of Chippewa
Indians, Spirit Lake Tribe, Wesley Davis,
Zachery S. King, and Collette Brown.

v.

ALVIN JAEGER, in his official capacity as
Secretary of State of North Dakota.

Case No. _____

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to 52 U.S.C. § 10310 and 42 U.S.C. § 1983, Plaintiffs file this action challenging North Dakota's legislative redistricting as a violation of Section 2 of the Voting Rights Act. The new redistricting law dilutes the voting strength of Native American voters from the reservations of the Turtle Mountain Band of Chippewa Indians and the Spirit Lake Tribe by packing and cracking those voters, reducing from two to one the number of state house seats in which Native American voters in this region of the state have an opportunity to elect their candidate of choice.

### INTRODUCTION

1.      On November 11, 2021, Governor Doug Burgum signed into law House Bill No. 1504 ("HB 1504"), redrawing North Dakota's state legislative districts to account for

population shifts captured by the 2020 Census. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021).

2.      HB 1504 establishes an effective Native American voting majority for two state house seats; however, the Voting Rights Act ("Voting Rights Act" or "VRA") requires the establishment of an effective Native American voting majority for three state house seats that will allow Native American voters to elect the candidate of their choice.

3.      North Dakota has 47 state legislative districts, and traditionally one senator and two state representatives are elected at large from each district. However, North Dakota law permits state house representatives to be elected either at-large *or* from subdistricts within a given senatorial district. N.D.C.C. 54-03-01.5(2).

4.      HB 1504 contains two house subdistricts in which Native Americans have a meaningful opportunity to elect candidates of their choice to the North Dakota State House.  Those are House District 9A and House District 4A. Residents of each subdistrict elect only a single representative to the state house.

5.      House District 4A covers the Fort Berthold Indian Reservation of the Mandan, Hidatsa, and Arikara (MHA) Nation.

6.      HB 1504's redistricting plan places the Turtle Mountain Reservation into District 9 (divided into subdistricts 9A and 9B) and the Spirit Lake Reservation into District 15 (with no subdistricts).

7.      By subdividing District 9 and keeping Spirit Lake out of District 9, the plan simultaneously packs Turtle Mountain Band of Chippewa Indians members into one

Appellate Case: 23-3697   Page: 24   Date Filed: 12/17/2023 Entry ID: 5345207

house district, and cracks Spirit Lake Tribe members out of any majority Native house district.

8. The packing of Native American voters into a single state house subdistrict, and the cracking of nearby Native American voters into two other districts dominated by white voters who bloc vote against Native American's preferred candidates, unlawfully dilutes the voting rights of Turtle Mountain and Spirit Lake Native Americans in violation of Section 2 of the VRA.

9. In order to comply with the VRA, North Dakota must implement a redistricting plan in which Native American voters on the Turtle Mountain and Spirit Lake Reservations comprise an effective, geographically compact majority in a single legislative district. Such a plan can be drawn, is legally required, and would provide those Native American voters the opportunity to elect their preferred candidates to both at-large state house seats and the state senate.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357, 42 U.S.C. § 1983, and 52 U.S.C. § 10301, *et seq*. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Rules 57 and 65 of the Rules of Civil Procedure. Jurisdiction for Plaintiffs' claim for costs and attorneys' fees is based upon Rule 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

11. This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the

3

Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

12.     The Court has personal jurisdiction over Defendant, who resides in this district.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e). Defendant resides in the State of North Dakota, and Defendant is a state official performing official duties in Bismarck, North Dakota. Plaintiff Tribes and Individual Plaintiffs are located within the State of North Dakota.

**PARTIES**

*Plaintiff - Spirit Lake Tribe (Mni Wakan Oyate)*

14.     Plaintiff Spirit Lake Tribe - Mni Wakan Oyate is a federally recognized Tribe with an enrollment of 7,559 members. 86 Fed. Reg. 7557.

15.     The Spirit Lake Tribe is located on the Spirit Lake Reservation.  The Tribal Headquarters are located at 816 3rd Ave. North, Fort Totten, ND 58335.

16.     The Spirit Lake Reservation is in east central North Dakota, and covers approximately 405 square miles, primarily in Benson County and Eddy County, with parts extending into Nelson, Wells, and Ramsey Counties. The Spirit Lake Reservation was established in 1867 through a treaty between the Sisseton Wahpeton Sioux Bands and the United States. The Treaty forced the relocation of the Sisseton Wahpeton Sioux Bands from a more expansive territory in present-day Minnesota and the Northern Plains onto the Reservation with the Sisseton, Wahpeton and the Cuthead Bands of the

Yanktonais, who had already been forced onto the Reservation. These Bands make up the present-day Spirit Lake Tribe.

17.     Approximately 3,459 Spirit Lake members live on the Spirit Lake Reservation, with more living in surrounding areas. This includes a sizeable population of eligible voters.

18.     HB 1504 places the Spirit Lake Reservation into Legislative District 15, which is comprised of one single-member state senate district and a two-member at-large state house districts.

### *Plaintiff - Turtle Mountain Band of Chippewa Indians*

19.     Plaintiff Turtle Mountain Band of Chippewa Indians is a federally recognized Tribe with an enrollment of more than 30,000 members. 86 Fed. Reg. 7557.

20.     Today, the Turtle Mountain Band of Chippewa Indians is located on the Turtle Mountain Indian Reservation. Many Turtle Mountain citizens live on the Reservation and in the surrounding areas, including on lands held in trust for the Tribe by the federal government outside the boundaries of the reservation. The Tribal Headquarters are located at 4180 Highway 281, Belcourt, ND 58316.

21.     The Turtle Mountain Reservation covers 72 square-miles in north central North Dakota, located entirely within Rolette County. It is one of the most densely populated reservations in the United States, with a population of 5,113 according in 2020 according to the United States Census Bureau. This includes a sizeable population of eligible voters. Substantial populations of tribal citizens also live in the areas surrounding the Reservation, including Rolla, St. John, Dunseith, and Rolette.

Appellate Case: 23-3697   Page: 27   Date Filed: 12/17/2023 Entry ID: 5345207

22.    HB 1504 places the Turtle Mountain Indian Reservation into Senate District 9 and House District 9A. Lands held in trust for the Turtle Mountain Band of Chippewa Indians are located in House District 9B.

23.    A substantial population of Turtle Mountain citizens live in House Districts 9A and 9B.

*Individual Voter Plaintiffs*

24.    Plaintiffs also include individual Native American voters ("Individual Plaintiffs") who reside in the districts that violate Section 2 of the Voting Rights Act.

25.    Individual Plaintiffs' votes are diluted in violation of Section 2 of the Voting Rights Act because they are either: (a) cracked into districts where Native Americans make up less than a majority of the voting age population and their voting power is overwhelmed by a white bloc voting in opposition to their candidates of choice, as in District 15; or (b) packed into a subdistrict with an excessively high number of Native voters—well above what is necessary to afford them an equal opportunity to elect their preferred candidate—as in House District 9A.

26.    Plaintiff Wesley Davis is Native American and a citizen of the Turtle Mountain Band of Chippewa Indians. Mr. Davis resides on the Turtle Mountain Reservation and within State Senate District 9 and House District 9A. Mr. Davis has lived at his residence for 10 years, has lived on the Turtle Mountain Reservation for 30 years, and is a regular voter in North Dakota elections. Mr. Davis intends to vote in 2022 and future elections.

6

27.     Plaintiff Zachary S. King is Native American and a citizen of the Turtle Mountain Band of Chippewa Indians. Mr. King resides on the Turtle Mountain Reservation and within State Senate District 9 and House District 9A. Mr. King has lived at this residence for 35 years and is a regular voter in North Dakota elections. Mr. King intends to vote in 2022 and future elections.

28.     Plaintiff Collette Brown is Native American and a citizen of the Spirit Lake Tribe. Ms. Brown resides on the Spirit Lake Reservation and within Legislative District 15. Ms. Brown has lived at this residence for 19 years, has resided on the Spirit Lake Reservation for 43 years and is a regular voter in North Dakota elections. Ms. Brown intends to vote in 2022 and future elections.

### *Defendant*

29.     Defendant Alvin Jaeger is sued in his official capacity as Secretary of State of North Dakota. The North Dakota Secretary of State is the State's supervisor of elections and is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D.C.C. §§ 16.1-01-01(1) & (2)(a). He is tasked with "maintain[ing] the central voter file," which "must contain . . . the legislative district . . . in which the [voter] resides." N.D.C.C. §§ 16.1-02-01 & -12(6).

### LEGAL BACKGROUND

30.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes

Appellate Case: 23-3697     Page: 29     Date Filed: 12/17/2023 Entry ID: 5345207

leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

31.     The dilution of a racial or ethnic minority group's voting strength "may be caused by the dispersal of [the minority population] into districts in which they constitute an ineffective minority of voters or from the concentration of [the minority population] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

32.     In *Gingles*, the Supreme Court identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

33.     After the preconditions are established, the statute directs courts to assess whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electoral to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Court has directed that the Senate Report on the 1982 amendments to the Voting Rights Act be consulted for its non-exhaustive factors that the court should consider in determining if,

in the totality of the circumstances in the jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

34.     The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent of which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which the minority group bears the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

35.     Nevertheless, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, 97th Cong. 2d Sess. (1982) at 29.

36.     Courts have found violations of Section 2 where district maps "pack" minority voters into a district where they constitute a significant supermajority, diluting their ability to elect a candidate of their choice in surrounding districts. *See Boneshirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006).

37.     Likewise, courts have found Section 2 violations occur where district maps "crack" compact minority populations between districts, thwarting their ability to elect a

candidate of choice in a district encompassing the entire minority population. *See Gingles,* 478 U.S. at 46 n.11; *See also Johnson v. De Grandy*, 512 U.S. 997,1007 (1994).

**FACTS**

38.    All or part of five Indian reservations are within the boundaries of the State of North Dakota. This includes the entirety of the Fort Berthold Indian Reservation, where the MHA Nation is located, the Spirit Lake Reservation, where the Spirit Lake Tribe is located, and the Turtle Mountain Reservation, where the Turtle Mountain Band of Chippewa Indians is located, as well as northern portions of the Standing Rock Reservation, where the Standing Rock Sioux Tribe is located, and the Lake Traverse Reservation, where the Sisseton Wahpeton Oyate is located. A map of the North Dakota reservations is below.



https://www.indianaffairs.nd.gov/tribal-nations.

39.     According to the 2020 Census, North Dakota has a total population of 779,094, of whom 636,160 (81.7%) are non-Hispanic White, 55,727 (7.2%) are Native American (alone or in combination), and 87,207 (11.2%) are members of other racial or ethnic groups.

40.     According to the 2020 Census, North Dakota has a voting-age population of 596,093, of whom 503,153 (84.4%) are non-Hispanic White, 35,031 (5.9%) are Native American (alone or in combination), and 57,909 (9.7%) are members of other racial or ethnic groups.

41.     The North Dakota legislature commenced its most recent redistricting process following the 2020 U.S. Census in August 2021. Redistricting was driven by the North Dakota Legislative Council Redistricting Committee (the "Redistricting Committee"), a subcommittee of the legislature comprised of eight state house representatives, including the chairman, and eight state senators, including the vice chairman. H.B. 1397, 67th Leg., Reg. Sess. (N.D. 2021).

42.     The Redistricting Committee was charged with developing a legislative redistricting plan to submit to the legislative assembly and implemented in time for use in the 2022 primary election. *Id.* Throughout the process, the Redistricting Committee held hearings in which it received testimony from the public and state legislators regarding legislative plans.

43.     Many of the requests of tribal leaders and native organizations were ignored in the process, including requests to hold Redistricting Committee meetings on or near reservations to allow tribal members to participate.

Appellate Case: 23-3697     Page: 33     Date Filed: 12/17/2023 Entry ID: 5345207

44.     Chairman Douglas Yankton of the Spirit Lake Tribe and other official representatives of the Spirit Lake Tribe, including Gaming Commission Executive Director Collette Brown (who is also an Individual Plaintiff), provided testimony to the Redistricting Committee on August 26, 2021,[1] September 15, 2021,[2] and September 29, 2021,[3] stating the Spirit Lake Tribe's official position that the Spirit Lake Reservation should be placed into a single state house subdistrict that would improve tribal citizens' representation in the State Legislature.

45.     At no point did the Turtle Mountain Band of Chippewa Indians nor its representatives request that the Tribe's reservation be placed into a single-member state house subdistrict.

46.     On September 29, 2021, the Redistricting Committee adopted its draft final statewide legislative plan and for the first time indicated the Committee's intent to split

---

[1] *Aug. 26 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Aug. 26, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5024-03000-meeting-minutes.pdf (minutes); *Testimony of Collette Brown at Aug. 26 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Aug. 26, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5024_03000appendixh.pdf.
[2] *Sep. 15 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 15, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5061-03000-meeting-minutes.pdf (minutes); *Testimony of Collette Brown at the Sep. 15 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 15, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5061_03000appendixd.pdf (testimony).
[3] *Sep. 28-29 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 28-29, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5063-03000-meeting-minutes.pdf (minutes); *Testimony of Douglas Yankton at the Sep. 28-29 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 28-29, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5063_03000appendixc.pdf (testimony).

Appellate Case: 23-3697     Page: 34     Date Filed: 12/17/2023 Entry ID: 5345207

District 9 into two state house subdistricts. The final draft plan included 47 state legislative districts, with two divided into single-member state house subdistricts, Districts 4 and 9.

47.     District 9, which comprises the boundaries of Senate District 9 (SD 9), is divided into single-member House Districts: 9A (HD 9A) and 9B (HD 9B). The Turtle Mountain Indian Reservation is located entirely in HD 9A, while some of the Tribe's trust land and members are located in HD 9B.

48.     The plan did not establish a single-member state house district encompassing the Spirit Lake Reservation. Instead, the Spirit Lake Reservation was located in District 15, which encompasses a single-member state senate district and a two-member at-large state house district.

49.     After reviewing the Redistricting Committee's final proposed plan, officials from the Spirit Lake Tribe and Turtle Mountain Band of Chippewa Indians determined that the best way to prevent the votes of citizens of the Tribal Nations from being diluted and to ensure compliance with the Voting Rights Act would be for the Legislature to adopt a joint legislative district that includes both the Spirit Lake Tribe and the Turtle Mountain Band of Chippewa Indians.

50.     On November 1, 2021, Spirit Lake Chairman Yankton and Turtle Mountain Chairman Azure issued a joint letter to Governor Doug Burgum, House Speaker Kim Koppelman, House Majority Leader Chet Pollert, House Minority Leader Joshua Boschee, Senate Majority Leader Rich Wardner, and Senate Minority Leader Joan Heckman detailing the Tribal Nations' concerns about the proposed map and indicating

13

the Tribal Nations' request to be placed into a single legislative district encompassing both Tribes' reservations. *See* Exhibit 1.

51.     The letter also put each of these officials on notice that the proposed District 9, which includes HD 9A and HD 9B, as they are currently drawn, would violate the Voting Rights Act and provided an analysis of racially polarized voting in North Dakota.

52.     Along with the letter, the Chairmen delivered a proposed draft of a district encompassing their two Tribal Nations as well as a draft map.

53.     On November 8, 2021, the Redistricting Committee held a hearing during the special legislative session to finalize its plan.

54.     At that meeting on November 8, 2021, Senator Richard Marcellais who represents SD 9 proposed an amendment to the Committee's final legislative map, which would have created a joint legislative district containing the Turtle Mountain Reservation and Spirit Lake Reservation.

55.     During the meeting, the committee heard testimony from Chairman Azure, Chairman Yankton, Senator Marcellais, and Representative Marvin Nelson of District 9 regarding the proposed amendment. Both Chairmen again indicated their Tribal Nations' position that the tribes' reservations should be placed into the same district.

56.     The Committee failed to adopt the amendment, as did the full Senate. Rather, on November 10, 2021, the North Dakota State Legislature passed HB 1504. Governor Burgum signed the bill into law the following day.

*Native Americans' Voting Strength Is Diluted by the Configuration of Districts 9A, 9B, and 15*

57.     HB 1504 packs Native American voters in District 9A, while cracking other Native American voters in Districts 9B and 15.

58.     House District 9A has a Native Voting-Age Population of 79.79 percent and is centered in Rolette.

59.     House District 9B has a Native American Voting-Age Population of 32.23 percent, cracking apart Native American populations near St. John and Turtle Mountain Trust lands from those in District 9A.

60.     Spirit Lake's Native American population is submerged into District 15, which has a Native American Voting-Age Population of 23.08 percent.

**Gingles** *Prong 1: Native American Voters Form a Geographically Compact Majority in an Alternative District with Two State House Seats*

61.     Native Americans living on and around the Spirit Lake Reservation and Turtle Mountain Reservation are sufficiently numerous and geographically compact to constitute a majority in an undivided legislative district.

62.     In that proposed district, Native American voters from Turtle Mountain and Spirit Lake reservations would be combined in a single district with a Native American Voting-Age Population of 69.1 percent. Under this configuration, Native American voters in the region would have the opportunity to elect their candidates of choice to both at-large state house seats as well as the senate.

63.     The Native American population on and around the Turtle Mountain and Spirit Lake reservations is geographically compact.

15

64.    The Spirit Lake and Turtle Mountain reservations are a mere 55 miles apart—a roughly one-hour drive between the reservations.

65.    The below map shows the Spirit Lake reservation and Turtle Mountain reservation (including adjacent trust lands) outlined in black lines, with the more densely populated Native American areas shown in blue.



66.    The Tribes' proposed district would be far more compact than the enacted District 14, which stretches over 150 miles—a nearly three hour drive—from Wolford in Pierce County to Alkaline Lake in Kidder County.

Appellate Case: 23-3697    Page: 38    Date Filed: 12/17/2023 Entry ID: 5345207

**Gingles** *Prong 2: Voting in the Region is Racially Polarized, with Native American Voters Demonstrating Political Cohesion*

67.    Native American voters in North Dakota, including those living on and around the Spirit Lake Reservation and Turtle Mountain Reservation, vote cohesively and overwhelmingly support the same candidates.

68.    For example, Rolette County precinct 09-03 has a Native American Voting-Age Population of 93.7 percent, and in the 2020 presidential election candidate Joe Biden carried the precinct by a margin of 87.2 percent to 11.6 percent.

69.    Benson County precinct 23-02 has a Native American Voting-Age Population of 91.8 percent, and Biden carried it by a margin of 78.6 percent to 19.6 percent.

**Gingles** *Prong 3: White Bloc Voting Usually Defeats Native American Preferred Candidates*

70.    In the absence of Section 2 compliant districts, white bloc voting in the region usually defeats the candidate of choice of Native American voters.

71.    Republican candidates usually defeat the Native American-preferred Democratic candidates in reconstituted elections in Districts 9B and 15.

72.    On the other hand, the Native American candidate of choice prevails by high margins in District 9A. In the 2020 presidential election, Native American candidate of choice Biden received 72.7 percent of the vote, compared to 37.0 percent in District 9B and 32.9 percent in District 15. In the 2020 gubernatorial election, Native American candidate of choice Lenz received 64.3 percent of the vote in District 9A, compared to 29.7 percent in District 9B and 25.8 percent in District 15.

Appellate Case: 23-3697     Page: 39     Date Filed: 12/17/2023 Entry ID: 5345207

***The Totality of Circumstances Demonstrates that Native American Voters Have Less Opportunity than Other Members of the Electorate to Participate in the Electoral Process and Elect Representatives of Their Choice***

73.     A review of the totality of the circumstances reveals that Native American voters in North Dakota have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See* 52 U.S.C. § 10301(b).

***Exclusion of Native Americans from the 2021 Redistricting Process***

74.     The North Dakota Legislature, including the Redistricting Committee, failed to actively and effectively engage tribal citizens in the 2021 Redistricting process.

75.     The Redistricting Committee failed to hold a single committee hearing on tribal lands, despite repeated requests from the Tribal Nations within North Dakota's borders to do so. Instead, all public hearings were held at substantial distances from tribal lands, making attendance and testimony impossible for most tribal citizens, and especially the many tribal citizens without reliable private transportation.

76.     Even when official representatives of the Tribal Nations were able to attend hearings of the Redistricting Committee, they were met with hostility by some legislators.

77.     For example, at a final meeting of the Redistricting Committee on November 8, Turtle Mountain Chairman Azure and Spirit Lake Chairman Yankton testified before the Committee.  The Chairman requested their respective communities of interest be included together in a single legislative district.

78.     Despite the Tribal leaders' requests, legislators repeatedly suggested that they better understood the Tribal Nations' concerns than the Tribes' own Chairmen.

18

Appellate Case: 23-3697     Page: 40     Date Filed: 12/17/2023 Entry ID: 5345207

79.     With the Chairmen still at the meeting, a Representative and member of the Redistricting Committee stated of the Chairmen's request, "I feel . . . that if we had come up with this plan, it would look we were trying to pack them all into one district and to marginalize them and so it's hard for me to listen to them ask to be marginalized, in my opinion."[4] Other legislators made similar comments.

80.     Representative Terry Jones made statements at a Tribal and State Relations Committee meeting with the Spirit Lake Tribe on September 1, 2021 that sought to discourage Tribes from exercising their right to request single-member house districts by his equating the request to "the definition of racism" because, in his view, the request for single-member districts means "that in order for [him] to be able to properly represent them [tribal members] that [his] skin had to be brown."[5]

81.     The legislators' comments are illustrative of the atmosphere of hostility toward the concerns of Tribal Nations during the 2021 redistricting process.

### Discrimination in Voting Against Native Americans

82.     As this Court has repeatedly recognized, North Dakota has a long history of both denying Native Americans the right to vote and diluting Native voting strength. *See, e.g.*, *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614, at \*3 (D.N.D. 2010); Consent Judgment and Decree, *United States v. Benson Cnty.*, Civ. A. No. A2-00-30

---

[4] *Nov. 8 Hearing of the Joint Redistricting Committee*, 67th Leg., 1st Spec. Sess. 3:40:29 (N.D. Nov. 8, 2021), https://video.legis.nd.gov/en/PowerBrowser/PowerBrowserV2/20211108/-1/22649.
[5] *Sep. 1 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. 10:38:07 (N.D. Sep. 1, 2021), https://video.legis.nd.gov/en/PowerBrowser/PowerBrowserV2/20210901/-1/21581.

(D.N.D. Mar. 10, 2000); *see also State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897).

83.     Until 1922, North Dakota explicitly barred most Native Americans from voting. Until 1897, Native Americans were statutorily denied the right to vote in North Dakota "unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent." *Denoyer*, 72 N.W. at 1019. After that law was struck down by the North Dakota Supreme Court as violating the state constitution, the legislature amended the Constitution to allow only "[c]ivilized persons of Indian descent" who "severed their tribal relations two years next preceding" an election to vote. N.D. Const., art. V § 121 (1898). Native Americans were denied the right to vote unless they could show that they "live[d] just the same as white people." *Swift v. Leach*, 178 N.W. 437, 438 (N.D. 1920).

84.     The North Dakota Constitution of 1898 also established a literacy test as a qualification for voting. N.D. Const. art. II, §§ 121, 127 (ratified by vote on Nov. 8, 1898). This practice was commonly used to disenfranchise minority voters and is prohibited by the Voting Rights Act of 1965. 52 U.S.C. § 10303; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 312, 316 (1966) (discussing the discriminatory use of literacy tests and the Voting Rights Act's ban on such tests).

85.     Discrimination against Native American voters continues in North Dakota today.  Over the past three decades, the State has continued to enact laws and adopt practices that discriminate against eligible Native voters.

86.     In 2000, the Justice Department filed an action against Benson County, North Dakota alleging that the county's at-large elections system for electing county commissioners denied Native American voters the opportunity to participate meaningfully in the political process. *See* Consent Judgment at Preamble, *Benson Cnty.*, Civ. A. No. A1-00-30. The parties entered into a consent decree in which Benson County admitted that its at-large system discriminated against Native American voters.  The County agreed to adopt a five-district election system, with two majority Native American districts. *Id.*¶ 6, 15.

87.     In 2010, the Spirit Lake Tribe sued Benson County to prevent the removal of a polling place on the reservation, some 100 years after the Tribe first sued to establish the reservation polling place. In considering the challenge, this Court recognized "[t]he historic pattern of discrimination suffered by members of the Spirit Lake [Tribe],"and found that the removal of the Spirit Lake polling pace likely violated Section 2 of the VRA. *Spirit Lake Tribe*, 2010 WL 4226614, at *3. The polling place was then reestablished on the reservation. *Id.* at *3.

88.     Beginning in 2013, the North Dakota legislature adopted a series of discriminatory voter identification laws targeting Native Americans.

89.     In both 2013 and 2014, the North Dakota legislature amended its voter ID law to restrict the acceptable forms of identification and eliminate certain fail-safe mechanisms for voters who lacked a qualifying ID. Specifically, the law required voters to present identification containing the voter's name, date of birth, and residential street address. *See* H.B. 1332, 63rd Leg. Assembly; Reg. Sess. § 5 (2013); Order Granting Motion

21

for Preliminary Injunction at *2-3, *Brakebill v. Jaeger*, No. 1:16-cv-008, 2016 WL 7118548, (D.N.D. Aug. 1, 2016). It also eliminated alternative options that had historically been available for voters without ID. *Id.* The North Dakota Legislature passed these discriminatory voter ID laws even after repeated warnings that the identification and residential address requirements would lead to the disenfranchisement of Native Americans.

90.     At the time, many Native American voters living on reservations had not been assigned residential addresses. And though the law purported to include tribal identification cards as qualifying IDs, most tribal IDs included a P.O. Box rather than the tribal citizen's non-existent residential address. As such, the residential address requirement disproportionately affected Native American voters and prevented them from relying on their tribal IDs for voting. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *4.

91.     In 2016, this Court found that the amended voter ID law discriminated against Native Americans.

92.     Specifically, it found that Native Americans "face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under the [2013] law," and that eligible Native voters had been disenfranchised because of it. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *9, 16-17.

93.     Concluding that the Native American plaintiffs were likely to succeed on a challenge to the law under the Equal Protection Clause of the Fourteenth Amendment, this Court enjoined the Secretary of State from enforcing the law in the November 2016

App25

Appellate Case: 23-3697     Page: 44     Date Filed: 12/17/2023 Entry ID: 5345207

Election without a fail-safe provision for voters who lack a qualifying ID. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *22. The state did not appeal that decision.

94.     In 2017, the North Dakota Legislature again amended the State's voter identification law to eliminate the fail-safe provision for voters who lack a qualifying ID listing their residential street address.

95.     After the Spirit Lake Tribe, Standing Rock Sioux Tribe, and various individual eligible Native American voters challenged the law again in federal court as discriminating against Native voters, the State agreed to enter into a consent decree. Under the consent decree, the Secretary of State must recognize tribal IDs as valid voter identification and ensure that Native American voters retain an effective fail-safe voting option, including by ensuring that otherwise eligible voters who lack an ID listing their residential address are provided with their address and corresponding documentation sufficient to allow them to vote. Order, Consent Decree, and Judgment, *Spirit Lake Tribe v. Jaeger*, No. 1:18-cv-00222-DLH-CRH (D.N.D. Apr. 27, 2020).

### *Historic Discrimination Against Native Americans in Other Areas*

96.     Native Americans in North Dakota face discrimination in other arenas, which exacerbates the barriers to their effective participation in the political process.

97.     Throughout the nineteenth and early twentieth centuries, the United States carried out official federal policy targeted at forcibly assimilating Native Americans into European-American culture. *See Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999). Forced assimilation included suppression and attempted destruction of Indigenous religions, languages, and culture.

23

98.     Assimilationist policies commonly brought violence in the Northern Plains. "In 1890 for example, the United States Cavalry shot and killed 300 unarmed Sioux [Lakota] men, women and children en route to an Indian religious ceremony called the Ghost Dance[.]" *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 817.

99.     Native Americans in North Dakota were a direct target of these discriminatory policies and practices.

100.    Christian and government boarding schools were established throughout North Dakota beginning in the late nineteenth century and persisting through the mid-twentieth century. Native American children were removed from their families and tribes and sent to the boarding schools to be "civilized" and indoctrinated into Christianity. *See e.g.* U.S. Dep't of Interior, *Extracts from the Annual Report of the Secretary of the Interior for the Fiscal Year, 1927*54 (1927); Native American Rights Fund, *Let All That Is Indian Within You Die!*, 38(2) NARF L. Rev. 1 (2013). These children routinely suffered physical and emotional abuse and neglect. At the same time, they were banned from speaking Indigenous languages and practicing their cultures and religions.

101.    The boarding school policy was incredibly harmful and its effects, including disparities in education and literacy between Native Americans and non-Native Americans, have persisted in North Dakota long after its official end. *See* Lewis Merriam, Tech. Dir. for Inst. for Gov't Research, *The Problem of Indian Administration, Report of a Survey made at the request of Hubert Work, Secretary of the Interior and submitted to him Feb. 21, 1928*; Native American Rights Fund, *Let All That Is Indian Within You Die!*, 38(2) NARF L. Rev. 1 (2013).

24

App27

102.    Native children attending state public schools in the mid-twentieth century also faced significant discrimination, including being subjected to humiliating stereotypes and language discrimination. *See Indian Education: A National Tragedy – A National Challenge*, Special Subcomm. on Indian Educ., 91st Cong., S.R. No. 91-501 (1969). Native students often reported feeling powerless, experiencing depression, and generally feeling alienated form their own cultures. Dropout rates among Native children attending public schools were higher than those for non-native children, while reading levels were lower. At the same time, Native people were generally prevented from serving on school boards. *Id.* at 23-31. Higher dropout rates amongst Native students persisted throughout the end of the twentieth century. *Educational Condition*, N.D. Dep't of                                     Pub.                                     Education, https://web.archive.org/web/20151225031658/https://www.nd.gov/dpi/SchoolStaff /IME/Programs_Initiatives/IndianEd/resources/EducationalCondition/.

103.    Native Americans in North Dakota, including the Plaintiff Tribes, were also subjected to discriminatory land allotment policies. Throughout the early-to mid-1900's, millions of acres of tribal land were transferred to private ownership, largely by non-Indians. These allotment policies dramatically reduced the land bases for many tribes, including those in North Dakota. These policies also created a confusing "checkerboard" of state, tribal, and federal jurisdiction, leading to reduced and inconsistent enforcement of criminal laws by non-tribal law enforcement agencies. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d. 98 (D.D.C. 2015), *appeal denied* 2015 WL 9310099 (D.C. Cir. 2015).

104.    The State of North Dakota has played an active role in discrimination against Native Americans since its inception.

105.    Significantly, the State, through the North Dakota Indian Affairs Commission, embraced the discriminatory and harmful forced assimilation and relocation policies of the federal government.

106.    Historic discrimination has hindered the ability of the Native American population in North Dakota to participate effectively in the political process.

### Modern Effects of Discrimination

107.    Native Americans in North Dakota continue bear the effects of the state and federal government's discriminatory policies and practices in income and poverty, education, employment, and health, which hinders their ability to participate effectively in the political process.

108.    Native Americans in North Dakota are three times more likely than the general population of North Dakota and nearly four times more likely than are whites in the state to live in poverty. According to the 2015-2019 American Community Survey Estimates, the poverty rate for Native Americans in North Dakota is 32.2 percent (nearly 1 in 3), compared 10.7 percent for the state's total population and only 8.2 percent amongst North Dakotans who are white alone.

109.    Approximately half of all Native American children in North Dakota live in poverty—a rate more than five times higher than any other racial group in the state. North Dakota Interagency Council on Homelessness, *Housing the Homeless: North Dakota's*

App29
Appellate Case: 23-3697    Page: 48    Date Filed: 12/17/2023 Entry ID: 5345207

*10-Year   Plan   to   End   Long-Term   Homelessness* ii   (October   2018),
https://www.ndhfa.org/wp-content/uploads/2020/07/HomelessPlan2018.pdf.

110. Native Americans in North Dakota face a higher rate of homelessness than
any other racial group in the state. In 2017, the North Dakota Interagency Council on
Homelessness estimated that Native Americans account for at least 21 percent of North
Dakota's homeless population, despite making up only 5 percent of the state's
population. *Id* at 17.

111. This 2017 study likely underestimated the actual number of Native
Americans who are effectively homeless because it failed to account for the many
individuals who live temporarily with family and other tribal members. *Id.* at 17.

112. Native Americans in North Dakota also fare worse than white North
Dakotans in education. Native Americans over the age of 25 are two and a half times as
likely as whites to lack a high school diploma. According to the 2019 American
Community Survey, approximately 15 percent of Native Americans lack a high school
diploma, compared to 6 percent of whites.

113. Native American students in North Dakota are 4.2 times more likely than
white students to be suspended from school. At the same time, white students are 4.3
times more likely than Native students to be enrolled in Advanced Placement classes.
ProPublica,                  *Miseducation:                  North                  Dakota*,
https://projects.propublica.org/miseducation/state/ND (last accessed Sep. 16, 2021).

114. Native Americans in North Dakota also suffer worse health outcomes than
the State's overall population, on average. For example, Native Americans report being

in poor or fair health at a rate almost double that of North Dakota's total population. North Dakota Dep't of Health, *North Dakota American Indian Health Profile*, Table 21 (Jul. 18, 2014), http://www.ndhealth.gov/HealthData/CommunityHealthProfiles/American%20Indi an%20Community%20Profile.pdf. Similarly, Native people in North Dakota aged 18-64 are more than twice as likely as the overall population to have a disability. *Id.* at Table 8. The infant death rate and child and adolescent death rate amongst Native Americans in North Dakota is approximately 2.5 times that of the State's total population. *Id.* at Table 13.

115.    Native Americans in North Dakota are also overrepresented in the state's prison and jail population. According to the Prison Policy Initiative, Native Americans in North Dakota are incarcerated at a rate 8 times that of the state's white population. Prison Policy Initiative, *North Dakota Profile*, https://www.prisonpolicy.org/profiles/ND.html (last accessed Sep. 16, 2021).

116. These and other socioeconomic factors related to the history of discrimination compound the political disempowerment of Native Americans in North Dakota caused by the discriminatory legislative districting scheme.

***Racially Polarized Voting and the Limited Success of Native American Candidates***

117.    Voting in North Dakota is racially polarized between white and Native voters.

118.    In the 2016 state-wide U.S. House of Representatives contest, Native American voters backed Native American candidate Chase Iron Eyes with 87 percent of

28

the vote, compared to 13 percent for Kevin Cramer. White voters, however, supported Cramer with 76 percent and Iron Eyes at 24 percent.

119. In the 2016 state-wide Public Service Commissioner race, the Native American vote backed Native American candidate Hunte Beaubrun 78 percent to 15 percent for Julie Fedorchak. However, white voters preferred Fedorchak with 70 percent of the vote, compared to only 21 percent of the vote in support of Hunte Beaubrun.

120. In the 2016 state-wide Insurance Commissioner contests, Native American candidate Ruth Buffalo received 87 percent of the Native American vote, while Jon Godfread received approximately 13 percent of the Native American vote. The white vote favored Godfread with 72 percent of the vote, compared to 28 percent for Buffalo.

121. Native Americans have had little success in being elected to state office in North Dakota outside of the previously Native American-majority District 9.

122. Upon information and belief, there has never been a Native American statewide elected official.

123. HB1504 results in a lack of proportionality for Native American voters; the number of state house and senate districts in which they can election their candidate of choice is lower than their share of the state's voting age population.

**CLAIM FOR RELIEF**

**COUNT 1**

*Section 2 of the Voting Rights Act, 52 U.S.C. § 10301*

124. Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

Appellate Case: 23-3697    Page: 51    Date Filed: 12/17/2023 Entry ID: 5345207

125.   Section 2 of the Voting Rights Act prohibits the enforcement of any qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color in a language minority group. 52 U.S.C. § 10301(a).

126.   Native American voters in northeastern North Dakota are "cracked" in District 9B and District 15 where they constitute a minority of the voting age population. The remaining Native American population is packed into District 9A, where Native Americans constitute a supermajority of the voting age population.

127.   The packing and cracking of Native American voters in Districts 9 and 15 dilutes the voting strength of Native voters, in violation of Section 2 of the Voting Rights Act.

128.   An alternative district can be drawn in which Native American voters constitute a geographically compact majority of eligible voters that will reliably elect Native Americans' preferred candidates to two at-large state house seats and one state senate seat.

129.   Voting in northeastern North Dakota is racially polarized, Native voters are politically cohesive, and white bloc voters usually defeats Native voters' preferred candidates.

130.   Under the totality of the circumstances the current State Legislative plan denies Native voters an equal opportunity to participate in the political process and to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

App33

Appellate Case: 23-3697     Page: 52     Date Filed: 12/17/2023 Entry ID: 5345207

131.     Absent relief from this Court, Defendants will continue to dilute the votes of the individual Plaintiffs and the members of the Plaintiff Tribes in violation of Section 2 of the VRA.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs ask that this Court:

A.     Declare that HB 1504 violates Section 2 of the Voting Rights Act;

B.     Preliminarily and permanently enjoin Defendants from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislature from unlawful districts;

C.     Set a reasonable deadline for the legislature to enact a redistricting plan that does not dilute, cancel out, or minimize the voting strength of Native American voters;

D.     If the legislature fails to enact a valid redistricting plan before the Court's deadline, order a new redistricting plan that does not dilute, cancel out, or minimize the voting strength of Native American voters;

E.     Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and,

F.     Grant such other relief as the Court deems proper.

Respectfully submitted this 7th day of February, 2022.

/s/ Michael S. Carter
Michael S. Carter
OK No. 31961
carter@narf.org
Matthew Campbell
NM No. 138207, CO No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80301
Telephone: (303) 447-8760 (main)
Fax: (303) 443-7776
*Attorneys for Plaintiffs*

Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy*
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200 (main)
*Attorneys for Plaintiffs*

Bryan Sells*
GA No. 635562
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L.
SELLS, LLC
Post Office Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212 (voice and fax)
*Attorney for Plaintiffs*

/s/ Timothy Q. Purdon
Timothy Q. Purdon
ND No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Attorney for Plaintiff Spirit Lake Nation*

* *pro hac vice* to be submitted

32

Charles Walen
     Plaintiff

     v.

                                             Case No. 1:22-cv-31

Doug Burgum, et al.
       Defendant,

&

Turtle Mountain Band of Chippewa et al
     Plaintiff

     V.                                          Case No.  3:22-cv-22

Alvin Jeager, et al.

       Defendant

## Clerk's Minutes
Proceedings: Mid-Discovery Status Conference

| | |
|---|---|
| Honorable Alice R. Senechal | Date: 9/15/22 |
| Todd Dudgeon, Deputy Clerk | Time: 10:00 am |
| Amy Strankowski, Kevin Thomson, Elizabeth Alvine, Law Clerk | Recess: 10:17 am |

Digital Recorder: 220915-002 Walen & Turtle Mtn (JS Chambers Recorder)
*********************************************************************

Appearances: Case 1:22-cv-31
Attorney for plaintiff Charles Walen: Paul Sanderson and Ryan Joyce
Attorney for defendant: Doug Burgum, et al David Phillips
Attorneys for Intervenors: Michael Carter, Bryan Sells

Appearances: Case 3:22-cv-223
Attorney for plaintiff Turtle Mountain Band of Chippewa/Spirit Lake: Tim Purdon, Michael Carter, Bryan Sells
Attorney for defendant Alvin Jeager et al: David Phillips
*********************************************************************
Court calls case, parties enter appearances, court states purpose of this hearing.
Court reviews the trial dates as discussed at the previous conference.
Walen case is on the trial calendar for October 2, 2023 (5 day trial)
Trial in the Turtle Mountain case is set for October 10, 2023 - 5 day bench trial.

Turtle Mountain Case - Mr. Carter provides the following update.  Working on document requests, interrogatories and subpoenas for next week.  Discussed with opposing counsel a proposed scheduling change...expert /report deadline, moving from Nov 15 to November 30.  Defendant will respond by January 17, rebuttal expert Feb 16, 2023 and expert witness  depositions deadline would be March 16, 2023.  (NOTE: This is for both cases).  Court approves changes to the schedule.

Walen case - Mr. Sanderson - written discovery out soon, agrees with Mr. Carter regarding the deadline change.  No report on settlement.

Mr. Phillips agrees with comments of opposing counsel.

Mr. Phillips raises the issue or earlier trial dates, especially in the Turtle Mountain case.  Plaintiffs are seeking a new map, which would require redistricting the entire state.  According to election officials, if plaintiffs are successful in the Turtle Mountain case, a June trial would be more feasible to any redistricting effort.

October trial dates are fine for now, but Mr. Philips wants to raise the issue that any redistricting may not be completed before the 2024 election if the state does not prevail at trial.

Mr. Phillips does not anticipate any dispositive motion filing in the Turtle Mountain case, nor does Mr. Carter.  Therefore it is possible to move the trial up on the calendar. Ms. Alvine will discuss the option with Judge Welte.

<u>Walen Case</u> - Pretrial conference Sept 13, 2023 at 10:00 am in Fargo.

Mr. Carter asks for combined trials with both cases, court will leave as separate trials.  Mr. Carter can file a motion for combined trials if appropriate.

Adjourn.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Turtle Mountain Band of Chippewa Indians, | ) | |
| Spirit Lake Tribe, Wesley Davis, Zachery S. King, | ) | |
| and Collette Brown, | ) | |
| | ) | **BENCH TRIAL MINUTES** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-22 |
| | ) | |
| Michael Howe, in his official capacity as Secretary | ) | |
| of State of North Dakota, | ) | |
| | ) | |
| Defendant. | ) | |

| Court Officials: | Counsel for Plaintiffs: |
|---|---|
| Honorable Peter D. Welte, Presiding Judge | Michael Carter |
| Jeff Sprout, Law Clerk | Mark Gaber |
| Lori Haberer, Deputy Clerk | Molly Danahy |
| Ronda Colby, Court Reporter | Tim Purdon |
| | Bryan Sells |
| | Samantha Kelty |
| | Nicole Hansen |
| | Allison Neswood |
| | |
| | Counsel for Defendant: |
| | David Phillips |
| | Brad Wiederholt |

## Monday, June 12, 2023 – First Day of Trial

*On the record - 9:10 A.M.*

Court calls case and parties note appearances. Parties also note their staff present, along with Plaintiffs Zachery King and Wesley Davis, and Deputy Secretary of State, Sandy McMerty.

Preliminary matters:
- The parties stipulate to pre-admission of Plaintiffs' Exhibits 1-97, 100-112, 120-126, 128-140, 146-159, and all of Defendant's Exhibits (300-520); Court admits all stipulated exhibits.
- Plaintiffs intend to seek further review of the recent 8th Circuit decision. Plaintiffs request to make proffer as to this issue; Defendant objects; Court denies request.
- Stipulated facts were filed (doc. 108).

Appellate Case: 23-3697     Page: 57     Date Filed: 12/17/2023 Entry ID: 5345207

Plaintiffs' opening statement by Mr. Carter (9:26-9:55 AM).

Defendant's opening statement by Mr. Phillips (9:55-10:11 AM).

*Recess 10:11-10:40 A.M.*

Housekeeping matters addressed. Court notes that the Plaintiffs may submit a proffer of evidence, as previously requested, in the form of a motion.

**PLAINTIFFS' CASE COMMENCES**.

**Douglas Yankton**, sworn and testifies.
 Direct Examination by Mr. Purdon.
 Cross Examination by Mr. Phillips.

*Recess 12:00-1:20 P.M.*

Court addresses the exhibits objected to by Defendant (i.e. Plaintiffs' Exhibits 98-99, 113-119, 127, 141-145). Court sustains objection to Exhibits 98-99; overrules objection to Exhibits 113-119, 127, 141-145.  Plaintiffs' Exhibits 113-119, 127, 141-145 are received by the Court.

 Cross Examination of Mr. Yankton by Mr. Phillips continues.
 Redirect Examination by Mr. Purdon.
 No Recross Examination.

**Dr. Loren Collingwood**, sworn and testifies.
 Direct Examination by Ms. Danahy.
 Plaintiffs offer Dr. Collingwood as an expert; no objection. The Court qualifies Dr. Collingwood as an expert.

*Recess 3:05-3:30 P.M.*

 Direct Examination of Dr. Collingwood by Ms. Danahy continues.
 Cross Examination by Mr. Phillips.
 Redirect Examination by Ms. Danahy.
 No Recross Examination.

*Recess 4:45 P.M.*

<u>**Tuesday, June 13, 2023 – Second Day of Trial**</u>

*On the record - 9:10 A.M.*

Court notes the Plaintiffs' motion for leave to file offer of proof filed yesterday at doc. 109; Defendant will file a response by tomorrow morning.

App39

**Collette Brown**, sworn and testifies.
>    Direct Examination by Ms. Hansen.
>    Cross Examination by Mr. Phillips.
>    Redirect Examination by Ms. Hansen.
>    Recross Examination by Mr. Phillips.

**Richard Marcellais**, sworn and testifies.
>    Direct Examination by Mr. Sells.
>    Cross Examination by Mr. Wiederholt.

*Recess 10:45-11:10 A.M.*

>    Cross Examination of Senator Marcellais by Mr. Wiederholt continues.
>    Redirect Examination by Mr. Sells.
>    No Recross Examination.

**Dr. Daniel McCool**, sworn and testifies.
>    Direct Examination by Ms. Kelty.
>    Plaintiffs offer Dr. McCool as an expert; no objection. The Court qualifies Dr. McCool
>    as an expert.

*Recess 12:00-1:20 P.M.*

>    Direct Examination of Dr. McCool by Ms. Kelty continues.
>    Cross Examination by Mr. Phillips.
>    Redirect Examination by Ms. Kelty.
>    No Recross Examination.

**Dr. Weston McCool**, sworn and testifies.
>    Direct Examination by Mr. Sells.
>    Plaintiffs offer Dr. McCool as an expert; no objection. The Court qualifies Dr. McCool
>    as an expert.

*Recess 3:10-3:40 P.M.*

>    Direct Examination of Dr. McCool by Mr. Sells continues.
>    Cross Examination by Mr. Phillips.
>    No Redirect Examination.

**Marvin Nelson**, sworn and testifies.
>    Direct Examination by Ms. Neswood.
>    Cross Examination by Mr. Wiederholt.
>    Redirect Examination by Ms. Neswood.
>    No Recross Examination.

*Recess 4:40 P.M.*

## Wednesday, June 14, 2023 – Third Day of Trial

*On the record - 9:05 A.M.*

Court has reviewed Plaintiffs' motion for leave to file offer of proof, along with Defendant's response. Court will permit Plaintiffs' offer of proof for the limited purpose of preserving the record, but will not make any ruling on it nor will the Court consider that information in its' decision in this case.

**Jamie Azure**, sworn and testifies.
      Direct Examination by Mr. Carter.
      Cross Examination by Mr. Wiederholt.
      No Redirect Examination.

*Recess 10:40-11:10 A.M.*

Plaintiffs, by Mr. Sells, make offer of proof per Rule 103 pursuant to the Court's earlier ruling. Court accepts the offer of proof for purposes of preserving the record.

**PLAINTIFFS REST**.


**DEFENDANT'S CASE COMMENCES**.

**M.V. (Trey) Hood, III**, sworn and testifies.
      Direct Examination by Mr. Phillips.
      Defendant offers Dr. Hood as an expert; no objection. The Court qualifies Dr. Hood as an expert.

*Recess 12:05-1:30 P.M.*

      Direct Examination of Dr. Hood by Mr. Phillips continues.
      Cross Examination by Mr. Gaber.

*Recess 3:00-3:20 P.M.*

      Cross Examination of Dr. Hood by Mr. Gaber continues.
      Redirect Examination by Mr. Phillips.
      Recross Examination by Mr. Gaber.

Defendant calls Erika White to testify. Plaintiffs renew objection to Ms. White offering expert testimony; objection overruled as moot (Mr. Wiederholt notes that expert testimony will not be solicited by Ms. White).

**Erika White**, sworn and testifies.
      Direct Examination by Mr. Wiederholt.

*Recess 4:40-4:43 P.M.*

App41

No Cross Examination of Ms. White.

Housekeeping matters addressed.

*Recess 4:45 P.M.*

### **Thursday, June 15, 2023 – Fourth Day of Trial**

*On the record - 9:05 A.M.*

Defendant calls Brian Nybakken to testify. Plaintiffs renew objection to Mr. Nybakken offering expert testimony; objection overruled as moot (Mr. Wiederholt notes that expert testimony will not be solicited by Mr. Nybakken).

**Brian Nybakken**, sworn and testifies.
      Direct Examination by Mr. Wiederholt.
      Cross Examination by Ms. Danahy.
      No Redirect Examination.

**DEFENDANT RESTS.**

Plaintiffs' closing argument by Mr. Gaber (9:53-10:20 AM).

*Recess 10:20-10:43 A.M.*

Defendant's closing argument by Mr. Phillips (10:43-10:56 AM).

Plaintiffs' rebuttal closing argument by Mr. Gaber (10:56-11:01 AM).

Court advises that the parties have until 6/30/23 to submit proposed findings.

Court comments.

Court takes matter under advisement and will issue its' ruling as soon as possible.

*Adjourned - 11:15 A.M.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Michael Howe, in his Official Capacity as Secretary of State of North Dakota,<br><br>Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 3:22-cv-22 |

Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain Tribe"), Spirit Lake Tribe ("Spirit Lake Tribe"), Wesley Davis, Zachery S. King, and Collette Brown assert the State of North Dakota's 2021 legislative redistricting plan dilutes Native American voting strength by unlawfully packing subdistrict 9A of district 9 with a supermajority of Native Americans and cracking the remaining Native American voters in the region into other districts, including district 15—in violation of Section 2 of the Voting Rights Act of 1965. Defendant Michael Howe, the Secretary of State of North Dakota, denies the Section 2 claim, arguing the 2021 redistricting plan is lawful.

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). It prohibits what the Tribes claim happened here—"the distribution of minority voters into districts in a way that dilutes their voting power." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Thornburg v. Gingles, 478 U.S. 30, 46 (1986). In Gingles, the United States Supreme Court identified three preconditions that must be initially satisfied to proceed with a Section 2 voter dilution claim:

Appellate Case: 23-3697     Page: 62     Date Filed: 12/17/2023 Entry ID: 5345207

1.      The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2.      The minority group . . . is politically cohesive; and,

3.      The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996). If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

A four-day bench trial was held on June 12, 2023. After consideration of the testimony at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, what follows are my findings of fact and conclusions of law. And as explained below, the Tribes have established a Section 2 violation of the VRA.

I.      **FINDINGS OF FACT**

A.      **The Parties**

Two Tribes and three individual voters make up the Plaintiffs. For the Tribes, the Turtle Mountain Tribe is a federally recognized Tribe under 88 Fed. Reg. 2112 (2023), possessing "the immunities and privileges available to federally recognized Indian Tribes[.]" Jamie Azure is its Chairman. Doc. 117 at 10:25-11:4. The Turtle Mountain Reservation is located entirely within Rolette County in northeastern North Dakota and covers 72 square miles. A large portion of Turtle Mountain's trust land is also located in Rolette County. Id. at 13:12-14:23; Id. at 15:11-16:4. The Turtle Mountain Tribe has over 34,000 enrolled members, and approximately 19,000 members

live on and around the Turtle Mountain Reservation, including on Turtle Mountain trust lands in Rolette County. Id. at 13:12-14:23.

The second Tribe is the Spirit Lake Tribe, which is also a federally recognized Tribe. Douglas Yankton, Sr. is its former Chairman. He served as Chairman during the 2021 redistricting process. Doc. 115 at 45:12-22. The Spirit Lake Tribe is located on the Spirt Lake Reservation. The Spirit Lake Reservation covers approximately 405 square miles, primarily in Benson County in northeastern North Dakota. Id. at 47:10-48:2, 55:13-23. The Spirit Lake Tribe has approximately 7,559 enrolled members, with approximately 4,500 members living on or near the Spirit Lake Reservation. Id. at 47:10-48:2.

Three individual voters join the Tribes as Plaintiffs: Wesley Davis, Zachary King, and Collette Brown. Davis and King are enrolled members of the Turtle Mountain Tribe. They live on the Turtle Mountain Reservation, are eligible to vote, and plan to continue voting in elections. They currently reside in what is now Senate district 9 and House subdistrict 9A. Doc. 108 at 6. Brown is an enrolled member of the Spirit Lake Tribe. She lives on the Spirit Lake Reservation, is eligible to vote, and plans to continue voting in elections. She resides in district 15. Doc. 116 at 7:8-9:11.

The Secretary is sued in his official capacity as Secretary of State of North Dakota. Doc. 108 at 7. The Secretary is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D. Cent. Code §§ 16.1-01-01(1) & (2)(a).

**B.    North Dakota's 2021 Redistricting Plan**

Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district following the Census that happens every 10 years. The North Dakota Legislative Assembly ("Legislative Assembly") is required to

3

App45

"guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates." N.D. Const., Art. IV, Sec. 2. It is also required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators" and requires that the "senate must be composed of not less than forty nor more than fifty-four members, and the house of representatives must be composed of not less than eighty nor more than one hundred eight members. These houses are jointly designated as the legislative assembly of the state of North Dakota." Id., Sec. 1. So, one Senator and at least two House members are allocated to each district. Section 2 of Article IV allows the House members to be either elected at-large from the district or elected from subdistricts created within the district. Id., Sec. 2.

### 1.  North Dakota's Legislative Districts Before the 2021 Redistricting

Recall that the Tribes challenge changes made to districts 9 and 15. For the decade prior to the 2021 redistricting, district 9 was entirely within Rolette County. Doc. 108 at 3. It had a Native American voting age population ("NVAP") of 74.4%, did not contain any subdistricts, and contained the entirety of the Turtle Mountain Reservation, and its trust land located within Rolette County. Id. This map shows the pre-2021 legislative districts in the region:



4

Appellate Case: 23-3697   Page: 65   Date Filed: 12/17/2023 Entry ID: 5345207

Pl. Ex. 103.

## 2.    2021 Redistricting Process and Plan

As a result of the COVID-19 pandemic, the 2020 Census data was delayed. Doc. 116 at 149:18-150:2. While waiting for the new data, on April 21, 2021, Governor Burgum signed House Bill 1397. It established a legislative management redistricting committee ("Redistricting Committee") that was required to develop and submit a redistricting plan by November 30, 2021, along with implementation legislation. Doc. 108 at 1.

On May 20, 2021, then-Chairman Yankton sent a letter to the Redistricting Committee, requesting they schedule public hearings on each of the reservations located within North Dakota. Pl. Ex. 155. In response, the North Dakota Tribal and State Relations Committee held a joint meeting with the Tribal Council of the Turtle Mountain Tribe at the Turtle Mountain Community College on the Turtle Mountain Reservation. Def. Ex. 305; Doc. 108 at 2.

Redistricting was discussed at the joint meeting for roughly 30 minutes. Def. Ex. 418 at 17:18-21; Def. Ex. 305. Chairman Azure testified he became aware that redistricting had been added to the meeting agenda shortly before the meeting began. Doc. 117 at 29:21-31:24. He testified the Tribe had limited information about the 2020 Census population data and the discussion focused primarily on a population undercount. Id. at 29:21-31:24. One individual spoke in favor of subdistricts generally during the 30-minute discussion. Id. at 70:4-73:19.

Eventually, on August 12, 2021, the Census Bureau released redistricting data in legacy format (meaning the format used in specific redistricting software). Doc. 108 at 2. The Census data was released in a user-friendly format to the public on September 16, 2021. Id. at 2. The Redistricting Committee held public meetings in Bismarck on August 26, 2021, in Fargo on September 8, 2021, and again in Bismarck on September 15 and 16. Additional public meetings

Appellate Case: 23-3697     Page: 66     Date Filed: 12/17/2023 Entry ID: 5345207

of the Redistricting Committee were held in Bismarck on September 22 and 23, and September 28 and 29. Id. at 3.

Brown testified on behalf of the Spirit Lake Tribe at the August 26 Redistricting Committee meeting. She advocated for the Redistricting Committee to consider tribal input and for the use of single member districts to elect representatives to the House. Def. Ex. 327. Brown also encouraged the Redistricting Committee to comply with the requirements of the VRA. Id.

On September 1, 2021, the Tribal and State Relations Committee held a public meeting at the Spirit Lake Casino and Resort on the Spirit Lake Reservation and discussed redistricting. Doc. 108 at 2. Chairman Yankton testified that Spirit Lake may be interested in a legislative subdistrict to elect its House member. Def. Ex. 334. At subsequent meetings, representatives of Spirit Lake requested a subdistrict. Def. Ex. 351; Def. Ex. 398.

At its September 28 and 29 meetings, the Redistricting Committee released several proposals for creating two subdistricts in district 9. Def. Ex. 405. One proposal extended district 9 to the east to incorporate population from Towner and Cavalier Counties, created a subdistrict in district 9 that generally encompassed the Turtle Mountain Reservation, and placed Spirit Lake in an at-large district with no subdistrict. Def. Ex. 408.

About a month after that proposed plan was introduced, the Tribes each consulted their leadership, obtained an analysis of racially polarized voting, created a new proposal for district 9, and sent a letter to the Governor and legislative leaders with their proposal. Pl. Ex. 156 at 19-24; Doc. 115 at 77:5-79:18; Doc. 117 at 34:14-36:11. The letter stated that the Redistricting Committee's proposal as to district 9, which placed the Turtle Mountain Reservation in a subdistrict, was a VRA violation. It also stated that the Turtle Mountain Tribe did not request to be placed in a subdistrict. Pl. Ex. 156 at 19-24. Included in the letter was an illustration of an

alternative district map, where the Turtle Mountain and Spirit Lake Reservations were placed into a single legislative district with no subdistricts. Pl. Ex. 156 at 19-24; Doc. 108 at 4. Effectively, this alternative district combined Rolette County with portions of Pierce and Benson Counties, instead of combining Rolette County with portions of Towner and Cavalier Counties. Compare Pl. Ex. 156 at 19-24 with Def. Ex. 408. The letter stated that voting in the region is racially polarized, with Native American voters preferring different candidates than white voters. Id. at 19-24.

Then, at the November 8, 2021, Redistricting Committee meeting, Senator Richard Marcellais, who represented district 9 since his election in 2006, spoke in favor of the Tribes' proposed district. Def. Ex. 429 at 21-23. Representative Marvin Nelson from district 9 also spoke in favor of the proposal. Id. at 33-35. Representative Joshua Boschee moved for the adoption of an amendment to include the Tribes' proposal, but the amendment did not pass. Doc. 108 at 4. The Redistricting Committee passed and approved its final redistricting plan and report, which recommended passing the original proposal involving districts 9 and 15 (extending district 9 to the east to incorporate population from Towner and Cavalier Counties, creating a subdistrict in district 9 encompassing the Turtle Mountain Reservation, and placing Spirit Lake in an at-large district with no subdistrict).

The next day, the House of Representatives debated and passed House Bill 1504, the redistricting legislation accompanying the Redistricting Committee's final plan and report. Id. at 5. Then the Senate debated House Bill 1504. Senator Marcellais moved for an amendment (similar to the one he proposed to the Redistricting Committee), but it did not pass. Id. The Senate passed House Bill 1504, which was signed by Governor Burgum on November 11, 2021. Id.

### 3.  2021 Redistricting Plan As Enacted

As enacted, the 2021 redistricting plan created 47 legislative districts and subdivided district 9 into single-member House subdistricts 9A and 9B. Id. The plan extended district 9

eastward to include portions of Towner and Cavalier Counties, with the Towner County and Cavalier County portions included with parts of Rolette County in subdistrict 9B. Pl. Ex. 100. It also placed the Turtle Mountain Reservation into Senate district 9 and House subdistrict 9A and placed portions of Turtle Mountain trust lands located within Rolette County into House subdistrict 9B. Doc. 108 at 5. The plan placed the Spirit Lake Reservation in district 15. Doc. 108 at 5.

According to the 2020 Census, the NVAP of Rolette County is 74.4%. The NVAP of the portion of Towner County in district 9 is 2.7%. There is an NVAP of 1.8% in the portion of Cavalier County in district 9. Pl. Ex. 1 at 16. Subdistrict 9A has a NVAP of 79.8% and subdistrict 9B has a NVAP of 32.2%. Pl. Ex. 42 at 7; Doc. 115 at 134:13-19, 136:7-137:25. District 15 has a NVAP of 23.1%. Doc. 115 at 135:3-13; Doc. 108 at 4.

Voters in Senate district 9 and Senate district 15 each elect one Senator. Doc. 108 at 5. Voters in House subdistricts 9A and 9B each elect one representative to the House of Representatives. Id. Voters in district 15 elect two representatives at-large to the House of Representatives. Id. This is the 2021 plan's map of the legislative districts in northeastern North Dakota:



Pl. Ex. 101.

8

### C.       The Tribes' Proposed Plans

In support of their Section 2 claim, the Tribes produced two proposed plans containing alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. This is the first proposed plan:



Pl. Ex. 105. And this is the second proposed plan:



9

Pl. Ex. 106. Both feature a district 9 that has a majority NVAP. The first proposed plan has a NVAP of 66.1%, and the second has a NVAP of 69.1%. Doc. 115 at 134:22-135:2, 135:14-17, 166:1-3.

    **D.**    **Trial Testimony and Evidence on Section 2 Claim**

At trial, former Chairman Yankton (Doc. 115 at 41-120), Collette Brown (Doc. 116 at 6-44), former Senator Richard Marcellais (Doc. 116 at 44-71), former House of Representatives member Marvin Nelson (Doc. 116 at 170-189), and Chairman Jamie Azure (Doc. 117 at 10-66) testified as fact witnesses for the Tribes. Erika White (Doc. 117 at 186-203) and Bryan Nybakken (Doc. 118 at 6-38), two representatives of the Secretary of State's office, testified as fact witnesses for the Secretary.

Four expert witnesses testified. Dr. Loren Collingwood (Doc. 115 at 120-201), Dr. Daniel McCool (Doc. 116 at 72-143), and Dr. Weston McCool (Doc. 116 at 144-170) testified as expert witnesses for the Tribes. Dr. M.V. Hood III (Doc. 117 at 72-182) testified as an expert witness for the Secretary.

Former Chairman Yankton testified to the shared representational interests, socioeconomic status, and cultural and political values of Turtle Mountain Tribal members and Spirit Lake Tribal members. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. 115. He also testified as to the political cohesiveness of the Tribes, explaining that the voters who live on the Turtle Mountain Reservation and the voters who live on the Spirit Lake Reservation vote similarly. Doc. 115 at 52:12-53:25.

He also testified specifically as to the 2018 election (which is a key point of contention in this case), where Native American voter turnout was particularly high. He stated that there were unique circumstances that led to increased Native American voter turnout in 2018. Those

Appellate Case: 23-3697    Page: 71    Date Filed: 12/17/2023   Entry ID: 5345207

circumstances included the election being a high-profile race, a backlash by Native American voters (who perceived North Dakota as trying to block them from voting by imposing a residential address requirement to vote), and the significant national attention and resources that flowed into the Tribes following the decision allowing the address requirement to go into effect just before the election. He testified that those resources—and resulting high voter turnout among Native American voters—was unlike anything he had seen, before or since. Doc. 115 at 80:18-86:17.

Dr. Loren Collingwood testified next. Doc. 115 at 119. Dr. Collingwood is an Associate Professor of Political Science at the University of New Mexico. Id. at 120. He teaches statistical programming, along with American politics, among other things. He has published several papers on the VRA and is qualified as an expert on voting behavior, race and ethnicity, racially polarized voting, map drawing, electoral performance, and redistricting analysis. Id. at 128:7-17.

Dr. Collingwood's expert testimony was extensive. He opined on each of the three Gingles preconditions. He reviewed the statistical data and analysis he used in reaching his expert conclusions as to racially polarized voting, white bloc voting, and the NVAP in the as-enacted districts compared to the Tribes' proposed districts. His expert reports were also admitted and received as exhibits. Pl. Ex. 1, 42.

Dr. Collingwood concluded that all three Gingles preconditions were met in districts 9 and 15. He found that racially polarized voting is present in North Dakota statewide and specifically in districts 9 and 15. He also found that, in statewide elections featuring Native American candidates, white voters vote as a bloc to Native American voters in all of the elections analyzed. He opined on the NVAP percentages. He further opined that there is racially polarized voting in district 9, subdistricts 9A and 9B, and district 15. Doc. 115 at 144-45.

11

Appellate Case: 23-3697   Page: 72   Date Filed: 12/17/2023 Entry ID: 5345207

Dr. Collingwood also opined on white bloc voting. Id. at 153-66. After wide review of his statistical analysis, he concluded that the white voting bloc usually defeats the Native American-preferred candidate of choice in districts 9, 9B, and 15. Id.

As to the 2018 election, Dr. Collingwood testified that the election was "an anomalous election." Id. at 156. He noted that he had "never seen any turnout number like this, ever." Id. As a result, he gave the 2018 election results less probative value and less weight, though the results were still included in his analysis. Id. at 158.

Collette Brown testified next for the Tribes. Doc. 116 at 6. Brown is the Gaming Commission Executive Director for the Spirit Lake Gaming Commission. Id. at 8. She ran for the Senate seat in district 15 in the 2022 election. Id. at 9. She spoke about the need for Native American representation and some of the difficulties she faced in her election campaign. Id. at 14. Brown also testified about her involvement in the 2021 redistricting process. Id. at 23. She stated that the Tribes did not request the subdistricts in district 9A and 9B. Id. at 23.

Former Senator Richard Marcellais testified next. Marcellais is an enrolled member of the Turtle Mountain Tribe and was the elected state Senator for district 9 from 2006-2022. Id. at 45, 48. He testified that he lost the 2022 election, and that after his loss, there are no Native Americans serving in the North Dakota Senate. Id. at 53.

Dr. Daniel McCool then testified as the second expert witness for the Tribes. Dr. Daniel McCool is a political science professor at the University of Utah. He specializes in Native American voting rights and Native American water rights. Id. at 73. He opined on the presence of the Senate Factors in North Dakota and the impact of the 2021 redistricting plan on Native Americans. Id. at 81. He reviewed in detail his expert report and concluded that there was substantial evidence of all of the Senate Factors, except factors four and six. Id. at 89-126. He

concluded that, under the totality of the circumstances, Native Americans in North Dakota have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Id.

Dr. Weston McCool testified as the third expert witness for the Tribes. He is a National Science Foundation post-doctoral research fellow with the Anthropology Department at the University of Utah. Id. at 144. His expertise is in quantitative data analysis and analytical methods. Id. He opined specifically as to Senate Factor 5. He reviewed his statistical analysis of seven socioeconomic variables, including education, employment, and health. Id. at 161. He concluded that Native Americans in the counties at issue bear the effects of discrimination along the socioeconomic factors articulated by Senate Factor 5, and the disparities serve as obstacles to hinder Native Americans' ability to effectively participate in the political process. Id.

Next former Representative Marvin Nelson testified. Doc. 116 at 170. He testified as to his experience representing Rolette County from 2010 to 2022. Id. at 172.

The final witness for the Tribes was Turtle Mountain Tribal Chairman Jamie Azure. Doc. 117 at 11. He testified about the Turtle Mountain Tribe and its membership. Id. at 14. He also spoke about the legislative district make-up before the 2021 redistricting plan, relative to the Tribes' Reservations and trust lands. Id. at 17. And as to the 2021 redistricting plan, he testified about the Tribes sharing community interests and that the Tribes did not request the subdistricts as enacted in district 9. Id. at 19.

Chairman Azure also spoke at length about the 2018 election. Id. at 20. He discussed the record voter turnout that year because of concerns over a voter identification law. He noted there was "a lot of attention" and many national resources were directed at the Tribes. Id. He also said

he had never seen that level of Native American voter engagement in his life and has not seen it since. Id. at 21.

The first witness for the Secretary was expert witness Dr. M.V. Hood, III. He is a political science professor at the University of Georgia and director of the School of Public and International Affairs Survey Research Center. Doc. 117 at 72. Dr. Hood is an expert on American politics, election administration, southern politics, racial politics, and Senate electoral politics. Id. at 75:12-76:7.

Dr. Hood's expert testimony was extensive. He reviewed his expert report (Pl. Ex. 81) and opined on each of the three Gingles preconditions. Doc. 117 at 72:2-182:20. Notably, he testified that he agreed that the first precondition was met but questioned whether there was enough data to prove the second precondition. Id. at 89.

On the third precondition (white bloc voting), he reached a different result than Dr. Collingwood. Id. He analyzed the same elections as Dr. Collingwood (Doc. 117 at 83:14-18), though he statistically weighed the elections differently, and concluded that white bloc voting was not present in district 9 at-large and as-enacted. Id. at 86. He stated that "Gingles 3 is not met because the Native American candidate of choice is not typically being defeated by the majority white voting bloc." Id. at 89. Dr. Hood also testified that he did not review the 2022 election results. Id. at 162.

As to the 2018 election, Dr. Hood testified that the Native American turnout in 2018 was historically high and that the results should not necessarily be excluded from a performance analysis. Dr. Hood testified that those 2018 results "prove[] that Native American turnout can be that high" and that if "[i]t was that high in 2018," it could be that high again. Id. at 86:7-15.

Erika White, the North Dakota Election Director, testified next. She spoke about the role of the Secretary in North Dakota elections and the processes and deadlines that are imposed on state elections by statute. Doc. 117 at 192. She testified too about the redistricting process.

The Secretary's final witness was Brian Nybakken, the Elections Systems Administration Manager in the Secretary's Elections Office. Doc. 118 at 6-33. He testified about the elections systems in place in North Dakota, auditor training, voter identification requirements, and certain election issues pertaining to Native Americans in North Dakota. Id.

## II.   **CONCLUSIONS OF LAW**

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates." Bone Shirt v. Hazeltine, 461 F.3d 1011, 1017-18 (8th Cir. 2006) (cleaned up).

Section 2 prohibits "the distribution of minority voters into districts in a way that dilutes their voting power." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Gingles, 478 U.S. at 46). Recall that, under Gingles, three preconditions must be initially satisfied to proceed with a Section 2 voter dilution claim:

1.   The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

15

2. The minority group . . . is politically cohesive; and,

3. The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996).

If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b); see also Johnson v. De Grandy, 512 U.S. 997, 1011-12 (1994) (once the three preconditions are met, the totality of the circumstances is addressed). To assess the totality of the circumstances, the Court considers the factors identified in the Senate Judiciary Committee Majority Report accompanying the bill that amended Section 2 (also known as the "Senate Factors"). S. Rep., at 28-29, U.S. Code Cong. & Admin. News 1982, pp. 206-207; Gingles, 478 U.S. at 36. Two other factors are also relevant: (1) was there a significant lack of response from elected officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. Gingles, 478 U.S. at 44; Bone Shirt, 461 F.3d at 1022.

The Senate Report stresses that these factors are "neither comprehensive nor exclusive." Gingles, 478 U.S. at 45. The extent to which voting is racially polarized (Senate Factor 2) and the extent to which minorities have been elected under the challenged scheme (Senate Factor 7) predominate the analysis. Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 894 F.3d 924, 938 (8th Cir. 2018); Bone Shirt, 461 F.3d

16

at 1022; Cottier v. City of Martin, 551 F.3d 733, 740 (8th Cir. 2008); Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995).

    **A.**    **The Gingles Preconditions**

        **1.**    **Gingles 1: Sufficiently Large and Geographically Compact**

The first Gingles precondition requires a Section 2 plaintiff to demonstrate that the minority group (here, Native Americans) is sufficiently large and geographically compact to constitute a majority in a potential district.[1] Gingles, 478 U.S. at 50. This is also known as the "majority-minority standard." Jeffers v. Beebe, 895 F. Supp. 2d 920, 931 (E.D. Ark. 2012). As explained in Gingles, "unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." Gingles, 478 U.S. at 50. So, this precondition focuses on electoral potential—and specifically here, whether Native American voters have the potential to constitute the majority of voters "in some reasonably configured legislative district." See Cooper v. Harris, 581 U.S. 285, 301 (2017); see also Houston v. Lafayette Cnty., Miss., 56 F.3d 606, 611 (5th Cir. 1995). Hence the analysis for the first precondition considers the proposed district(s) and not the existing district. See, e.g., Bone Shirt, 461 F.3d at 1018.

As an initial matter, the Secretary argues the first precondition is not met because district 9, as-enacted, better reflects traditional redistricting criteria than the Tribes' proposed districts. He also asserts that the first precondition is not met as to district 15. But a Section 2 claim is not a competition between which version of district 9 better respects traditional redistricting criteria. See

---

[1] While the first precondition refers to a minority constituting a majority in a "single-member district," the analysis is done on a case-by-case basis, and the Gingles factors "cannot be applied mechanically and without regard to the nature of the claim." See Voinovich v. Quilter, 507 U.S. 146, 158 (1993).

Appellate Case: 23-3697   Page: 78   Date Filed: 12/17/2023   Entry ID: 5345207

Allen v. Milligan, 143 S. Ct. 1487, 1505 (2023) (noting Gingles 1 is not a "beauty contest" between plaintiffs' maps and the state's districts). The claim is not defeated simply because the challenged plan performs better on certain traditional redistricting criteria than the proposed plan. Id. (finding that plaintiffs' demonstrative plans were reasonably configured, even where the enacted plan arguably performed better on certain traditional redistricting criteria than the demonstrative plans).

With that issue resolved, the question is whether Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. The parties agree that Native American voters have the potential to constitute the majority of voters in both proposed versions of district 9. The NVAP in the Tribes' first proposed plan is 66.1%. Doc. 15 at 134:22-135:2, 135:14-17, 166:1-3. The NVAP in the Tribes' second proposed plan is 69.1%. Id. So, the remaining issue is whether these proposed districts are "reasonably configured." See Johnson v. De Grandy, 512 U.S. 997, 1008 (1994).[2]

A district is reasonably configured "if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Milligan, 143 S. Ct. at 1503. Courts may also consider other traditional redistricting criteria, including respect for political boundaries and keeping together communities of interest. Id. at 1505 (considering respect for political subdivisions and communities of interest as traditional redistricting criteria); Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 259 (2015) (citing compactness and not splitting counties or precincts as examples of traditional redistricting criteria, amongst others).

The evidence at trial shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and

---

[2] De Grandy articulated this standard in the context of single-member districts. Here, given the comparison of subdistricts to multimember districts, it is more useful to consider the number of representatives that Native American voters have an opportunity to elect.

Appellate Case: 23-3697     Page: 79     Date Filed: 12/17/2023 Entry ID: 5345207

keeping together communities of interest.  First, as to contiguity and compactness, the proposed districts are made up of a contiguous land base (Pl. Exs. 105, 106) and contain no obvious irregularities as to compactness. Indeed, the evidence at trial demonstrated that the proposed districts did not appear more oddly shaped than other districts, and both proposed districts are reasonably compact. See Doc. 115 at 139:17-23, 141:4-8; Pl. Ex. 1 at 32, 39. The proposed plans are also comparatively compact when viewed against other districts in the 2021 redistricting plan. Pl. Ex. 1 at 32, 39. Statistically too, Dr. Collingwood testified the compactness scores of the proposed districts are within the range of compactness scores for other districts in the 2021 redistricting plan. See Doc. 115 at 139:17-140:5, 141:24-143:20; Pl. Ex. 1 at 32, 39; Pl. Ex. 42 at 9-11; Pl. Ex. 126, 128, and 129.

The Tribes' proposed plans also respect existing political boundaries, including Reservation boundaries, and keep together communities of interest. As to political boundaries, the proposed plans keep together the Turtle Mountain Reservation and its trust lands. Pl. Exs. 105, 106. The plans similarly preserve and keep together two communities of interest. Several witnesses testified that the Tribes represent a community of interest because of their geographic proximity and their members shared representational interests, socioeconomic statuses, and cultural values. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. Chairman Azure and former Chairman Yankton persuasively testified to all those shared interests. Id. As to representational interests, the Tribes often collaborate to lobby the Legislative Assembly on their shared issues, including gaming, law enforcement, child welfare, taxation, and road maintenance, among others. See Doc. 115 at 56:12-61:18, 64:1-70:6; Doc. 116 at 21:11-21; Doc. 117 at 25:23-28:8. The residents on the Tribes' Reservations also have similar socioeconomic and education levels—levels that differ from the white residents in neighboring counties. Pl. Ex.73

at 513; Doc. 116 at 156:17-159:8; 161:13-161:24. Residents of the Tribes also participate in similar cultural practices and events and share cultural values. See Doc. 117 at 18:14-19:13.

All this evidence shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and keeping together communities of interest.[3] The proposed plans demonstrate that Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. And as a result, the Tribes have proven by a preponderance of the evidence that the first Gingles precondition is satisfied.

### 2.  Gingles 2: Racially Polarized Voting and Political Cohesion

"The second Gingles precondition requires a showing that the Native American minority is politically cohesive." Bone Shirt, 461 F.3d at 1020. "Proving this factor typically requires a statistical and non-statistical evaluation of the relevant elections." Id. (citing Cottier, 445 F.3d at 1118). "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections, and can be established with the same evidence plaintiffs must offer to establish racially polarized voting, because political cohesiveness is implicit in racially polarized voting." Id.

The parties and their experts agree that voting in districts 9 and 15 (when voting at large) is racially polarized, with Native American voters cohesively supporting the same candidates. Doc. 108 at 6. Based on the evidence at trial, voting in subdistricts 9A and 9B is also racially polarized, with Native American voters cohesively supporting the same candidates. Pl. Ex. 13, 14; Doc. 115

---

[3] The Secretary expresses concern that the districts under the Tribes' proposed plans would be illegal racial gerrymanders. But even assuming race was the predominate motivating factor in drawing the districts, establishing (and then remedying) a Section 2 violation provides a compelling justification for adopting one of the proposed plans. See Cooper, 581 U.S. at 292.

at 145:23-146:2. Although subdistricts 9A and 9B do not contain enough precincts for a full statistical analysis, subdistrict 9A has an NVAP of 68.5%. Pl. Ex. 1 at 15. That, combined with the undisputed political cohesiveness of district 9 at-large, demonstrates that voters in subdistrict 9A are politically cohesive. Pl. Ex. 1 at 15; Doc. 115 at 149:7-150:25.

Dr. Hood agreed that Native American voters are politically cohesive in subdistricts 9A and 9B. Pl. Ex. 80 at 4-6; Doc. 117 at 139:19-140:16. He testified that his conclusion assumed that the vote distribution within in each subdistrict "mirrors the overall district." Doc. 117 at 140:1-16. Testimony from Chairman Azure and former Chairman Yankton confirms the statistical data. Both testified that voters living on the Turtle Mountain Reservation and Spirit Lake Reservation vote similarly. Doc. 116 at 16:5-19:19, 28:14-25; Doc. 115 at 52:12-53:25.

The statistical evidence, combined with the lay witness testimony, shows that the Native American minority is politically cohesive. The Tribes have proven by a preponderance of the evidence that the second <u>Gingles</u> precondition is met.

### 3. <u>Gingles</u> 3*:* White Bloc Voting

With the first and second preconditions met, the analysis turns to the third precondition, which is the chief point of disagreement between the Tribes and the Secretary. The third <u>Gingles</u> precondition "asks whether the white majority typically votes in a bloc to defeat the minority candidate." <u>Bone Shirt</u>, 461 F.3d at 1020. "This is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) determining whether the white majority votes as a bloc to defeat the minority preferred candidate, and (3) determining whether there were special circumstances . . . present when minority-preferred candidates won." <u>Id.</u> (cleaned up).

Not all elections are equally relevant in assessing white bloc voting. "Endogenous[4] and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." Id. "Although they are not as probative as endogenous elections, exogenous elections hold some probative value." Id. In addition, "[t]he more recent an election, the higher its probative value." Id. There is no requirement that a particular number of elections be analyzed in determining whether white bloc voting usually defeats minority-preferred candidates. Gingles, 478 U.S. at 57 n.25. "The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." Id.

In assessing the third precondition, courts look to the districts in which it is alleged that Native American preferred candidates are prevented from winning, not on neighboring "packed" districts. Bone Shirt, 461 F.3d at 1027 (Gruender, J., concurring) ("If the State's approach were correct, packing would be both the problem and the solution—i.e., having illegally packed Indians into one district, the State could then point out that Indians are sometimes able to elect their preferred candidate in the packed district"); De Grandy, 512 U.S. at 1003-04 (focusing on whether white voters vote as a bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up the voting majority"). Finally, courts must also consider whether "special circumstances . . . may explain minority electoral success in a polarized contest." Gingles, 478 U.S. at 57 & n.26. Special circumstances must be considered if "the election was not representative of the typical way in which the electoral process functions." Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998).

---

[4] An endogenous election is an election where a district (or subdistrict) is electing a direct representative for that district (or subdistrict), as opposed to an exogenous election, which in this case, are statewide elections.

### i.      Subdistrict 9B

Starting with subdistrict 9B, the parties agree that a white bloc voting usually defeats Native American preferred candidates in subdistrict 9B when the three most probative election types are considered. And the evidence at trial supports that conclusion.

Because the challenged plan that created the subdistrict was enacted in 2021, the only endogenous election data available is from the 2022 election. Nonetheless, the data is highly probative. One of two state legislative elections in subdistrict 9B's boundaries was the district 9 at-large Senate election, which featured a Native American candidate,[5] who lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 9 | Weston: 63.0%<br>Marcellais*: 36.8% | Lose |

Pl. Ex. 1 at 21. The other endogenous election in subdistrict 9B featured two white candidates. The Native American preferred candidate, incumbent Marvin Nelson, also lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State House District 9B | Henderson: 56.5%<br>Nelson*: 37.6% | Lose |

Id. Beyond the 2022 endogenous election data, there are four exogenous (or statewide) elections since 2016 that featured Native American candidates that voters in precincts within the boundaries of now-subdistrict 9B voted in.[6] In each of those contests, the Native American candidate lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 64.4%<br>Moniz*: 35.3% | Lose |

---

[5] In all tables below, the Native American preferred candidates are marked with an asterisk.
[6] To account for the lack of subdistrict specific election data, this data is generated from collecting precinct data from those precincts now in subdistrict 9B.

Appellate Case: 23-3697   Page: 84   Date Filed: 12/17/2023 Entry ID: 5345207

| | | |
|---|---|---|
| 2016 Insurance Commissioner | Godfread: 58.4%<br>Buffalo*: 41.6% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 60.2%<br>Hunte-Beaubrun*: 32.4% | Lose |
| 2016 U.S. House | Cramer: 62.2%<br>Iron Eyes*: 32.9% | Lose |

Id. at 17-20.

The next set of data focuses on the most recent three election cycles, where special circumstances were not present—here, the 2022, 2020, and 2016 elections.[7] Per the table below, the defeat rate of the Native American preferred candidates was 100% for every election cycle:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 70.9%<br>Dooley*: 28.9% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 65.6%<br>Lamb*: 34.3% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 65.4%<br>Hammer*: 34.3% | Lose | |
| 2022 Secretary of State | Howe: 57.1%<br>Powell*: 33.7% | Lose | |
| 2022 U.S. House | Armstrong: 61.4%<br>Mund*: 38.4% | Lose | |
| 2022 U.S. Senate | Hoeven: 60.6%<br>Christiansen*: 27.5% | Lose | |
| 2020 Auditor | Gallion: 59.8%<br>Hart*: 40.1% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Governor | Burgum: 65.3%<br>Lenz*: 29.8% | Lose | |
| 2020 President | Trump: 60.8%<br>Biden*: 37.0% | Lose | |

---

[7] As discussed in detail below, the 2018 election involved special circumstances that made it atypical.

| | | | |
|---|---|---|---|
| 2020 Public Service Commissioner | Kroshus: 60.4%<br>Buchmann*: 39.8% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Treasurer | Beadle: 58.6%<br>Haugen*: 41.2% | Lose | |
| 2020 U.S. House | Armstrong: 64.4%<br>Raknerud*: 33.4% | Lose | |
| 2016 Governor | Burgum: 61.7%<br>Nelson*: 35.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 56.6%<br>Clinton*: 33.8% | Lose | |
| 2016 Treasurer | Schmidt: 53.6%<br>Mathern*: 39.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 72.9%<br>Glassheim*: 22.1% | Lose | |

Pl. Ex. 1 at 17-20. This evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in subdistrict 9B. As a result, the third precondition is met as to subdistrict 9B.

> ### ii.    District 15

The parties also agree that the same conclusion follows as to district 15. Again, the only endogenous election is the 2022 state legislative election, where two Native-American preferred candidates appeared on the ballot. Both were defeated:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 15 | Estenson: 65.5%<br>Brown*: 33.8% | Lose |
| 2022 State House District 15 | Frelich: 41.6%<br>Johnson: 38.6%<br>Lawrence-Skadsem*: 19.7% | Lose |

Pl. Ex. 1 at 27. There have been no endogenous all-white elections in district 15. Four exogenous elections since 2016 have featured Native American candidates within the boundaries of district 15. In each of those contests—100% of the time—the Native American candidate lost:

25

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose |

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2016 Insurance Commissioner | Godfread: 64.6% Buffalo*: 35.4% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 63.8% Hunte-Beaubrun*: 27.6% | Lose |
| 2016 U.S. House | Cramer: 65.5% Iron Eyes*: 27.9% | Lose |

Pl. Ex. 1 at 17-20. As shown below, Native American preferred candidates have lost every exogenous all-white election in the record:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 75.0% Dooley*: 24.9% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 70.9% Lamb*: 29.0% | Lose | |
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 70.4% Hammer*: 29.4% | Lose | |
| 2022 Secretary of State | Howe: 61.2% Powell*: 27.8% | Lose | |
| 2022 U.S. House | Armstrong: 62.8% Mund*: 37.1% | Lose | |
| 2022 U.S. Senate | Hoeven: 58.5% Christiansen*: 24.8% | Lose | |
| 2020 Auditor | Gallion: 65.4% Hart*: 34.5% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Governor | Burgum: 67.6% Lenz*: 25.8% | Lose | |
| 2020 President | Trump: 64.3% Biden*: 33.0% | Lose | |

26

| | | | |
|---|---|---|---|
| 2020 Public Service Commissioner | Kroshus: 64.1%<br>Buchmann*: 35.7% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Treasurer | Beadle: 63.2%<br>Haugen*: 36.3% | Lose | |
| 2020 U.S. House | Armstrong: 68.7%<br>Raknerud*: 28.1% | Lose | |
| 2016 Governor | Burgum: 71.1%<br>Nelson*: 24.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 57.6%<br>Clinton*: 31.2% | Lose | |
| 2016 Treasurer | Schmidt: 59.5%<br>Mathern*: 31.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 75.7%<br>Glassheim*: 18.5% | Lose | |

Pl. Ex. 1 at 27-30.

Again, like subdistrict 9B, all this evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in district 15. As a result, the third precondition is met as to district 15.

### iii.   District 9

District 9 at-large presents a much closer call and is the central point of disagreement between the parties. The Secretary disputes whether the white vote bloc usually defeats the Native American preferred candidate in (as-enacted and at-large) district 9. But based on the evidence at trial, the Tribes proved by a preponderance of the evidence that a white bloc voting does usually defeat Native American preferred candidates in the as-enacted and at-large district 9.

Without question, and consistent with case law, the most probative election in district 9 at-large is the 2022 Senate election. The election featured each of the three factors that makes an election more probative—(1) it is an endogenous election, (2) it featured a Native American candidate, and (3) it is part of the most recent election cycle. Native American incumbent Senator Marcellais lost his bid for reelection despite Native American voters casting roughly 80% of their

Appellate Case: 23-3697    Page: 88    Date Filed: 12/17/2023 Entry ID: 5345207

ballots for him. Pl. Ex. 1 at 15; see Bone Shirt, 461 F.3d at 1021 (affirming finding that Gingles 3 was satisfied where "[i]n the only mixed-race endogenous election . . . the Indian-preferred candidate for state senate lost even though he received 70 percent of the Native-American vote"). As the 2022 election data shows, Senator Marcellais, the Native American candidate, was defeated by his opponent, the candidate of choice of white voters in the district:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 9 | Weston: 53.7% Marcellais*: 46.1% | Lose |

Pl. Ex. 1 at 17. Moving to the statewide exogenous elections since 2016, four have featured Native American candidates within the current boundaries of district 9. In those elections, the Native American candidate lost half of the elections:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 54.1% Moniz*: 45.7% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 46.5% Hunte-Beaubrun*: 46.1% | Lose |
| 2016 Insurance Commissioner | Godfread: 43.2% Buffalo*: 56.8% | Win |
| 2016 U.S. House | Cramer: 46.9% Iron Eyes*: 49.3% | Win |

Pl. Ex. 1 at 17-20. When all contests featuring Native American candidates (whether endogenous or exogenous) are taken together, the defeat rate for Native American candidates is 60%.

Among exogenous all-white elections, Native American preferred candidates lost 100% of the 2022 elections, 67% of the 2022 and 2020 elections combined, and 56% of the 2022, 2020, and 2016 elections combined:

Appellate Case: 23-3697    Page: 89    Date Filed: 12/17/2023 Entry ID: 5345207

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 60.2% Dooley*: 39.6% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 55.3% Lamb*: 44.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 55.2% Hammer*: 44.6% | Lose | |
| 2022 Secretary of State | Howe: 47.5% Powell*: 42.3% | Lose | |
| 2022 U.S. House | Armstrong: 52.8% Mund*: 47.0% | Lose | |
| 2022 U.S. Senate | Hoeven: 51.3% Christiansen*: 36.4% | Lose | |
| 2020 Auditor | Gallion: 46.5% Hart*: 53.4% | Win | **2020 Defeat Rate: 33%** |
| 2020 Governor | Burgum: 52.8% Lenz*: 43.1% | Lose | |
| 2020 President | Trump: 47.2% Biden*: 50.8% | Win | |
| 2020 Public Service Commissioner | Kroshus: 46.4% Buchmann*: 53.4% | Win | |
| 2020 Treasurer | Beadle: 45.6% Haugen*: 54.2% | Win | |
| 2020 U.S. House | Armstrong: 50.6% Raknerud*: 47.0% | Lose | |
| 2016 Governor | Burgum: 48.3% Nelson*: 48.7% | Win | **2016 Defeat Rate: 25%** |
| 2016 President | Trump: 44.2% Clinton*: 45.1% | Win | |
| 2016 Treasurer | Schmidt: 41.6% Mathern*: 50.0% | Win | |
| 2016 U.S. Senate | Hoeven: 59.7% Glassheim*: 33.9% | Lose | |

Pl. Ex. 1 at 17-20. From this data, a pattern emerges: the more recent the election, the more likely the Native American preferred candidate is to lose. When averaged together, the total defeat rate

29

is 56%. Beyond that, even when the 2018 election results (which, as explained below, was an atypical election) are factored in, the 100% defeat rate for Native American candidates of choice in the most recent election is highly probative and compelling evidence of white bloc voting. Said another way, giving each election the appropriate weight per Eighth Circuit and Supreme Court case law, the evidence proves by a preponderance that Native American candidates of choice will not be successful over 50% of the time in as-enacted and at-large district 9.

### iv.     2018 Election and Special Circumstances

One of the key differences of opinion between Dr. Collingwood and Dr. Hood concerns the probative value and weight of the 2018 election. "Only minority electoral success in typical elections is relevant to whether a Section 2 majority voting bloc usually defeats the minority's preferred candidate." Ruiz, 160 F.3d at 557. So, a central issue is whether 2018 was a typical election, deserving equal weight as other elections, or whether it was an atypical election, deserving less weight than other elections. The Secretary argues that 2018 is a typical election deserving equal weight; the Tribes assert that the 2018 election was atypical and deserves less weight.

In 2018, a North Dakota voter identification law was upheld that required a residential address to vote. The voter identification requirement affected the number of Native Americans eligible to vote and resulted in significant national and regional attention to Native American voters and increasing voter turnout. Voter turnout did increase dramatically, as compared to years prior and since:

30

| Election | White Electorate Share | Native American Electorate Share |
|----------|------------------------|----------------------------------|
| 2014 | 67% | 33% |
| 2016 | 63% | 37% |
| 2018 | 50% | 50% |
| 2020 | 63% | 37% |
| 2022 | 60% | 40% |

Pl. Ex. 42 at 4-5. Because of the increase in Native American voter turnout, Native American preferred candidates also performed much better than in any other years, prior or since. Pl. Ex. 1 at 18.

Chairman Azure and former Chairman Yankton persuasively testified about the extraordinary resources that poured into North Dakota's Native American reservations in the lead up to the 2018 election. Doc. 115 at 80:18-86:17; Doc. 117 at 21:8-12. The voter identification law caused a backlash among Native American voters, which was aided by substantial financial resources promoting get-out-the-vote efforts on the reservations. Id. National celebrities gave concerts and performances on the reservations to promote turnout. Id. Both testified that the resources—and resulting turnout among Native American voters—was unlike anything they have seen before or since. Id.

That testimony is supported by the data. Native American turnout in 2018 was unusually high. Not only did it exceed statewide turnout and approach white turnout in district 9, but it inverted the normal pattern of lower turnout in midterm versus presidential elections:

31



Pl. Ex. 43.

With those facts in mind, the experts offer competing opinions on the probative value of the 2018 election. Dr. Hood concluded that the third precondition was not met in as-enacted and at-large district 9 because Native American preferred candidates were successful in over 50% of the elections he reviewed. To reach that conclusion and opinion, Dr. Hood reviewed the election data from Dr. Collinwood's report and added together the elections in at-large district 9 and subdistrict 9A and 9B. Pl. Ex. 81 at 4. He also included the election data from the 2018 election. Doc. 117 at 143. In other words, Dr. Hood considered all election data equally and gave no probative weight or value to any one election. Doc. 117 at 85:19-86:6. Also, and importantly, Dr. Hood did not consider the 2022 election results. Id. at 150.

Dr. Collingwood reached a different conclusion. He concluded the 2018 election presented special circumstances, including unprecedented voter turnout, that "warrant and counsel against mechanically interpreting" the results. Pl. Ex. 1 at 18. As a result, he gave the 2018 election less weight when calculating white bloc voting in district 9. He also did consider the 2022 election, weighed that election more heavily, and concluded that the Native American preferred candidate "lost every single contest." Pl. Ex. 1 at 21. Dr. Collingwood opined that the third precondition is met because "white voters are voting as a bloc to prevent Native Americans from electing

Appellate Case: 23-3697     Page: 93     Date Filed: 12/17/2023 Entry ID: 5345207

candidates of choice in recent elections, in endogenous elections . . , and in 60% of contests across all tested years in which the Native American preferred candidate was a Native American." Pl. Ex. 1 at 43.

Having heard the testimony by both experts at trial, along with having reviewed their respective reports, Dr. Collingwood's conclusions and analysis are more credible because they follow the general directives of the Eighth Circuit in weighing elections in VRA cases. Indeed, the Eighth Circuit has recognized that endogenous elections should be considered more probative than exogenous elections; elections with a Native American candidate are more probative than elections that do not feature a Native American candidate; and that more recent elections have more probative value than less recent elections. Bone Shirt, 461 F.3d at 1020-21. Dr. Hood gave all elections equal probative value and generally weighed all elections the same. But Dr. Collingwood's report and methodology more closely tracks the instruction from the Eighth Circuit in weighing election data in VRA cases, making it more credible and reliable. In addition, Dr. Hood's testimony at trial acknowledged that endogenous elections, elections featuring Native American candidates, and more recent elections are more probative. Doc. 117 at 142:9-143:7. He also testified that the 2022 endogenous election for the district 9 Senate seat was the "single most probative" election because it featured all three probative characteristics (id. at 143:12-17), but he did not consider the 2022 endogenous election in reaching his conclusions (id. at 150).

Substantively and statistically, Dr. Hood's conclusion on the third precondition rests on adding together all data from district 9 and subdistricts 9A and 9B. But recall that subdistrict 9A has a near 80% NVAP, and Native American preferred candidates win 100% of the time. A district with a packed minority population is not one where the defeat of minority preferred candidates is to be expected, and it should not be considered as part of the third Gingles precondition. See Bone

33

Appellate Case: 23-3697      Page: 94      Date Filed: 12/17/2023 Entry ID: 5345207

Shirt, 461 F.3d at 1027. And importantly, as Dr. Hood testified and acknowledged at trial, if subdistrict 9A was removed from his analysis, the Native American preferred candidates defeat rate is 59.5%. Doc. 117 at 148:16-24. That alone also satisfies the third Gingles precondition.

Having reviewed the testimony and evidence, giving the elections the appropriate weight consistent with Eighth Circuit case law, the Tribes have proven by a preponderance of the evidence that the white majority typically votes in a bloc to defeat the minority candidate in as-enacted and at-large district 9. As such, the third Gingles precondition is also established as to as-enacted and at-large district 9.

### B.      Totality of the Circumstances and the Senate Factors

With the Gingles preconditions met, the Section 2 analysis turns to the totality of the circumstances and analysis of the Senate Factors. The Senate Factors come from the Senate Committee report to the 1982 amendment to the VRA and directs courts to consider the following factors in determining whether the totality of the circumstances indicate a Section 2 violation:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

34

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.R. No. 97-417 at 28-29 (1982); <u>Gingles</u>, 478 U.S. at 44-45. Two additional factors are also probative in determining a Section 2 violation: (1) was there a significant lack of response from elected officials to the needs of the minority group; and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. <u>Gingles</u>, 478 U.S. at 44. "[T]his list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, . . . there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." <u>Id.</u> at 45 (internal citations omitted).

### 1.    Senate Factors 2 and 7

"Two factors predominate the totality-of-circumstances analysis: the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme." <u>Bone Shirt</u>, 461 F.3d at 1022. As to Senate Factor 2, the extent of racially polarized voting, the record reflects a high level of racially polarized voting in districts 9 and 15 and subdistricts 9A and 9B. That evidence is largely undisputed and was discussed at length above. As to Senate Factor 7—the extent to which Native Americans have been elected—the only election under the 2021 redistricting plan in 2022 resulted in the loss of a Native American Senator (who had held the seat since 2006). Brown, a Native American, also lost the district 15 race. In effect, as a result of the 2021 redistricting plan, Native Americans experienced a net-loss of representation. Both factors weigh the totality of the circumstances towards a Section 2 violation.

35

### 2.      Remaining Senate Factors

This leaves factors one, three,[8] and five,[9] along with tenuousness, lack of response, and proportionality. As to the first Senate Factor, which considers historical discrimination practices, the Tribes offered expert testimony from Dr. Daniel McCool. He testified as to the long history of mistreatment of Native Americans in North Dakota and discussed evidence of contemporary discrimination against Native Americans, including many successful voting discrimination claims affecting Native Americans. Doc. 116 at 90-126. The evidence of discrimination in the democratic and political process against Native Americans in North Dakota is well-documented and undisputed by the Secretary. So, the first Senate Factor 1 weighs toward a Section 2 violation.

Next, as to the third Senate Factor, which considers discrimination through voting practices and procedures, the Tribes suggest that the 2021 redistricting plan itself is the best evidence of voting practices or procedures that enhance the opportunity for discrimination. But beyond that blanket assertion, there is no evidence that the Secretary used the 2021 redistricting plan to enhance the opportunity of discrimination against Native Americans. As a result, the third Senate Factor does not weigh toward finding Section 2 violation.

Senate Factor 5 considers the effects of discrimination against Native Americans more broadly, in such areas as education, employment, and health care. Dr. Weston McCool offered undisputed evidence as to the lower socio-economic status of Native Americans in North Dakota and that Native Americans continue to experience the effects of discrimination across a host of socioeconomic measures, which results in inequal access to the political process. Doc. 116 at 148.

---

[8] Senate Factor 4, which addresses candidate slating processes, is not applicable on these facts.
[9] The parties agree that Senate Factor 6 is not at issue.

And the Secretary did not challenge that evidence. Senate Factor 5 weighs toward a Section 2 violation.

The three remaining factors in the totality of the circumstances analysis are tenuousness, lack of response, and proportionality. Tenuousness looks at the justification and explanation for the policy or law at issue. "The tenuousness of the justification for the state policy may indicate that the policy is unfair." Cottier v. City of Martin, 466 F. Supp. 2d 1175, 1197 (D.S.D. 2006).

While the actions of the Legislative Assembly may not have ultimately went far enough to comply with Section 2 of the VRA, the record establishes that the Secretary and the Legislative Assembly were intensely concerned with complying with the VRA in passing the 2021 redistricting plan and creating the districts and subdistricts at issue. The justification by the Secretary for the 2021 redistricting plan is not tenuous, and this factor does not weigh in favor of a Section 2 violation.

The next factor is lack of response. The Tribes generally assert the Legislative Assembly was unresponsive to the needs of the Native American community. But the Secretary presented ample evidence of Tribal representatives and members generally advocating for subdistricts. Doc. 116 at 28, 32-33, 33-34, 134, 141. Again, the record is clear that the Legislative Assembly sought input from the Tribes and their members and attempted to work with the Tribes to comply with the VRA, even though the VRA compliance measures fell short. Also recall that the redistricting plan was developed under a truncated timeline because of the COVID-19 pandemic. On these facts, one cannot find a lack of response by the Secretary and the Legislative Assembly, and as a result, this factor does not weigh in favor of a Section 2 violation.

The final factor is proportionality. Based on their share of statewide VAP, Native Americans should hold three Senate seats and six House seats. However, under the 2021

Appellate Case: 23-3697   Page: 98   Date Filed: 12/17/2023 Entry ID: 5345207

redistricting plan, Native Americans hold zero seats in the Senate and two House seats. Either of the proposed plans would yield one Senate seat and three House seats. While certainly not dispositive, this obvious disparity as to proportionality is further evidence of vote dilution under the totality of circumstances.

All told, while a closer decision than suggested by the Tribes, the two most critical Senate Factors (2 and 7) weigh heavily towards finding a Section 2 violation. Those factors, together with the evidence on Senate Factors 1, 5, and proportionality, demonstrates that the totality of the circumstances deprive Native American voters of an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the VRA.

## III.   CONCLUSION AND ORDER

"Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Id. (citing Gingles, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native

American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 17th day of November, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

39

Local AO 450 (rev. 1/23)

# United States District Court
### *District of North Dakota*

Turtle Mountain Band of Chippewa  Indians, et al.,

           Plaintiffs,

  vs.

Michael Howe, in his Official Capacity as
Secretary of State of North Dakota,

           Defendant.

JUDGMENT IN A CIVIL CASE

Case No.   3:22-cv-00022

---

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☑ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

☐ **Decision on Motion**.  This action came before the Court on motion.  The issues have been considered and a decision rendered.

☐ **Stipulation**.  This action came before the court on motion of the parties.  The issues have been resolved.

☐ **Dismissal**.  This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P.  41(a)(1)(ii).

## IT IS ORDERED AND ADJUDGED:

See attached.

Date:  November 17, 2023

KARI M. KNUDSON, CLERK OF COURT

by:  */s/ Pamela Bloomquist, Deputy Clerk*

Pursuant to the Order dated November 17, 2023, (Doc. 125), "Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Id. (citing Gingles, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown | Case No. 3:22-cv-00022 |
| Plaintiffs, | |
| vs. | **NOTICE OF APPEAL** |
| Michael Howe in his official capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Notice is hereby given that Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota, appeals to the United States Court of Appeals for the Eighth Circuit the Judgment entered on November 17, 2023 (ECF Doc. No. 126), and the underlying orders encompassed within it.

This appeal is taken pursuant to 28 U.S.C. § 1291, and Rules 3(a)(1) and 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

Dated this 4th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By:     */s/ David R. Phillips*
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
Telephone: (701) 751-8188

Philip Axt (ND Bar No. 09585)
Solicitor General

App84

Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Defendant Michael Howe, in his
official capacity as Secretary of State of
North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **NOTICE OF APPEAL** was on the 4th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty

AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Philip Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg
Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630
sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By: _/s/ David R. Phillips_
DAVID R. PHILLIPS

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown | Case No. 3:22-cv-00022 |
| Plaintiffs, | |
| vs. | **MOTION FOR STAY OF JUDGMENT PENDING APPEAL** |
| Michael Howe in his official capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota ("Defendant") hereby moves the Court for an order staying execution without bond the Judgment entered November 17, 2023, permanently enjoining Defendant from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B, and ordering Defendant and the Legislative Assembly to adopt a plan to remedy the violation of Section 2 by December 22, 2023. The grounds for this motion are that the judgment has been appealed, and the Court is empowered to stay the judgment on appeal.

This motion is made pursuant to Rule 8 of the Federal Rules of Appellate Procedure and Rule 62 of the Federal Rules of Civil Procedure, and is supported by the attached Brief in Support of Motion for Stay of Judgment Pending Appeal.

Dated this 4th day of December, 2023.

> State of North Dakota
> Drew H. Wrigley
> Attorney General

By:   */s/ David R. Phillips*
    David R. Phillips (ND Bar No. 06116)
    Special Assistant Attorney General
    dphillips@bgwattorneys.com
    300 West Century Avenue
    P.O. Box 4247
    Bismarck, ND 58502-4247
    Telephone: (701) 751-8188

    Philip Axt (ND Bar No. 09585)
    Solicitor General
    Email: pjaxt@nd.gov
    600 E. Boulevard Ave., Dept. 125
    Bismarck, ND 58505
    Telephone: (701) 328-2210

    Counsel for Defendant Michael Howe, in his
    official capacity as Secretary of State of
    North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **MOTION FOR STAY OF JUDGMENT PENDING APPEAL** was on the 4th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400

Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Phil Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg
Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630

sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By: _____ */s/ David R. Phillips* _____
DAVID R. PHILLIPS

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown <br><br> Plaintiffs, <br><br> vs. <br><br> Michael Howe in his official capacity as Secretary of State of North Dakota, <br><br> Defendant. | Case No. 3:22-cv-00022 <br><br><br> **BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** |

## I.    INTRODUCTION

In this action, Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown (collectively "Plaintiffs") allege that North Dakota's 2021 state legislative redistricting plan dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act ("VRA") (codified at 52 U.S.C. § 10301). The basis for Plaintiffs' "dilution" allegation is a preference for racially gerrymandering the election map to join together two different and distinct Native American tribal reservations within a single elongated legislative district—despite the fact those two different tribal reservations have never before been joined together into the same legislative district in State history.

On Friday, November 17, 2023—less than two months before the date candidates are scheduled to begin petitioning to be on the 2024 ballot—the Court entered judgment for Plaintiffs. The Court enjoined the Secretary of State from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of legislative elections for several districts, and the Court set a schedule by which the Secretary and Legislative Assembly shall have until December

Appellate Case: 23-3697     Page: 111     Date Filed: 12/17/2023 Entry ID: 5345207

22, 2023, to adopt a remedial plan, the Plaintiffs shall have until January 5, 2024, to object to that remedial plan, and the Secretary shall have until January 19, 2024, to file a reply in support of that remedial plan. Doc. 126 (Judgment) at 2.

But on the following Monday, November 20, 2023, the Eighth Circuit rendered a decision highly relevant to the instant case in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, —F.4th—, 2023 WL 8011300 (8th Cir. Nov. 20, 2023). In that decision, the Eighth Circuit unequivocally held that Section 2 of the VRA does not create a private right of action, because the statute's plain text clearly "intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Id*. at *5 (citation omitted). The Eighth Circuit declined to address whether 42 U.S.C. § 1983 could nonetheless be used by private parties to bring Section 2 claims under the VRA. *See id*. at *12 (noting the question was not properly before it). However, the Eighth Circuit's holding and rationale cast significant doubt over this Court's finding that private Plaintiffs in this action can use Section 1983 for a private right of action to bring Section 2 VRA claims when, as the Eighth Circuit has now held, Section 2 of the VRA does not permit lawsuits by private plaintiffs.

In light of *Arkansas State Conf. NAACP*, the Secretary has a legally sound basis to seek appellate review of this Court's judgment in the instant matter. However, the timing of this Court's judgment and injunction make it impossible for the Secretary to receive meaningful appellate review before the 2024 election map needs to be established with finality. As will be discussed further *infra*, the realities of administering a statewide election in North Dakota mean that the 2024 election map needs to be finalized no later than December 31, 2023. After that date, candidates are scheduled begin petitioning to be on the ballots in their respective districts, and adjusting the district boundaries thereafter will risk substantial confusion, cost, and unfairness for candidates,

voters, and election administrators alike. Moreover, that potential for confusion and unfairness, without the opportunity for meaningful appellate review, risks undermining the election process and voter confidence in a presidential election year.

The Secretary has filed a Notice of Appeal to challenge this Court's finding that the Plaintiffs have a private right of action. However, because this Court's injunction was entered with insufficient time to seek meaningful appellate review without disrupting the State's 2024 election, a stay of the Court's injunction pending appeal (and through the 2024 election cycle) is appropriate under the Supreme Court's *Purcell* analysis for staying injunctions that interfere with upcoming elections.

Alternatively, even if the Court finds a *Purcell* analysis is inapplicable, a stay of the Court's injunction pending appeal should be granted under a traditional stay analysis.

Rules 8(a)(1)(A) and (C) of the Federal Rules of Appellate Procedure direct the Secretary to bring this motion in the District Court as a condition to seeking a stay pending appeal in the Court of Appeals. The Secretary respectfully requests that the Court enter an order on this motion as soon as possible, but no later than **December 12, 2023**, so that, if the motion to stay is denied by this Court, a stay pending appeal may be sought from the Eighth Circuit ahead of the January 1, 2024 ballot petitioning deadline.

## II.    LAW & ARGUMENT

### A.    Injunctions Likely to Disrupt Scheduled Elections Are Subject to the Supreme Court's *Purcell* Analysis

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). That is because "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political

parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This principle comes from *Purcell v. Gonzalez*, where the Supreme Court explained that courts should not change election rules proximate to an election when doing so could confuse voters and create problems for administering the election. *See* 549 U.S. 1, 4 (2006) ("Court orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls.").

Therefore, when a plaintiff seeks to enjoin the operation of election procedures before an election, the framework for assessing the injunction is adjusted, and federal courts must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Id*. at 4; *see also Riley v. Kennedy*, 553 U.S. 406, 426 (2008) ("practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges"). And "when a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this [c]ourt, as appropriate, should correct that error." *Republican Nat'l Comm*., 140 S. Ct. at 1207. Importantly, this analysis is not limited to only the date of the election itself, but also considers the necessary requirements that must be completed before then for the election to proceed in an organized and transparent manner. *E.g.*, *Merrill v. Milligan,* 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) ("Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. … Nor do incumbents know if they now might be running against other incumbents … On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials …").

The Supreme Court has not fully delineated when a *Purcell* stay analysis is required; however, Justice Kavanaugh's concurrence in *Merrill v. Milligan,* 142 S. Ct. 879 (2022), is instructive for this case. The *Merrill* case involved several challenges to Alabama's congressional electoral maps, wherein the plaintiffs alleged vote dilution in violation of the VRA. *See Singleton v. Merrill*, No. 2:21-cv-1291 (N.D. Ala.), *Milligan v. Merrill*, No. 2:21-cv-1530 (N.D. Ala.), and *Caster v. Merrill*, No. 2:21-cv-1536 (N.D. Ala.). The Alabama Secretary of State was enjoined by the district court from conducting elections based on the existing redistricting plan, and the Alabama legislature was given 14 days to enact a new redistricting plan. No. 2:21-cv-1530, Doc. 107, pp. 5-6; *see also* No. 2:21-cv-01536, Doc. 101, pp. 6-7. However, the Supreme Court stayed the district court's injunction pending appellate review. *See Merrill*, 142 S. Ct. at 879.

Justice Kavanaugh, joined by Justice Alito, wrote separately to concur with the stay of the injunction. *See Merrill,* 142 S. Ct. at 879–82 (Kavanaugh, J., concurring). Citing the *Purcell* principle, the concurrence explained, "[t]he stay order follows this Court's election-law precedents, which establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Id.* at 879. Justices Kavanaugh and Alito then further explained "the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881. The heightened standard that plaintiffs must establish when an injunction is likely to disrupt a scheduled election has four elements:

(i) the underlying merits are entirely clearcut in favor of the plaintiff;

(ii) the plaintiff would suffer irreparable harm absent the injunction;

(iii) the plaintiff has not unduly delayed bringing the complaint to court; and

(iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* This modified test for stays in election cases has been applied by various district courts in the Eighth Circuit, including by this Court. *See Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022) ("Justice Kavanaugh's framework provides helpful guidance for addressing the *Purcell* issue"); *see also, e.g.*, *Berry v. Ashcroft*, No. 4:22-CV-00465, 2022 WL 2643504, at *2–3 (E.D. Mo. July 8, 2022); *Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 933–35 (D.S.D. 2022). And this modified stay standard has been expressly applied by the Eleventh Circuit Court of Appeals. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) ("we agree with Justice Kavanaugh that *Purcell* only (but significantly) 'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference"); *see also Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at *2–3 (11th Cir. Aug. 4, 2023).

**B.     A Stay Pending Appeal Should be Granted Under the Modified *Purcell* Analysis**

Under the modified *Purcell* analysis, the Court should grant a stay of its injunction pending the Secretary's appeal and permitting preparation for the November 2024 elections to continue under the legislatively-enacted map while this litigation continues.

**(i)  The Underlying Merits Are Not Entirely Clearcut in Favor of The Plaintiffs**

The first element of the modified test for staying an injunction that threatens to disrupt the administration of a scheduled election is that the underlying merits are "entirely clearcut" in favor of the plaintiffs. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The burden to establish

that the underlying merits for an injunction are "entirely clearcut" lies with the plaintiff. *Id.*; *see also League of Women Voters*, 32 F.4th 1363 at 1372 (11th Cir. 2022) ("Whatever the precise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a 'heightened' burden.").

In July of 2022, this Court denied Defendant's motion to dismiss for lack of a private right of action under either Section 2 of the VRA or 42 U.S.C. § 1983 by finding that "§ 1983 provides a private remedy for violations of Section 2 of the VRA, and therefore, it is not necessary for the Court to decide whether Section 2, standing alone, contains a private right of action." Doc. 30 at 6. However, after the Court made that finding, the Eighth Circuit's recent decision in *Arkansas State Conf. NAACP* called into doubt this Court's finding of a private right of action under Section 1983 for alleged violations of Section 2 of the VRA.

In that opinion, the Eighth Circuit squarely held, that under the plain text of the VRA, the United States Attorney General is the only party who can sue to enforce Section 2 of the VRA. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4-11 (Section 2 of the VRA "intended to place enforcement in the hands of the [Attorney General], rather than private parties"). The Eighth Circuit declined to address the question of whether a private right of action missing from Section 2 of the VRA could still be found by private plaintiffs under 42 U.S.C. § 1983 for bringing Section 2 claims. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *12 (noting the issue was not properly presented in that case). However, the Eighth Circuit's holding that Section 2 of the VRA lacks a private right of action because it affirmatively assigns a right of action to the U.S. Attorney General would also support holding that a private right of action for Section 2 claims cannot be smuggled in through Section 1983.

As the Secretary intends to establish on appeal, Section 1983 cannot be used to bring a Section 2 VRA claim for at least two reasons: (1) Section 2 confers aggregate—not individual—rights; and (2) the fact that the VRA expressly assigns enforcement authority to the U.S. Attorney General precludes private enforcement under Section 1983.

### (a) *Section 2 of the VRA confers aggregate—not individual— rights*

The first question in deciding whether a statute can be enforced by private litigants under Section 1983 is whether the "statute confers an individual right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) (noting "§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Importantly, that right must be individual, not aggregate. *Id.* at 275 (where statutes "have an 'aggregate' focus, they are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights"); *see also, e.g., Does v. Gillespie*, 867 F.3d 1034, 1041-42 (8th Cir. 2017) ("a statute that speaks to the government official" empowered by a statute "'does not confer the sort of *individual* entitlement that is enforceable under § 1983'") (quoting *Gonzaga*, 536 U.S. at 287). And Section 2 of the VRA falls well short of unambiguously conferring any ***individual*** right on any particular person. To the contrary, it only confers rights on minority groups in the ***aggregate***.

Section 2 of the VRA contains two subsections—subsections (a) and (b). *See* 52 U.S.C. 10301. It may be true the first subsection appears, on a glance, to describe an individual right; it forbids voting practices that "result[] in a denial or abridgement of the right of ***any citizen*** … to vote on account of race or color … as provided in subsection (b)." 52 U.S.C. 10301(a) (emphasis added); *Cf. Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4 (noting subsection (a) appears to contain elements of both individual and aggregate rights, but declining to resolve the question because Section 2 lacks a private remedy). However, subsection (b), added in 1982, explains and

clarifies subsection (a) is a <u>group</u> right. Subsection (b) provides "[a] violation of subsection (a) is established if … the political processes leading to nomination or election ...  are not equally open to participation by ***members of a class of citizens*** protected by subsection (a) in that ***its members*** have less opportunity than other members of the electorate to participate in the political process … ." 52 U.S.C. 10301(b) (emphasis added).

Congress's addition of the language in subsection (b) thus starkly de-individualized the Section 2 right. Indeed, whether a state has violated Section 2 has nothing to do with the electoral opportunity enjoyed by any individual voter—the analysis does not require consideration of whether any particular voter can elect his or her candidate of choice. Rather, what Section 2 protects is the electoral opportunity of aggregated minority groups as a whole.

Unlike ordinary antidiscrimination statutes, proving that any specific individual voter suffered discrimination or a dilution of his or her voting power does not suffice to prove a Section 2 violation. Instead, Section 2 plaintiffs must prove that a "minority group" as a whole has "distinctive minority group interests" in the form of candidates they collectively prefer, and that white bloc voting usually defeats the group's collectively-preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The ultimate question is therefore whether, in the aggregate, "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 48 n.15. And if an individual minority voter's preferred candidates are usually defeated by white bloc voting, but the candidates preferred by his or her "minority group" are not defeated (or if his or her group has no cohesive preferences either way), there is no Section 2 violation. *See id.* at 51.

Because Section 2 protects group rights, not any individual's rights, it follows that it does not create private rights that individual plaintiffs can enforce under Section 1983. "Statutes with

an 'aggregate,' rather than an individual, focus 'cannot give rise to individual rights.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013) (some internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 288).

In rejecting Defendants' motion to dismiss for lack of a private right of action under Section 1983, this Court misstated and mis-applied the test.  he test is not simply whether Section 2 of the VRA "confers a right" in a generalized sense. *Cf.* Doc. 30 (July 2022 Order) at 10. Instead, the test is whether Section 2 of the VRA creates an individual, non-aggregated right that could be enforced through Section 1983. *See Gonzaga*, 536 U.S. at 284-85; *Does v. Gillespie*, 867 F.3d at 1041-42. And as described above, it does not.

In short, because Section 2 of the VRA confers an aggregate right and not an individual right, it does not create any individual right that would be enforceable through a private right of action under 42 U.S.C. § 1983. That consideration provides the first reason why Plaintiffs' likelihood of success for asserting a private right of action under Section 1983 for an alleged violation of Section 2 of the VRA is not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

> *(b)* <u>*The fact that the VRA expressly assigns enforcement authority to the United States Attorney General precludes private claims under Section 1983*</u>

Additionally, even when a federal statute creates individual rights, Section 1983 claims are precluded when the remedial devices provided in the underlying statute are sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of a private lawsuit under Section 1983. *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981). The State may show Congress "shut the door to private enforcement … impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Gonzaga*, 536 U.S. at 285.

Section 12 of the Voting Rights Act provides a comprehensive scheme to enforce Section 2 by the Attorney General of the United States. 52 U.S.C. § 10308. This includes a right of the Attorney General to seek an injunction, and potential penalties of a fine up to $5,000 and/or be imprisoned for up to five years. *Id.* With respect to Section 2, the plain language of the Voting Rights Act provides for enforcement by the Attorney General only, not by private parties. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *5 ("If the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'") (citation omitted).

In its *Order Denying Motion to Dismiss*, this Court found, "Critically, … there is also nothing in Section 12 that is incompatible with private enforcement, as there can be collective and private remedies available for the same federal statute." Doc. 30 at 11 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)). However, the cited case, *Cannon*, stated:

> When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights … . ***Title IX presents the atypical situation*** in which all of the circumstances that the Court has previously identified as supportive of an implied remedy are present. We therefore conclude that petitioner may maintain her lawsuit, despite the absence of any express authorization for it in the statute.

*Cannon*, 441 U.S. at 717 (emphasis added). This Court did not cite any authority or provide analysis as to why Section 2 of the VRA includes an implied remedy, or why the VRA was an "atypical situation" for finding one. And in any event, the Eighth Circuit Court of Appeals has now held there is no private remedy in the VRA, express or implied. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4-5. This Court's holding on this point was thus in error.

In its Order Denying Motion to Dismiss, this Court also stated: "Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for 'the prevailing party, other than the United States.'" Doc. 30 (July 2022 Order)

at 11 (quoting 52 U.S.C. § 10310(e)). But the Court's statement does not support the Court's holding. Section 10310(e), by its text, refers only to attorney's fees for actions to "directly enforce the Fourteenth and Fifteenth Amendments"; dilution claims under Section 2 are **_not_** actions to directly enforce the Fourteenth and Fifteenth Amendments, as the Eighth Circuit recently re-affirmed. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *7 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'"). Here again, the Court's' reasoning was in error.

Finally, in its Order Denying Motion to Dismiss, this Court also pointed to the fact that Section 2 VRA claims have previously been successfully brought by private litigants. Doc. 30 (July 2022 Order) at 11-12. But, as the Eighth Circuit recently noted, none of those cases actually analyzed the question of whether a private right of action exists to enforce Section 2 violations, and such cases do not control the analysis in a case where the question is actually presented. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *9-11 (noting statements to that effect in prior cases "were *just* background assumptions—mere dicta at most"). The Court's reasoning on this point was thus again in error.

In short, Plaintiffs should not be permitted to circumvent the comprehensive enforcement scheme provided in the VRA by using Section 1983 to bring private litigation. Finding that Section 1983 enables private litigants to bring Section 2 claims would undermine Congress's clear decision to assign enforcement authority for Section 2 claims to the U.S. Attorney General. And that is another reason why Plaintiffs' likelihood of success for asserting a private right of action under Section 1983 for alleging a VRA Section 2 claim is not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

### (ii)  Plaintiffs Would Not Suffer Irreparable Harm Absent the Injunction

The second element of the modified test for stays in election cases is that the plaintiffs would suffer irreparable harm absent the injunction. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). "Lack of irreparable harm 'is an independently sufficient ground upon which to deny a preliminary injunction.'" *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

As discussed above, Plaintiffs did not have a private right of action available to them to commence this lawsuit in the first place. The aggregate rights afforded by Section 2 of the VRA can only be enforced by the Attorney General of the United States, who is not a party to this case. The Attorney General of the United States may bring an action to address the alleged harm to Plaintiffs and others, but it has chosen not to do so in this action. Moreover, while this litigation has been underway, the November 2022 elections were already held using the challenged map, and Plaintiffs have made no showing they will be irreparably harmed by continuing to vote in accordance with the challenged map while this litigation is resolved on appeal.

### (iii)  While Plaintiffs Did Not Unduly Delay Bringing the Complaint, the Issuance of Judgment was Unfortunately Timed

The third element of the modified test for stays in election cases is whether the plaintiffs unduly delayed bringing the complaint to court. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). While the Secretary does not assert that Plaintiffs unduly delayed in bringing their original Complaint, there was nevertheless a critical delay in this case that brings it within the scope of a *Purcell* analysis.

The bench trial in this case was held from June 12-15, 2023. This trial date was set significantly earlier than the originally scheduled trial in North Dakota's other recent redistricting case, *Walen, et. al. v. Burgum, et. al.*, No. 1:22-CV-00031 (D.N.D.), which was initially set for

trial from October 2-6, 2023. The earlier trial date for this case was specifically requested by the Secretary to account for the possibility that if Plaintiffs were successful at trial the State may be ordered to perform a redistricting that could potentially interfere with the November 2024 elections if delayed too long. Doc. 33 at p. 2. However, the trial concluded on June 15, 2023, and the District Court did not issue its Findings of Fact and Conclusions of Law (Doc. 125) and Judgment (Doc. 126) until November 17, 2023, more than **five months later**.

The Secretary respectfully acknowledges that carefully weighing the evidence and adjudicating the dispute requires a significant amount of time, and makes no suggestion that the Court's Judgment was improperly delayed. However, the fact remains that the Judgment was not issued until the latter half of November, shortly before the Thanksgiving holiday and with insufficient time to seek appellate review before the election map needs to be finalized. This timing of the Judgment's issuance—as well as the Court's schedule for creating and reviewing a remedial plan extending to at least January 19, 2024 (and potentially longer)—makes it impossible to seek meaningful appellate review, meet statutory deadlines, and carry out the 2024 elections without significant cost, confusion, and hardship, as discussed further *infra*.

### (iv)  The Changes in Question Are Not Feasible Before the Election Without Significant Cost, Confusion, or Hardship.

The fourth element of the modified test for stays in election cases is whether the changes in question are feasible before the election without significant cost, confusion, or hardship. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The Court's schedule for proposing and objecting to remedial maps goes until January 19, 2024, which is only 144 days (about 4.7 months) before the June 11, 2024 statewide primary election. N.D.C.C. § 16.1-11-01. But even more pressingly, the Court's deadline extends past the December 31, 2023, deadline by which candidates petitioning

to be on the ballot need to know what election map applies for delineating the district boundaries. *See* N.D.C.C. § 16.1-11-15; *see also* Tr. Transcript, Vol. III, at pp. 190-91.

What qualifies as "too close" to scheduled election deadlines under *Purcell* varies depending on "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill* 142 S. Ct. at 881 n.1 (2022) (Kavanaugh, J., concurring). The ability of the State to seek meaningful appellate review of the election-impacting injunction also factors into a *Purcell* timing analysis. *See, e.g., Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (noting that *Purcell* "direct[s] courts to weigh the opportunity for appellate review").

Courts have applied the *Purcell* principle to prevent injunctions prior to elections on similar timeframes as the present case. For example, in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), the District Court for the Northern District of Florida initially denied a stay of its order enjoining amendments to Florida's Election Code, stating that the closest election was still roughly five months away. *Id.* at 1172–73. However, the Eleventh Circuit granted a stay pending appeal, finding that while "the Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes … [w]hatever *Purcell*'s outer bounds, we think that this case fits within them." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).[1] Additionally, in *Merrill*, the Supreme Court granted a stay even though the primary election was still "about four months" away from the Supreme

---

[1] In its opinion granting a stay, the Eleventh Circuit stated that the election was less than 4 months from the District Court's injunction. *See League of Women Voters,* 32 F.4th at 1371. However, as noted by the district court, it was in fact almost 5 months, or 145 days, away. *See League of Women Voters*, 595 F. Supp. 3d at 1172 ("Florida's primary election is set for August 23, 2022, and the general is set for November 8, 2022. … So the closest election is roughly five months away.").

Court stay, and even longer from the District Court's injunctions that were issued two weeks prior. *See Merrill*, 142 S. Ct. at 879, 888 (Kagan, J., dissenting).

Here, it is not feasible for the Legislative Assembly to adopt a remedial plan by the Court-ordered deadline of December 22, 2023. And even if a remedial plan could be adopted in time, the Court's scheduling plan following adoption goes until January 19, 2024, well after important scheduled election activities have already commenced, inevitably causing confusion and hardship among voters, election officials, and candidates.

*(a) Cost, confusion, and hardship to the Legislative Assembly*

The Court's Judgment gave the Secretary and the North Dakota Legislative Assembly until December 22, 2023, to adopt a remedial plan, and the Court directed that any such a plan would be subject to Plaintiffs' objections, a reply in support by the Secretary no later than January 19, 2024, and presumably the Court's review and approval (or rejection) of the proffered remedial plan sometime thereafter. Doc. 126 at 2.

The District Court is correct that the State should be given the opportunity to adopt a remedial map before one is imposed by the federal courts. "The Supreme Court has repeatedly held that 'redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt.'" *Diaz v. Silver*, 932 F. Supp. 462, 465 (E.D.N.Y. 1996) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)). "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Miller v. Johnson*, 515 U.S. 900 (1995) (internal citations omitted).

However, the Court's direction for the Legislative Assembly and Secretary to "adopt a plan" for the Court's (and Plaintiffs') review (Doc. 126 at 2) is unclear. Under the North Dakota

Constitution, the Legislative Assembly (not the Secretary of State) is charged with the task of redistricting, and new redistricting plans must be enacted through duly enacted laws, which require bicameral approval and presentation to the Governor. *See* N.D. Const., art. IV, §§ 2, 13; art. V, § 9. It is not apparent that the State Constitution permits the State Legislative Assembly to conditionally "adopt a plan" for the Court's review through any process other than duly enacting a new law. *Cf.* N.D. Const., art. IV, §§ 2, 13.

Additionally, the Court's direction to the Legislative Assembly to adopt a remedial plan also has significant problems of logistics and timing. The Court gave the Legislative Assembly just 35 days from the date of its Judgment (November 17, 2023 to December 22, 2023) to adopt a remedial plan. Doc. 126 at 2. However, North Dakota does not have a full-time legislature, and the Legislative Assembly's 2023 biennial regular session was already adjourned by the date of the Court's Judgment. Furthermore, the window provided by the Court falls over the winter holiday period, compounding logistical difficulties. Consequently, the Legislative Assembly—which is not a party to this dispute—has indicated to the Secretary that it will not be able to reconvene to adopt a remedial map by this Court's deadlines.[2]

### (b) *Cost, confusion, and hardship with respect to the 2024 elections*

Even if the Legislative Assembly was able to comply with the Court's Judgment and adopt a remedial plan by December 22, 2023, the schedule set by the Court to review and approve the remedial plan—extending until at least January 19, 2024, and potentially later—will delay the finalization of the State's legislative district map until it is too late to carry out the 2024 election cycle without significant cost, confusion, and hardship for candidates, voters and election

---

[2] Through this brief, the Secretary does not purport to speak for or on behalf of the Legislative Assembly.

administrators. While the Judgment directs that the first elections in the remedial district(s) shall occur in the November 2024 general election (Doc. 126 at p. 2), the final map must be in place for the June 11, 2024 primary election, where the candidates who will run in the general election are selected by the voters. N.D.C.C. § 16.1-11-01. But even before that, the final map must be in place by January 1, 2024, when candidates begin petitioning for inclusion on the ballot in their districts. N.D.C.C. § 16.1-11-15; *see also* Tr. Transcript, Vol. III, at pp. 190-91. Consequently, for a variety of reasons to be discussed *infra*, compliance with the Court's injunction is likely to cause significant confusion, cost, and hardship.

First of all, it must be noted that while the injunction only expressly applies to Districts 9 and 15 and Subdistricts 9A and 9B, the complexity of district line crafting ensures that those are not the only districts that will be impacted by the Court's Judgment. Changing those district boundaries cannot happen in a vacuum. Due to the constitutional and statutory requirement that legislative districts have substantial population equality (N.D. Const., art. IV, § 2; N.D.C.C. § 54-03-01.5(5)), changes to the boundaries of Districts 9 and 15 will necessarily require changes in at least the immediately adjacent districts, and potentially cascading further throughout the State. For example, Plaintiffs' Demonstrative Plan 1 requires changes to Districts 9, 14, 15, and 29. *See* Tr. Exhibit P001 at pp. 31-32. Plaintiffs' Demonstrative Plan 2 requires changes to Districts 9, 14, and 15. *See* Tr. Exhibit P001 at pp. 38-39. And if the North Dakota Legislative Assembly adopts its own remedial plan in accordance with the Court's Judgment, its map may impact different or additional districts. Therefore, under the Court's Judgment, it potentially will not be known which districts are subject to being altered until sometime after January 19, 2024.

But beyond uncertainty over which districts will be impacted, a significant problem of timing relates to the collection of signatures by candidates. Candidates running by petition are

required to get "the signatures of at least one percent of the total resident population of the legislative district as determined by the most recent federal decennial census." N.D.C.C. § 16.1-11-06(1)(b)(3)(d). Candidates can begin circulating petitions for signatures on January 1 preceding a primary election (January 1, 2024, with respect to the 2024 primary election). Candidates only have from January 1, 2024, until April 8, 2024, to gather the required number of signatures on petitions. These are dates set by statute. *See* N.D.C.C. §§ 16.1-11-06, 16.1-11-15. All districts impacted by the yet-to-be adopted remedial plan could then have candidates gathering signatures beginning January 1, 2024, only to later find out later that some or all of the signatures they gathered no longer qualify. Consequently, any delay in establishing a final redistricting map directly impacts candidates' ability to meet the requirements to be placed on the ballot in all districts impacted by the yet-to-be adopted remedial plan.

In addition to the signature gathering issues for candidates, the candidates themselves may find out after a remedial plan is adopted and accepted by the Court that they no longer reside within the district in which they are running. The North Dakota Constitution provides, "An individual may not serve in the legislative assembly unless the individual lives in the district from which selected." N.D. Const., art. IV, § 5. Candidates cannot make an informed decision about whether they should run for a seat in the Legislative Assembly, or which district they should gather signatures in, until the boundaries of the districts are established. A candidate may start campaigning and gathering signatures January 1, 2024, only to find out after January 19, 2024, that he or she actually resides in a different district and will not be constitutionally eligible to serve in the Legislative Assembly for that district.

For example, District 14 is not subject to the Court's injunction, but will potentially be altered by the remedial plan (as it is under both of Plaintiffs' demonstrative plans). As an even-

numbered district, District 14 will have a senator and two representatives up for election in 2024 as part of North Dakota's staggering of terms for the Legislative Assembly. *See* N.D.C.C. § 54-02-01.15(3)(a) ("A senator must be elected from each even-numbered district in 2024 for a term of four years."); *see also* N.D.C.C. § 54-02-01.15(3)(b) ("Two representatives must be elected from each even-numbered district not comprised of subdistricts in 2024 for a term of four years."). In other words, despite being ostensibly unaffected by the Court's injunction, candidates who reside in District 14 and gather signatures in January 2024, as permitted by statute, may later discover that, due to the yet-to-be established remedial map's geographical changes, they no longer reside in District 14 or the signatures that they gathered were from citizens who no longer reside in District 14.

The timing of the Court's Judgment also causes issues for candidates running by the endorsement of a political party. According to N.D.C.C. § 16.1-03-17, if redistricting of the Legislative Assembly becomes effective after the organization of political parties and before the primary or the general election, some of the political parties in newly established districts are required to reorganize as closely as possible in conformance with Chapter 16.1-03 to assure compliance with primary election filing deadlines. This would include districts in which the population residing within any new geographic area added to the district is at least 25 percent of the district's total population. N.D.C.C. § 16.1-03-17(2). The reorganization of the parties has already occurred based on the enjoined maps. *See* Tr. Transcript, Vol. III, at pp. 195-96; *see also* N.D.C.C. §§ 16.1-03-01, 16.1-03-17. The Court's Judgment will require the political parties to reorganize and caucus well past the statutory deadline of May 15 if they are to endorse candidates to be placed on the ballot. *See* Tr. Transcript, Vol. III, at pp. 195.

These types of hardships and uncertainties for candidates are recognized as the basis for staying an election-disrupting injunction. As Justice Kavanaugh noted in *Merrill*: "Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries." 142 S. Ct. at 880. (Kavanaugh, J., concurring). Moreover, "state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.*

Additionally, the Court's schedule for reviewing an adopted remedial plan makes it impossible for county commissions to timely comply with their election duties. The board of county commissioners for each of North Dakota's 53 counties is required to divide the county into precincts and establish the county precinct boundaries no later than December 31 of the year immediately preceding an election cycle (by December 31, 2023, for the 2024 election cycle). N.D.C.C. §§ 16.1-04-01(1)(a), 16.1-04-01(3). North Dakota law prohibits a single precinct from encompassing more than one legislative district. N.D.C.C. § 16.1-04-01(1)(a). County commissions must establish the precincts in a properly noticed public meeting in accordance with N.D.C.C. ch. 11-11. Once the Court approves a remedial plan sometime after January 19, 2023, the commissions of the impacted counties would have to meet to establish precincts, already passed their statutory deadline of December 31, 2023.

This statutory deadline to set precincts is very important to the administration of the election because establishment of the precincts is necessary for the county auditors to be able to begin the extremely detailed and time-consuming process of updating the data for the Street

Master, discussed at length at trial by State Elections Director Erika White (Tr. Transcript, Vol. III, at p. 202) and the Elections Systems Administration Manager Brian Nybakken (Tr. Transcript, Vol. IV, at pp. 11-24). The Street Master is tied to the Central Voter File and identifies highways, roads, lanes, and boulevards within a precinct, allowing election officials to determine whether a particular house number resides within a particular precinct.  Tr. Transcript, Vol. IV, at p. 11. The Street Master ties an address to a precinct, to a ballot style, and ultimately to the voter to ensure that the voter is receiving the correct ballot at the polling location with the correct candidates, contests, and ballot measures. Tr. Transcript, Vol. III, at p. 202. It is crucial that the Street Master is properly updated so that voters are given the correct ballot, and are not voting on candidates from the wrong district, or for example voting on bond measures they will not be paying for. *Id.*

For the reasons noted above, the Court's Judgment and injunction should be stayed pending appeal to prevent undue cost, confusion, and hardship, and the 2024 election cycle should be allowed to proceed under the current legislatively enacted maps while this litigation is pending appellate review and final resolution.

### C.    A Stay Should be Granted Even if a Traditional Stay Analysis is Applied

Even if the Court does not apply the modified test discussed above, a stay should nevertheless be granted based upon the traditional criteria. Courts within the Eighth Circuit traditionally consider the following four factors when determining whether to stay an order of a district court pending appeal or to suspend an order granting an injunction while an appeal is pending: "(1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 423 (8th Cir. 1996).

### (i)  Secretary Howe is Likely to Prevail on the Merits of the Appeal

The bases of the Secretary's appeal are discussed in more detail above. The Secretary's appeal is based on recent Eighth Circuit precedent which unequivocally established there is no private right of action to enforce Section 2 of the Voting Rights Act in this Circuit. As discussed *supra*, that holding considerably erodes the basis of this Court's finding that Section 1983 can be used to bring a private cause of action under Section 2 of the VRA. The Secretary is therefore likely to prevail on the merits, and North Dakota should not be forced to adopt a court-ordered remedial plan until it has at least had the opportunity to have its arguments meaningfully considered in the appellate courts.

### (ii)  The State Will be Irreparably Harmed Absent a Stay

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). "[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people … is enjoined."). Further, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). Sovereign harms are magnified when the challenged law reflects "the State's policy judgments" about election-related matters. *Perry v. Perez*, 565 U.S. 388, 393 (2012).

As discussed in more detail above, the State's ability to conduct statewide elections in 2024 will be irreparably harmed absent a stay of this Court's injunction and Judgment. The Judgment

provides that the Secretary Howe and the Legislative Assembly may adopt a plan to remedy the violation of Section 2 by December 22, 2023—a deadline which is currently less than one month away and was only 35 days away when the Judgment was entered. This deadline is not feasible, as discussed above. Additionally, as also discussed above, the requirements and timeline laid out by the Court in its Judgment cannot be feasibly incorporated into the election timelines established in North Dakota law for the 2024 election cycle without causing confusion and hardship among candidates, voters, and election officials alike.

### (iii)  Plaintiffs and The Public Will Not be Harmed if the Court Grants the Stay and the Public Interest is Best Served by Granting the Stay

As discussed above, Plaintiffs will not be harmed by a stay of this Court's injunction pending appeal because they did not have a private right of action available to them to commence this lawsuit in the first place. Moreover, while this litigation has been underway, the November 2022 elections were already held using the challenged map, and Plaintiffs have made no showing they will be irreparably harmed by continuing to vote in accordance with the challenged map while this litigation is resolved on appeal.

Likewise, the public interest would be served by a stay of the Court's Judgment pending appeal. Like the candidates and election officials, voters and the general public have an obvious interest in the 2024 elections being properly administered without unnecessary confusion and hardship. The public interest is also served by ensuring that the redistricting maps enacted by the peoples' elected representatives receive meaningful appellate review before they are struck down and replaced by the decree of a federal court. *See Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court"); *see also, e.g., Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) ("The public interest is served in preserving the integrity of the right

to appellate review.") (citation omitted). And for the reasons discussed *supra*, significant confusion and hardship is likely to develop if a stay of this Court's injunction is not granted pending appeal and the legislative maps are not fixed in place by the January 1, 2024, starting date for candidates to begin petitioning to be on the ballots in their respective districts. The public interest therefore weighs in favor of staying this Court's injunction pending appeal and through the 2024 election. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (even if a State's redistricting is ultimately held unlawful, "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case").

## III.    CONCLUSION

For the reasons set forth above, the Secretary respectfully requests that the Court grant this motion for a stay of judgment pending appeal. The Secretary respectfully requests that the Court enter an order on this motion as soon as possible, but no later than **December 12, 2023**, so that, if the motion to stay is denied by this Court, a stay pending appeal may be sought from the Eighth Circuit ahead of the January 1, 2024, deadline for candidates to begin petitioning for signatures in their districts.

Dated this 4th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By:   */s/ David R. Phillips*
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
Telephone: (701) 751-8188

App116

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** was on the 4th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493

Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Phil Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg
Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630
sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice

App118

950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By: ____*/s/ David R. Phillips*_____
        DAVID R. PHILLIPS

App119

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, et al.,<br><br>                      Plaintiffs,<br><br>     v.<br><br>MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota, et al.,<br><br>                      Defendant. | Civil No. 3:22-cv-00022-PDW-ARS |

**PLAINTIFFS' MOTION TO AMEND REMEDIAL ORDER**

Plaintiffs respectfully move the Court for an order amending its remedial schedule and order in this case. In light of the Legislature's stated intent not to meet the Court's December 22, 2023, deadline to enact a proposed remedial plan, the Court now has the opportunity to amend its order to ensure that the November 2024 election takes place under a court-approved map that complies with Section 2 of the Voting Rights Act before any *Purcell* timing concerns arise.

The Court provided the Legislature until December 22, 2023, to adopt a legislative redistricting plan that remedies the violation of Section 2 of the Voting Rights Act. Doc. 125 at 39. That order provides that Plaintiffs could file any objections to that plan by January 5, 2024, and that Defendants could file any response by January 19, 2024. *Id.* Over two weeks after this Court issued judgment, the Secretary moved for a stay and requested a ruling by this Court just one week later, by December 12, 2023. Doc. 132 at 3. That stay motion does not challenge the district court's conclusion that the current map violates Section 2, rather it contends that 42 U.S.C. § 1983 provides no cause of action for private plaintiffs to bring suit under Section 2—something no court anywhere has ever held. Plaintiffs oppose the requested stay and, notwithstanding the

1

Appellate Case: 23-3697     Page: 139     Date Filed: 12/17/2023 Entry ID: 5345207

Secretary's delay in filing it, will expedite their filing of a response brief consistent with the requested decision date of December 12, 2023. Plaintiffs file this separate motion now seeking an alteration of the Court's remedial schedule and process in light of various representations in the Secretary's stay motion. Counsel for the Secretary indicated that they would respond in writing with their position on the date ordered by the Court.

The Secretary raises several objections to the timing of this Court's remedial order, primarily that the process extends beyond December 31, 2023, the date state law envisions that precinct boundaries will be settled and the day before candidate petition circulation commences on January 1, 2014. Doc. 132 at 14-22. The Secretary has also notified the Court that the Legislative Assembly will not be adopting a remedial plan by the Court's December 22, 2023, deadline. Doc. 132 at 17. Although the Secretary objects that the Court provided the Legislature "just 35 days," that is more time than other courts have allowed in similar cases. *See, e.g.*, Order, *Caster, et al. v. Allen, et al.*, No. 2:21-cv-01536-AMM (N.D. Ala. June 20, 2023), Doc. 156 (providing 31 days for Legislature to adopt remedial plan following remand from Supreme Court in *Allen v. Milligan*, 599 U.S. 1 (2023)); Memorandum Opinion, *Harris v. McCrory*, No. 1:13-cv-94 (M.D.N.C. Feb. 5, 2016), Doc. 142 (providing 14 days for Legislature to adopt remedial plan in a decision affirmed by Supreme Court in *Cooper v. Harris*, 581 U.S. 285 (2017)).[1]

In light of the Secretary's representations, Plaintiffs respectfully request that the Court modify its remedial order to clarify that **Plaintiffs' Demonstrative Plan 1** will be ordered into

---

[1] The Legislative Management Committee met on December 5, 2023, and voted to hire counsel and move to intervene in this case on behalf of the Legislature and to publish an RFP to retain a redistricting expert. N.D. Leg. Mgmt. Comm' Meeting (Dec. 5, 2023), https://video.ndlegis.gov/en/PowerBrowser/PowerBrowserV2/20231204/-1/31899. Plaintiffs will oppose the Legislature's untimely intervention motion once it is filed. In any event, consistent with what it advised the Secretary, the Committee announced no intention of enacting a remedial map by December 22, 2023.

2

effect as the remedial plan if the Legislature does not adopt, and the Governor does not sign into law,[2] an alternative remedial plan by **December 22, 2023**. Should the Legislature enact a remedial plan by that date, Plaintiffs request to be provided until **December 26, 2023**, to file any objections and accompanying expert analysis and/or proposed alternative remedial plan(s), with any response from the Secretary to be filed by **December 28, 2023**. Plaintiffs' proposed amendment is sensible for several reasons.

*First*, the Secretary has indicated that the Legislature will not be enacting a remedial plan by the Court's deadline. Doc. 132 at 17. Plaintiffs' proposal retains the opportunity for the Legislature to change its mind while simultaneously ensuring a legally compliant map is in effect should the Legislature fail to act, as it has told the Secretary it will. Ordering Plaintiffs' Demonstrative Plan 1 as the remedial plan in the absence of legislative action permits county and state officials to prepare for the imposition of that plan now, and well in advance of the December 31 deadline suggested by the Secretary. Plaintiffs' proposal also permits an expedited briefing schedule should the Legislature reverse course and enact a remedial plan, and should plaintiffs have any objection to that plan. To the extent a legislatively enacted plan involves additional or different precinct modifications, counties could prepare those in advance of December 31 in the event the Court approves the legislatively enacted remedial proposal.

---

[2] The Secretary expresses confusion about whether the Court's order envisioned a "conditional[]" adoption of a plan by the Legislature. Doc. 132 at 17. The Secretary misreads the Court's order. In cases where a redistricting plan is enjoined as violating Section 2, the Court—if timing permits—must provide an opportunity for the Legislature to enact (through the state's normal process—here bicameralism and presentment) a remedial plan. The Court retains jurisdiction to determine whether that plan remedies the violation, and if it does not, to similarly enjoin that plan and impose its own remedy. *See, e.g.*, *Caster v. Allen*, Order at 5, No. 2:21-cv-01536-AMM (N.D. Ala. June 20, 2023), ECF No. 156 (providing opportunity for plaintiffs to file objections if Alabama legislature enacts remedial plan).

Appellate Case: 23-3697     Page: 141     Date Filed: 12/17/2023 Entry ID: 5345207

*Second*, Plaintiffs' Demonstrative Plan 1 has already been adjudicated by the Court to "comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and keeping together communities of interest." Doc. 125 at 20. It remedies the Section 2 violation by offering Native American voters an equal opportunity to elect their candidates of choice. *See* P001.032 (Collingwood Report).

*Third*, implementing Plaintiffs' Demonstrative Plan 1 will not be challenging for state and local officials. It requires changes to just four districts, primarily Districts 9 and 15 with minor adjustments to Districts 14 and 29. Only two precincts in the entire state would be altered by the imposition of Plaintiffs' Demonstrative Plan 1, the remainder of the changes follow existing county and precinct boundaries. *See* Doc. 132 at 21-22 (detailing the process for redrawing precinct boundaries). In Ramsey County, Precinct 361503 would be split between Districts 15 and 29. That split would follow Census block boundaries and—for nearly the entire length—three roadways (85th St. NE, County Hwy. 8, and 60th St. NE). *See* Trial Tr. Vol. 4 at 20:8-24 (testimony of Brian Nybakken, Elections Systems Administrator Manager for the Secretary of State, testifying that following roadways for precinct boundaries eases the administrative task of assigning voters to new precincts). In Stutsman County, Precinct 472910[3] would be split between Districts 14 and 29. That split would match exactly the 2020 precinct boundaries in Stutsman County, significantly easing the burden on county officials. However, this precinct split is unnecessary. Plaintiffs' Demonstrative Plan 1 followed the 2020 precinct boundaries in Stutsman County, but it can be modified to follow exactly the new precinct boundaries, with all of Precinct 472910 being placed in District 14. Doing so would have no effect on the plan-wide population deviation, as

---

[3]   *See* Stutsman County, N.D. Voting Precinct Map, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.stutsmancounty.gov/files/election-precinct-county-wide-map.pdf.

4

exceedingly few people would be affected, and would eliminate the need for any precinct boundary modifications by Stutsman County officials.[4]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court modify its remedial order as set forth above and expeditiously announce that, in the absence of legislative action by December 22, 2023, Plaintiffs' Demonstrative Plan 1 (or a modified version that eliminates the need for a Stutsman County precinct alteration, or Plaintiffs Demonstrative Plan 2, *see* n.4) will be the court-ordered map for the 2024 elections. Doing so will resolve all *Purcell* and timing concerns raised by the Secretary in his stay motion.

December 5, 2023                                 Respectfully submitted,

/s/ Michael S. Carter                            /s/ Mark P. Gaber
Michael S. Carter                                DC Bar No. 988077
OK Bar No. 31961                                 mgaber@campaignlegal.org
Matthew Campbell                                 Molly E. Danahy
NM Bar No. 138207, CO Bar No. 40808              DC Bar No. 1643411
mcampbell@narf.org                               mdanahy@campaignlegal.org
NATIVE AMERICAN RIGHTS FUND                      CAMPAIGN LEGAL CENTER
250 Arapahoe Ave.                                1101 14th St. NW, Ste. 400
Boulder, CO 80302                                Washington, DC 20005
Telephone: (303) 447-8760                        Telephone: (202) 736-2200
*Counsel for Plaintiffs*                         Fax: (202) 736-2222
                                                 *Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074           Bryan Sells (admitted *pro hac vice*)
kelty@narf.org                                   GA Bar No. 635562
NATIVE AMERICAN RIGHTS FUND                      bryan@bryansellslsaw.com
950 F Street NW, Ste. 1050                       THE LAW OFFICE OF BRYAN L. SELLS,
Washington, DC 20004                             LLC
Telephone: (202) 785-4166                        PO Box 5493

---

[4]    Plaintiffs recommend the imposition of Plaintiffs' Demonstrative Plan 1 because its District 9 is somewhat more compact than Plan 2's version. However, Plaintiffs' Demonstrative Plan 2 affects fewer surrounding districts, requiring changes to only Districts 9, 14, and 15—with very minimal changes to District 9. Plaintiffs would also support the imposition of Plaintiffs' Demonstrative Plan 2 if the Court wished to further minimize the changes to the enacted map.

5

*Counsel for Plaintiffs*

/s/ Timothy Q. Purdon
Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiff Spirit Lake Tribe and*
*Turtle Mountain Band of Chippewa Indians*

Atlanta, GA 31107-0493
Telephone: (404) 480-4212
*Counsel for Plaintiffs*

App125

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Mark P. Gaber*
Mark P. Gaber
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

TURTLE MOUNTAIN BAND OF CHIPPEWA
INDIANS, et al.,

                                       Plaintiffs,

      v.

MICHAEL HOWE, in his official capacity as
Secretary of State of North Dakota, et al.,

                                      Defendant.

Civil No. 3:22-cv-00022-PDW-ARS

**MOTION TO EXPEDITE**

Plaintiffs respectfully request that the Court expedite the briefing and decision regarding Plaintiffs' Motion to Amend Remedial Order. The motion requests modification of the Court's remedial order in this case in response to timing and *Purcell* concerns raised in the Secretary's stay motion, as well as the Secretary's representation that the Legislature does not intend to enact a remedial plan by the Court's December 22, 2023, deadline. An order granting Plaintiff's motion to amend the remedial order and process will resolve the timing and *Purcell* concerns raised by the Secretary. Because these arguments form a substantial basis for the Secretary's motion for a stay, and the Secretary has indicated that he intends to seek a stay from the Eighth Circuit if his current motion is denied, Plaintiffs respectfully request that the Court expedite briefing and consideration of Plaintiffs' motion to amend to ensure that the status of the Court's remedial order and process is clarified and a final map is in place before December 31, 2023, the date suggested by the Secretary.

Plaintiffs respectfully request that the Secretary be ordered to file any response to Plaintiffs' motion by **Friday, December 8**, and that an order on Plaintiffs' motion be expeditiously

1

entered thereafter. The Secretary's counsel has indicated that they will respond in writing to the

Motion to Amend with their position by the deadline set by the Court.

## CONCLUSION

For the foregoing reasons, the Motion to Expedite should be granted.


December 5, 2023

Respectfully submitted,

/s/ Michael S. Carter
Michael S. Carter
OK Bar No. 31961
Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
Telephone: (303) 447-8760
*Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
Telephone: (202) 785-4166
*Counsel for Plaintiffs*

/s/ Timothy Q. Purdon
Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiff Spirit Lake Tribe and*
*Turtle Mountain Band of Chippewa Indians*

/s/ Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200
Fax: (202) 736-2222
*Counsel for Plaintiffs*

Bryan Sells (admitted *pro hac vice*)
GA Bar No. 635562
bryan@bryansellslsaw.com
THE LAW OFFICE OF BRYAN L. SELLS,
LLC
PO Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212
*Counsel for Plaintiffs*

2

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.


*/s/ Mark P. Gaber*
Mark P. Gaber
*Counsel for Plaintiffs*

| | |
|---|---|
| **From:** | ndd_nef@ndd.uscourts.gov |
| **Sent:** | Wednesday, December 6, 2023 2:45 PM |
| **To:** | CourtMail@ndd.uscourts.gov |
| **Subject:** | Activity in Case 3:22-cv-00022-PDW-ARS Turtle Mountain Band of Chippewa Indians et al v. Jaeger Order on Motion to Expedite |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of North Dakota**

## Notice of Electronic Filing

The following transaction was entered on 12/6/2023 at 2:44 PM CST and filed on 12/6/2023

| | |
|---|---|
| **Case Name:** | Turtle Mountain Band of Chippewa Indians et al v. Jaeger |
| **Case Number:** | 3:22-cv-00022-PDW-ARS |
| **Filer:** | |
| **WARNING: CASE CLOSED on 11/17/2023** | |
| **Document Number:** | 136(No document attached) |

**Docket Text:**
**(Text Only) ORDER by Chief Judge Peter D. Welte granting [135] Motion to Expedite. The Secretary shall file his response to the [134] Motion to Amend Remedial Order on 12/8/2023. (EA)**

**3:22-cv-00022-PDW-ARS Notice has been electronically mailed to:**

Scott K. Porsborg    sporsborg@smithporsborg.com, aheinen@smithporsborg.com, bschmidt@smithporsborg.com, jlengowski@smithporsborg.com, mklimpel@smithporsborg.com

Timothy Q. Purdon    TPurdon@RobinsKaplan.com, cmcdonald@robinskaplan.com, courtmail@RobinsKaplan.com, lbuck@robinskaplan.com

Matthew A. Sagsveen (Terminated)    masagsve@nd.gov, jthiel@nd.gov

David R. Phillips (Terminated)    dphillips@bgwattorneys.com, kfinck@bgwattorneys.com, lsteckler@bgwattorneys.com, smartin@bgwattorneys.com

Bradley Neuman Wiederholt (Terminated)    bwiederholt@bgwattorneys.com, kfinck@bgwattorneys.com,

lsteckler@bgwattorneys.com, sgrinolds@bgwattorneys.com, smartin@bgwattorneys.com

Brian D. Schmidt     bschmidt@smithporsborg.com, aheinen@smithporsborg.com, jlengowski@smithporsborg.com, mklimpel@smithporsborg.com

Matthew Lee Campbell     mcampbell@narf.org, Stirling@narf.org

Victor J. Williamson     victor.williamson@usdoj.gov

Austin T. Lafferty     alafferty@smithporsborg.com

Mark Gaber     mgaber@campaignlegalcenter.org, docketing@campaignlegalcenter.org

Molly Danahy     mdanahy@campaignlegal.org

Michael Stephen Carter     carter@narf.org, Stirling@narf.org, hoerter@narf.org

Bryan L. Sells     bryan@bryansellslaw.com

Samantha Blencke Kelty     kelty@narf.org

Allison Neswood     neswood@narf.org

Philip Axt     pjaxt@nd.gov

**3:22-cv-00022-PDW-ARS Notice will not be electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Case No: 3:22-cv-00022

Turtle Mountain Band of Chippewa
Indians, Spirit Lake Tribe, Wesley Davis,
Zachary S. King, and Collette Brown.

    Plaintiffs,

v.

Michael Howe, in his official capacity as
Secretary of State of North Dakota.

    Defendant

  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )

**NORTH DAKOTA LEGISLATIVE
ASSEMBLY'S MOTION TO
INTERVENE**

   \*\*\*      \*\*\*      \*\*\*

The North Dakota Legislative Assembly hereby moves this Court to intervene in this action. The purpose of the Assembly's motion is to protect and defend its interests as explained in the attached pleading entitled "North Dakota Legislative Assembly's Brief in Support of Motion to Intervene, Joinder in the Secretary's Motion for Stay of Judgment Pending Appeal, and Response to the Plaintiffs' Motion to Amend Remedial Order."

The Assembly submits this motion in accordance with Rule 24 of the Federal Rules of Civil Procedure. This motion is supported by the attached aforementioned brief.

Dated this 8th day of December, 2023.

       SMITH PORSBORG SCHWEIGERT
       ARMSTRONG MOLDENHAUER & SMITH

       By _/s/ Scott K. Porsborg_
         Scott K. Porsborg (ND Bar ID #04904)
         sporsborg@smithporsborg.com
         Brian D. Schmidt (ND Bar ID #07498)
         bschmidt@smithporsborg.com
         122 East Broadway Avenue
         P.O. Box 460

Bismarck, ND 58502-0460
(701) 258-0630

Attorney for the North Dakota Legislative
Assembly, Senators Ray Holmberg, Nicole
Poolman, and Rich Wardner; Representatives
Bill Devlin, Mike Nathe, and Terry B. Jones,
and Former Senior Counsel Claire Ness

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2023, a true and correct copy of the foregoing **NORTH DAKOTA LEGISLATIVE ASSEMBLY'S MOTION TO INTERVENE** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

**ATTORNEYS FOR PLAINTIFFS**

Michael S. Carter                    carter@narf.org
Matthew Campbell                     mcampbell@narf.org
Allison Neswood                      neswood@narf.org
Attorneys At Law
250 Arapahoe Ave.
Boulder, CO 80302

**ATTORNEYS FOR PLAINTIFFS**

Mark P. Garber                       mgaber@campaignlegal.org
Molley E. Danahy                     mdanahy@campaignlegal.org
Attorneys At Law
1101 14th St. NW, Ste. 400
Washington, DC 20005

**ATTORNEY FOR PLAINTIFFS**

Timothy Q Purdon                     tpurdon@robinskaplan.com
Attorney at Law
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501

App133

## ATTORNEY FOR PLAINTIFFS

Samantha B. Kelty
Attorney at Law
950 F Street NW, Ste. 1050
Washington, D.C. 20004

kelty@narf.org

## ATTORNEY FOR PLAINTIFF

Bryan Sells
Attorney at Law
P.O. Box 5493
Atlanta, GA 31107-0493

bryan@bryansellslaw.com

## ATTORNEYS FOR DEFENDANT MICHAEL HOWE

Matthew A Sagsveen
Phillip Axt
Assistant Attorney General
500 North 9th Street
Bismarck, ND 58501-4509

masagsve@nd.gov
pjaxt@nd.gov

David R. Phillips
Bradley N. Wiederholt
Special Assistant Attorney General
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247

dphillips@bgwattorneys.com
bwiederholt@bgwattorneys.com

By /s/ Brian D. Schmidt
BRIAN D. SCHMIDT

App134

25.5076.01000



# North Dakota Legislative Council

STATE CAPITOL, 600 EAST BOULEVARD, BISMARCK, ND 58505-0360

☎701.328.2916
🖷701.258.3462
www.ndlegis.gov
lcouncil@ndlegis.gov

November 30, 2023

## MEETING NOTICE

**A meeting room will be available to the public for this meeting; however, this meeting will be held by Microsoft Teams and committee members will receive sign-in information 1 day before the meeting. A livestream of the meeting will be available to the public at: https://video.ndlegis.gov.**

Representative Mike Lefor, Chairman, has called a meeting of the **LEGISLATIVE MANAGEMENT**.

**Date:**  Tuesday, December 5, 2023

**Time:**  10:00 a.m.

**Place:**  Harvest Room, State Capitol, Bismarck

**Video:** This meeting can be viewed online at https://video.ndlegis.gov.

**Agenda:**  Discussion regarding litigation relating to legislative redistricting and the appointment of a redistricting committee. **The discussion will include an executive session for attorney consultation pursuant to North Dakota Century Code Sections 44-04-19.1 and 44-04-19.2.**

**Special Note:**  Anyone who plans to attend the meeting and needs assistance because of a disability should contact the Legislative Council staff as soon as possible.

**Committee Members:**  Representatives Mike Lefor, Glenn Bosch, Josh Boschee, Zachary Ista, Dennis Johnson, Ben Koppelman, Emily O'Brien, Paul J. Thomas, Robin Weisz; Senators Brad Bekkedahl, Kyle Davison, Kathy Hogan, David Hogue, Jerry Klein, Tim Mathern, Janne Myrdal, Donald Schaible

**Staff Contact:**   John Bjornson, Director

Any member unable to attend this meeting is asked to notify this office as soon as possible.

Sincerely,


/S/
John Bjornson
Director

JB/CC



EXHIBIT

App135



North Dakota Legislative Management
**Meeting Minutes**
25.5076.03000

600 East Boulevard Avenue, Bismarck, ND 58505

## LEGISLATIVE MANAGEMENT

Tuesday, December 5, 2023
Harvest Room, State Capitol
Bismarck, North Dakota

Representative Mike Lefor, Chairman, called the meeting to order at 10:00 a.m.

**Members present:** Representatives Mike Lefor, Glenn Bosch*, Josh Boschee*, Zachary Ista*, Dennis Johnson, Ben Koppelman*, Emily O'Brien*, Paul J. Thomas*, Robin Weisz; Senators Brad Bekkedahl*, Kyle Davison*, Kathy Hogan, David Hogue*, Jerry Klein*, Tim Mathern*, Janne Myrdal*, Donald Schaible*

**Members absent:** None

**Others present:** See Appendix A
*Attended remotely*

### OPENING REMARKS

Chairman Lefor noted the committee has the legal authority to conduct a closed meeting during an executive session pursuant to North Dakota Century Code Sections 44-04-19.1 and 44-04-19.2 for the purposes of attorney consultation regarding litigation relating to redistricting.

It was moved by **Representative Weisz**, seconded by **Senator Hogan**, and carried on a roll call vote that the **Legislative Management hold an executive session for the purposes of attorney consultation regarding litigation relating to redistricting.** Representatives Lefor, Bosch, Boschee, Ista, Johnson, Koppelman, O'Brien, Thomas, and Weisz and Senators Bekkedahl, Davison, Hogan, Hogue, Klein, Mathern, Myrdal, and Schaible voted "aye." No negative votes were cast.

### EXECUTIVE SESSION

The Legislative Management went into executive session from 10:07 a.m. to 10:35 a.m. All committee members were present for the executive session. During the executive session, the Legislative Management consulted with outside legal counsel and the Legislative Council staff regarding potential litigation relating to redistricting, including receipt of advice regarding legal strategies and strengths and weakness of legal arguments.

### COMMITTEE DISCUSSION

Chairman Lefor reconvened the public portion of the meeting at 10:38 a.m. He reminded committee members not to discuss any of the litigation issues discussed during the executive session. He noted the committee received testimony (Appendix B) from Mr. Jamie Azure, Chairman, Turtle Mountain Band of Chippewa Indians, and Ms. Lonna Street, Chairwoman, Spirit Lake Nation, and called for a short recess to allow committee members time to review the testimony.

Chairman Lefor called for discussion regarding next steps on behalf of the Legislative Assembly.

It was moved by **Senator Hogue**, seconded by **Senator Myrdal**, and carried on a roll call vote that the **Legislative Assembly intervene in the case of *Turtle Mountain Band of Chippewa Indians et al v. Howe* and retain Mr. Scott Porsborg and Mr. Brian Schmidt as outside counsel to provide any assistance regarding the litigation and to request a stay.** Representatives Lefor, Bosch, Johnson, Koppelman, O'Brien, Thomas, and Weisz and Senators Bekkedahl, Davison, Hogue, Klein, Myrdal, and Schaible voted "aye." Representatives Boschee and Ista and Senators Hogan and Mathern voted "nay."

A committee member noted it is the committee's intent to form a redistricting committee so work on an alternative remedial map can commence while any motions related to the case are pending.

**North Dakota Legislative Council**                                                    December 5, 2023



Appellate Case: 23-3697     Page: 155     Date Filed: 12/17/2023 Entry ID: 5345207

25.5076.03000                                                    Legislative Management

In response to a question from a committee member, Mr. John Bjornson, Director, Legislative Council, noted the exact costs of litigation are unknown, but funds sufficient to cover the costs are available among the amount budgeted for the next legislative session and the amount remaining in carryover funds.

Chairman Lefor noted he elected to form a Redistricting Committee after discussions with the Senate Majority Leader and Minority Leadership. The membership of the committee is provided in Appendix C.

**It was moved by Senator Hogue, seconded by Representative Weisz, and carried on a roll call vote that the Chairman of the Legislative Management, in consultation with the Legislative Council, be authorized to issue a request for proposals for the purpose of engaging an expert to help the newly formed Redistricting Committee with its analysis.** Representatives Lefor, Bosch, Boschee, Ista, Johnson, Koppelman, O'Brien, Thomas, and Weisz and Senators Bekkedahl, Davison, Hogan, Hogue, Klein, Mathern, Myrdal, and Schaible voted "aye." No negative votes were cast.

No further business appearing, Chairman Lefor adjourned the meeting at 10:57 a.m.

_____
John Bjornson
Director

ATTACH:3

APPENDIX A

# ATTENDANCE SHEET

Date: _12-05-23_   Committee: _Legislative Management_

PLEASE PRINT

| Name | Organization/City | E-mail Address |
|---|---|---|
| Scott Porsburg | Smith Porsberg Schweigert Armstrong Moldenhaer + Smith | |
| Brian Schmidt | Smith Porsburg Schweigert Armstrong Moldenhaer + Smith | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Testimony of Turtle Mountain Band of Chippewa Indians Chairman Jamie Azure
and Spirit Lake Nation Chairwoman Lonna Street
Before the North Dakota Legislative Assembly Legislative Management
Committee
December 5, 2023**

Chairman Lefor and members of the Legislative Management Committee, we are Jamie Azure, Chairman of the Turtle Mountain Band of Chippewa Indians, and Lonna Street, Chairwoman of the Spirit Lake Nation. We submit this testimony jointly on behalf of our respective Tribes. As you know, the United States District Court for the District of North Dakota recently found that the Legislative Assembly's 2021 redistricting plan violates the federal Voting Rights Act ("VRA") by unlawfully diluting the voting strength of Native American voters who live on and around the Turtle Mountain and Spirit Lake reservations. We submit testimony once again to respectfully request that the Legislature follow the law and fix its map to provide fair representation to the Native American voters living in Legislative Districts 9 and 15.

After conducting a trial, the District Court on November 17, 2023 found that the Legislature's "2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA." Judgment, 3:22-CV-00022-PDW-APS, ECF No. 126 at 2. The court permanently enjoined the Secretary of State from permitting any elections to take place in Districts 9 and 15

December 5, 2023 of Testimony of Chairman Jamie Azure and Chairwoman Lonna Street

until a legal map is in place. The Secretary of State and the Legislative Assembly have been given until December 22, 2023 to adopt a new map.

We were saddened to see that rather than seeking to correct the unlawful vote dilution being suffered by the Native American voters in districts 9 and 15, the Secretary of State announced he will be appealing the District Court's decision. Though seeming to lack a substantive argument that unlawful vote dilution is not occurring, it appears that the appeal will seek to have the case dismissed based on a procedural argument that the tribal member voters, and the Tribes on their behalf, do not have the authority to challenge violations of their own voting rights.

We hope the Secretary of State and the Legislative Assembly have considered that a prior unsuccessful motion to dismiss filed in the case already resolved the plaintiffs' right to sue on grounds that are unaffected by the Eighth Circuit's recent decision, which the Secretary has cited as the basis for his forthcoming appeal; but we hope more that the Legislature will decide to do the right thing for the Native American voters and who have only ever asked for one thing – that the Legislature simply follow the law.

On November 1, 2021, the Legislative Management Redistricting Committee ("Redistricting Committee") was notified by a letter from the Tribes that the Redistricting Committee's proposed redistricting plan, if enacted, would violate the VRA. A true and correct copy of the letter is attached to this testimony as

2

December 5, 2023 of Testimony of Chairman Jamie Azure and Chairwoman Lonna Street

Attachment 1. The letter included a detailed VRA election analysis and a proposed alternative map that would satisfy the VRA. The VRA analysis submitted by four North Dakota Tribes (Spirit Lake Nation, Turtle Mountain Band of Chippewa Indians, MHA Nation and Standing Rock Sioux Tribe) and tribal members throughout the redistricting process is the only known VRA analysis to have been reviewed by the Redistricting Committee. There is no evidence in the legislative record that the Legislature or the Redistricting Committee engaged a VRA expert to conduct its own analysis, which could have corroborated the Tribes' analysis and perhaps prevented this violation from occurring in the first place.

In fact, in the recent *Walen v. Burgum* case, in which the Mandan, Hidatsa and Arikara ("MHA") Nation intervened to defend Subdistrict 4A, the District Court relied on the abundant analysis and testimony supplied by the tribes in the legislative record in upholding the Subdistrict 4A as reasonably necessary to comply with the VRA.

Besides providing the Redistricting Committee with the VRA analysis and a proposed remedy map, the letter from the Tribes also put the Redistricting Committee on notice that its map "is illegally drawn and we believe will be struck down in court if it is adopted by the State Legislature." The Redistricting Committee and a majority of the Legislature failed to heed this warning. A proposed amendment

3

Appellate Case: 23-3697    Page: 160    Date Filed: 12/17/2023 Entry ID: 5345207

**December 5, 2023 of Testimony of Chairman Jamie Azure and Chairwoman Lonna Street**

to the Redistricting Committee's plan, which would have prevented this foreseeable

violation, was voted down by the Redistricting Committee and then by the Senate.

In review of the map proposed by the Tribes to the Legislature, as well as

another similar map proposed by the Tribes during the litigation, the District Court

found:

> The evidence at trial shows that the Tribes' proposed plans comport
> with traditional redistricting principles, including compactness,
> contiguity, respect for political boundaries, and keeping together
> communities of interest . . . Indeed, the evidence at trial demonstrated
> that the proposed districts did not appear more oddly shaped than other
> districts, and both proposed districts are reasonably compact. The
> proposed plans are also comparatively compact when viewed against
> other districts in the 2021 redistricting plan. (citations omitted).

Findings of Fact and Conclusions of Law, 3:22-CV-00022-PDW-APS, ECF No. 125

at 18-19. A true and correct copy of the map proposed by the Tribes in the District

Court is attached to this testimony combined as Attachment 2.

It was not too late to do the right thing when the Tribes brought their VRA

analysis to the Redistricting Committee in 2021, and it is not too late now to ensure

that the 2024 elections will respect the voting rights of Native Americans. As in

2021, we once again ask that the Legislature adopt a redistricting plan that complies

with the VRA and protects the right to vote of <u>all</u> voters.

Thank you for your consideration of this request.

4

ATTACHMENT 1

Appellate Case: 23-3697   Page: 162   Date Filed: 12/17/2023   Entry ID: 5345207

 

November 1, 2021

The Honorable Doug Burgum
Governor of the State of North Dakota
600 East Boulevard Ave.
Bismarck, ND 58505

The Honorable Joshua Boschee
Minority Leader
North Dakota House of Representatives
600 East Boulevard Ave.
Bismarck, ND 58505

The Honorable Kim Koppelman
Speaker
North Dakota House of Representatives
600 East Boulevard Ave.
Bismarck, ND 58505

The Honorable Rich Wardner
Majority Leader
North Dakota State Senate
600 East Boulevard Ave.
Bismarck, ND 58505

The Honorable Chet Pollert
Majority Leader
North Dakota House of Representatives
600 East Boulevard Ave.
Bismarck, ND 58505

The Honorable Joan Heckaman
Minority Leader
North Dakota State Senate
600 East Boulevard Ave.
Bismarck, ND 58505

Dear Governor Burgum, Speaker Koppelman, and Leaders Pollert, Boschee, Wardner and Heckaman:

On behalf of the Turtle Mountain Band of Chippewa Indians ("Turtle Mountain") and the Spirit Lake Nation ("Spirit Lake"), we write to express concerns with the proposed legislative map to be considered for approval by the State Legislature on November 8, and to respectfully request that our Tribal Nations be incorporated into the same legislative district.

Throughout the redistricting process, the Tribes of North Dakota made numerous requests to the Legislature's Redistricting Committee to hold redistricting hearings on and near reservations to allow tribal members an opportunity to be heard on how their state legislative representation will be guided for the next ten years. Those requests fell on deaf ears. Many of our tribal members lack the means to travel to Bismarck and were therefore shut out of the redistricting process. Also concerning was the Redistricting Committee's position that the Tribal and State Relations Committee could report back to it if any redistricting comments happened to be brought up during the Tribal and State Relations Committee meetings. That approach was wholly inadequate. Despite repeated requests, the only outreach from the

Attachment 1

Appellate Case: 23-3697     Page: 163     Date Filed: 12/17/2023 Entry ID: 5345207

Redistricting Committee was the e-mailing of a hearing notice to the Tribes with one day's notice. Of course, given the short notice, not all of the Tribes were able to make it to Bismarck to attend the hearing. Indeed, we as tribal leaders are governing in the middle of a pandemic with limited resources, and so one day's notice is far from sufficient.

At that redistricting hearing, representatives from the Spirit Lake Nation, Standing Rock Sioux Tribe, and Three Affiliated Tribes advocated for the creation of legislative subdistricts to improve their representation. Of these requests, only a subdistrict for the Three Affiliated Tribes reservation area was approved by the Redistricting Committee. The Committee, however, also decided to create subdistricts in the Turtle Mountain reservation area, even though no subdistricts were ever requested by Turtle Mountain to the Redistricting Committee.

As a result of the poor outreach to our Tribal Nations, despite our repeated requests, the Redistricting Committee's proposed District 9, containing the Turtle Mountain reservation, is illegally drawn and we believe will be struck down in court if it is adopted by the State Legislature. To remedy this situation, and to also allow the members of Turtle Mountain and Spirit Lake to be able to elect the representatives of their choice in accordance with federal law, we have developed a proposed district containing the Turtle Mountain and Spirit Lake reservations. (**Attached as Figure 1**).

Given that our Tribal communities together would be sufficiently large and geographically compact to form a majority-minority district, and given the racially polarized voting that exists when comparing our communities to the surrounding areas, our proposed district satisfies the Voting Rights Act, and would negate the need for a subdistrict. To illustrate, the below charts show the differences between Native American and non-Native American voting patterns in 2016 and 2020 state-wide elections for the precincts within the district we have proposed. Our Tribal communities have voted cohesively in favor of clearly identified Native American preferred candidates. On the other hand, the non-Native American voters have, without exception, overwhelmingly voted against the Native American candidate of choice.



Attachment 1

Appellate Case: 23-3697      Page: 164      Date Filed: 12/17/2023 Entry ID: 5345207

The disparity is even more severe when Native American candidates have run for office. In the 2016 election for the United States House of Representatives, a Native American candidate, Chase Iron Eyes, was preferred by an estimated 98 percent of Native American voters, but received only 21 percent of the vote from white voters. The vast majority of white voters rallied behind the eventual winner of the race, Kevin Cramer, who received only an estimated 2 percent of the Native American vote. A similar pattern is visible in the 2016 race for Insurance Commissioner, where an estimated 98 percent of Native American voters cast a ballot in favor of the Native American candidate, Ruth Buffalo, while being favored by only 28 percent of white voters.

Not only will adopting the district proposed by our Tribes allow the State of North Dakota to forgo costly litigation (which would likely result in the Redistricting Committee's map being overturned anyway), the proposed district can also be incorporated into the overall state-wide redistricting map very easily, with minimal impacts to the districts proposed by the Redistricting Committee for the rest of the state. We have taken the additional step of drawing a full state-wide map that incorporates our proposed district. (**Attached as Figure 2**). To illustrate this minimal impact, we have additionally provided a map that shows the lines of a proposed state-wide map that incorporates our proposed district, overlaid with the lines of the Redistricting Committee's proposed map. (**Attached as Figure 3**). As you can see, incorporation of our proposed district only creates small changes to the other districts proposed by the Redistricting Committee, and only in the northeast corner of the state.

We respectfully bring this request forward, not only as the leaders of sovereign Tribal Nations, but as fellow citizens of the State of North Dakota. All citizens deserve to have their voices heard and to be treated fairly and equally under the law. Our proposed district accomplishes this, which benefits our Tribes as well as the State of North Dakota and all of its citizens. We appreciate your thorough attention to this matter.


Sincerely,


Jamie Azure
Chairman
Turtle Mountain Band of Chippewa Indians

Douglas Yankton Sr.
Chairman
Spirit Lake Nation


Attachment 1

Figure 1 – Proposed District Including Spirit Lake and Turtle Mountain Reservations



| District | Population | Deviation | %Deviation | 18+ Native American Population | % 18+Native American Population |
|----------|-----------|-----------|------------|-------------------------------|--------------------------------|
| 9 | 17,341 | 765 | 4.62% | 7,887 | 69.06% |

Attachment 1

**Figure 2 – Proposed District as Incorporated Into State-Wide District Map**



Attachment 1

Appellate Case: 23-3697   Page: 167   Date Filed: 12/17/2023 Entry ID: 5345207

**Figure 3 – Our Proposed District as Incorporated into State-Wide Map (Dark Brown Lines), Overlaid with and the Redistricting Committee's Map (Green Lines)**



Attachment 1

Appellate Case: 23-3697    Page: 168    Date Filed: 12/17/2023 Entry ID: 5345207

ATTACHMENT 2

Appellate Case: 23-3697   Page: 169   Date Filed: 12/17/2023 Entry ID: 5345207

# ALTERNATIVE MAP PROPOSED
# BY THE TRIBES IN DISTRICT COURT
### District 9 Regional Map



Attachment 2



ALTERNATIVE MAP PROPOSED
BY THE TRIBES IN DISTRICT COURT

Statewide Map

Attachment 2

APPENDIX C

**Redistricting Committee Membership**

**House**

Rep. Mike Lefor                Vice Chairman
Rep. Craig Headland
Rep. Mike Nathe
Rep. Austen Schauer
Rep. Josh Boschee

**Senate**

Sen. Ron Sorvaag               Chairman
Sen. Brad Bekkedahl
Sen. Bob Erbele
Sen. Dick Dever
Sen. Kathy Hogan

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown<br><br>Plaintiffs,<br><br>vs.<br><br>Michael Howe in his official capacity as Secretary of State of North Dakota,<br><br>Defendant. | Case No. 3:22-cv-00022<br><br><br>**SECRETARY HOWE'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND REMEDIAL ORDER** |

**SECRETARY'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND**

In an effort to mitigate some of the disruption to North Dakota's 2024 election likely to follow from the Court's Order and Judgment (Dkt. Nos. 125 and 126), Plaintiffs have moved the Court to amend its remedial order to provide as follows:

(A) *If* the State does not adopt a remedial election plan by December 22 (through a duly enacted statute), *then* the Court will order Plaintiffs' Demonstrative Plan 1[1] into effect;

(B) *If* the State does adopt a remedial election plan by December 22 (through a duly enacted statute), *then* Plaintiffs' response to that plan will be due December 26, and the Secretary's reply will be due December 28 (and presumptively the Court would then issue an order on what plan will be given effect no later than December 31).

Dkt. No. 134 at 2-3.  Plaintiffs suggest "[d]oing so will resolve all *Purcell* and timing concerns raised by the Secretary in his stay motion."  *Id.* at 5.  But Plaintiffs are mistaken. The Secretary opposes Plaintiffs' motion to amend and responds as follows.

---

[1] Plaintiffs also say "if the Court wished to further minimize the changes to the enacted map," they "would also support the imposition of Plaintiffs' Demonstrative Plan 2."  Dkt. No. 134 at 5 n.4.

- 1 -

Appellate Case: 23-3697     Page: 173     Date Filed: 12/17/2023 Entry ID: 5345207

**(1) The Secretary and the State of North Dakota need finality on what map will be used for the 2024 election cycle no later than December 31, 2023**.

As addressed in significant detail in the Secretary's Motion for Stay of Judgment Pending Appeal (Dkt. No. 132 at 17-22), the State needs finality on what redistricting map will be used for the 2024 election cycle no later than December 31.  That is the deadline by which county commissioners are statutorily required to set precinct boundaries for the 2024 election.  Dkt. No. 132 at 21-22.[2] And that is the statutory date after which candidates can begin petitioning to be on the ballot in their respective districts. Dkt. No. 132 at 18-20.  Consequently, changing the redistricting plan after December 31 cannot be done without imposing significant cost, hardship, confusion, and unfairness for voters, candidates, and election administrators alike.  *Contra Purcell v. Gonzales*, 549 U.S. 1 (2006).  Plaintiffs' motion to amend does not appear to dispute that December 31 is an important cut-off date for fixing the 2024 election map with finality.

For that reason, the Secretary reiterates that whatever may be decided on appeal regarding the merits of his challenge to this Court's judgment, the State needs final resolution on what redistricting plan will be used for the 2024 election cycle no later than December 31, 2023.  *Cf. Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (even if a State's redistricting is ultimately held unlawful, when "a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case"); *Upham v. Seamon*, 456 U.S. 37, 44 (1982) (even if it is determined on appeal that a district court improperly struck down a State's redistricting plan and imposed its own remedial plan, the realities of administering the election may require "allow[ing] the election to go forward in accordance with the [improper court-imposed] schedule.").

_____

[2] Though as a practical matter, the county commissioners will need to know what map will be utilized for the 2024 election cycle prior to that December 31 deadline, as the precinct boundaries must be set through properly noticed public meetings.  *See* Dkt. No. 132 at 21.

**(2) The State's right to receive meaningful appellate review, and the requirement that Federal courts provide State legislatures a reasonable opportunity to adopt a remedial plan before imposing one by judicial decree, mean the legislatively enacted map should stay in place through the 2024 election cycle.**

As addressed in the Secretary's Motion for Stay of Judgment Pending Appeal (Dkt. No. 132 at 6-12), the Secretary has a sound legal basis to seek appellate review of this Court's finding that 42 U.S.C. § 1983 provides a private right of action for claims arising under Section 2 of the Voting Rights Act (VRA).  The basis for appeal is a recent decision from the Eighth Circuit— issued *after* this Court made its finding—holding that Section 2 of the VRA does not create a private right of action, because the statute's plain text "intended to place enforcement in the hands of the [Attorney General], rather than private parties."  *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, —F.4th—, 2023 WL 8011300, *5 (8th Cir. Nov. 20, 2023) (citation omitted).  That decision casts serious doubt as to whether the Plaintiffs in this action ever had a private right of action to enforce Section 2 of the VRA under Section 1983.[3]  Plaintiffs will no doubt argue the Eighth Circuit's holding doesn't control in this case.  Ultimately the appellate courts may find those arguments right, or they may find them wrong.  But it is undeniable the Eighth Circuit's recent holding makes that a serious question in need of resolution, and the Secretary therefore has a sound basis for seeking appellate review.

"[T]he public has a strong interest in the appeal right as one component of the constitutional right to due process in enforcement of the nation's laws."  *Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) (citation omitted).  That is especially true where, as here, a federal court's imposition of its own redistricting plan "represents a serious intrusion on the most vital of

---

[3] Notably, after acknowledging that pleading failures are occasionally excused, the Eighth Circuit rejected consideration of the Section 1983 argument in that case and modified the district court's judgment to dismiss the action with prejudice.  *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *12.  If the Eighth Circuit believed Section 1983 provided a private right of action to allege Section 2 violations, it likely would not have denied the opportunity to assert the argument.

local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citation omitted); *see also, e.g., Chapman v. Meier,* 420 U.S. 1, 27 (1975) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court"). Indeed, this Court itself has recognized that when it comes to enjoining State election plans, it is required "to weigh the opportunity for appellate review." *Walen v. Burgum*, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (citing *Purcell*, 549 U.S. at 5).

However, and unfortunately, the timing of this Court's judgment makes it impossible for the Secretary to receive meaningful appellate review before the December 31 deadline by which a final plan must be locked in place.  The Secretary timely filed its notice of appeal shortly after this Court's final judgment, and the Eighth Circuit has scheduled the appellant's merit brief for January 25, 2024, with the appellees' brief due 30 days after the appellants' brief, and a reply brief and oral argument to be scheduled thereafter.  *See* Docket No. 23-3655 (8th Cir.).  Even if the Secretary and Plaintiffs were to agree to seek expedited argument of the merits on appeal, it is exceptionally unlikely that the Eighth Circuit would be able to hear argument and render a judgment on the merits of the appeal before the December 31 deadline for finalizing the election map (and even if it could, such an accelerated schedule would risk depriving that court of the opportunity for a deliberative review commensurate with the importance of the issue raised).

The timing of the Court's judgment has thus made it impossible for the Secretary to receive meaningful appellate review before the December 31 deadline, and the State's duly enacted legislative map should be left in place for the 2024 election cycle while the Secretary's appeal goes forward in the appellate courts.  *Cf. Riley v. Kennedy*, 553 U.S. 406, 426 (2008) ("practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges").  Moreover, as noted in the Secretary's Motion for Stay of Judgment Pending Appeal

Appellate Case: 23-3697     Page: 176     Date Filed: 12/17/2023 Entry ID: 5345207

(Dkt. No. 132 at 13), the State has already held the November 2022 election using the legislatively enacted plan while this litigation played out in the District Court, and it should continue being allowed to use that legislatively enacted plan while this litigation plays out on appeal.  In light of this, the Court should not grant Plaintiffs' motion to impose a remedial map until the appellate courts are able to address the viability of the Plaintiffs' claim.

 Furthermore, as addressed in the Secretary's Motion for Stay of Judgment Pending Appeal (Dkt. No. 132 at 16-17), the Secretary respectfully maintains that the Court's order (with or without Plaintiffs' proposed amendments) does not afford the State Legislative Assembly a "reasonable opportunity" to adopt a remedial plan before the December 31 deadline by which the plan must fixed with finality for the 2024 election cycle.  *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).  In North Dakota, the authority to establish redistricting plans lies with the Legislative Assembly— not with the Secretary of State.  *See* N.D. Const., art. IV, § 2.  And the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt."  *Wise*, 437 at 539.

As Plaintiffs note in their motion, the Legislative Assembly has responded to this Court's order by taking action to appoint an interim redistricting committee and retain a redistricting expert for preparing a remedial plan.  Dkt. No. 134 at 2 n.1.  However, the timing of the Court's order does not give the Legislative Assembly a reasonable chance to respond to the Court's judgment with a remedial plan before the December 31 cut-off by which a final plan must be in place.  That factor further weighs against imposing one of Plaintiffs' Demonstrative Plans and weighs in favor of granting the Secretary's motion for a stay of judgment through the 2024 election cycle, which would allow the Legislative Assembly a reasonable opportunity to adopt a remedial plan before one is imposed by a Federal court.

Appellate Case: 23-3697   Page: 177   Date Filed: 12/17/2023 Entry ID: 5345207

For those reasons, the Secretary has asked this Court to stay its judgment pending appeal and allow the State to continue using its legislatively enacted plan for the 2024 election cycle.  Dkt. No. 132.  The Secretary has also respectfully asked this Court for its decision on that stay motion no later than December 12, 2023, so that if this Court declines to grant a stay the Secretary has time to seek a stay from the Eighth Circuit before the December 31 deadline.  Plaintiffs' motion to amend, however, seeks to short circuit those stay requests and have this Court judicially impose a redistricting plan on the State of North Dakota before the stay motions have been resolved.

**CONCLUSION**

For the reasons set forth, the State has a right to receive meaningful appellate review of this Court's judgment before its duly enacted redistricting plan is invalidated, but the timing of this Court's judgment makes it impossible to receive meaningful appellate review before the December 31 deadline by which the plan must be set with finality for the 2024 election cycle.  The Legislative Assembly should also be given a reasonable opportunity to adopt a remedial plan before the Federal courts impose one.  The Secretary therefore maintains that a stay of this Court's judgment pending appeal and through the 2024 election cycle is appropriate and warranted, and on that basis the Secretary opposes Plaintiffs' motion to amend the remedial order to impose Demonstrative Plan 1 (or Demonstrative Plan 2).

Dated this 8th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By:   */s/ David R. Phillips*
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247

- 6 -

Bismarck, ND 58502-4247
Telephone: (701) 751-8188

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Defendant Michael Howe, in his
official capacity as Secretary of State of
North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **SECRETARY HOWE'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND REMEDIAL ORDER** was on the 8th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC

- 7 -

PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Phil Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg
Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630
sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice

- 8 -

950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By: /s/ David R. Phillips
DAVID R. PHILLIPS

- 9 -

App162

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA IN-DIANS, et al.,<br><br>                                         Plaintiffs,<br><br>        v.<br><br>MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota, et al.,<br><br>                                         Defendant. | Civil No. 3:22-cv-00022-PDW-ARS |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
## FOR STAY OF JUDGMENT PENDING APPEAL

The Secretary does not contend that he is entitled to a stay because of any error in this Court's ruling that North Dakota's legislative map violates the rights of Native American voters under Section 2 of the Voting Rights Act ("VRA"). Indeed his 25-page stay motion never mentions the merits of this case. Rather, the Secretary contends that § 1983—which Congress enacted pursuant to its Fourteenth Amendment enforcement power for the primary purpose of providing a cause of action for Reconstruction Amendment enforcement statutes—somehow does not apply to the Voting Rights Act, Congress's most significant such law. No court anywhere has ever reached such a radical and illogical conclusion. Even those litigants and dissenting justices who have resisted the expansion of § 1983 have done so by arguing that it *only* provides a cause of action for Reconstruction Amendment enforcement laws, such as the Voting Rights Act. Adopting the Secretary's position would turn § 1983 jurisprudence on its head.

The Secretary also contends that *Purcell* concerns warrant a stay, but those concerns are resolved if the Court grants Plaintiffs' pending motion to modify the remedial order in this case to

1

ensure that a remedial plan is in place by December 31. The Supreme Court has held that when a district court relies upon a defendant's assertion of the date upon which a Section 2 remedial map must be finalized, the court of appeals cannot issue a stay based upon *Purcell*. *See Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (Mem.) (granting application to vacate Eleventh Circuit's stay issued based upon *Purcell* concerns where the defendant "could not fairly have advanced" a *Purcell* argument because the district court finalized relief by the date suggested by the defendant).

The equities in this case plainly support enforcing the Court's injunction and remedial order while the Secretary pursues his novel theory—unrelated to the merits of the case—on appeal.

## LEGAL STANDARD

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 566 U.S. 418, 433-34 (2009). In evaluating whether the party seeking the stay has met its burden, Courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434. While courts must balance the relative strength of all four factors, "[t]he most important factor is the [applicant's] likelihood of success on the merits." *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011); *see also Nken*, 556 U.S. at 434.

## ARGUMENT

The Secretary cannot meet his burden under *Nken* to demonstrate that a stay is warranted. To begin, the Secretary has waived any argument that he is likely to succeed on the merits of Plaintiffs' Section 2 claim—his stay motion is based solely on § 1983. And he has no likelihood of success on that front. Section 1983's primary purpose was to provide a cause of action for

Appellate Case: 23-3697     Page: 183     Date Filed: 12/17/2023 Entry ID: 5345207

statutes, like Section 2, that enforce the Fourteenth and Fifteenth Amendments. The Secretary's invocation of the *Gonzaga* framework, which is used to determine whether § 1983 applies to Spending Clause statutes, is misplaced. But even if the *Gonzaga* framework applied, Section 2 plainly meets it. The Secretary cannot show that the equities favor a stay when he is not even seeking a stay based upon any claimed error in the Court's Section 2 ruling. Regardless of *who* can sue, this Court has declared that the map violates the VRA; the parties and the public interest favor enforcing the Court's injunction while the Secretary advances his novel appellate theory. Finally, any *Purcell* issue is eliminated by the Court granting Plaintiffs' pending motion to modify the remedial order. For that reason, the Court need not consider the Secretary's suggestion that it apply the heightened stay standard suggested by Justice Kavanaugh, which is not only contrary to *Nken*—which is the binding Supreme Court precedent on point—but is in any event inapplicable where *Purcell* concerns do not exist.

I.   **The Secretary has waived any argument that he is likely to succeed on the merits of Plaintiffs' Section 2 claim.**

The Secretary does not address the underlying merits of the Court's ruling that Districts 9, 15, 9A, and 9B discriminate against Native American voters in his application for a stay. As such, the Secretary should be precluded from making any future argument that a stay is justified because he is likely to prevail on appeal on the underlying merits of Plaintiffs' Section 2 claim. *Cf. Akeyo v. O'Hanlon,* 75 F.3d 370, 374 (8th Cir. 1996) ("As a general rule, we do not address arguments raised for the first time in a reply brief and there are no reasons in this case to depart from this rule").

## II.    The Secretary is not likely to succeed on his novel theory that Plaintiffs lack a cause of action for Section 2 claims under § 1983.[1]

### A.    Section 1983 provides a cause of action to enforce statutes, like the Voting Rights Act, enacted pursuant to Congress's Fourteenth and Fifteenth Amendment enforcement powers.

The Civil Rights Act of 1871 provides a cause of action for the redress of violations of federal rights committed by state actors. *See* 42 U.S.C. § 1983; *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 175 (2023) ("That is, any person within the jurisdiction of the United States may invoke this cause of action against any other person who, acting 'under color of' state law, has deprived them of 'any rights, privileges, or immunities secured by the Constitution and laws of the United States.'"); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).

Specifically, § 1983 provides a cause of action to enforce a statute, like the VRA, enacted pursuant to Congress's Fourteenth and Fifteenth Amendment enforcement powers. Such a statute necessarily prohibits state officials from "subject[ing] any citizen of the United States . . . to the deprivation of [] rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983, because those are precisely the harms the statute proscribes. *See* U.S. Const. amend. XIV, § 3 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws."); *id.* § 5 ("The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."); U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of

---

[1]    Plaintiffs preserve for subsequent appellate review their contention that the Eighth Circuit wrongly decided that Section 2 contains no implied private right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, ___ F. 4th ___, No. 22-1395, 2023 WL 8011300 (8th Cir. Nov. 20, 2023).

4

race, color, or previous condition of servitude."); *id.* § 2 ("The Congress shall have the power to enforce this article by appropriate legislation.").

The Secretary's reliance on the test developed in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), to support his argument is misplaced. *Gonzaga*'s test is aimed at ensuring that courts do not proliferate § 1983 enforcement for statutes enacted pursuant to Congress's spending power. It does not apply to determining whether Reconstruction Amendment enforcement statutes—which are expressly authorized by the Constitution to regulate State conduct—fall within § 1983's ambit. Section 1983 was *itself* enacted pursuant to Congress's Fourteenth Amendment enforcement power with a "principal purpose" to "ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Thiboutot*, 448 U.S. at 7 (internal quotation marks omitted). It therefore necessarily applies to Reconstruction Amendment statutes unless expressly exempted by the statutory text.

Section 1983 was originally enacted by the Reconstruction Congress as § 1 of the Civil Rights Act of 1871, also known as the Ku Klux Klan Act. It was enacted "to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." Act of Apr. 20, 1871, 17 Stat. 13. In 1874, the statute was amended to afford a cause of action to enforce not just rights secured by the *Constitution*, but by the "laws" as well. *Thiboutot*, 448 U.S. at 6-7. As the Supreme Court explained in *Thiboutot*, "a principal purpose of the added language was to 'ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Id.* at 7. Indeed, in the same 1874 amendments, Congress revised the accompanying jurisdictional statute—which today is codified at 28 U.S.C. § 1343(3)—to apply to "deprivations of rights secured by 'the Constitution of the United States or of any right secured by any law providing for equal rights.'" *Thiboutot*, 448 U.S.

Appellate Case: 23-3697     Page: 186     Date Filed: 12/17/2023 Entry ID: 5345207

at 8. In 1957, Congress amended § 1343 again by adding subsection (4), which grants federal court jurisdiction over claims "[t]o secure damages or secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." P.L. 85-315 (Sept. 9, 1957), 71 Stat. 637 (codified as 28 U.S.C. § 1343(4)).

In *Thiboutot*, the Court rejected the petitioners' argument that "the phrase 'and laws' [in § 1983] should be read as *limited* to civil rights or equal protections laws." 448 U.S. at 6 (emphasis added). Although the Court acknowledged that extending § 1983 to laws securing civil rights and equal protection was "a principal purpose" of Congress, the Court reasoned that there were "other purpose[s]" too, permitting a broader interpretation of the statute's reach. *Id.* at 7. The Court thus held that "the plain language of the statute undoubtedly embraces" claims asserting violations of the Social Security Act. *Id.* at *4. Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, dissented and would have held that § 1983 only provides a cause of action for statutes "providing for the equal rights of citizens" *Id.* at *21-22 (Powell, J., dissenting).

Following *Thiboutot*, the Court has cautioned that although § 1983 may provide a cause of action for statutes enacted pursuant to the Constitution's Spending Clause, greater hesitancy is required in that context. In *Pennhurst State School & Hospital v. Halderman*, the Court explained that "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." 451 U.S. 1, 28 (1981). In *Gonzaga*, the Court considered whether the Family Educational Rights and Privacy Act ("FERPA"), which was enacted pursuant to Congress's spending power, could be enforced through § 1983. 536 U.S. at 276. In concluding that § 1983 did not apply to FERPA, the Court cited *Pennhurst* and explained that "[w]e made clear that unless Congress 'speak[s] with a clear

6

Appellate Case: 23-3697      Page: 187      Date Filed: 12/17/2023 Entry ID: 5345207

voice,' and manifests an 'unambiguous' intent to confer individual rights, *federal funding provisions* provide no basis for private enforcement by § 1983." *Id.* at 280 (quoting *Pennhurst*, 451 U.S. at 17, 28, & n.21) (second bracket in original) (emphasis added). Where Congress does provide a clear intent to confer individual rights in spending power statutes, the *Gonzaga* Court held, § 1983 presumptively applies unless Congress expressly said otherwise or if it impliedly did by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 285.

In June of this year, the Court issued its most recent § 1983 decision. In *Talevski*, the Court addressed whether portions of the Federal Nursing Home Reform Act ("FNHRA")—enacted pursuant to the Spending Clause—were enforceable via § 1983. 599 U.S. at 171. The Court first rejected petitioners' invitation to overrule *Thiboutot* and hold that spending power statutes are categorically ineligible for § 1983 coverage. *Id.* at 180. The Court then noted that "[f]or Spending Clause legislation in particular," it will be the "atypical" statute that will "'unambiguously confe[r]' individual rights, making those rights 'presumptively enforceable' under § 1983." *Id.* at 183. The Court held that the FNHRA provisions at issue cleared that hurdle and were enforceable under § 1983. *Id.* at 191.

Justice Barrett, joined by Chief Justice Roberts, concurred in *Talevski*, explaining that "*Gonzaga* sets the standard for determining when a *Spending Clause* statute confers individual rights," *id.* at 193 (Barrett, J., concurring) (emphasis added), and that "[c]ourts must tread carefully before concluding that Spending Clause statutes may be enforced through § 1983," *id.* at 195. In dissent, Justice Thomas noted that § 1983 was more appropriately "confined to laws enacted under Congress' Reconstruction Amendments enforcement powers." *Id.* at 225 n.12 (Thomas, J., dissenting).

App169

As the statutory history and caselaw surrounding § 1983 demonstrate, it is universally accepted that statutes enacted to enforce the Fourteenth and Fifteenth Amendments are enforceable through § 1983; even the justices who have dissented from Supreme Court's § 1983 cases have reasoned that it provides a cause of action for civil rights statutes enacted to enforce the Reconstruction Amendments. Indeed, § 1983 *itself* was enacted pursuant to Congress's Fourteenth Amendment enforcement power, and its "principal purpose" was to "ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Thiboutot*, 448 U.S. at 7. Congress enacted Section 2 of the VRA pursuant to its Fourteenth and Fifteenth Amendment enforcement powers. *See* Pub. L. 89-110, Aug. 6, 1965, 79 Stat. 437 ("An Act . . . [t]o enforce the fifteenth amendment of the Constitution of the United States . . . ."); S. Rep. No. 97-417, at 27, 39 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 205, 217 (explaining that Section 2 is enacted pursuant to both Fourteenth and Fifteenth Amendment enforcement powers). Its plain-text purpose is to guarantee "equality of rights." *Thiboutot*, 448 U.S. at 7; *see* 52 U.S.C. § 10301(b) (providing that a violation occurs where political process is not "equally open to participation").

Section 2 enforces the voting guarantees of the Fourteenth and Fifteenth Amendments even though it proscribes discriminatory *effects* in redistricting, not just discriminatory *intent*. "When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 [of the Fourteenth Amendment] authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004). "Congress's § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000); *see also Lane*, 541 U.S. at 520 (explaining that

Appellate Case: 23-3697     Page: 189     Date Filed: 12/17/2023 Entry ID: 5345207

Congress may enforce the Fourteenth and Fifteenth Amendments by "prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Id.* (quoting *Kimel*, 528 U.S. at 81)). Congress's 1874 amendment of § 1983 had as its primary purpose providing a cause of action for such statutes so that the full scope of Congress's Fourteenth and Fifteenth Amendment enforcement powers would be subject to § 1983 causes of action, not just conduct that violated the amendments themselves. *See Thiboutot*, 448 U.S. at 7.[2]

Because Fourteenth and Fifteenth Amendment enforcement statutes—like Section 2 of the VRA—sit at the center of Congress's purpose in enacting § 1983, those statutes must be held enforceable by § 1983 absent an express indication that Congress chose otherwise. Nothing in Section 2 removes it from § 1983's ambit. Indeed, a contrary conclusion would be absurd. It would defy reason to conclude that Congress meant for a statute enacted pursuant to its Fourteenth Amendment enforcement power—§ 1983—to be unavailable to enforce a statute enacted pursuant to its Fourteenth and Fifteenth Amendment enforcement powers—Section 2 of the VRA—while simultaneously concluding that a spending power nursing home statute *is* enforceable by § 1983. That would turn § 1983 on its head.

The Secretary's reliance on the *Gonzaga* framework to contend that Section 2 is not enforceable under § 1983 is thus misplaced; "*Gonzaga* sets the standard for determining when a *Spending Clause* statute confers individual rights," *Talevski*, 599 U.S. at 193 (Barrett, J.,

---

[2]     The Eighth Circuit addressed this issue in dicta in *Arkansas State Conference NAACP*, noting that "§ 2 reflects an effort by *Congress* 'to enforce' the Fourteenth and Fifteenth Amendments," but observing that this "issue is not free from doubt." 2008 WL 8011300, at *7 n.3 (emphasis in original). The court did not explain what that doubt could be; there is none. The Supreme Court's rulings leave no doubt whatsoever on this question. Prophylactic enforcement statutes prohibiting discriminatory effects enacted under Congress's enforcement power "carry out the basic objectives of the Equal Protection Clause." *Lane*, 541 U.S. at 520.

concurring) (emphasis added), not whether § 1983 applies to Fourteenth and Fifteenth Amendment enforcement statutes.[3]

### B.      Section 2 of the VRA confers individual rights enforceable under § 1983.

Even assuming that the *Gonzaga* test applies here—it does not—the test is easily satisfied. Under *Gonzaga*, when analyzing whether Spending Clause statutes create a private right that can be enforced through § 1983, a court must first "determine whether Congress intended to create a federal right" in the statute that a plaintiff seeks to enforce. *Gonzaga*, 536 U.S. at 283 (emphasis in original). If a statutory provision surmounts this hurdle, "§ 1983 can presumptively be used to enforce" those rights. *Talevski*, 599 U.S. at 172, 184.

### 1.      Section 2 of the VRA is a rights-creating statute.

To determine whether Spending Clause statutes confer individual rights enforceable under § 1983, courts "employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Talevski*, 599 U.S. at 183–84. The Supreme Court recently confirmed that the test is satisfied where the provision in question is "phrased in terms of the persons benefited" and contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class." *Id*.

Section 2 of the Voting Rights Act contains distinctly rights-creating language. It protects the "right of any citizen . . . to vote" free from racial discrimination. 52 U.S.C. § 10301(a); *see*

---

[3]      Circuit courts have likewise noted that *Gonzaga* is aimed at Spending Clause statutes. *See, e.g.*, *Colon-Marrero v. Velez*, 813 F.3d 1, 19 (1st Cir. 2016) (concluding that it was "noteworthy" that Help America Vote Act was enacted pursuant to the Elections Clause, which provides more specific authority than Spending Clause); *Qwest Corp. v. City of Santa Fe, N.M.*, 380 F.3d 1258, 1265 n.2 (10th Cir. 2004) (noting that *Gonzaga* addressed Spending Clause legislation where the Court is reluctant to infer congressional intent to create privately enforceable federal rights).

10

*also Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (recognizing that Section 2 "grants [individual citizens] a right to be free from" voting discrimination). It explicitly refers to a citizen's "right" and is "phrased in terms of the person benefitted"—the main criteria for whether a statute contains rights-creating language. *See Talevski*, 599 U.S. at 183-84; *Gonzaga*, 536 U.S. at 284; *Osher v. City of St. Louis, Mo.*, 903 F.3d 698, 702–03 (8th Cir. 2018). In focusing on the "individuals protected," Section 2's "right of any citizen" language creates an "implication of an intent to confer rights on a particular class of persons," *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (citation omitted). *See also Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 302 (3d Cir. 2007) ("With an explicit reference to a right and a focus on the individual protected, this language suffices to demonstrate Congress's intent to create a personal right."). Section 2 also identifies the "class of beneficiaries," *Talevski*, 599 U.S. at 183, to which plaintiffs belongs—individuals denied the right to vote "on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b)." 52 U.S.C. § 10301(a). Section 2 goes on to provide that a violation is established if political processes are not equally open to "members of a class of citizens" so protected. 52 U.S.C. § 10301(b). This is exactly the type of "rights-creating," individual-centric language with an "unmistakable focus on the benefited class" the Supreme Court has referred to. *Talevski*, 599 U.S. at 183.[4]

The Eighth Circuit acknowledged this in *Arkansas State Conference NAACP*, citing this same language and noting that it "unmistakabl[y] focus[es] on the benefited class": those subject

---

[4]     In this regard, Section 2 parallels Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d—a statute the Supreme Court has pointed to as an exemplar of "rights-creating" language. *Sandoval*, 532 U.S. at 288–89; *League of United Latin Am. Citizens v. Abbott*, 2021 WL 5762035, at *1 & n.1 (W.D. Tex. 2021) ("*LULAC* II") (noting that § 601 of Title VI "seems to mirror Section 2" of the VRA).

11

to discrimination in voting." 2023 WI 8011300, at *4 (brackets in original). But in *dicta*,[5] the court

noted that the opening sentence of Section 2(a) "focuses on what states and political subdivisions

cannot do, which is "impose[] or apply[y]" discriminatory voting laws." *Id.* (brackets in original).

For this reason, the Eighth Circuit observed that "[i]t is unclear whether § 2 creates an individual

right," *id.* at *3, because "[i]t is unclear what to do when a statute focuses on both" individual

rights and what "states and political subdivisions cannot do," *id.* at *4.[6]

But the Supreme Court expressly answered that precise question in the context of § 1983

in *Talevski*. The petitioners in *Talevski* contended that FNHRA did not create individual rights

because it "establish[es] who it is that must respect and honor these statutory rights; namely, the

Medicaid-participant nursing homes in which these residents reside." 599 U.S. at 185. The Su-

preme Court rejected the argument, reasoning "that is not a material diversion from the necessary

focus on the nursing home residents" and that "it would be strange to hold that a statutory provision

fails to secure rights simply because it considers, alongside the rights bearers, the actors that might

threaten those rights (and we have never so held)." *Id.* The Court emphasized the point with an

example: "[t]he Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because

it directs state actors not to deny equal protection." *Id.* at 185 n.12. *Talevski* controls the § 1983

analysis in this regard.

For decades, "[b]oth the Federal Government and individuals have sued to enforce § 2,"

seeking injunctive relief "in appropriate cases to block voting laws from going into effect." *Shelby

Cnty.*, 570 U.S. at 537. Since 1982, more than 400 Section 2 cases have been litigated in federal

---

[5]     The Eighth Circuit's discussion of whether Section 2 creates an individual right is *dicta*
because the court did not base its holding on the presence of an individual right. *See Ark. State
Conf. NAACP*, 2023 WL 8011300, at *4, *see Boaz v. United States*, 884 F.3d 808, 810 (8th Cir.
2018) (explaining that statements not necessary to the court's holding are *dicta*).

[6]     The Secretary does not rely on this *dictum* in his stay motion.

court. And private plaintiffs have been the primary driver of Section 2 litigation.[7] The Supreme Court has heard at least 11 Section 2 cases since 1982 in which private plaintiffs have participated.[8] Over the past forty years, there have been at least 182 successful Section 2 cases; of those 182 cases, only 15 were brought solely by the Attorney General.[9]

Section 2 of the VRA unambiguously conferred individual rights on the Plaintiffs here.

### 2. Section 2 does not create "aggregate rights."

The Secretary contends that although Section 2(a) "appears, on a glance, to describe individual rights," it actually "only confers rights on minority groups in the ***aggregate.***" Doc. 132 at 8 (emphasis in original). This is so, the Secretary contends, because Section 2(b) provides that a violation of Section 2(a) occurs when elections are not "equally open to participation by ***members of a class of citizens*** protected by subsection (a)." Doc. 132 at 9 (emphasis in original). According to the Secretary, "Congress's addition to the language in subsection (b) thus starkly de-individualized the Section 2 right." Doc. 132 at 9.

---

[7]    *See* Ellen D. Katz et al., Section 2 Cases Database, Univ. of Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu/database (hereinafter "Katz Study") (VRI_Dataset_2021.12.31 listing 439 electronically-reported cases with judicial decisions between 1982 and 2021 addressing a substantive Section 2 claim).

[8]    *See e.g., Brnovich*, 141 S. Ct. 2321; *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Bartlett v. Strickland*, 556 U.S. 1 (2009); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC* I"); *Holder v. Hall*, 512 U.S. 874 (1994); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Growe v. Emison*, 507 U.S. 25 (1993); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Houston Lawyers' Ass'n v. Attorney General of Tex.*, 501 U.S. 419 (1991); *Chisom*, 501 U.S. 380; *Thornburg v. Gingles*, 478 UK.S. 30 (1986).

[9]    *See* Katz Study, supra note 7, at Codebook, https://voting.law.umich.edu/wp-content/uploads/2022/02/VRI_Codebook.pdf (defining successful cases as those where "the ultimate outcome of the lawsuit was that a plaintiff achieved success on the merits by proving a violation of the VRA," or where "a positive real-world outcome could be determined from the opinions reviewed, e.g. a consent decree or a positive settlement").

Appellate Case: 23-3697     Page: 194     Date Filed: 12/17/2023 Entry ID: 5345207

The Court need not spend much time on this argument, because the Supreme Court has expressly rejected it. In *Shaw v. Hunt*, the Supreme Court rejected the argument that a Section 2 violation that is "proved for a particular area" of a state could be remedied by drawing a minority opportunity district elsewhere in the state, because Section 2 creates individual, not group, rights. 517 U.S. 899, 917 (1996).

> Arguing . . . that the State may draw the district anywhere derives from a misconception of the vote-dilution claim. To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not. *See* § 1973[10] ("the right of any citizen.").

*Id.*

That suffices to defeat the Secretary's argument. But even if the Supreme Court had not already rejected the Secretary's position, it would still fail because the Secretary misapprehends *Gonzaga*'s caution about statutes that have an "aggregate focus" to assert that the phrase means something that it does not. *Id*. at 9-10. By cherry picking language, the Secretary asserts that "rights must be individual, not aggregate." Doc. 132 at 8 (citing Gonzaga, 536 at 275; *Id*. at 10 (citing *Midwest Foster Care & Adoptions Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013). But the Supreme Court recently confirmed that Spending Clause statutes that create federal rights must have an "unmistakable focus on the benefited class." *Talevski*, 599 U.S. at 183; *Gonzaga*, 536 U.S. at 284 (courts look at whether statute by its terms grants rights to "any identifiable class."). Thus, to create a right in the first instance, the statute must have some aggregate "benefit" or "identifiable" class in mind. Contrary to the Secretary's assertion, when courts discuss this aggregate focus question, it is not a dichotomy of individual rights against "aggregate minority group" rights, as the Secretary promotes. *Id*. at 9. Rather, it is a question about whether a given statute has a focus

---

[10]     Section 2 was recodified after *Hunt* from 42 U.S.C. § 1973 to 52 U.S.C. § 10301.

Appellate Case: 23-3697     Page: 195     Date Filed: 12/17/2023 Entry ID: 5345207

on "aggregate services that are provided through spending clause legislation" as opposed to individual rights. *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1196 (8th Cir. 2013).

Moreover, if the Secretary's "aggregate right" theory were correct, then any member of the minority group would have standing to sue. But "[i]n vote dilution cases, the harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Anne Harding v. County of Dallas, Tex.*, 948 F.3d 302, 307 (5th Cir. 2020); *see also Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (holding that plaintiff lacked standing under Section 2 because he did not allege that his "right to vote has been infringed because of his race"). And no one questions that Section 2 prohibits intentional discrimination as well as discriminatory effects. *See, e.g. Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016). For example, if a poll worker were to explicitly deny an individual the right to vote because they were American Indian or because their great grandfather was an American Indian, a successful Section 2 claim could be brought to vindicate that individual's Section 2 and Constitutional rights. *See, e.g., Guinn v. United States*, 238 U.S. 347, 360–365 (1915) (grandfather clause); *Myers v. Anderson*, 238 U.S. 368, 379–380 (1915) (same). The Secretary's position is incompatible with this accepted law.

### C. The Secretary has failed to show that enforcement of Section 2 under § 1983 is incompatible with the VRA's enforcement scheme.

"By its terms, § 1983 is available to enforce every right that Congress validly and unambiguously creates." *Talevski*, 599 U.S. at 192. Under the Court's Spending Clause analysis, once it is established that a statute protects individual rights, defendants cannot rebut the presumption that § 1983 provides a cause of action to enforce those rights unless they "demonstrate[] that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the

Appellate Case: 23-3697     Page: 196     Date Filed: 12/17/2023   Entry ID: 5345207

statute itself" or "[2] impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Gonzaga*, 536 U.S. at 285 n.4 (quotation marks omitted); *see Talevski*, 599 U.S. at 186.

The Secretary does not contend that Congress expressly shut the door to private enforcement of Section 2 of the VRA under § 1983. As such, the Secretary must demonstrate that Congress impliedly foreclosed enforcement under § 1983 by creating a "comprehensive enforcement scheme *that is incompatible* with individual enforcement under § 1983." *Talevski*, 599 U.S. at 186 (emphasis in original) (internal citations and quotation marks omitted). But the Secretary merely contends that "Section 12 of the Voting Rights Act provides a comprehensive scheme to enforce Section 2 by the Attorney General" and therefore that private enforcement under § 1983 is precluded. Doc. 132 at 11. The Secretary fails to demonstrate that private enforcement of Section 2 claims under § 1983 would be "incompatible" with public enforcement of those claims by the Attorney General under Section 12. This is fatal to the Secretary's claim. *See*, *e.g., Talevski*, 599 U.S at 188 ("HHC's single-minded focus on comprehensiveness mistakes the shadow for the substance"); *see also*, *id.* at 188-89 ("§ 1983 can play its textually prescribed role as a vehicle for enforcing [statutory] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork."); *id.* at 187 (noting Court has described inquiry as whether § 1983 enforcement would be "incompatible," "inconsistent," or "thwar[t]" statutory enforcement scheme (bracket in original)).

The Secretary appears to suggest that because Section 2 lacks any express private right of action, Congress impliedly precluded private enforcement under § 1983. But this gets the Supreme Court's holdings backwards. The Court has found implicit preclusion of a cause of action under § 1983 in just three cases and has done so *only* where the rights-creating statute contains an express

16

private right of action. *See Talevski*, 599 U.S. at 189 (finding that the "incompatibility evinced in our three prior cases finding implicit conclusion" turned on the fact that each statute had "a dedicated right of action" for private parties). Thus, the fact that Section 2 lacks an express private right of action confirms that Congress did *not* intend to preclude enforcement under § 1983. *Cf. City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("[T]he existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not."); *see also* Op. Denying Mot to Dismiss at 11, Doc. 30 ("An express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a remedy under 1983.") (*citing Blessing v. Freestone*, 510 U.S. 329, 341 (1997)). Absent its own express private enforcement scheme, the Secretary cannot show that Section 2 impliedly precluded private enforcement under § 1983.

This is because, as the Court recognized in *Talevski*, private enforcement under § 1983 is only "incompatible" with a statute's comprehensive enforcement scheme when it would allow plaintiffs to "circumvent[] . . . presuit procedures" and "give[] plaintiffs access to . . . remedies that were unavailable" under an express private right provided for in the underlying statute. *Id.* at 189.[11] Here, because there is no express private right of action under Section 2, there is no concern that § 1983 enforcement would supplant the "careful congressional tailoring" evidenced by "a private judicial right of action" or a "federal administrative remedy." *Talevski*, 599 U.S. at 190.

---

[11]      Notably, the VRA's enforcement provisions explicitly state that there are no mandatory administrative exhaustion requirements for persons suing to enforce the VRA. 52 U.S.C. § 10308(f) ("The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of chapters 103 to 107 of this title shall have exhausted any administrative or other remedies that may be provided by law.").

Because private enforcement under § 1983 merely "complement[s]" rather than "supplant[s]" the enforcement scheme set forth in the VRA, the Secretary cannot demonstrate that private enforcement is impliedly precluded. *Id.*[12]

Moreover, when Congress amended Section 2 to cover discriminatory results claims in 1982, it would have been especially cognizant of § 1983's application to the law. The Supreme Court had just two years prior clarified that § 1983 applied to statutes—especially Reconstruction Act enforcement ones—and not just constitutional claims. *See Thiboutot*, 448 U.S. at 7. There would have been no reason to expressly provide for a cause of action in the Act itself.[13]

Next, the Secretary faults this Court for its conclusion that decades of simultaneous VRA enforcement by private parties and the Department of Justice indicates that there is no incompatibility between public and private enforcement of the VRA. Doc. 132 at 12. The Secretary claims that because these suits did not address the question of whether there was a private right of action under the VRA, they cannot "control the analysis in a case where the question is actually presented." *Id*. But this Court did not decide whether there was a private right of action under the VRA, and that question—while preserved by Plaintiffs—is not currently presented here. Instead, the Court is tasked with determining whether private enforcement of Section 2 under § 1983 is "incompatible" with the VRA's express provisions governing public enforcement. It was not error

---

[12]     The Secretary faults this Court for, in its order denying its motion to dismiss, failing to show why the VRA was an "atypical situation" warranting a private remedy. Doc. 132 at 11. But the case cited by the Secretary, *Cannon v. University of Chicago*, 441 U.S. 677 (1979), is not about § 1983, which has a different test than courts apply to find an implied right of action.

[13]     The Eighth Circuit highlighted the Civil Rights Act of 1964 as a law that expressly provides a private right of action. *Ark. State Conference NAACP*, 2023 WL 8011300, at *3. But § 1983 by its terms does not apply to the hotels, restaurants, stores, and other privately-owned public accommodations regulated by the Civil Rights Act of 1964 because those entities are not government officials acting under color of law. 42 U.S.C. § 1983. Whatever relevance that law has in the implied right of action analysis, it is not relevant to the § 1983 analysis.

for this Court to consider the fact that private actions to enforce Section 2 have coexisted with DOJ enforcement for decades without conflict in concluding that the two are not incompatible.

Finally, the Secretary contends that this Court was wrong to cite the VRA's fee-shifting provision, 52 U.S.C. § 10310(e), as evidence that the VRA anticipates litigation by private plaintiffs. Doc. 132 at 11-12. The Secretary's argument—that § 10310(e) only applies to suits that "directly" enforce the Fourteenth and Fifteenth Amendment—is misplaced. The statute does not use the word "directly," and the Supreme Court has held that statutes prohibiting discriminatory effects *do* enforce the amendments. *See e.g.*, *Lane*, 541 U.S. at 520; *see also Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) (holding that § 10310(e) applies to prevailing plaintiffs under Section 2 because that statute enforces the "voting guarantees of the Fourteenth and Fifteenth Amendments"). In any event, this Court need not—and given the Eighth Circuit's reasoning, *see Ark. State Conference NAACP*, 2023 WL 8011300, at *7 n.4—should not, rely upon § 10310(e) at this stage. The fee-shifting provision was a minor point in this Court's motion-to-dismiss order— and that point is not dispositive to the pertinent inquiry of whether § 1983 is *incompatible* with the VRA's enforcement scheme. Plaintiffs who prevail in a § 1983 suit to enforce Section 2 are eligible for fees under 42 U.S.C. § 1988, and because both § 1988 and § 10310(e) confer fee awards on the "prevailing party," the two cannot be incompatible with each other. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598, 603 & n.4 (2001) (explaining that the Supreme Court has treated the phrase "prevailing party" consistently across the U.S. Code in fee-shifting provisions, citing in particular the VRA provision and § 1988).

## III.   The Secretary cannot establish an irreparable harm absent a stay.

The Secretary asserts that that the State would be irreparably harmed absent a stay because this case involves redistricting and the Court's final judgment against the Secretary resulted in a

19

permanent injunction against the use of legislatively enacted discriminatory districts. While it may be true that a state may suffer some form of injury when its laws are enjoined, it is also true that states asserting that type of injury have typically made at least some showing that the laws in question were validly enacted and the state is likely to succeed in demonstrating that on appeal. Here, however, the Secretary contends only that he is likely to succeed in showing that the Attorney General has to sue him. The Secretary has made no showing that the challenged districts were in fact lawfully enacted and that he is likely to succeed in demonstrating that on appeal. Having failed entirely to make that showing, the Secretary also cannot demonstrate that he would be irreparably harmed if the injunction against those districts remains in place.

Regardless, "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). Rather, a stay is "'an exercise of judicial discretion' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id*. If an irreparable injury of the type asserted by the Secretary were sufficient to justify a stay, judgments against states would be automatically stayed, and there would be no need for the *Nken* factors. *Cf. Allen v, Milligan*, 600 U.S. __, 23A241 (U.S. Sept. 26, 2023) (order denying application for a stay of court-ordered remedial redistricting plan pending appeal). As such, the mere fact that the injunction implicates state law is not sufficient to meet the Secretary's burden under *Nken*.

Next, the Secretary claims that the State would be irreparably harmed absent a stay because there is not sufficient time under the Court's original schedule for a remedial plan to be adopted and approved without disrupting the 2024 elections. As such, the Secretary asserts that the *Purcell* principle counsels in favor of a stay. But the Secretary's *Purcell* concerns, though catalogued in exhaustive detail, are entirely resolved by Plaintiffs' proposed amendments to the remedial

Appellate Case: 23-3697     Page: 201     Date Filed: 12/17/2023 Entry ID: 5345207

schedule. *See* Mot. to Amend Remedial Plan, Doc. 134. Under Plaintiffs' proposed schedule, if the Legislature declines to adopt a plan to remedy the discriminatory effects of Districts 9, 9A, 9B, and 15 by the Court's deadline of December 22, 2023, as seems likely, *see* Mot. to Amend at 2, Plaintiffs' Demonstrative Plan 1 will be ordered into effect as the remedial plan. If the Legislature changes course and adopts a remedial plan by December 22, Plaintiffs have proposed an expedited schedule for the parties and the Court to review the plan in advance of the December 31 deadline. Either way, Plaintiffs' proposed schedule would ensure that a remedial map is in place by December 31—the date identified by the Secretary as the final deadline for the election map to be finalized. *See* Mem. in Support of Mot. to Stay at 2, Doc. 132. The Supreme Court has vacated a stay issued by a court of appeals on *Purcell* grounds where the district court abided by the deadline suggested by the state. *See Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (Mem.).

To be clear, Plaintiffs disagree that December 31 is the deadline for relief after which *Purcell* concerns arise. January 1 is merely the *opening* of candidate signature gathering—candidates have over three months to collect signatures. Doc. 132 at 19; N.D.C.C. § 16-1-11-06, 16.1-11-15. Legislative candidate must collect the signature of just 1% of the total population of their districts. *Id.* § 16-1-11-06(1)(b)(3)(d). The ideal population of a North Dakota senate district is 16,576. So candidates must collect around 166 signatures. The suggestion that it would cause confusion and disrupt the electoral process if candidates from the three or four affected districts have from late January through April 8—rather than from January 1—to collect 166 signatures is simply not credible. And the Supremacy Clause means that precinct adjustments necessary to implement the Court's order could after December 31. *See* N.D.C.C. § 16.1-04-01(3). Although the existing remedial schedule causes the Secretary no irreparable harm, the Court should grant Plaintiffs' motion to amend it to eliminate the Secretary's *Purcell* arguments.

Even if a remedial plan is in place by December 31, the Secretary suggests that *Purcell* may remain at issue because there is not sufficient time for the appellate process to play out before December 31. But that was so in *Rose* too, and the Supreme Court did not permit a stay on that basis. *See id.* Instead, the Court remanded for the Eleventh Circuit to consider the request for a stay "on the traditional stay factors and a likelihood of success on the merits." *Id.* Every injunction is effective upon issuance unless the stay factors are met. The operation of injunctions pending appeal is the rule; a stay is the exception. The general rule is especially applicable where, as here, the Secretary is not seeking a stay on the merits of the case.

IV.     **Plaintiffs would be substantially injured by allowing discriminatory maps to remain in place for the 2024 elections.**

Plaintiffs would face substantial injury if the Court were to stay its judgment and allow the 2024 elections to take place under discriminatory maps. The right to vote is the "fundamental political right . . . preservative of all rights*." Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). Plaintiffs have proven after a full trial on the merits that Districts 9, 9A, 9B, and 15 "deny or abridge" the right to vote of the individual Plaintiffs and the members of the Plaintiff tribes by denying them the opportunity to elect candidates of their choice to the North Dakota state legislature on account of their race. Forcing Plaintiffs to endure another election tainted by vote dilution and discrimination would be unconscionable and constitutes not only a substantial injury but an irreparable harm in its own right. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury" in part because "once the election occurs, there can be no do-over and no redress."); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("[W]hen the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm regardless of whether the plaintiff

seeks redress under the Fourteenth Amendment itself or under a statute enacted via Congress's power to enforce the Fourteenth Amendment.").

The Secretary asserts, however, that Plaintiffs will not be irreparably harmed, because in his view, Plaintiffs had no right to challenge the discriminatory maps in the first place. But it is indisputable that even if Plaintiffs lacked a cause of action bring their case—they did not—that would not transform discriminatory districts into lawful ones. As such, Plaintiffs are harmed by the State's infringement on the fundamental right to vote regardless of whether they or the Attorney General can sue for relief. The Secretary cannot seriously suggest that using a procedural loophole to continue subjecting the individual Plaintiffs and the members of the Plaintiff Tribes to open and ongoing discrimination at the hands of the State imposes no substantial harm.

Finally, the Secretary contends that because Plaintiffs have already been subjected to un-lawful maps for one election cycle, they cannot show that irreparable harm. But that compounds rather than mitigates their injury. And the Secretary's suggestion that Plaintiffs somehow acqui-esced to voting under discriminatory maps in 2022, despite the fact that Plaintiffs challenged the maps as violative of federal law in this Court nine months before the election took place, is aston-ishing. And it is particularly disingenuous given that the Secretary concedes that Plaintiffs moved promptly to secure their rights when they filed suit, yet asserts that, nearly two years later and nearly one year out from the next election, it is already too late for Plaintiffs to obtain relief for 2024.

## V.    The public interest weighs against allowing discriminatory maps to remain in place for the 2024 elections.

The public interest also weighs against allowing discriminatory maps to remain in place for the 2024 elections. Like Plaintiffs, election officials, candidates, voters, and the general public all have an obvious interest in elections that are free from discrimination on the basis of race.

23

Moreover, having forgone any attempt to demonstrate that he is likely to prevail in showing that the challenged districts are nondiscriminatory, the Secretary cannot in good conscience claim that the public interest would be served by keeping them in place pending appellate review.

Nor is there any risk of harm or confusion to the general public absent a stay. As noted above, Plaintiffs' proposed amendments to the remedial schedule will ensure that a remedial map is in place by December 31, the deadline the Secretary has identified to ensure that the 2024 elections are not affected.

Finally, given that the Secretary's justification for the stay rests solely on procedural arguments rather than the merits of the judgment against him under Section 2, he cannot show that the public interest would be injured by holding the 2024 elections under maps that are fair and non-discriminatory while the appeals process plays out.  Even if the Secretary were to ultimately prevail on his novel procedural argument, the Legislature is on notice that Districts 9, 9A, 9B, and 15 violate Section 2 of the VRA. A procedural victory would not relieve the Legislature of its statutory obligation to draw nondiscriminatory maps. Indeed, leaving in place districts that are known to have a discriminatory effect on Native Americans would risk claims that the Legislature was engaged in intentional discrimination on the basis of race. Only a reversal on the merits would result in leaving the enjoined maps in place, and the Secretary has not even attempted to demonstrate that such an outcome is likely such that he warrants a stay. Allowing a court-ordered remedial map to go into effect pending appeal serves the public interest under these circumstances. And this is particularly so if the Legislature forgoes the opportunity to draw its own map.

## VI.    The Court is bound by *Nken*.

Finally, it is worth addressing the Secretary's assertion that there is a separate framework for analyzing stays in cases where *Purcell* is implicated. First, there is no need for the Court to

Appellate Case: 23-3697     Page: 205     Date Filed: 12/17/2023 Entry ID: 5345207

reach this issue because, as discussed above, adopting Plaintiffs' proposed remedial schedule would vitiate any concerns under *Purcell*, and thus render the Secretary's proposed alternative framework inapplicable. Second, the framework relied on by the Secretary, which shifts the burden to Plaintiffs to oppose a stay under a heightened standard, has not been adopted by the Supreme Court or the Eighth Circuit and is expressly precluded by *Nken*, which controls here. *See, e.g.*, 566 U.S. at 433-34 ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."). While more clarity on when *Purcell* applies would be helpful, and the framework proposed by Justice Kavanaugh in *Merrill* may "provide helpful guidance," in determining when it applies, *Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022), *Nken* still controls. As such, demonstrating that the extraordinary remedy of a stay is warranted is the Secretary's burden under the relevant and controlling *Nken* factors. Moreover, even assuming there is an additional framework to consider under *Purcell*, nothing in Justice Kavanaugh's concurrence suggests that framework relieves the party seeking a stay from their obligations under *Nken*, nor could it.

Regardless, Plaintiffs easily meet the Secretary's test. To begin, the Secretary does not contend that the test applies to the merits of Plaintiffs' Section 2 claim, but rather only to the § 1983 question. But the underlying merits of Plaintiffs' § 1983 cause of action to enforce Section 2 are similarly clearcut, as addressed above. The Secretary's novel theory to the contrary is not only untested but unfounded in context or case law. The merits could not be more clearcut in Plaintiffs' favor on this issue.

Third, Plaintiffs would suffer irreparable harm if a stay were entered. *See supra* Part IV.

Fourth, as the Secretary concedes, Plaintiffs did not unduly delay in seeking relief, and in fact have sought at every opportunity to ensure that this case would be decided in time to avoid

any potential disruption to the 2024 elections. These efforts include expediting their response to the stay motion and seeking to amend the remedial schedule to resolve the Secretary's concerns.

Finally, the Secretary concedes that the changes in question are feasible so long as the remedial map is in place by December 31, as it would be under Plaintiffs' proposed schedule. Nor do the changes necessary to remedy Plaintiffs' injuries impose significant costs, confusion, or hardship on the Secretary. *See* Mot. to Amend Remedial Plan at 4-5 (explaining that the minimum changes necessary to remedy the violations alleged by Plaintiffs require altering just two precinct lines and just four of the districts in the 2021 plan). As such, even under the Secretary's proposed test, a stay is not justified here.

## CONCLUSION

For the foregoing reasons, the Court should deny the Secretary's motion to stay its final judgment pending appeal.

December 10, 2023

/s/ Michael S. Carter
Michael S. Carter
OK Bar No. 31961
Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
Telephone: (303) 447-8760
*Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
Telephone: (202) 785-4166
*Counsel for Plaintiffs*

Respectfully submitted,

/s/ Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200
Fax: (202) 736-2222
*Counsel for Plaintiffs*

Bryan Sells (admitted *pro hac vice*)
GA Bar No. 635562
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L. SELLS, LLC
PO Box 5493
Atlanta, GA 31107-0493

26

<table>
<tr><td></td><td>Telephone: (404) 480-4212</td></tr>
</table>

/s/ Timothy Q. Purdon                 *Counsel for Plaintiffs*

Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiff Spirit Lake Tribe and*
*Turtle Mountain Band of Chippewa Indians*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Mark P. Gaber
Mark P. Gaber
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

|  |  |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, et al., <br><br>                          Plaintiffs, <br><br>      v. <br><br> MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota, et al., <br><br>                          Defendant. | Civil No. 3:22-cv-00022-PDW-ARS |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO AMEND REMEDIAL ORDER

The Court should grant Plaintiffs' motion to amend the remedial order because Plaintiffs' proposal (1) continues to provide the Legislature a reasonable opportunity to adopt its own proposal, (2) ensures that a lawful plan will be in effect for the November 2024 election, and (3) fully addresses the Secretary's contention that the plan for the next election must be finalized by December 31. The Secretary's and the Legislature's[1] objections to Plaintiffs' motion are without merit. Plaintiffs respectfully request that the Court expedite its decision on this motion so that the *Purcell* concerns the Secretary raises are resolved before the Secretary seeks additional relief from

---

[1]      On December 8, 2023, the Legislative Assembly filed a combined brief that supports its motion to intervene, joins in the Secretary's motion to stay, and responds to Plaintiffs' motion to amend. Doc. 138. Plaintiffs will file a separate opposition brief to the Legislature's motion to intervene, but will focus here on its arguments regarding Plaintiffs' motion to amend the remedial order.

1

Appellate Case: 23-3697     Page: 209     Date Filed: 12/17/2023 Entry ID: 5345207

the Eighth Circuit so that the court of appeals has the benefit of understanding the contours of this Court's remedial order as it considers the Secretary's motion.[2]

## ARGUMENT

**I.    The Court has afforded the Legislature a reasonable opportunity to adopt a remedial plan.**

The Court has afforded the Legislature a reasonable opportunity to adopt a remedial plan. "When a federal court declares an existing apportionment scheme [unlawful], it is . . . appropriate, *whenever practicable*, to afford a *reasonable opportunity* for the legislature to . . . adopt[] a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (emphasis added). The Supreme Court has explained, however, that "[w]hen those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal courts" to devise a remedy. *Id.*

This Court permanently enjoined the Secretary's further implementation of Districts 9, 15, 9A, and 9B on November 17, 2023, and provided the Legislature until December 22, 2023—35 days—to adopt a remedial proposal and submit it to the Court for review. Doc. 125 at 39.[3] That period—35 days—is more than reasonable. Indeed, it *exceeds* the time most courts provide legislative bodies to adopt remedial plans. For example, the Eighth Circuit has affirmed a district court's imposition of a Section 2 remedial plan that provided the government half as much time as

---

[2]    The Secretary has indicated an intention to seek relief from the Eighth Circuit after Tuesday, December 12, 2023; Plaintiffs respectfully request the Court decide Plaintiffs' motion by that date.

[3]    Contrary to the Legislature's characterization, Doc. 138 at 6, this Court did not order the Legislature or the Secretary to adopt a remedial plan. Consistent with case law, the Court provided a time period during which the Legislature could adopt one before proceeding to impose its own remedial plan. If the Legislature were to adopt such a plan, the Secretary would be involved in implementing it—thus the Court's reference to the Secretary. Doc. 125 at 39.

Appellate Case: 23-3697     Page: 210     Date Filed: 12/17/2023 Entry ID: 5345207

this Court has afforded the Legislature here. *See Williams v. City of Texarkana*, 861 F. Supp. 756, 767 (W.D. Ark. 1992) (issuing liability determination on Sept. 29, 1992 and providing until Oct. 15, 1992 to submit remedial plans), *aff'd*, 32 F.3d 1265, 1268 (8th Cir. 1994) (affirming district court's imposition of remedial map). Following the Supreme Court's *Allen v. Milligan* decision this year, the district court provided the Alabama Legislature 31 days—4 fewer than this Court has provided here—to adopt a remedial plan; the Supreme Court has denied a stay of the subsequent remedial order. Order, *Caster, et al. v. Allen, et al.*, No. 2:21-cv-01536-AMM (N.D. Ala. June 20, 2023), Doc. 156, *stay denied*, *Allen v. Milligan*, __ S. Ct. __, 2023 WL 6218394 (U.S. Sept. 26, 2023) (Mem.). Courts across the country routinely provide less time than this Court has afforded the Legislature. *See, e.g.*, *Robinson v. Ardoin*, 37 F.4th 208, 232 (5th Cir. 2022) (affirming order providing 14 days); *Calvin v. Jefferson Cnty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (providing 16 days); *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (providing 14 days); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) (providing 19 days).

The Legislature contends that it is "impossible," Doc. 138 at 6, and "impracticable," *id.* at 14, for it to adopt a remedial plan in the 35 days provided by the Court. Thus, the Legislature contends, the Court must keep the existing (unlawful) plan in place to govern the November 2024 election. Not so.

Even if it were truly impossible or impracticable for the Legislature to adopt a proposed plan in the 35 days this Court has provided, that is precisely the circumstance in which the Supreme Court has directed district courts to *impose* a remedial plan to ensure that a lawful plan is in place for the "imminent" election. *See Wise*, 437 U.S. at 540 (explaining that legislature should be provided first opportunity where "practicable," but that court must impose plan if "imminence of

3

a state election makes it impractical" for legislature to adopt its own proposal). That is, although federal courts must for comity and federalism purposes afford the legislature an opportunity where practicable, the paramount objective is ensuring that elections are conducted under a redistricting map that does not violate federal law.

Moreover, the Legislature has not shown why it could not adopt a remedial plan in the 35 days this Court provided—nor has it cited any case law for the proposition that 35 days is unreasonable. Strangely, the Legislature does not address this issue in the relevant argument section of its brief—instead it focuses on speculating about the motivation and timing of Plaintiff's motion,[4] *see* Doc. 138 at 15-16—but elsewhere in the Legislature's brief it appears to proffer some statements related to its objection to the time period.

First, the Legislature notes that Thanksgiving occurred during the 35-day period, *see* Doc. 138 at 3 n.1. A one-day holiday does not render the 35-day period unreasonable; for example, Independence Day occurred during the 31-day period the Alabama Legislature was provided following the Supreme Court's *Milligan* decision. *See supra* at 3.

Second, the Legislature observes that laws enacted between August 1 and January 1 become effective 90 days after passage unless (1) the Legislature by two-thirds vote designates it emergency legislation or (2) the law is enacted in a Special Session called by the Governor. Doc. 138 at 5. But these facts do not make the 35-day period unreasonable. The Legislative Management Committee could request a special session, Doc. 138 at 6; N.D. Const. art. V § 7; N.D.C.C. § 54-

---

[4]     The Legislature repeatedly contends that Plaintiffs filed their motion as some nefarious response to the Legislative Management Committee's December 5 meeting. Doc. 138 at 3, 15. They did not. Plaintiffs filed this motion to provide a solution to the timing concerns raised by the Secretary and to avoid any *Purcell* objections to this Court's injunction. Given that the Legislature's meeting was ongoing while the motion was being drafted, Plaintiffs alerted the Court to the committee meeting, as would seem appropriate.

03-02.2, but it has not done so here. And even if the remedial legislation failed to garner a two-thirds majority to accelerate its effective date, the remedial map would still be effective in time to govern the primary and general elections (in June and November 2024), and nothing would preclude the affected counties from aligning their precinct boundaries to that map by December 31. In any event, the State's inability to take legislative action during a 35-day period would not render the period unreasonable, nor would it justify permitting an unlawful map to remain in place. *See Wise*, 437 U.S. at 540.[5]

Third, the Legislature complains that this Court took five months to issue its opinion and judgment following trial, and that it too must analyze any map for compliance with state law and the VRA. Doc. 138 at 13. But this Court's effort in resolving the VRA question has *eased* the Legislature's task. Having received this Court's guidance about the obligations, the Legislature offers no explanation why 35 days is insufficient.

Fourth, this is not complicated. Given the stark white bloc voting in all surrounding counties, the only configuration that complies with the VRA is one that joins Rolette and Benson Counties. Plaintiffs have offered two possibilities. The Legislature offers no explanation for what it might do differently, or how any tweaks would materially affect the map even if it did propose a plan. And unlike the decennial redistricting process in which the Legislature is redrawing the entire map in response to population changes, here changes are needed to only three or four districts. A consultant retained by the Legislature could do this in a matter of hours. Thirty-five days is more than sufficient time.

---

[5]     Notably, in *Ardoin*, the defendant objected that because of various procedural requirements, the court's 14-day period would effectively be 5 days. 37 F.4th at 232. The Fifth Circuit held that this was sufficient time, particularly because the Louisiana legislature "would not start from scratch," having received VRA-compliant proposals during the legislative process. The same is true here—except with 35, not 14, days.

Fifth, the Legislature has not acted with haste. It waited 18 days to even hold the December 5 Legislative Management Committee meeting. That is more time than the "reasonable" 14-day time period most courts provide legislatures. The request for proposals it has posted for an expert consultant does not require responses until December 15.[6] The Legislature did not raise any objection to the 35-day period with this Court until 21 days—fully three weeks—into the period. Doc. 138 at 14. The Legislature's delay suggests it has never intended to meet the Court's reasonable deadline.[7]

## II. Adoption of Plaintiffs' proposed remedial plan is appropriate in the absence of a legislative proposal.

In the absence of a remedial plan proposed by the Legislature, this Court is empowered to adopt a plan proposed by Plaintiffs. In *Bone Shirt v. Hazeltine*, the district court provided the South Dakota legislature an opportunity to adopt a proposed remedial plan, but the legislature did not do so. 461 F.3d 1011, 1022 (8th Cir. 2006). In such a circumstance, the Eighth Circuit explained, "the district court [may] fashion its own remedy or, as here, adopt a remedial plan proposed by the plaintiffs." *Id.* at 1022. The Legislature is therefore wrong to contend there is anything improper with Plaintiffs requesting that the Court issue an order specifying that Plaintiffs' demonstrative plan will be the court-imposed remedy should the Legislature fail to act by December 22. Doc. 138 at 15-16.

Tellingly, neither the Secretary nor the Legislature identify any substantive objection to Plaintiffs' demonstrative plans in their responses to Plaintiffs' motion. The Legislature merely

---

[6]     *See* N.D. Legis. Mgm't Comm., RFP for Redistricting Analysis Consultants (Dec. 8, 2023), https://www.ndlegis.gov/sites/default/files/committees/68-2023/25.9174.01000.pdf.

[7]     The Legislature cites footnotes 1 and 2 from Plaintiffs' motion to contend that Plaintiffs "acknowledge" that this Court has provided the Legislature a time period that is "unreasonable, unrealistic, and illusory." Doc. 138 at 2. The logical connection between the content of the footnotes and the Legislature's characterization of them is not at all clear.

appears to object that *Plaintiffs* are the source of the map. That is not a legally cognizable objection in light of its stated plan not to offer its own proposal in the reasonable time this Court has allotted. *See Bone Shirt*, 461 F.3d at 1022.

### III.   Plaintiffs' motion *resolves* an issue for which the Secretary desires "meaningful appellate review."

Other than a passing comment—with no cited authority—contending that 35 days is an unreasonable time period for legislative action, the Secretary's sole objection to Plaintiffs' motion to amend the remedial order appears to be that the Secretary desires time for "meaningful appellate review" of this Court's decision before this Court's injunction becomes effective for the November 2024 election. Doc. 140 at 3-6. But that is an argument the Secretary advances in support of his motion for a *stay*—it is not an objection to Plaintiffs' motion to amend the remedial order. Indeed, the Secretary says as much. *See id.* (discussing argument in context of request for a stay). Given that one of the Secretary's two bases for seeking a stay pending appeal is a *Purcell* argument about this Court's remedial process extending beyond December 31, it is difficult to imagine how the Secretary is harmed by an order amending that remedial process so that it is completed by December 31. To the extent the Secretary wishes to maintain his *Purcell argument* as a basis for seeking a stay from the Eighth Circuit—that is an insufficient reason for this Court not to resolve the *Purcell* timing concerns raised by the Secretary. This Court is entitled to rely upon the December 31 deadline proffered by the Secretary in fashioning its remedy in this case. *See Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (Mem.) (granting application to vacate Eleventh Circuit's stay issued based upon *Purcell* concerns where the defendant "could not fairly have advanced" a *Purcell* argument because the district court finalized relief by the date suggested by the defendant). The Court should take the Secretary at his word and expeditiously grant Plaintiff's motion so that

App196

it is clear in any subsequent stay proceeding in the Eighth Circuit that this Court has, consistent with *Rose*, adhered to the *Purcell* deadline advanced by the Secretary.

The Secretary's objection that he cannot complete an appeal before December 31 is meritless in any event. The Secretary *could have* acted with haste but did not do so. This Court entered judgment on November 17. The Secretary waited over two weeks to file a notice of appeal or seek a stay. He could have acted immediately, seeking emergency relief. The Eighth Circuit has granted expedition in prior election appeals. *See, e.g.*, Order, *Miller v. Thurston*, No. 20-2095 (8th Cir. June 15, 2020) (granting expedition of appeal and requiring appellant's brief be filed by June 17, 2020, and appellee's brief be filed by June 22, 2020). Last month a redistricting appeal was docketed with the Fifth Circuit on October 17 and the court granted expedition, with briefing completed by November 6, oral argument heard on November 7, and a decision issued on November 10. *See* Order, *Petteway v. Galveston County, Tex.*, No. 23-40582 (5th Cir. Oct. 19, 2023), Doc. 40; Opinion (Nov. 10, 2023), Doc. 118-1. If the Secretary wished to have final appellate resolution prior to December 31, he could have sought it. He did not.

Moreover, the Secretary is not entitled to avoid the operation of the Court's injunction merely because an appeal will not be resolved before December 31. As the Supreme Court's vacatur of the Eleventh Circuit's stay in *Rose* makes clear, the *Purcell* question focuses on whether the *district court* has ensured that its injunction will not interfere with any election deadlines. This Court is entitled to rely upon the Secretary's stated December 31 date. *Rose*, 134 S. Ct. at 58. The Secretary's "meaningful appellate review" argument is thus not one that implicates *Purcell*, but rather must be decided under the traditional stay factors—to which Plaintiffs respond separately. It is not a reason to decline to conform the Court's remedial timeline to the Secretary's December 31 deadline—which is the objective Plaintiffs seek to achieve with their motion. Indeed, it is all

8

the more reason *to grant* Plaintiffs' motion. Doing so respects the Secretary's wishes regarding the timeline, avoids *Purcell* concerns, ensures stability for the November 2024 election, and eliminates an appellate issue. Particularly considering that neither the Secretary nor the Legislature have proffered any *substantive* objection to Plaintiffs' proposed remedial plan, and neither assert any objection to the Court's Section 2 merits determination as a basis to seek a stay, the Court should grant Plaintiff's motion.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion to amend the remedial order. Moreover, Plaintiffs request that the Court expedite its decision to do so, and enter an order in by the December 12 date after which the Secretary has indicated he will seek relief from the Eighth Circuit.

December 10, 2023

Respectfully submitted,

/s/ Michael S. Carter
Michael S. Carter
OK Bar No. 31961
Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
Telephone: (303) 447-8760
*Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
Telephone: (202) 785-4166
*Counsel for Plaintiffs*

/s/ Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200
Fax: (202) 736-2222
*Counsel for Plaintiffs*

Bryan Sells (admitted *pro hac vice*)
GA Bar No. 635562
bryan@bryansellslsaw.com
THE LAW OFFICE OF BRYAN L. SELLS, LLC
PO Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212

/s/ Timothy Q. Purdon                  *Counsel for Plaintiffs*
Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiff Spirit Lake Tribe and*
*Turtle Mountain Band of Chippewa Indians*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Mark P. Gaber
Mark P. Gaber
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown<br><br>Plaintiffs,<br><br>vs.<br><br>Michael Howe in his official capacity as Secretary of State of North Dakota,<br><br>Defendant. | Case No. 3:22-cv-00022<br><br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** |

Defendant Michael Howe in his official capacity as Secretary of State of North Dakota (the "Secretary") submits this brief in reply to *Plaintiff's Opposition to Defendant's Motion for Stay of Judgment Pending Appeal* (Doc. 142) and in support of the Secretary's *Motion for Stay of Judgment Pending Appeal* (Doc. 131).

(1) A *Purcell* Analysis is Appropriate.

Citing *Rose v. Raffensperger*, Plaintiffs argue that "when a district court relies upon a defendant's assertion of the date upon which the Section 2 remedial map must be finalized, the court of appeals cannot issue a stay based upon *Purcell*." Doc. 142 at 2 (citing *Rose*, 143 S. Ct. 58 (2022)). But *Rose* is distinguishable from this case.

In *Rose*, unlike here, the Georgia Secretary of State's "motion for a stay pending appeal relied on the traditional stay factors … *see Nken v. Holder*, 556 U.S. 418 (2009)." 143 S.Ct. at 59. The Supreme Court held it was error that "the Eleventh Circuit failed to analyze the motion under that framework, instead applying a *Purcell* analysis." *Id*. The Supreme Court also indicated in *Rose* that the Georgia Secretary of State "could not fairly have advanced [the *Purcell* principle] himself

Appellate Case: 23-3697     Page: 219     Date Filed: 12/17/2023 Entry ID: 5345207

in light of his previous representations to the district court that the schedule … was sufficient to enable effectual relief as to the November elections should applicants win at trial." *Id.*   Those aren't the facts of this case.

Unlike the Georgia Secretary in *Rose*, the North Dakota Secretary in this case has expressly raised the *Purcell* issue in his motion for a stay briefing. *See* Doc. 132 at pp. 3-22.  Further, unlike the Georgia Secretary in *Rose*, Secretary Howe has not represented to the Court in this case that his "concerns are resolved if the Court grants Plaintiffs' pending motion to modify the remedial order in this case to ensure that a remedial plan is in place by December 31." *Cf.* Doc. 142 at 1-2. To the contrary, the Secretary has argued strenuously that the State has a sound appellate argument that Plaintiffs had no right to commence this lawsuit under either the Voting Rights Act ("VRA") or 42 U.S.C. § 1983, but that the timing of the Court's order has made it impossible for the State to receive meaningful appellate review before the State's 2024 election map must be fixed with finality.  Doc. 132 at 6-12. Contrary to Plaintiffs' suggestion, the *Rose* case does not hold that the Secretary's right of appeal is immaterial to a *Purcell* analysis, and in fact this Court has recognized the exact opposite. *E.g., Walen v. Burgum*, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (*Purcell* "direct[s] courts to weigh the opportunity for appellate review").

However, even if the Court does not apply *Purcell* and instead relies on a traditional stay analysis, the Secretary has explained why a stay should be granted even under a traditional stay analysis. *See* Doc. 132 at 22-25; *see also, e.g., Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 565 F. Supp. 2d 23, 25 n. 1 (D.D.C. 2008) (when considering a stay pending appeal, "courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms favors a stay.").

(2) The *Gonzaga* Framework Applies to Plaintiff's Section 1983 Claims.

Plaintiffs argue the Secretary is not likely to succeed in his appeal because the "Fourteenth and Fifteenth Amendment enforcement statutes – like Section 2 of the VRA – sit at the center of Congress's purpose in enacting § 1983" and "must be held enforceable by § 1983 absent an express indication that Congress chose otherwise."  Doc. 142 at 9.  Resting on that logic, Plaintiffs argue the *Gonzaga* framework for assessing Section 1983 claims is immaterial, and that is "universally accepted" that a statute like the VRA would be privately enforceable through Section 1983, regardless of whether the statute creates individual rights or private enforcement would be incompatible with the statutory enforcement scheme.  Doc. 142 at 8-9.

Notably, Plaintiffs' brief doesn't cite any legal authority standing for this purportedly "universally accepted" proposition.  No case cited by Plaintiffs holds in absolute terms that a statute like the VRA is enforceable under Section 1983 regardless of whether it creates individual rights and regardless of whether private enforcement would be incompatible with the statute's enforcement scheme.  Instead of citing caselaw establishing a different framework, Plaintiff simply attacks the framework for assessing Section 1983 claims announced by the Supreme Court in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), and similar cases, arguing that framework has no relevance because the underlying statutes in those cases were enacted pursuant to the Spending Clause.  Doc. 142 at 7-10. However, the fact that Spending Clause statutes may have a heightened bar for finding a private right of action under Section 1983 does not mean that the *Gonzaga* framework for assessing Section 1983 claims—requiring that the statute create an individual right and not be incompatible with the statutory enforcement scheme—is inapplicable outside of the Spending Clause context. Indeed, this Court also relied on *Gonzaga* as the framework for its analysis of § 1983 in this case in its *Order Denying Motion to Dismiss.  See* Doc. 30 at 8-9.

Plaintiffs essentially take the position that every civil rights statute contains a private right of action by way of Section 1983, even when the statute at issue does not create individual rights, and even where private enforcement is incompatible with the specific enforcement scheme laid out in the statute. But that cannot be correct, and borders on the absurd. The Court should reject Plaintiffs' argument and analyze the applicability of Section 1983 to this case according to the *Gonzaga* framework, as it already has done.

<u>(3) Section 2 Does Not Create Individual Rights.</u>

Plaintiffs argue Section 2 of the VRA conveys individual rights enforceable under Section 1983. Doc. 142 at 10-13. Plaintiffs note the Eighth Circuit recently suggested Section 2 appears to have both individual and group rights, and stated "'[i]t is unclear what to do when a statute focuses on both" individual rights and what "states and political subdivisions cannot do."" Doc. 142 at 12 (citing *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4). Plaintiffs then incorrectly assert "the Supreme Court expressly answered that precise question in the context of § 1983 in [*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023)]."

In *Talevski*, the Supreme Court stated, "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Talevski*, 599 U.S. at 185. Plaintiffs claim *Talevski* is controlling in that regard. Doc. 142 at p. 12. However, Plaintiffs have completely missed the point of the Secretary's argument. As explained in the Secretary's Brief, while subsection (a) of Section 2 of the VRA may appear, on a glance, to describe an individual right (forbidding voting practices that "result[] in a denial or abridgement of the right of any citizen … to vote on account of race or color … as provided in subsection (b)), the 1982 addition of subsection (b) clarifies that subsection (a) is a group right. 52 U.S.C. 10301(a) and (b). Subsection

Appellate Case: 23-3697     Page: 222     Date Filed: 12/17/2023 Entry ID: 5345207

(b) provides "[a] violation of subsection (a) is established if … the political processes leading to nomination or election ... are not equally open to participation by ***members of a class of citizens*** protected by subsection (a) in that ***its members*** have less opportunity than other members of the electorate to participate in the political process … ."  52 U.S.C. 10301(b) (emphasis added). Section 2 does not contain both individual and aggregate rights.   Rather, subsection (b) clarifies that subsection (a) is an aggregate right.

Relatedly, Plaintiffs argue Section 2 does not create aggregate rights, citing *Shaw v. Hunt*, 517 U.S. 899, 917 (1996).  Doc. 142 at 14.  Plaintiffs note that in *Shaw*, "the Supreme Court rejected the argument that a Section 2 violation that is 'proved for a particular area' of a state could be remedied by drawing a minority opportunity district elsewhere in the state, because Section 2 creates individual, not group, rights." *Id.* Plaintiffs then incorrectly assert, "[t]hat suffices to defeat the Secretary's argument." *Id*. But Plaintiff's reliance on *Shaw* in that regard is misplaced.

*Shaw* addressed whether a state can treat all minorities in the state as interchangeable, by leaving the challenged minority-dilution area in place and creating a new minority-empowered area elsewhere in the State. The Court rejected such geographic interchangeability.  517 U.S. at 918.  Within a "particular area," however, the right against vote dilution still belongs to the members of the minority group in the aggregate, not to any specific individuals including the named plaintiffs, and it can only be understood in that context.  As indicated in the Secretary's Brief, the *Gingles* test is clear that Section 2 of the VRA deals with the right of minorities collectively in an area to elect their candidate of choice. Doc. 132 at 9. The candidate that any specific minority voter might wish to prevail in a given election is immaterial to a Section 2 dilution claim.  It doesn't matter for a Section 2 dilution claim what candidate any specific person may want –all that matters is the aggregate preference in the "particular area." *Id.*

(4) Private Enforcement Is Incompatible with the VRA's Enforcement Scheme.

Plaintiffs argue the Secretary has failed to show that private enforcement of Section 2 under through Section 1983 is incompatible with the VRA's enforcement scheme, claiming that is fatal to the Secretary's claim.  Doc. 142 at 16 (citing *Talevski*, 599 U.S. at 188).  However, the Eighth Circuit's recent decision in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*— explicitly holding that Congress intended to place enforcement authority only with the Attorney General of the United States—does in fact establish private enforcement under § 1983 would be incompatible.  *See* 2023 WL 8011300, at *5 (8th Cir. Nov. 20, 2023) ("[i]f the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'" (citation omitted); *see also, e.g.*, *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 122 (2005) (noting "ordinary inference that the remedy provided in the statute is exclusive," absent textual evidence it was intended "to complement, rather than supplant, § 1983").

Relatedly, Plaintiffs argue that 52 U.S.C. § 10310(e)'s fee-shifting for suits to enforce the Fourteenth and Fifteenth Amendments also supports applying Section 1983 to Section 2 of the VRA.  Doc. 142 at p. 19.  However, as the Secretary observed in his brief, VRA Section 2 dilution claims are not actions to enforce the Fourteenth and Fifteenth Amendments, but instead go beyond the rights provided by those provisions.  Doc. 142 at 11-12.  Plaintiffs' argument to the contrary runs headlong into the Eight Circuit's recent decision.  *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *7 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'"); *see also, e.g., Allen v. Milligan*, 599 U.S. 1, 10-11 (2023) (explaining the current form of Section 2 was enacted in response to the Court's

Appellate Case: 23-3697     Page: 224     Date Filed: 12/17/2023 Entry ID: 5345207

holding that the Fifteenth Amendment only applies to discriminatory intent, not discriminatory effect). Perhaps for that reason, Plaintiffs back away from defending the Court's prior reasoning on this point.  *See* Doc. 142 at 19 (noting "[t]he fee-shifting provision was a minor point in this Court's motion-to-dismiss order," and "this Court need not … rely upon § 10310(e) at this stage").

<u>(5) The Public Interest Favors a Stay</u>

Finally, Plaintiffs argue that the public interest would be served by invalidating the State's duly enacted redistricting plan prior to the State having a meaningful opportunity for appellate review.  Doc. 23-24.  This argument is mistaken.  "[T]he public has a strong interest in the appeal right as one component of the constitutional right to due process in enforcement of the nation's laws." *Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) (citation omitted).  That is especially true where, as here, a federal court's imposition of its own redistricting plan "represents a serious intrusion on the most vital of local functions."  *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citation omitted).

A stay of this Court's judgment pending appeal would serve the public interest by allowing the Secretary to receive meaningful appellate review of this Court's judgment regarding Plaintiffs' private right of action, while also providing the State Legislative Assembly with a reasonable opportunity to enact a remedial plan for after the 2024 election cycle without unnecessary disruption and confusion for candidates, voters, and election administrators.

## CONCLUSION

For the reasons set forth above and set forth in the Secretary's Initial Brief (Doc. 132), the Secretary respectfully requests that the Court grant his motion for a stay of judgment pending appeal (Doc. 131). The Secretary respectfully requests the Court enter an order no later than **December 12, 2023**.

Dated this 11th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By: _/s/ David R. Phillips_
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
Telephone: (701) 751-8188

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** was on the 11th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400

Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Phil Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg

Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630
sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By:    /s/ David R. Phillips
        DAVID R. PHILLIPS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Case No: 3:22-cv-00022

| | | |
|---|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachary S. King, and Collette Brown. | ) ) ) ) | |
| Plaintiffs, | ) ) ) | **NORTH DAKOTA LEGISLATIVE ASSEMBLY'S BRIEF IN REPLY TO MOTION FOR STAY OF JUDGMENT PENDING APPEAL** |
| v. | ) ) | |
| Michael Howe, in his official capacity as Secretary of State of North Dakota. | ) ) ) | |
| Defendant | ) | |

***          ***          ***

## I.   INTRODUCTION

The North Dakota Legislative Assembly ("Assembly") submits this brief in reply to Plaintiffs' Opposition to Defendant's Motion for Stay of Judgment Pending Appeal (Doc. 142) to protect its constitutional redistricting interests as recognized by the Supreme Court[1].   The Plaintiffs' attempt to fast-track a judicially imposed map on the people of North Dakota is a direct attack on the Assembly's interest and the will of the people.   The Plaintiffs' proposal is the exact situation *Purcell* is designed to prevent.   In reality, the tides have shifted dramatically since the Eighth Circuit's November 20, 2023 decision in Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment, - F.4th-, 2023 WL 8011300 (8th Cir. Nov. 20, 2023).   Presumably, Plaintiffs now realize this and scramble to impose their map before the Eighth Circuit dismisses their case with prejudice under its rationale in Arkansas State Conf. NAACP.

---

[1] The Assembly filed a joinder in the Secretary's Motion for a Stay. (Doc. 138).

The Secretary correctly contends the *Purcell* principle should control this motion. In fact, Justice Kavanaugh explained the *Purcell* principle is specifically designed to protect candidates, state and local officials, and voters from the "chaos and confusion" in this situation. Merrill v. Milligan, 142 S. Ct. 879, 881 (2022) (J. Kavanaugh Concurrence). This is especially true where "our long-deplorable vote-dilution jurisprudence…has spawned intractable difficulties of definition and application." Allen v. Milligan, 599 U.S. 1, 90 (2023) (J. Thomas dissent). After attempting to apply this "long-deplorable vote-dilution jurisprudence," this Court found the Assembly's efforts "did not go far enough to comply with Section 2." See Id.; Doc. 125 at p. 38. The Assembly disagrees with this Court's assessment, but nonetheless has taken steps to gather additional input from an expert and others to prepare a remedial plan pending appeal.

Even though the Assembly's guideposts are "notoriously unclear and confusing" and "there is considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim," it has no reasonable opportunity to develop a remedial plan if a stay is not granted. Merrill, 142 S. Ct. at 880 (J. Kavanaugh Concurrence) (emphasis added). The Supreme Court has repeatedly cautioned federal courts to make every effort to avoid this situation. Wise v. Lipscomb, 437 U.S. 535, 539 (1978). This Court should follow precedent and do the same.

## II.   ARGUMENT

The Assembly must be allowed an opportunity to protect its paramount "retained sovereign…power to enact…any laws that do not conflict with federal law." Cameron v. EMW Women's Surgical Center, P.S.C., 595 U.S. 267, 277 (2022). While this Court held the Assembly carefully examined the VRA and believed its enactment of N.D.C.C. § 54-03-01.14 "would comply with the VRA" it concluded "those efforts did not go far enough to comply with Section

2." Doc. 125 at p. 38. The Assembly certainly disagrees with this conclusion and will seek appellate review of this determination[2].

A stay is justified under either *Purcell* or traditional stay analysis. In light of the Eighth Circuit's recent holding in <u>Arkansas State Conf. NAACP</u>, there is a substantial likelihood the Judgment will be overturned on appeal because the Plaintiffs lack a private right of action to assert a vote dilution claim arising under § 2 of the VRA.

## A.      The Stay Must be Granted under Any Applicable Standard.

As the Secretary noted, "the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." <u>Merrill</u>, 142 S. Ct. at 881 (J. Kavanaugh Concurrence). The rationale for this principle is as follows:

> That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. <u>Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others</u>. It is one thing for a State on its own to toy with its election laws close to a State's elections. <u>But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.</u>

<u>Id</u>. at 880-81 (emphasis added).

---

[2] Plaintiffs assert "the Secretary has waived any argument that he is likely to succeed on the merits of Plaintiffs' Section 2 claim – his motion is based solely on § 1983." Doc. 142 at p.2. The Assembly does not agree with this statement as the merits were vehemently contested throughout trial. The Assembly contests the Court's application of *Gingles* and asserts the Plaintiffs failed to meet their burden of proof. <u>See</u> Doc. 138 at p. 8 at n. 5. The Assembly preserves its right to contest the merits on appeal.

This is especially applicable here as Plaintiffs impermissibly seek to impose a redistricting map on the people of North Dakota no later than December 22, 2023, by judicial order. See Doc. 134 at pp. 2-3. The Secretary correctly points out North Dakota law prohibits a board of county commissioners from establishing voting precincts "later than December thirty-first of the year immediately preceding an election cycle…." N.D.C.C. § 16.1-04-01. Further, candidates must circulate and gather all nomination petitions between January 1 and April 8, 2024, for the 2024 election. N.D.C.C. § 16.1-11-15. These are important dates as candidates for a legislative office must not only reside in the district they seek to represent, but must obtain "the signatures of at least one percent of the total resident population of the legislative district as determined by the most recent federal decennial census." N.D. Const. Art. IV § 5; N.D.C.C. § 16.1-11-06(1)(b)(3)(d). These requirements must be considered in the Court's analysis. In fact, Justice Kavanaugh noted these exact concerns justify a stay as follows:

> With respect to the request for a stay of the District Court's injunction for the 2022 elections, the State argues that the District Court's injunction is a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others…Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries.
>
> On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges. The District Court's order would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion.

Merrill, 142 S. Ct. at 880 (J. Kavanaugh Concurrence) (emphasis added).

Imposition of a map - by judicial fiat - upon the state electorate immediately before these deadlines will cause the substantial chaos and confusion *Purcell* is designed to prevent.

-4-

Moreover, if this Court denies a stay and imposes a judicially crafted map at the eleventh hour, it is not only likely – but probable – the Eighth Circuit will reverse this Court's Judgment in light of Arkansas State Conf. NAACP.  If this Court follows the Plaintiffs' suggestions and the Eighth Circuit predictably reverses this Court's Judgment, chaos and confusion are imminent. County commissions, election officials, potential candidates, and the public will be left to wonder if they are to follow the map imposed by the federal judiciary or the one their elected officials enacted through the normal legislative process. This situation must be avoided.

This is why the *Purcell* principle provides a stay is appropriate unless "the underlying merits are entirely clearcut in favor of the plaintiff." Id. at 881.   Here, this Court acknowledged this standard cannot be met.  See Doc. 125 at p. 38.  It is nearly impossible for a legislative body to accurately predict how one district court judge will apply the *Gingles* preconditions and "totality of circumstances" test to facts undeveloped until litigation[3].  See  Merrill, 142 S. Ct. at 880 (J. Kavanaugh Concurrence) (explaining "there is considerable disagreement and uncertainty regarding…a vote dilution claim"); see also Allen, 599 U.S. 1, 90 (2023) (J. Thomas Dissent) (explaining "our long-deplorable vote-dilution jurisprudence…has spawned intractable difficulties of definition and application.")  This is especially true here where the Plaintiffs' map - they assert should be imposed on the people of North Dakota - was not presented until mere hours before the Assembly voted to pass N.D.C.C. § 54-03-01.14.  If the Court denies a stay, the Assembly will be deprived of a reasonable opportunity to carry out its constitutional duty on behalf of the people of North Dakota because it failed to predict the results of "uncertain" and "long-deplorable vote-dilution jurisprudence."  This cannot be the result.

---

[3] Even after undertaking substantial evaluation, this Court concluded this case presented a close call.  Doc. 125 at p. 38.

-5-

However, whether this Court applies *Purcell* or the traditional stay analysis, the Eighth

Circuit's decision in <u>Arkansas State Conf. NAACP</u> demands this Court grant a stay.  As this Court

is well-aware, the Eighth Circuit analyzed the text of § 2 of the VRA in detail and concluded "there

is no 'private remedy' to enforce § 2...." <u>Id</u>. at *10.  The Eighth Circuit explained its rationale for

reaching this conclusion as follows:

> The dissent is right that "this case presents two paths," *post* at 1223–24, but our
> view of them is a little different. The first is to follow what other courts have done:
> turn an assumption into a holding and conclude that a private right of action exists
> under § 2. <u>The second is to figure out the right answer ourselves: start with the text,</u>
> <u>apply first principles, and use the interpretive tools the Supreme Court has</u>
> <u>provided. For us, the choice is clear.</u> *See Bolden*, 446 U.S. at 60 & n.8, 100 S.Ct.
> 1519 (plurality opinion) (suggesting early on that it was questionable whether § 2
> authorized private enforcement).

<u>Id</u>. at *10 n. 7 (emphasis added).

In figuring out the "right answer," the Eighth Circuit acknowledged the plaintiffs requested

to amend their pleadings to assert a vote dilution claim arising under 42 U.S.C. § 1983. <u>Id</u>. at *12.

After noting pleading failures are "occasionally excused," the Eighth Circuit modified the district

court's judgment and dismissed the case "with prejudice." <u>Id</u>.  Had the Eighth Circuit believed 42

U.S.C. § 1983 presented plaintiffs an avenue to vindicate their rights under § 2 of the VRA, it

would not have done so.  <u>See</u> <u>Universal Title Ins. Co. v. U.S.</u>, 942 F.2d 1311, 1314-15 (8th Cir.

1991) (explaining the Eighth Circuit has "the discretion to consider an issue for the first time on

appeal where the proper resolution is beyond any doubt, <u>or where injustice might otherwise result,</u>

or when the argument involves a <u>purely legal issue</u> in which no additional evidence or argument

would affect the outcome of the case.") (internal quotations omitted) (emphasis added).  Dismissal

with prejudice was clearly warranted as the Eighth Circuit explained:

App215
Appellate Case: 23-3697   Page: 234   Date Filed: 12/17/2023 Entry ID: 5345207

Congress not only created a method of enforcing § 2 that does not involve private parties, but it also allowed someone else to bring lawsuits in their place. If the text and structure of § 2 and § 12 show anything, it is that "Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties."

Arkansas State Conference NAACP, -F.4th- 2023 WL 8011300 at *5 (emphasis added) (alteration in original) (citation omitted).

The Court further explained that "[i]f private plaintiffs have the same causes of action as the Attorney General, then the reverse is true too… As things stand now, the Attorney General cannot bring a § 1983 action on behalf of someone else." Id. at * 6. The only reasonable reading of Arkansas State Conference NAACP is that private parties cannot enforce § 2 of the VRA and 42 U.S.C. § 1983 certainly does not provide a vehicle to do so.

Regardless of whether this Court applies *Purcell* or traditional stay analysis, a stay must be granted. From a practical standpoint, a stay eliminates the possibility that local officials, candidates, and the public will be subject to "chaos and confusion" with the imposition of a last-minute judicially imposed map. See Merrill, 142 S. Ct. at 880 (J. Kavanaugh Concurrence). Moreover, from a legal standpoint, the grant of a stay will maintain the long-standing precedent that redistricting "is a legislative task which federal courts should make every effort not to pre-empt." Wise, 437 U.S. at 539. This is especially true after the Eighth Circuit explained – without making an explicit holding - that 42 U.S.C. § 1983 cannot be used to enforce § 2 of the VRA. See Arkansas State Conference NAACP, 2023 WL 8011300 at *5-*12.

III.     CONCLUSION

For the aforementioned reasons, a stay of judgment pending appeal must be granted.

-7-

Dated this 12th day of December, 2023.

SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER & SMITH

By /s/ Scott K. Porsborg
Scott K. Porsborg (ND Bar ID #04904)
sporsborg@smithporsborg.com
Brian D. Schmidt (ND Bar ID #07498)
bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
(701) 258-0630

Attorneys for North Dakota Legislative
Assembly; Ray Holmberg, Nicole Poolman,
Rich Wardner, Bill Devlin, Mike Nathe,
Terry B. Jones, and Claire Ness

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December, 2023, a true and correct copy of the foregoing **NORTH DAKOTA LEGISLATIVE ASSEMBLY'S BRIEF IN REPLY TO MOTION FOR STAY OF JUDMENT PENDING APPEAL** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

**ATTORNEYS FOR PLAINTIFFS**

Michael S. Carter                    carter@narf.org
Matthew Campbell                     mcampbell@narf.org
Attorneys At Law
1506 Broadway
Boulder, CO 80301

**ATTORNEYS FOR PLAINTIFFS**

Mark P. Garber                       mgaber@campaignlegal.org
Molley E. Danahy                     mdanahy@campaignlegal.org
Attorneys At Law
1101 14th St. NW, Ste. 400
Washington, DC 20005

-8-

**ATTORNEY FOR PLAINTIFFS**

      Timothy Q Purdon                      tpurdon@robinskaplan.com
      Attorney at Law
      1207 West Divide Avenue, Suite 200
      Bismarck, ND 58501

**ATTORNEY FOR PLAINTIFFS**

      Samantha B. Kelty                    kelty@narf.org
      Attorney at Law
      1514 P St. NW, Suite D
      Washington, D.C. 20005

**ATTORNEY FOR PLAINTIFF**

      Bryan Sells                           bryan@bryansellslaw.com
      Attorney at Law
      P.O. Box 5493
      Atlanta, GA 31107-0493

**ATTORNEYS FOR DEFENDANT MICHAEL HOWE**

      Matthew A Sagsveen               masagsve@nd.gov
      Assistant Attorney General
      500 North 9th Street
      Bismarck, ND 58501-4509

      David R. Phillips                  dphillips@bgwattorneys.com
      Bradley N. Wiederholt           bwiederholt@bgwattorneys.com
      Special Assistant Attorney General
      300 West Century Avenue
      P.O. Box 4247
      Bismarck, ND 58502-4247

                               By /s/ Scott K. Porsborg
                                 SCOTT K. PORSBORG

App218
Appellate Case: 23-3697     Page: 237     Date Filed: 12/17/2023 Entry ID: 5345207

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Case No: 3:22-cv-00022

Turtle Mountain Band of Chippewa       )
Indians, Spirit Lake Tribe, Wesley Davis,  )
Zachary S. King, and Collette Brown.     )          **NORTH DAKOTA LEGISLATIVE**
                                        )          **ASSEMBLY'S BRIEF IN SUPPORT OF**
            Plaintiffs,                 )          **MOTION TO INTERVENE, JOINDER**
                                        )          **IN THE SECRETARY'S MOTION FOR**
v.                                      )          **STAY OF JUDGMENT PENDING**
                                        )          **APPEAL AND RESPONSE TO THE**
Michael Howe, in his official capacity as  )        **PLAINTIFFS' MOTION TO AMEND**
Secretary of State of North Dakota.      )          **REMEDIAL ORDER**
                                        )
            Defendant                   )

        ***                    ***                    ***

## I.    INTRODUCTION

The North Dakota Legislative Assembly ("Assembly") submits this motion to protect its well-established right to draw its legislative districts. "It is true, of course, that States retain broad discretion in drawing districts to comply with the mandate of § 2." League of United Latin American Citizens v. Perry, 548 U.S. 399, 429 (2006). Redistricting "is primarily the duty and responsibility of the State through its legislature...rather than of a federal court." Voinovich v. Quilter, 507 U.S. 146, 156 (1993).  In fact, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." Wise v. Lipscomb, 437 U.S. 535, 539 (1978).  This is why it "is therefore appropriate, whenever practicable, to afford a **reasonable opportunity** for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." Id. at 540 (Emphasis added).

The Assembly has not been afforded a "reasonable opportunity" to adopt a remedial plan.

- 1 -

App219
Appellate Case: 23-3697    Page: 238    Date Filed: 12/17/2023 Entry ID: 5345207

The Assembly's "opportunity" – as provided by the Court - is unreasonable, unrealistic, and illusory. The Plaintiffs' Motion to Amend Remedial Plan acknowledges this is true.  Doc. 134 at pp. 2 n.1, p. 3 n.2.  Seizing this opportunity, Plaintiffs impermissibly request the Court further obstruct and impede the Assembly's ability to perform its redistricting duties as required by the North Dakota Constitution.  See Growe v. Emison, 507 U.S. 25, 34 (1993) ("[A] federal court must neither affirmatively obstruct state [redistricting] nor permit federal litigation to be used to impede it."); see also Doc. 134.

On December 5, 2023, Legislative Management appointed an interim redistricting committee and authorized a Request for Proposal ("RFP") to retain a redistricting expert.  This meaningful attempt at due diligence - and compliance with its state constitutional duties - will be an act of futility if this Court does not allow the Assembly a reasonable opportunity to act. The Assembly hereby submits this Brief in Support of Motion to Intervene, Joinder in the Secretary's Motion for Stay of Judgment Pending Appeal (Doc. 131), and Response to the Plaintiffs' Motion to Amend Remedial Order (Doc. 134).

## II.    FACTS

More than five months after conclusion of trial, this Court issued its November 17, 2023, "Findings of Fact and Conclusions of Law" and entered judgment.  Doc. Nos. 112, 125, 126. After noting this was "a closer decision than suggested by the Tribes" the Court ordered the "Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2."  Doc. 125 at p. 39.

Secretary Howe filed a Notice of Appeal and Motion for Stay of Judgment Pending Appeal on December 4, 2023.  Doc. 130, 131.  Secretary Howe's motion is supported – in part – by the Eighth Circuit's recent holding that Section 2 of the Voting Rights Act does not provide a private

App220
Appellate Case: 23-3697     Page: 239     Date Filed: 12/17/2023 Entry ID: 5345207

right of action in <u>Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment</u>, —F.4th—, 2023 WL 8011300 (8th Cir. Nov. 20, 2023).  Doc. 132 at p. 2.

Representative Lefor, Chairman of the Legislative Management, called a meeting of the Legislative Management and Legislative Council posted notice on November 30, 2023[1]. Affidavit of Emily Thompson ("Thompson Aff'd."), Exhibit # 1.  Legislative Management met on December 5, 2023. <u>Id</u>., Exhibit # 2.   During this meeting, Chairman Lefor appointed an interim redistricting committee. <u>Id</u>. Further, Legislative Management approved an RFP to retain an expert statistical consultant to aid in development of a remedial plan.  <u>Id</u>.

In an apparent response to Legislative Management's meeting, Plaintiffs filed their "Motion to Amend Remedial Order" and "Motion to Expedite" approximately six and a half hours after Legislative Management adjourned[2].  <u>See</u> Doc. 134, 135, Thompson Aff'd., Exhibit # 2. Plaintiffs' Motion to Amend seeks "an order to clarify that **Plaintiffs' Demonstrative Plan 1** will be ordered into effect as the remedial plan if the Legislature does not adopt, and the Governor does not sign into law,[2] an alternative remedial plan by December 22, 2023." Doc. 134 at pp. 2-3 (emphasis and footnote in original).  Footnote 2 of the Plaintiffs' motion acknowledges the Court must provide "an opportunity for the Legislature to enact (through the state's normal process-here bicameralism and presentment) a remedial plan."  <u>Id</u>. at p. 3 n. 2. The Plaintiffs' motion further made numerous references to the "Secretary's representations" (<u>Id</u>. at p. 2), despite the Secretary's clarification that he "does not purport to speak for on behalf of the Legislative Assembly." Doc.

---

[1] The District Court issued its Order on Friday, November 17th; however, Thanksgiving fell on November 23rd.  Legislative Management consists of 17 members of the Legislative Assembly.

[2] Per the Notice of Electronic Filing, the Plaintiffs filed Doc. 134 at 5:28 p.m. and Doc. 135 at 5:29 p.m. central time on December 5, 2023.  Legislative Management's meeting adjourned at approximately 10:57 a.m. central time on December 5, 2023. Plaintiffs noted the actions taken by Legislative Management merely hours before they filed their motions. Doc. 134 at p.2 n.1.

No. 132 at p. 17, n.2.  As explained below, the Secretary was correct to provide such a disclaimer.

Additionally, Plaintiffs requested the Court set an expedited deadline of December 8, 2023, for the Secretary to respond to their Motion to Amend Remedial Order.  Doc. 135.  The Court granted the Plaintiffs' motion to expedite and required a response be filed by the Plaintiffs' proposed deadline. Doc. 136. The Court's December 22, 2023 deadline for the Assembly <u>and</u> Secretary Howe to "adopt" a remedial plan presents a legal impossibility and does not provide the Assembly a reasonable opportunity to carry out its duties.

**A.      Summary of Applicable North Dakota Law.**

Plaintiffs acknowledge the Assembly must be afforded an opportunity to enact a remedial plan through its normal legislative process.  <u>See</u> Doc. 134 at p. 3 n. 2.  However, the deadline imposed by the Court deprives the Assembly of this requirement.

**1.      The North Dakota Constitution vests redistricting powers to the Assembly**

The North Dakota Constitution provides the power to establish legislative districts rests with the Assembly.  N.D. Const. Art. IV § 2 ("The legislative assembly shall…divide the state into as many senatorial districts of compact and contiguous territory as there are senators.") Section 2 of the North Dakota Constitution also provides the "legislative assembly shall guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates." <u>Id</u>.  Further, the "legislative assembly shall enact all laws necessary to carry into effect the provisions of this constitution." N.D. Const. Art. IV § 13.  "No bill may become law except by a recorded vote of a majority of the members elected to each house." <u>Id</u>.

In accordance with the above constitutional provisions, North Dakota law contains numerous legislative redistricting requirements.  <u>See</u> N.D.C.C. § 54-03-01.5.  North Dakota's

- 4 -

App222

legislative districts are enacted into state law. N.D.C.C. § 54-03-01.14. However, the legislative districts of North Dakota cannot be imposed by the Assembly's decree. Rather, the North Dakota Constitution provides an extensive system of checks and balances.

**2.   The North Dakota Constitution's constraints on the Assembly's power.**

The United States Supreme Court recently acknowledged "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto." <u>Arizona State Legislature v. Arizona Ind. Redistricting Com'n.</u>, 576 U.S. 787, 808 (2015). North Dakota's prescriptions for lawmaking also include the referendum and Governor's veto. See N.D. Const. Art. III § 1 and Art. V § 9. However, if neither of these unlikely events occur, the soonest a bill could become law is if the Governor orders a special session, in which case the effective date of the law is substantially accelerated.[3] N.D. Const. Art. IV § 13.

**3.   The Assembly's ability to meet is limited by the North Dakota Constitution.**

Unlike most states, the Assembly's ability to meet in regular session is limited to 80 natural days during the biennium. N.D. Const. Art. IV § 7. The Assembly has only 5 natural days remaining during this biennium and can only reconvene as determined by Legislative Management. <u>See</u> N.D.C.C. § 54-03-02(3). Alternatively, the North Dakota Constitution allows only the governor to "call special sessions of the legislative assembly." N.D. Const. Art. V § 7.

---

[3] Every law enacted by the Assembly - during its regular session - becomes effective August 1st after its filing with the secretary of state, "or if filed on or after August first and before January first of the following year ninety days after its filing" or a subsequent date as specified in the law. N.D. Const. Art. IV § 13. An exception applies if two-thirds of the members elected to each house declare an emergency measure and includes such declaration in the Act. <u>Id</u>. Alternatively, "[e]very law enacted by a special session of the legislative assembly takes effect on a date specified in the Act." <u>Id</u>.

App223
Appellate Case: 23-3697   Page: 242   Date Filed: 12/17/2023 Entry ID: 5345207

While Legislative Management may vote to "request the governor call a special session of the legislative assembly," it cannot force the governor to do so. See Id.; N.D.C.C. § 54-03-02.2.

In sum, the Assembly's ability to enact redistricting legislation is not fully within its control. What is absolutely clear is that compliance with the Court's order is impossible as Secretary Howe has no authority to "adopt" redistricting legislation. See Doc. 125 at p. 39; Doc. 126 at p. 2.

### 4.    Various other statutes impact North Dakota elections.

In addition to the above constraints, North Dakota law also provides various timing requirements in advance of elections. These statutory requirements were explained at length by the Secretary. Doc. 132 at *passim.* Therefore, those requirements will not be restated.

## III.    LAW AND ARGUMENT

The Assembly's request to be heard in this litigation is directly supported by Eighth Circuit precedent recognizing "[f]ederal courts are reluctant to devise and impose redistricting and reapportionment plans, because such tasks are traditionally performed by legislative bodies." Williams v. City of Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994). In fact, when a federal court declares a plan violates federal law, it "is therefore appropriate, whenever practicable, to afford a **reasonable opportunity** for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." Id. (quoting Wise, 437 U.S. at 540 (1978) (emphasis added). The Assembly has a strong interest in doing so because if it "offers a remedial plan, the court must defer to the proposed plan unless the plan does not completely remedy the violation or the proposed plan itself constitutes a section two violation." Id. However, "the district court must fashion a remedial plan" if the Assembly declines to propose a remedy. Id.

- 6 -

The Plaintiffs' Motion to Amend Remedial Order is a clear attempt to usurp these requirements as it impermissibly requests the Court impose their demonstrative map on the North Dakota electorate by judicial fiat. Doc. 134 at pp. 2-3. This is clearly not what is intended by the Voting Rights Act. See Shaw v. Hunt, 517 U.S. 899, 917 n.9 (1996) (Explaining a § 2 plaintiff does not have "the right to be placed in a majority-minority district once a violation of the statute is shown. States retain broad discretion in drawing districts to comply with the mandate of § 2."); Bush v. Vera, 517 U.S. 952, 978 (1996) ("[W]e adhere to our longstanding recognition of the importance in our federal system of each State's sovereign interest in implementing its redistricting plan...the States retain a flexibility that federal courts enforcing § 2 lack...by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, §2 liability.") This is because a federal court must not permit federal litigation be used to impede the Assembly's redistricting duties. Growe, 507 U.S. at 34.

The Court's December 22, 2023 deadline deprives the Assembly of a "reasonable opportunity" to adopt "a substitute measure" as required by binding precedent. Williams, 32 F.3d at 1268 (8th Cir. 1994); see also Bone Shirt, 461 F.3d 1011, 1022 (8th Cir. 2006) ("As required, the defendants were afforded the first opportunity to submit a remedial plan.") Further, the Plaintiffs' Motion to Amend Remedial Order impermissibly seeks to deprive the State of its important sovereign redistricting interest. See Shaw, 517 U.S. at 917 n.9; Bush, 517 U.S. at 978. The Assembly submits this motion to protect its powers under the North Dakota Constitution, ensure the Court provides it the "reasonable opportunity" to adopt a redistricting plan, and protect its sovereign interests as recognized by binding case law.

A.    **The Assembly's Motion to Intervene**

The Assembly has a strong, well-recognized, and unique interest to protect at this stage of

App225
Appellate Case: 23-3697    Page: 244    Date Filed: 12/17/2023 Entry ID: 5345207

this litigation. To be sure, the Assembly's and Secretary's interests were aligned through trial with respect to questions regarding whether Plaintiffs could satisfy *Gingles*. However, the initial inquiry under *Gingles* is only "designed to establish liability, and not a remedy." Bone Shirt, 461 F.3d at 1019; see also Cottier v. City of Martin, 445 F.3d 1113, 1117 (8th Cir. 2006) ("[T]he ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem." (citing Thornburg v. Gingles, 478 U.S. 30, 50 n. 17 (1986))) [4]. As explained above, the Assembly – not the Secretary - must be afforded a "reasonable opportunity" to adopt a "substitute measure" to remedy the asserted violation[5]. Williams, 32 F.3d at 1268 (8th Cir. 1994).

Legislative Management - not the Secretary - appointed an interim redistricting committee and authorized an RFP to procure a redistricting expert and ensure a remedial plan comports with both the requirements of § 2 and North Dakota's traditional redistricting principles. Redistricting is a legislative function and not within the Secretary's authority. See Arizona State Legislature, 576 U.S. at 808 (Explaining redistricting is a legislative function to be performed in accordance with a State's lawmaking procedures).

Further, this Court impermissibly ordered both the "Secretary and Legislative Assembly….to adopt a plan to remedy the violation of Section 2." Doc. 125 at p. 39. The Secretary has no power to "adopt" a redistricting plan. The Assembly – not the Secretary – is the only body vested with such power[6]. The Assembly must be allowed to intervene in this action to

---

[4] Cottier was reversed on other grounds in Cottier v. City of Martin, 604 F.3d 553 (8th Cir. 2010) (en banc).

[5] The Assembly does not concede its existing plan violated Section 2 or that Plaintiffs met their burden to establish liability and preserves all arguments for appeal.

[6] However, this power is subject to the people's referendum and governor's veto. N.D. Const. Art. IV § 2, Art. III § 1, Art. V § 9; see also Arizona State Legislature, 576 U.S. at 808. The people of

- 8 -

protect its well-recognized unique redistricting interests.

Intervention is governed by Fed. R. Civ. P. 24 which provides the following in relevant part:

> **(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:
>> **(1)** is given an unconditional right to intervene by a federal statute; or
>> **(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> **(b) Permissive Intervention.**
>> **(1)** *In General.* On timely motion, the court may permit anyone to intervene who:
>>> **(A)** is given a conditional right to intervene by a federal statute; or
>>> **(B)** has a claim or defense that shares with the main action a common question of law or fact.
>>
>> **(2)** *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:
>>> **(A)** a statute or executive order administered by the officer or agency; or
>>> **(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.

Fed. R. Civ. P. 24(a)-(b).

It is well-recognized the Assembly has an interest to propose a remedial plan. Williams, 32 F.3d at 1268; Bone Shirt, 461 F.3d at 1022. The Secretary does not represent the same interest as he has no authority to comply with the Court's directive. See N.D. Const. Art. IV § 2. If the Assembly is not afforded a "reasonable opportunity" to adopt a remedial plan, its ability to protect

---

North Dakota has previously and successfully exercised the power of referendum to nullify apportionment legislation. See Chapman v. Meier, 420 U.S. 1, 12 (1975) (explaining the Assembly passed an apportionment act in 1973 providing for five multimember senatorial districts, however, it "promptly was suspended by a referendum petition" and the "Assembly's work to reapportion was thus nullified by the people.") Notably, the power to apportion is inextricably intertwined with the power to establish legislative districts. See N.D. Const. Art. IV at § 2; see also Williams, 32 F.3d at 1268 (acknowledging federal courts are reluctant to impose redistricting and reapportionment plans as they are to be performed by legislative bodies).

App227
Appellate Case: 23-3697     Page: 246     Date Filed: 12/17/2023 Entry ID: 5345207

this interest will be not only be "impaired," but never recognized. The law does not allow for these circumstances. Williams, 32 F.3d at 1268; Bone Shirt, 461 F.3d at 1022. As a result, the Assembly is entitled to intervene as a matter of right under Fed. R. Civ. P. 24(a).

Alternatively, the Assembly's motion may be appropriately considered under Fed. R. Civ. P. 24(b). The Assembly has a claim for protecting its "reasonable opportunity" to adopt a remedial redistricting plan that complies with the North Dakota Constitution and the VRA. The Assembly clearly has an interest sufficient to justify intervention whether as a matter of right or permissively under Rule 24.

Further, the Assembly's motion is "timely" within the meaning of Rule 24. In Cameron v. EMW Women's Surgical Center, P.S.C., the Court held the Sixth Circuit should have permitted Kentucky's Attorney General to intervene pending *en banc* review even though the State's interests were previously defended by the Kentucky Secretary for Health and Family Services. 595 U.S. 267 (2022). The Court specifically held the Sixth Circuit's "assessment of timeliness was mistaken" when it found "the attorney general's motion was not timely because it came after years of litigation in the District Court and after the panel had issued its decision." Id. at 279. The Court explained "timeliness is an important consideration in deciding whether intervention should be allowed, see, *e.g.*, Fed. Rules Civ. Proc. 24 (a) and (b)(1), but timeliness is to be determined from all the circumstances, and the point to which a suit has progressed is ... not solely dispositive." Id. (quotations omitted) (cleaned up). Rather, "the most important circumstance relating to timeliness is that the attorney general sought to intervene as soon as it became clear that the Commonwealth's interests would no longer be protected by the parties in the case." Id. at 279-80 (quotation omitted). Although the attorney general's motion did not seek intervention until litigation has "proceeded for years, that factor is not dispositive. The attorney general's need to seek intervention did not

- 10 -

arise until the secretary ceased defending the state law, and the <u>timeliness of his motion should be assessed in relation to that point in time</u>." <u>Id</u>. at 280 (emphasis added).

In reaching this decision, the Court noted "our Constitution split the atom of sovereignty…The Constitution limited but did not abolish the sovereign powers of the States, which retained a residuary and inviolable sovereignty…Paramount among the States' retained sovereign powers is the <u>power to enact</u> and enforce <u>any laws that do not conflict with federal law</u>." <u>Id</u>. at 277 (quotations omitted) (emphasis added).

Further, "a State clearly has a legitimate interest in the continued enforceability of its own statutes…and a federal court must respect…the place of the States in our federal system…This means that a State's opportunity to defend its laws in federal court should not be lightly cut off." <u>Id</u>. (internal quotations and citations omitted). The Court continued as follows:

> The importance of ensuring that States have a fair opportunity to defend their laws in federal court has been recognized by Congress. Under 28 U.S.C. § 2403(b), when a state law "affecting the public interest is drawn in question" in any "court of the United States" and neither the State nor any state agency or officer is a party, the court must notify the state attorney general, and the State must be allowed to intervene. See also Fed. Rule Civ. Proc. 24(a)(1). Even if this provision is not directly applicable in this case because the secretary for Health and Family Services was still a party when the intervention motion was filed, <u>it nevertheless reflects the weighty interest that a State has in protecting its own laws</u>. The way in which Kentucky divides executive authority and the unusual course that this litigation took should not obscure the important constitutional consideration at stake.

<u>Id</u>. at 278 (emphasis added).

Under <u>Cameron</u>, the Assembly is allowed to intervene and protect its reasonable opportunity to exercise its sovereign power to enact laws - that do not conflict with federal law - by the development of a remedial plan. This is why an interim redistricting committee was appointed and Legislative Management authorized an RFP to retain an expert to aid in this process.

- 11 -

Further, the Assembly's interest – distinctly separate from the Secretary's – was not triggered until the Court found § 2 liability. As explained above, a clear distinction exists between a finding of § 2 liability and the development of a remedial plan. Bone Shirt, 461 F.3d at 1019; Cottier, 445 F.3d at 1117. It is clear the Assembly's interest in having a "reasonable opportunity" to adopt a "substitute measure" was not triggered until the Court found liability under § 2 and further placed under attack by the Plaintiffs' Motion to Amend Remedial Order. This motion is certainly "timely" and meets all the requirements for intervention under Fed. R. Civ. P. 24. See Cameron, 595 U.S. 277-80. Therefore, the Assembly's motion to intervene should be granted.

**B.      Joinder in the Secretary's Motion for a Stay of Judgment Pending Appeal**

The Assembly agrees the legal rationale articulated in the Secretary's Brief in Support for Stay of Judgment Pending Appeal certainly justifies a stay and will not restate those legal arguments here. However, the Secretary's interests in administering the election – while certainly legitimate and important – are not the same as the Assembly's redistricting interests. These issues involve two separate branches of North Dakota's government. Much like the Secretary cannot "adopt" legislation, the Assembly cannot administer the 2024 election.

There are additional issues under the North Dakota Constitution to be considered. Obviously, as explained above, redistricting is a legislative function. However, the Assembly's duty to establish legislative districts is not satisfied by simply sitting down and drawing a map. The Assembly must ensure "every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates." N.D. Const. Art. IV § 2. However, the Assembly is constrained by the following statutory requirements:

A legislative redistricting plan based on any census taken after 1999 must meet the following requirements:

1. The senate must consist of forty-seven members and the house must consist of ninety-four members.
2. Except as provided in subsection 3, one senator and two representatives must be apportioned to each senatorial district. Representatives may be elected at large or from subdistricts.
3. Multimember senate districts providing for two senators and four representatives are authorized only when a proposed single-member senatorial district includes a federal facility or federal installation, containing over two-thirds of the population of the proposed single-member senatorial district.
4. Legislative districts and subdistricts must be compact and of contiguous territory.
5. Legislative districts must be as nearly equal in population as is practicable. Population deviation from district to district must be kept at a minimum. The total population variance of all districts, and subdistricts if created, from the average district population may not exceed recognized constitutional limitations.

N.D.C.C. § 54-03-01.5.

Additionally, the Assembly must also take into consideration the *Gingles* preconditions as well as the totality of circumstances test when developing a remedial plan to ensure it is afforded deference by the court and remedies the asserted violation. See Williams, 32 F.3d at 1268. This Court acknowledged the evaluation of Section 2 "is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." Doc. 125 at p. 38 (quoting Missouri State conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016)). In fact, this Court reviewed the existing plan in excess of five months before issuing a decision. However, the Court only provided the Assembly – which is not in session - 35 days (including intervening holidays and weekends) to develop a remedial plan that complies with Section 2. This is not a "reasonable opportunity," but rather an illusory one.

Legislative Management acknowledges this issue requires expertise and is actively pursuing an expert to aid the newly appointed interim redistricting committee. This is reasonable

- 13 -

Appellate Case: 23-3697     Page: 250     Date Filed: 12/17/2023 Entry ID: 5345207

and necessary. <u>See</u> <u>Caster v. Merrill</u>, 2022 WL 264819 at *3 (N.D. Ala. Jan. 24, 2022) (In granting a motion for a stay, the district court ordered that if the Legislature were unable to pass a remedial plan in its timeframe the defendants were "to advise the court so that the court may retain (at the expense of the Defendants) an eminently qualified expert to draw on an expedited basis a map that complies with federal law for use in Alabama's 2022 congressional elections.") The Assembly cannot perform any meaningful due diligence under the Court's current schedule.

This Court recognized "the Legislative Assembly did carefully examine the VRA and believed that creating subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA." Doc. 125 at p. 38. This is undoubtedly true; however, despite its best efforts, this Court found "those efforts did not go far enough to comply with Section 2." <u>Id</u>. A common sense reading of the Court's decision indicates the Assembly needs to go further to develop a redistricting plan for the Court's satisfaction. The Assembly desires to do so, but it is impracticable to perform this task by December 22, 2023.

In sum, the Assembly seeks protection of its "reasonable opportunity" to develop a map that complies with traditional redistricting principles and this Court's interpretation of the VRA[7]. Establishing these districts dictates who is eligible to run for office. N.D. Const. Art. IV § 5 (All individuals "elected…to the legislative assembly must be, on the day of the election…a qualified elector in the district from which the member was selected…An individual may not serve in the legislative assembly unless the individual lives in the district from which selected.") Additionally, redistricting impacts the existing legislators and any individuals who wish to run for office or vote for their preferred candidate. This is why redistricting is a legislative function afforded to the

---

[7] As the Secretary correctly noted, recent Eighth Circuit case law provides a strong indication that Plaintiffs did not have the right to bring this lawsuit. <u>See</u> Doc. 132.

- 14 -

people's representatives and "federal courts are reluctant to devise and impose redistricting…plans." Williams, 32 F.3d at 1268.   This is a serious issue, and the Assembly merely desires a reasonable opportunity to treat it as such.

Therefore, although for additional reasons than articulated by the Secretary, the Assembly joins in the Secretary's Motion for Stay of Judgment Pending Appeal. Doc. 131.

### C.   The Assembly's Response to Plaintiffs' Motion to Amend Remedial Order.

As explained above, the Plaintiffs' filed their Motion to Amend Remedial Order (Doc. 134) approximately 6 and a half hours after Legislative Management appointed an interim committee and authorized an RFP to procure an expert.   Plaintiffs tacitly acknowledge this was a motivating factor for their motion.   Doc. 134 at p. 2 n. 1.   It is abundantly clear the Plaintiffs want this Court to simply adopt their Demonstrative Plan 1 on December 22, 2023.   Their motion is clearly an attempt to further deprive the Assembly of any meaningful opportunity to enact a remedial plan through redistricting legislation.   The Supreme Court does not condone this practice and this Court should follow its precedent.   See Shaw, 517 U.S. at 917 n.9 (explaining a § 2 plaintiff does not have the right to be placed in their preferred district once a § 2 violation is established, but rather the States retain discretion to comply with § 2's mandate).   This Court must not permit the Plaintiffs' litigation strategies to obstruct or impede the Assembly's right to perform its redistricting duties.   Growe, 507 U.S. at 34.

The Supreme Court "repeatedly held" federal courts should "make every effort not to pre-empt" a legislative body's redistricting tasks. Wise, 437 U.S. at 539.   The Plaintiffs openly request the Court ignore this long-standing Supreme Court precedent and impose their will on the North Dakota electorate.   Supreme Court precedent clearly explains this task should only be assumed by the federal courts as a last resort, not because it is the most expedient or convenient option.

- 15 -

Nonetheless, that is exactly what Plaintiffs desire.  The Plaintiffs' Motion to Amend Remedial Order should be denied.

## IV.    CONCLUSION

For the aforementioned reasons, the Assembly's Motion to Intervene should be granted, the Secretary's Motion for Stay of Judgment Pending Appeal (Doc. 131) should be granted, and Plaintiffs' Motion to Amend Remedial Order (Doc. 134) should be denied.

Dated this 8th day of December, 2023.

SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER & SMITH


By  /s/ Scott K. Porsborg
    Scott K. Porsborg (ND Bar ID #04904)
    sporsborg@smithporsborg.com
    Brian D. Schmidt (ND Bar ID #07498)
    bschmidt@smithporsborg.com
    122 East Broadway Avenue
    P.O. Box 460
    Bismarck, ND 58502-0460
    (701) 258-0630

    Attorney for the North Dakota Legislative
    Assembly, Senators Ray Holmberg, Nicole
    Poolman, and Rich Wardner; Representatives
    Bill Devlin, Mike Nathe, and Terry B. Jones,
    and Former Senior Counsel Claire Ness

- 16 -

Appellate Case: 23-3697    Page: 253    Date Filed: 12/17/2023 Entry ID: 5345207

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2023, a true and correct copy of the foregoing **NORTH DAKOTA LEGISLATIVE ASSEMBLY'S BRIEF IN SUPPORT OF MOTION TO INTERVENE, JOINDER IN THE SECRETARY'S MOTION FOR STAY OF JUDGMENT PENDING APPEAL AND RESPONSE TO THE PLAINTIFFS' MOTION TO AMEND REMEDIAL ORDER** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

### ATTORNEYS FOR PLAINTIFFS

Michael S. Carter                          carter@narf.org
Matthew Campbell                       mcampbell@narf.org
Allison Neswood                         neswood@narf.org
Attorneys At Law
250 Arapahoe Ave.
Boulder, CO 80302

### ATTORNEYS FOR PLAINTIFFS

Mark P. Garber                           mgaber@campaignlegal.org
Molley E. Danahy                       mdanahy@campaignlegal.org
Attorneys At Law
1101 14th St. NW, Ste. 400
Washington, DC 20005

### ATTORNEY FOR PLAINTIFFS

Timothy Q Purdon                      tpurdon@robinskaplan.com
Attorney at Law
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501

### ATTORNEY FOR PLAINTIFFS

Samantha B. Kelty                      kelty@narf.org
Attorney at Law
950 F Street NW, Ste. 1050
Washington, D.C. 20004

**ATTORNEY FOR PLAINTIFF**

Bryan Sells
Attorney at Law
P.O. Box 5493
Atlanta, GA 31107-0493

bryan@bryansellslaw.com

**ATTORNEYS FOR DEFENDANT MICHAEL HOWE**

Matthew A Sagsveen
Phillip Axt
Assistant Attorney General
500 North 9th Street
Bismarck, ND 58501-4509

masagsve@nd.gov
pjaxt@nd.gov

David R. Phillips
Bradley N. Wiederholt
Special Assistant Attorney General
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247

dphillips@bgwattorneys.com
bwiederholt@bgwattorneys.com

By /s/ Scott K. Porsborg
  SCOTT K. PORSBORG

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al., | **ORDER** |
| Plaintiffs, | Case No. 3:22-cv-22 |
| vs. | |
| Michael Howe, in his Official Capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Defendant Michael Howe, the Secretary of State of North Dakota, moves to stay the remedial order and judgment pending appeal in this Voting Rights Act ("VRA") case. Doc. 131. Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown move to amend or correct the remedial order, given the Secretary's motion to stay. Doc. 134. The Plaintiffs oppose the Secretary's motion (Doc. 142), and the Secretary opposes the Plaintiffs' motion (Doc. 140). The North Dakota Legislative Assembly also moves to intervene and moves for a stay. Doc. 137; Doc. 151. All four motions are denied.

**A.      Motion to Stay Judgment Pending Appeal**

The Secretary asks for a stay of the judgment finding a Section 2 violation after trial and a final decision on the merits. Tellingly though, the Secretary does not challenge the merits of the order and decision on the Section 2 claim. Instead, he argues (1) a stay of the judgment is appropriate per Purcell v. Gonzalez, 549 U.S. 1 (2006), and (2) that 42 U.S.C. § 1983 does not apply to the VRA.

**1.      Purcell Principle**

In his motion, the Secretary largely leans on Purcell to suggest a stay pending appeal is warranted. But Purcell does not apply on these facts. And even if it did, it is perhaps more troubling

to suggest that <u>Purcell</u> permits what the Secretary asks for here—that a federal court overlook and stay a proven Section 2 violation because it requires a state to correct the violation well before any election is ever scheduled to occur.

     <u>Purcell</u> and its progeny articulated a general principle "that lower federal courts should ordinarily not alter the election rules on the <u>eve</u> of an election." <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 589 U.S. ___, 140 S. Ct. 1205, 1207 (2020) (emphasis added). But the context is critical—<u>Purcell</u> and the majority of cases relying on and citing to it are cases involving <u>preliminary</u> injunctive relief, where there is no merits decision on a claim. <u>Purcell</u>, 549 U.S. at 4 (granting stay of preliminary injunction concerning voter identification procedures entered weeks before an election); <u>North Carolina v. League of Women Voters of N.C.</u>, 574 U.S. 927 (2014) (granting stay of preliminary injunction entered close to an election date); <u>Wise v. Circosta</u>, 978 F.3d 93, 103 (4th Cir. 2020) (denying preliminary injunction of new absentee ballot rule less than a month before election); <u>Veasey v. Perry</u>, 769 F.3d 890, 895 (5th Cir. 2014) (granting stay of preliminary injunction entered 9 days before election); <u>Genetski v. Benson</u>, No. 20-000216-MM, 2020 WL 7033539, at *2 (Mich. Ct. Cl. Nov. 2, 2020) (declining to grant preliminary injunction the day before an election). As explained in <u>Purcell</u>, there are "considerations specific to election cases" when deciding whether to <u>enjoin</u> an election law <u>in close temporal proximity to an election</u>. <u>Purcell</u>, 549 U.S. at 4. Also of chief concern in <u>Purcell</u> cases is the risk of voter confusion. <u>See Democratic Nat'l Comm. v. Wisconsin State Legislature</u>, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring) (stating, "Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes.").

     This is not a preliminary injunctive relief case. This is a case where a Section 2 violation of the VRA was proven by evidence at trial. Beyond that, there is no imminent election, little risk

of voter confusion, and the final judgment was not issued on the "eve" of any election. It strains credibility to seriously suggest otherwise. As the Plaintiffs correctly point out, the deadlines cited by the Secretary concern the opening date for candidate signature gathering—for elections that are still months away. Indeed, the Secretary's concern is not as to voter confusion but rather the administrative burden of correcting the Section 2 violation. Because there is no imminent election and no order for preliminary injunctive relief enjoining an election rule, Purcell does not apply, and it does not support granting a stay pending appeal.

### 2.  Traditional Stay Pending Appeal Factors

Setting Purcell aside, in deciding whether to grant a stay pending appeal, courts consider four factors: (1) whether the stay applicant has made a strong showing that the applicant is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. Chafin v. Chafin, 568 U.S. 165, 179 (2013). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." Org. for Black Struggle v. Ashcroft, 978 F.3d 603, 607 (8th Cir. 2020). Stays pending appeal are disfavored, even if the movant may be irreparably harmed. Nken v. Holder, 556 U.S. 418, 427 (2009).

First, the Secretary has not made a strong showing he is likely to succeed on the merits. Once again, nowhere in the Secretary's motion does he challenge (or even address) the merits of the Section 2 claim and the Court's finding of a Section 2 violation after trial. He instead focuses on a new legal theory that 42 U.S.C. § 1983 provides no cause of action for private plaintiffs to bring a Section 2 claim. This issue was addressed in an order denying the Secretary's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), though both

Appellate Case: 23-3697     Page: 258     Date Filed: 12/17/2023 Entry ID: 5345207

parties raise new arguments that were not raised during the initial briefing of that issue. No doubt this issue is ripe for appellate review given the Eighth Circuit's recent decision in Arkansas State Conference of NAACP v. Arkansas Board of Apportionment, __ F.4th __, No. 22-1395, 2023 WL 8011300 (8th Cir. Nov. 20, 2023). But simply because the issue is set for appellate review does not mean the Secretary has made a strong showing that he is likely to succeed on the merits. This seems particularly true when he does not challenge or address the merits of the substantive Section 2 claim at issue. So, the first factor does not weigh in favor of a stay pending appeal.

Next, the Secretary will not be irreparably injured absent a stay. The Secretary largely rehashes his Purcell analysis to show irreparable injury absent a stay. As noted above, Purcell does not apply, and the Court struggles to understand how the Secretary would be irreparably injured by complying with Section 2 of the VRA. And per Nken, even if the Secretary may be irreparably harmed, a stay pending appeal is not a matter of right. 556 U.S. at 433. The second factor does not weigh in favor of a stay pending appeal.

Third, granting a stay would substantially injure the Plaintiffs and all other Native Americans voting in districts 9 and 15. A stay would effectively allow an ongoing Section 2 violation to continue until a decision on the § 1983 issue is reached by a reviewing court. There is substantial harm inherent in the deprivation of the Plaintiffs' fundamental voting rights. See Martin v. Kemp, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018). As such, the third factor weighs heavily against a stay.

Finally, the public interest lies in correcting Section 2 violations, particularly when those violations are proven by evidence and data at trial. Concerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights. This factor also weighs against a stay pending appeal.

4

Again, it is worth emphasizing that this motion for a stay pending appeal is <u>not</u> made in the context of any preliminary injunction, where there is no final decision on the merits of a claim. And it is <u>not</u> made in the context of any imminent election. Instead, it is a request for a stay after a full and final decision on the merits, after a trial, on a Section 2 claim—a merits decision the Secretary does not address or even challenge in his motion. In that context, the law and the four factors conclusively instruct that a stay pending appeal is inappropriate, and the Secretary's motion to stay is denied.

**B.**   **Motion to Amend or Correct Remedial Order and Motion to Intervene**

Turning to the Plaintiffs' motion to amend or correct the remedial order, the motion presents an issue of jurisdiction. The filing of a notice of appeal generally divests the district court of jurisdiction over the case, and the district court cannot reexamine or supplement the order being appealed. <u>See</u> <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982); <u>Liddell v. Board of Educ.</u>, 73 F.3d 819, 822 (8th Cir. 1996). Here, the Plaintiffs ask the Court to reexamine the deadlines in the remedial order in response to the Secretary's <u>Purcell</u> concerns. But the Court cannot reexamine the remedial order because the Secretary filed his notice of appeal before the motion to amend or correct. The Court lacks jurisdiction to amend or correct the remedial order, and the motion (Doc. 134) is denied.

The same is true for the Legislative Assembly's motion to intervene and motion to stay. It is axiomatic that the motion to intervene is untimely per Federal Rule of Civil Procedure 24, but again, this Court lacks jurisdiction to reexamine or supplement the order and judgment on appeal. Adding the Legislative Assembly as a party at this late stage is a rather extraordinary request to supplement the order and judgment on appeal, and the motions (Doc. 137; Doc. 151) are denied.

App241

Appellate Case: 23-3697     Page: 260     Date Filed: 12/17/2023 Entry ID: 5345207

**C.      Conclusion**

After a trial, and careful review of all of the evidence and data, the Court concluded the 2021 redistricting plan violated Section 2 of the VRA. Put simply, the facts and the law do not support a stay of the remedial order and judgment pending appeal. The Secretary's motion to stay pending appeal (Doc. 131) is **DENIED**. Because the notice of appeal divested this Court of jurisdiction over this case, the Plaintiffs' motion to amend or correct the remedial order (Doc. 134) and the Legislative Assembly's motion to intervene (Doc. 137) and motion to stay (Doc. 151) are also **DENIED**.

**IT IS SO ORDERED**.

Dated this 12th day of December, 2023.

_/s/ Peter D. Welte_____
Peter D. Welte, Chief Judge
United States District Court

6

# United States Court of Appeals for the Eighth Circuit

**Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown,**

Plaintiff-Appellees,

v.

**Michael Howe, in his official capacity as Secretary of State of North Dakota,**

Defendant-Appellant.

APPEAL FROM DECISION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA
(No. 3:22-cv-00022)

## SECRETARY HOWE'S MOTION FOR STAY OF JUDGMENT PENDING APPEAL AND MOTION TO EXPEDITE

Pursuant to Fed. R. App. Proc. 8(a)(2), the Secretary of State of North Dakota (the "Secretary"), moves for an order staying the district court's judgment pending appeal and through the November 2024 election cycle. Because the State needs finality on what election map will be used for the 2024 elections no later than Sunday, December 31, 2023, the Secretary respectfully requests that the Court render a decision on this motion for a stay no later than **Friday, December 29, 2023.**

## BACKGROUND

Appellees allege North Dakota's 2021 state legislative redistricting plan dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act ("VRA") (codified at 52 U.S.C. § 10301). The basis for Appellees' "dilution" allegation is a preference for racially gerrymandering the election map to join two distinct Native American tribal reservations within a single elongated legislative district—despite the fact those different tribal reservations have never been joined together into one legislative district in State history.  The district court found Appellees had a private right of action under 42 U.S.C. § 1983.

On November 17, 2023, more than five months after the conclusion of a bench trial—and weeks before the 2024 election map must be fixed with finality—the district court issued a judgment concluding the State's redistricting plan "prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA" and enjoining the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of candidates in several legislative districts. R.Doc. 126 at 2. The district court also set a schedule by which the Secretary and Legislative Assembly[1] shall have until December 22 to adopt a remedial plan, the Appellees shall have until

---

[1] The State Legislative Assembly was not a party to the underlying action at the time of the district court's judgment, though it has since moved to intervene.  R.Doc. 137. That motion to intervene was denied by the district court.  R.Doc. 153.

January 5 to object to any such remedial plan, and the Secretary shall have until January 19 to reply in support of any such remedial plan. *Id.*[2]

As discussed further *infra*, administering a statewide election in North Dakota requires the 2024 election map to be finalized no later than December 31, 2023. That is the date by which counties must fix precinct boundaries (with other requirements building off that). And it is also the date after which candidates begin petitioning to be on the ballots in their respective districts (with a limited window for doing so). Changing the district boundaries after that date will risk substantial confusion, cost, hardship, and unfairness for candidates, voters, and election administrators alike.

The Secretary timely filed a notice of appeal and moved for a stay of judgment pending appeal in the district court, emphasizing the State needs finality on what election map will be used no later than December 31, and that compliance with the Court's order was not possible without imposing significant cost, confusion, and hardship. R.Doc. 131. The district court denied the motion to stay on December 12, 2023. R.Doc. 153.[3] It also denied a motion by Appellees to accelerate the remedial deadlines ahead of December 31 and a motion by the Legislative Assembly to intervene, both on the basis the notice of appeal deprived it of jurisdiction. *Id.*

The Secretary now moves this Court for a stay of the district court's judgment

[2] Copies of the district court's order and final judgment are attached as Exhibits 1 and 2, respectively.
[3] The district court's order denying the motion for stay is attached as Exhibit 3.

pending appeal and through the 2024 election cycle. This Court's recent decision in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, —F.4th—, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), *pet. for rehearing filed* (Dec. 11, 2023), strongly supports concluding the district court erred when it found Appellees had a private right of action under 42 U.S.C. § 1983, R.Doc. 30,[4] and the Secretary has a sound basis for seeking appellate review of the district court's judgment.

But the timing of the District Court's order means the Secretary cannot receive meaningful appellate review before the deadline by which the 2024 election map must be fixed with finality. Moreover, the district court's order deprives the State Legislative Assembly of a reasonable opportunity to adopt a remedial plan before one is imposed by a Federal court, and it cannot be complied with without risking significant confusion, cost, and disruption for the 2024 elections.

The Secretary asks this Court to preserve the status quo pending appeal and allow the State's legislatively enacted map to remain in place through the 2024 elections while this litigation plays out in the appellate courts.

## LAW & ARGUMENT

Because the district court's injunction was entered with insufficient time to seek meaningful appellate review without disrupting the State's 2024 election, a stay

---

[4] A copy of the district court's order denying the Secretary's motion to dismiss and finding the Plaintiffs had a private right of action is attached as Exhibit 4.

of the Court's injunction pending appeal and through the 2024 election cycle is appropriate under the Supreme Court's *Purcell* analysis for staying injunctions that disrupt upcoming elections.

Alternatively, even if the Court finds a *Purcell* analysis is inapplicable, a stay pending appeal should be granted under a traditional stay analysis.

**A.     Injunctions Likely to Disrupt Scheduled Elections Are Subject to the Supreme Court's *Purcell* Analysis**

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This principle comes from *Purcell v. Gonzalez*, where the Supreme Court explained courts should not change election rules proximate to an election when doing so could create problems for administering the election.  *See* 549 U.S. 1, 4 (2006) ("Court orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls.").

When a State's ability to efficiently administer an upcoming election is threatened, the framework for assessing an injunction is adjusted and federal courts must "weigh, in addition to the harms attendant upon issuance or nonissuance of an

injunction, considerations specific to election cases and its own institutional procedures." *Id*. at 4. And "when a lower court … alters the election rules so close to the election date, our precedents indicate that this [c]ourt, as appropriate, should correct that error." *Republican Nat'l Comm*., 140 S. Ct. at 1207.

Importantly, this principle considers not only the date of the election itself, but also the deadlines and requirements that must be met for the election to proceed in an organized and transparent manner. *Merrill,* 142 S. Ct. at 880 (Kavanaugh, J., concurring) ("Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. … Nor do incumbents know if they now might be running against other incumbents … On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials …").

The Supreme Court has not fully delineated when a *Purcell* analysis is required; however, Justice Kavanaugh's concurrence in *Merrill* is instructive. The *Merrill* case involved several challenges to Alabama's congressional electoral maps, wherein the plaintiffs alleged vote dilution in violation of the VRA, and the Alabama Secretary of State was enjoined by the district court from conducting elections based on the existing redistricting plan. Even though the primary election was still "about four months" away at the time the case came before the Supreme Court, 142 S. Ct.

at 888 (Kagan, J., dissenting), the Supreme Court stayed the district court's injunction pending appellate review. *Id*. at 879.

Justice Kavanaugh, joined by Justice Alito, wrote separately to concur with the stay of the injunction. *See Merrill,* 142 S. Ct. at 879–82 (Kavanaugh, J., concurring). Citing the *Purcell* principle, the concurrence explained, "[t]he stay order follows this Court's election-law precedents, which establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Id.* at 879. Justices Kavanaugh and Alito further explained "the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881. The heightened standard when an injunction is likely to disrupt an election has four elements:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff;

> (ii) the plaintiff would suffer irreparable harm absent the injunction;

> (iii) the plaintiff has not unduly delayed bringing the complaint to court; and

> (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* This modified test for stays in election cases has been applied by district courts in the Eighth Circuit. *See Walen v. Burgum*, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022) ("Justice Kavanaugh's framework provides helpful guidance for addressing the *Purcell* issue"); *see also Berry v. Ashcroft*, 2022 WL 2643504, at *2–3 (E.D. Mo. July 8, 2022); *Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 933–35 (D.S.D. 2022). And this modified standard has been expressly applied by the Eleventh Circuit. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) ("we agree with Justice Kavanaugh that *Purcell* only (but significantly) 'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference"); *see also Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at *2–3 (11th Cir. Aug. 4, 2023).

**B.     A Stay Pending Appeal Should be Granted Under the Modified *Purcell* Analysis**

Under the modified *Purcell* analysis, this Court should grant a stay of the district court's judgment pending appeal and allow preparation for the November 2024 elections to continue under the State's duly enacted map.

### (i)   The District Court's Order Threatens Significant Cost, Confusion, and Hardship for North Dakota's 2024 Elections.

Taking the last element first, the fourth element is whether the changes in question are feasible before the election without significant cost, confusion, or

hardship. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The district court's schedule for proposing and objecting to remedial maps goes until January 19, 2024, which is 144 days (about 4.7 months) before the June 11, 2024 primary election. N.D.C.C. § 16.1-11-01. But even more pressingly, the district court's schedule extends past the December 31 deadline by which counties need to establish their precinct boundaries and candidates petitioning to be on the ballot need to know what district they are in. N.D.C.C. § 16.1-11-15; N.D.C.C. §§ 16.1-04-01.

What qualifies as "too close" to election deadlines under *Purcell* varies depending on "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill* 142 S. Ct. at 881 n.1 (2022) (Kavanaugh, J., concurring). The ability of the State to seek meaningful appellate review of the election-impacting injunction also factors into a *Purcell* analysis. *See Walen v. Burgum*, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (*Purcell* "direct[s] courts to weigh the opportunity for appellate review").

Courts have applied the *Purcell* principle to prevent election-disrupting injunctions on similar timeframes as the present case. For example, in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), the district court denied a stay of its order on *Purcell* grounds on the basis the closest election was still roughly five months away. *Id.* at 1172–73. But the Eleventh Circuit granted a stay of the order, finding that while "the Supreme Court has never specified

precisely what it means to be 'on the eve of an election' for *Purcell* purposes …

[w]hatever *Purcell*'s outer bounds, we think that this case fits within them." *League of Women Voters*, 32 F.4th at 1371. And in *Merrill*, the Supreme Court granted a stay even though the primary election was still "about four months" away from the date of Supreme Court's stay—and even longer from the district court's injunctions. *See Merrill*, 142 S. Ct. at 879, 888 (Kagan, J., dissenting).[5]

Here, it is not feasible for the North Dakota Legislative Assembly to adopt a remedial plan by the district court-ordered deadline of December 22, 2023. And even if a remedial plan could be adopted in time, the district court's order doesn't provide finality on what map must be used until January 19, 2024 (and perhaps longer), well after important scheduled election activities have already commenced, inevitably causing confusion and hardship among voters, election officials, and candidates.

### (a) *Cost, confusion, and hardship to the Legislative Assembly*

The district court's judgment gave the Secretary and Legislative Assembly until December 22 to adopt a remedial plan, and directed that any such a plan would be subject to Appellees' objections, a reply by the Secretary no later than January

---

[5] The district court's rejection of the *Purcell* principle in this case on the basis there is "no imminent election" (R.Doc. 153 at 2) was thus in error, and failed to account for the fact that redistricting-related injunctions are significantly more disruptive than other election-related injunctions.

19, and presumably the district court's approval (or rejection) of the proffered remedial plan sometime thereafter. R.Doc. 126, Exh. 2, at 2.

The Supreme Court "has repeatedly held that redistricting and reapportioning … is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978); *see also Miller v. Johnson*, 515 U.S. 900 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."). Therefore, "whenever practicable," federal courts should provide state legislatures "a reasonable opportunity" to adopt remedial plans before imposing one. *Wise*, 437 at 540.

However, the district court did not give the Legislative Assembly a reasonable opportunity to adopt a remedial plan. The district court gave the Legislative Assembly just 35 days (November 17, 2023 to December 22, 2023) to adopt a remedial plan. But North Dakota does not have a full-time legislature, and its 2023 biennial session was already adjourned by the date of the judgment. Furthermore, the window provided by the district court falls over the winter holiday period, compounding logistical difficulties. Consequently, the Legislative Assembly indicated in its motion to intervene that the district court's deadlines do not provide it with a reasonable opportunity to adopt a remedial plan. R.Doc. 138 at 7-8.[6]

---

[6] Through this motion, the Secretary does not purport to speak for or on behalf of the Legislative Assembly.

### (b) *Cost, confusion, and hardship with respect to the 2024 elections*

Even if the Legislative Assembly was able to adopt a remedial plan by December 22, the schedule set by the district court to review and approve the remedial plan—extending until at least January 19, 2024, and potentially later—will delay the finalization of the State's election map until it is too late to carry out the 2024 election cycle without significant cost, confusion, and hardship. While the judgment directs that the first elections in the remedial district(s) shall occur in the November 2024 general election (R.Doc. 126, Exh. 2, at 2), the final map must be in place for the June 11, 2024 primary election. N.D.C.C. § 16.1-11-01. But even before that, the final map must be in place by no later than December 31, 2023, which is the date by which counties must fix precinct boundaries and after which candidates begin petitioning to be on the ballots in their respective districts. Consequently, for a variety of reasons to be discussed *infra*, the district court's judgment is likely to cause significant confusion, cost, and hardship.

First of all, it must be noted that while the injunction only expressly applies to Districts 9 and 15 and Subdistricts 9A and 9B, the complexity of district line crafting ensures that those are not the only districts that will be impacted by the district court's judgment. Changing district boundaries cannot happen in a vacuum. Due to constitutional and statutory requirements that legislative districts have substantial population equality (N.D. Const., art. IV, § 2; N.D.C.C. § 54-03-01.5(5)),

changes to the boundaries of Districts 9 and 15 will necessarily require changing at least the adjacent districts, and potentially cascading further throughout the State. Therefore, under the district court's judgment, it potentially will not even be known which districts are subject to being altered until sometime after January 19, 2024.

But beyond uncertainty over which districts will be impacted, a significant problem of timing relates to collecting signatures for ballot access. Candidates running by petition are required to get "signatures of at least one percent of the total resident population of the legislative district." N.D.C.C. § 16.1-11-06(1)(b)(3)(d). Candidates only have from January 1 until April 8 to gather the required number of signatures. N.D.C.C. §§ 16.1-11-06, 16.1-11-15. Unless the maps are fixed with finality before January 1, candidates could begin gathering signatures only to later learn some or all of the signatures they gathered no longer qualify. Consequently, any delay in establishing a final redistricting map directly—and unfairly—impacts candidates' ability to meet the requirements to be placed on the ballot.

In addition to the signature gathering issues, the candidates themselves may find out after a remedial plan is adopted by the district court that they no longer reside within the district in which they are running. The North Dakota Constitution requires that State legislators live in the district they represent. N.D. Const., art. IV, § 5. But candidates cannot make an informed decision about whether they should run for a seat in the Legislative Assembly until the district boundaries established,

and delaying some candidates' ability to make that decision will risk introducing significant confusion and unfairness into the election.

Additionally, the district court's schedule for reviewing an adopted remedial plan makes it impossible for county commissions to timely comply with their election duties. The board of county commissioners for each of North Dakota's 53 counties is required to divide the county into precincts and establish the precinct boundaries for the 2024 elections no later than December 31, 2023. N.D.C.C. §§ 16.1-04-01(1)(a), 16.1-04-01(3). North Dakota law prohibits a single precinct from encompassing more than one legislative district. N.D.C.C. § 16.1-04-01(1)(a). And county commissions must establish their precincts in a properly noticed public meeting, in accordance with N.D.C.C. ch. 11-11.

This deadline to set precincts is very important to the administration of the election because establishing precincts is necessary for county auditors to begin the extremely detailed and time-consuming process of updating the data for the Street Master, discussed at length at trial by State Elections Director Erika White (Tr. Transcript, Vol. III at p. 202) and the Elections Systems Administration Manager Brian Nybakken (Tr. Transcript, Vol. IV at pp. 11-24).[7] The Street Master is tied to the Central Voter File and identifies highways, roads, lanes, and boulevards within a precinct, allowing election officials to determine whether a particular house

---

[7] Excerpts of the Trial Transcript cited in this motion are attached as Exhibit 5.

number resides within a particular precinct. Tr. Transcript, Vol. IV at p. 11. The Street Master ties an address to a precinct, to a ballot style, and ultimately to the voter to ensure that the voter is receiving the correct ballot at the polling location with the correct candidates, contests, and ballot measures. Tr. Transcript, Vol. III at p. 202. It is crucial that the Street Master is properly updated so that voters are given the correct ballot, and they are not voting on candidates from the wrong district, or, for example, voting on bond measures they will not be paying for. *Id.*

These types of hardships and uncertainties are recognized as the basis for staying an election-disrupting injunction. As Justice Kavanaugh noted in *Merrill*: "Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries." 142 S. Ct. at 880 (Kavanaugh, J., concurring). Moreover, "state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.*

The District Court was therefore mistaken when it stated the State isn't injured by its order because the missed deadlines only "concern the <u>opening</u> date for candidate signature gathering." R.Doc. 153, Exh. 3, at 3 (emphasis original). The

disruption goes much deeper than that (even assuming it wouldn't introduce manifest unfairness for some candidates to have smaller windows for gathering signatures than other candidates). The district court's judgment should thus be stayed pending appeal and through the 2024 election to prevent undue cost, confusion, and hardship.

### (ii)    The Underlying Merits Are Not Entirely Clearcut in Favor of The Appellees

The next factor under a *Purcell* analysis is whether the merits are "entirely clearcut" in support of the injunction. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *see also League of Women Voters*, 32 F.4th 1363 at 1372 ("Whatever the precise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a 'heightened' burden.").

In this action, the district court denied a motion to dismiss by finding 42 U.S.C. § 1983 provides a private right of action for violations of Section 2 of the VRA. R.Doc. 30, Exh. 4, at 6. That finding has been cast into serious doubt by this Court's recent holding that Section 2 of the VRA lacks a private cause of action because it was "intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *5.

As the Secretary will establish on appeal, Section 1983 cannot be used to bring a Section 2 VRA claim for at least two reasons: (1) Section 2 confers group—not

individual—rights; and (2) the fact the VRA expressly assigns enforcement authority to the Attorney General precludes private enforcement under Section 1983.

### (a) *Section 2 of the VRA confers aggregate—not individual— rights*

The first question in deciding whether a statute can be enforced by private litigants under Section 1983 is whether the "statute confers an individual right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Importantly, that right must be individual, not aggregate. *Id.* at 275 (where statutes "have an 'aggregate' focus, they are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights"); *see also, e.g., Does v. Gillespie*, 867 F.3d 1034, 1041-42 (8th Cir. 2017) ("a statute that speaks to the government official" empowered by a statute "'does not confer the sort of *individual* entitlement that is enforceable under § 1983'") (emphasis original) (quoting *Gonzaga*, 536 U.S. at 287).

Section 2 of the VRA contains two subsections—subsections (a) and (b). *See* 52 U.S.C. 10301.  On a glance, it could seem as if subsection (a) describes an individual right; it forbids voting practices that "result[] in a denial or abridgement of the right of **any citizen** … to vote on account of race or color … as provided in subsection (b)." 52 U.S.C. 10301(a) (emphasis added); *Cf. Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4 (noting subsection (a) appears to contain elements

of both individual and aggregate rights, but declining to resolve the question because Section 2 lacks a private remedy). However, subsection (b), added in 1982, explains and clarifies that subsection (a) is a <u>group</u> right. Subsection (b) provides "[a] violation of subsection (a) is established if … the political processes leading to nomination or election ...  are not equally open to participation by ***members of a class of citizens*** protected by subsection (a) in that ***its members*** have less opportunity than other members of the electorate to participate in the political process…." 52 U.S.C. 10301(b) (emphasis added).

Congress's addition of the language in subsection (b) de-individualizes the Section 2 right.  Indeed, unlike ordinary antidiscrimination statutes, proving that any specific individual voter suffered discrimination or a dilution of his or her voting power does not prove a Section 2 violation.  Instead, the *Gingles* test provides that Section 2 plaintiffs must prove a "minority group" has "distinctive minority group interests" in the form of candidates they collectively prefer. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The ultimate question is therefore whether, in the aggregate, "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 48 n.15. The electoral success of any individual minority

voter's preferred candidate is immaterial to the Section 2 analysis; what matters is the preference of the "minority group." *See id.* at 51.[8]

Because Section 2 protects group rights within a particular area, not any specific individual's rights, it follows that it does not create private rights that individual plaintiffs can enforce under Section 1983. "Statutes with an 'aggregate,' rather than an individual, focus 'cannot give rise to individual rights.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 288).

In rejecting the Secretary's motion to dismiss for lack of a private right of action, the district court misstated and mis-applied the test. The test is not simply whether Section 2 of the VRA "confers a right" in a generalized sense. *Cf.* R.Doc. 30, Exh. 4, at 10. Instead, the test is whether Section 2 of the VRA creates an individual, non-aggregated right that could be enforced through Section 1983. *See Gonzaga*, 536 U.S. at 284-85; *Does v. Gillespie*, 867 F.3d at 1041-42.

---

[8] In their opposition to the Secretary's motion to stay before the district court, Appellees argued that *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) categorically held that the Section 2 right is an individual one. But Appellees extrapolate too much from the language of *Shaw*. *Shaw* was addressing whether all minorities in a state are geographically interchangeable, such that a state could leave a minority-dilution district in one part of the state if it created a new minority-empowered district elsewhere. The Court rejected such geographic interchangeability. 517 U.S. at 918. Within a "particular area," however, the right against vote dilution still belongs to the minority group, and under the *Gingles* framework it can only be understood in that context.

### (b) _The fact the VRA expressly assigns enforcement authority to the Attorney General precludes private claims under Section 1983_

Additionally, even when a federal statute creates individual rights, Section 1983 claims are precluded when the enforcement scheme provided in the underlying statute demonstrates congressional intent to preclude the remedy of a private lawsuit under Section 1983. _Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n_, 453 U.S. 1 (1981). The State may show Congress "shut the door to private enforcement … impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." _Gonzaga_, 536 U.S. at 285.

Section 12 of the VRA provides for a comprehensive enforcement scheme by the Attorney General of the United States. 52 U.S.C. § 10308. This includes a right of the Attorney General to seek an injunction, fines up to $5,000, and/or imprisonment for up to five years. _Id._ And with respect to Section 2, the plain language of the Voting Rights Act provides for enforcement by the Attorney General only, not by private parties. _Arkansas State Conf. NAACP_, 2023 WL 8011300, at *5 ("If the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'") (citation omitted); _see also, e.g., City of Rancho Palos Verdes, Cal. v. Abrams_, 544 U.S. 113, 122 (2005) (noting "ordinary inference that the remedy provided in the statute is exclusive," absent textual evidence it was intended "to complement, rather than supplant, § 1983").

In its order denying the Secretary's motion to dismiss, the district court stated: "Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for 'the prevailing party, other than the United States.'" R.Doc. 30, Exh. 4, at 11 (quoting 52 U.S.C. § 10310(e)). But the district court's statement does not support its holding. Section 10310(e), by its text, refers only to attorney's fees for actions to "enforce the Fourteenth and Fifteenth Amendments"; dilution claims under Section 2 are ***not*** actions to enforce the Fourteenth and Fifteenth Amendments, as this Court recently re-affirmed. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *7 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'*"); see also Allen v. Milligan*, 599 U.S. 1, 10-11 (2023) (explaining the current form of Section 2 was enacted in response to the Court's holding the Fifteenth Amendment only applies to discriminatory intent, not discriminatory effect). The district court's reasoning was thus in error.

In its order denying the Secretary's motion to dismiss, the district court also pointed to the fact that Section 2 VRA claims have previously been successfully brought by private litigants. R.Doc. 30, Exh. 4, at 11-12. But none of those cases actually analyzed the question of whether a private right of action exists under Section 1983 to enforce Section 2 violations, and such cases do not control the

analysis in a case where the question is actually presented. *See Arkansas State Conf.*

*NAACP*, 2023 WL 8011300, at *9-11 (noting prior cases allowing a private right of

action for Section 2 claims "were *just* background assumptions—mere dicta at

most"). The district court's reasoning on this point was thus again in error.

In short, for at least two reasons, Appellees' likelihood of success for asserting

a private right of action under Section 1983 for alleging a VRA Section 2 claim is

not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

### (iii)    Appellees Would Not Suffer Irreparable Harm Absent the Injunction

The next element of the modified test for stays in election cases is that the

plaintiffs would suffer irreparable harm absent the injunction. *Merrill*, 142 S. Ct. at

881 (Kavanaugh, J., concurring). However, as discussed above, Appellees did not

have a private right of action available to them to commence this lawsuit in the first

place. Moreover, while this litigation was pending before the district court, the

November 2022 elections were already held using the challenged map.

### (iv)   While Appellees Did Not Unduly Delay Bringing the Complaint, the Issuance of Judgment was Unfortunately Timed

The final element of the modified test for stays in election cases is whether

the plaintiffs unduly delayed bringing the complaint to court. *Merrill*, 142 S. Ct. at

881 (Kavanaugh, J., concurring). While the Secretary does not assert that Appellees

unduly delayed in bringing their original Complaint, there was nevertheless a critical delay in this case that brings it within the scope of a *Purcell* analysis.

The bench trial in this case was held from June 12-15, 2023. This trial date was specifically requested by the Secretary to account for the possibility that if Appellees were successful at trial the State may be ordered to perform a redistricting that could interfere with the November 2024 elections if delayed too long. R.Doc. 33 at 2. However, while the trial concluded on June 15, 2023, the district court did not issue its judgment until November 17, 2023, more than **five months later**.

The Secretary respectfully acknowledges that carefully weighing the evidence and adjudicating the dispute requires time. However, the fact remains that the judgment was not issued until the latter half of November, shortly before the Thanksgiving holiday and with insufficient time to seek appellate review before the election map needs to be finalized. This timing of the judgment—as well as the Court's schedule for creating and reviewing a remedial plan extending to at least January 19, 2024 (and potentially longer)—makes it impossible to seek meaningful appellate review, meet statutory deadlines, and carry out the 2024 elections without significant cost, confusion, hardship, and unfairness, as discussed *supra*.

## C. A Stay Should be Granted Even if a Traditional Stay Analysis is Applied

Even if this Court does not apply the modified test discussed above, a stay should nevertheless be granted based upon the traditional criteria for a stay pending

appeal: "(1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 423 (8th Cir. 1996); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009).

### (i) Secretary Howe is Likely to Prevail on the Merits of the Appeal

As discussed above, the Secretary's appeal is based on recent precedent from this Court which established there is no private right of action to enforce Section 2 of the VRA in this Circuit. That holding casts considerable doubt on district court's finding that Section 1983 can be used to bring a private cause of action under Section 2 of the VRA. The Secretary is likely to prevail on the merits of that challenge, and North Dakota should not be forced to adopt a court-ordered remedial plan until it has at least had the opportunity to have its arguments meaningfully considered in the appellate courts.

The district court's order denying the Secretary's motion to stay focused on the fact the Secretary's appeal challenges the district's legal finding of a private right of action rather than its fact-intensive conclusions under the *Gingles* factors. R.Doc. 153, Exh. 3, at 4. The basis for the district court's focus on this point is not entirely clear, because if the Secretary prevails in arguing the district court erred as a matter of law in finding a private right of action, then the district court's *Gingles* factor

findings were improperly reached and its judgment enjoining the use of North Dakota's duly enacted map is legally invalid. Moreover, the Legislative Assembly has indicated in its intervention filings that it intends to appeal the district court's *Gingles* factor conclusions. R.Doc. 148 at 3 & n.2.

### (ii) The State Will be Irreparably Harmed Absent a Stay

"[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Further, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). Sovereign harms are magnified when the challenged law reflects "the State's policy judgments" about election-related matters. *Perry v. Perez*, 565 U.S. 388, 393 (2012). And "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citation omitted).

As discussed in more detail above, the State's ability to conduct statewide elections in 2024 will be irreparably harmed absent a stay of the district court's injunction and judgment. The requirements and timeline laid out by the district court in its judgment cannot be feasibly incorporated into the 2024 election cycle without causing confusion and hardship among candidates, voters, and election officials

alike.  Moreover, the timing of the district court's judgment irreparably injures the State because "absent a stay, the [State] would lack any meaningful right to appeal the [] injunction," given the impending election deadlines.  *Pavek v. Donald J. Trump for President, Inc.,* 967 F.3d 905, 907 (8th Cir. 2020)

### (iii)  The Public Interest is Best Served by Granting the Stay

As discussed above, Appellees will not be harmed by a stay of the district court's injunction pending appeal because they did not have a private right of action available to them to commence this lawsuit in the first place.

Likewise, the public interest would be served by a stay of the district court's judgment pending appeal, which would enable to 2024 elections to be properly administered without unnecessary confusion and hardship.  The Secretary is appealing the district court's judgment; however, the district court was wrong as a matter of Supreme Court precedent when it stated "[c]oncerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights."  R.Doc.153, Exh. 3, at 4.  To the contrary, that is empathetically what the Supreme Court has held.  *E.g., Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid").

The public interest is also served by ensuring that the redistricting maps enacted by the peoples' elected representatives receive meaningful appellate review before they are struck down and replaced by the decree of a federal court. *See Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court"); *see also*, *e.g., Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) ("The public interest is served in preserving the integrity of the right to appellate review.") (citation omitted).

For those reasons, the public interest weighs in favor of staying the district court's injunction pending appeal and through the 2024 election.

## CONCLUSION

For the reasons set forth above, the Secretary respectfully requests that this Court grant stay of the district court's judgment pending appeal and through the 2024 elections. Because of impending deadlines and the State's need for finality on what map will be used for the 2024 election no later than December 31, the Secretary respectfully requests a decision on this motion no later than **December 29, 2023.** The Secretary further requests that the Appellees be directed to file any response to this motion no later than **December 20, 2023**, and that the Secretary be directed to file any reply no later than **December 22, 2023**.

Dated this 13th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By: _/s/ David R. Phillips_
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
Telephone: (701) 751-8188

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Appellant Michael Howe, in his official
capacity as Secretary of State of North Dakota

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This motion exceeds the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This brief contains 6,864 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d)(2). Appellant has filed an Application to File an Overlength Motion.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Time New Roman 14 point.

This brief has been scanned for viruses and the brief is virus-free.

                      */s/ David R. Phillips*
                      David R. Phillips

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2023, I electronically submitted the foregoing to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

*/s/ David R. Phillips*
David R. Phillips

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Michael Howe, in his Official Capacity as Secretary of State of North Dakota, <br><br> Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Case No. 3:22-cv-22 |

Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain Tribe"), Spirit Lake Tribe ("Spirit Lake Tribe"), Wesley Davis, Zachery S. King, and Collette Brown assert the State of North Dakota's 2021 legislative redistricting plan dilutes Native American voting strength by unlawfully packing subdistrict 9A of district 9 with a supermajority of Native Americans and cracking the remaining Native American voters in the region into other districts, including district 15—in violation of Section 2 of the Voting Rights Act of 1965. Defendant Michael Howe, the Secretary of State of North Dakota, denies the Section 2 claim, arguing the 2021 redistricting plan is lawful.

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). It prohibits what the Tribes claim happened here—"the distribution of minority voters into districts in a way that dilutes their voting power." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Thornburg v. Gingles, 478 U.S. 30, 46 (1986). In Gingles, the United States Supreme Court identified three preconditions that must be initially satisfied to proceed with a Section 2 voter dilution claim:

# Exhibit 1

1.   The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2.   The minority group . . . is politically cohesive; and,

3.   The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996). If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

A four-day bench trial was held on June 12, 2023. After consideration of the testimony at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, what follows are my findings of fact and conclusions of law. And as explained below, the Tribes have established a Section 2 violation of the VRA.

## I.   **FINDINGS OF FACT**

### A.   **The Parties**

Two Tribes and three individual voters make up the Plaintiffs. For the Tribes, the Turtle Mountain Tribe is a federally recognized Tribe under 88 Fed. Reg. 2112 (2023), possessing "the immunities and privileges available to federally recognized Indian Tribes[.]" Jamie Azure is its Chairman. Doc. 117 at 10:25-11:4. The Turtle Mountain Reservation is located entirely within Rolette County in northeastern North Dakota and covers 72 square miles. A large portion of Turtle Mountain's trust land is also located in Rolette County. Id. at 13:12-14:23; Id. at 15:11-16:4. The Turtle Mountain Tribe has over 34,000 enrolled members, and approximately 19,000 members

live on and around the Turtle Mountain Reservation, including on Turtle Mountain trust lands in Rolette County. Id. at 13:12-14:23.

The second Tribe is the Spirit Lake Tribe, which is also a federally recognized Tribe. Douglas Yankton, Sr. is its former Chairman. He served as Chairman during the 2021 redistricting process. Doc. 115 at 45:12-22. The Spirit Lake Tribe is located on the Spirt Lake Reservation. The Spirit Lake Reservation covers approximately 405 square miles, primarily in Benson County in northeastern North Dakota. Id. at 47:10-48:2, 55:13-23. The Spirit Lake Tribe has approximately 7,559 enrolled members, with approximately 4,500 members living on or near the Spirit Lake Reservation. Id. at 47:10-48:2.

Three individual voters join the Tribes as Plaintiffs: Wesley Davis, Zachary King, and Collette Brown. Davis and King are enrolled members of the Turtle Mountain Tribe. They live on the Turtle Mountain Reservation, are eligible to vote, and plan to continue voting in elections. They currently reside in what is now Senate district 9 and House subdistrict 9A. Doc. 108 at 6. Brown is an enrolled member of the Spirit Lake Tribe. She lives on the Spirit Lake Reservation, is eligible to vote, and plans to continue voting in elections. She resides in district 15. Doc. 116 at 7:8-9:11.

The Secretary is sued in his official capacity as Secretary of State of North Dakota. Doc. 108 at 7. The Secretary is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D. Cent. Code §§ 16.1-01-01(1) & (2)(a).

**B.      North Dakota's 2021 Redistricting Plan**

Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district following the Census that happens every 10 years. The North Dakota Legislative Assembly ("Legislative Assembly") is required to

Appellate Case: 23-3655     Page: 33     Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697     Page: 294     Date Filed: 12/17/2023 Entry ID: 5345207

"guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates." N.D. Const., Art. IV, Sec. 2. It is also required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators" and requires that the "senate must be composed of not less than forty nor more than fifty-four members, and the house of representatives must be composed of not less than eighty nor more than one hundred eight members. These houses are jointly designated as the legislative assembly of the state of North Dakota." Id., Sec. 1. So, one Senator and at least two House members are allocated to each district. Section 2 of Article IV allows the House members to be either elected at-large from the district or elected from subdistricts created within the district. Id., Sec. 2.

### 1.    North Dakota's Legislative Districts Before the 2021 Redistricting

Recall that the Tribes challenge changes made to districts 9 and 15. For the decade prior to the 2021 redistricting, district 9 was entirely within Rolette County. Doc. 108 at 3. It had a Native American voting age population ("NVAP") of 74.4%, did not contain any subdistricts, and contained the entirety of the Turtle Mountain Reservation, and its trust land located within Rolette County. Id. This map shows the pre-2021 legislative districts in the region:



4

Pl. Ex. 103.

### 2.     2021 Redistricting Process and Plan

As a result of the COVID-19 pandemic, the 2020 Census data was delayed. Doc. 116 at 149:18-150:2. While waiting for the new data, on April 21, 2021, Governor Burgum signed House Bill 1397. It established a legislative management redistricting committee ("Redistricting Committee") that was required to develop and submit a redistricting plan by November 30, 2021, along with implementation legislation. Doc. 108 at 1.

On May 20, 2021, then-Chairman Yankton sent a letter to the Redistricting Committee, requesting they schedule public hearings on each of the reservations located within North Dakota. Pl. Ex. 155. In response, the North Dakota Tribal and State Relations Committee held a joint meeting with the Tribal Council of the Turtle Mountain Tribe at the Turtle Mountain Community College on the Turtle Mountain Reservation. Def. Ex. 305; Doc. 108 at 2.

Redistricting was discussed at the joint meeting for roughly 30 minutes. Def. Ex. 418 at 17:18-21; Def. Ex. 305. Chairman Azure testified he became aware that redistricting had been added to the meeting agenda shortly before the meeting began. Doc. 117 at 29:21-31:24. He testified the Tribe had limited information about the 2020 Census population data and the discussion focused primarily on a population undercount. Id. at 29:21-31:24. One individual spoke in favor of subdistricts generally during the 30-minute discussion. Id. at 70:4-73:19.

Eventually, on August 12, 2021, the Census Bureau released redistricting data in legacy format (meaning the format used in specific redistricting software). Doc. 108 at 2. The Census data was released in a user-friendly format to the public on September 16, 2021. Id. at 2. The Redistricting Committee held public meetings in Bismarck on August 26, 2021, in Fargo on September 8, 2021, and again in Bismarck on September 15 and 16. Additional public meetings

Appellate Case: 23-3655     Page: 35     Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697     Page: 296     Date Filed: 12/17/2023 Entry ID: 5345207

of the Redistricting Committee were held in Bismarck on September 22 and 23, and September 28 and 29. Id. at 3.

Brown testified on behalf of the Spirit Lake Tribe at the August 26 Redistricting Committee meeting. She advocated for the Redistricting Committee to consider tribal input and for the use of single member districts to elect representatives to the House. Def. Ex. 327. Brown also encouraged the Redistricting Committee to comply with the requirements of the VRA. Id.

On September 1, 2021, the Tribal and State Relations Committee held a public meeting at the Spirit Lake Casino and Resort on the Spirit Lake Reservation and discussed redistricting. Doc. 108 at 2. Chairman Yankton testified that Spirit Lake may be interested in a legislative subdistrict to elect its House member. Def. Ex. 334. At subsequent meetings, representatives of Spirit Lake requested a subdistrict. Def. Ex. 351; Def. Ex. 398.

At its September 28 and 29 meetings, the Redistricting Committee released several proposals for creating two subdistricts in district 9. Def. Ex. 405. One proposal extended district 9 to the east to incorporate population from Towner and Cavalier Counties, created a subdistrict in district 9 that generally encompassed the Turtle Mountain Reservation, and placed Spirit Lake in an at-large district with no subdistrict. Def. Ex. 408.

About a month after that proposed plan was introduced, the Tribes each consulted their leadership, obtained an analysis of racially polarized voting, created a new proposal for district 9, and sent a letter to the Governor and legislative leaders with their proposal. Pl. Ex. 156 at 19-24; Doc. 115 at 77:5-79:18; Doc. 117 at 34:14-36:11. The letter stated that the Redistricting Committee's proposal as to district 9, which placed the Turtle Mountain Reservation in a subdistrict, was a VRA violation. It also stated that the Turtle Mountain Tribe did not request to be placed in a subdistrict. Pl. Ex. 156 at 19-24. Included in the letter was an illustration of an

6

alternative district map, where the Turtle Mountain and Spirit Lake Reservations were placed into a single legislative district with no subdistricts. Pl. Ex. 156 at 19-24; Doc. 108 at 4. Effectively, this alternative district combined Rolette County with portions of Pierce and Benson Counties, instead of combining Rolette County with portions of Towner and Cavalier Counties. Compare Pl. Ex. 156 at 19-24 with Def. Ex. 408. The letter stated that voting in the region is racially polarized, with Native American voters preferring different candidates than white voters. Id. at 19-24.

Then, at the November 8, 2021, Redistricting Committee meeting, Senator Richard Marcellais, who represented district 9 since his election in 2006, spoke in favor of the Tribes' proposed district. Def. Ex. 429 at 21-23. Representative Marvin Nelson from district 9 also spoke in favor of the proposal. Id. at 33-35. Representative Joshua Boschee moved for the adoption of an amendment to include the Tribes' proposal, but the amendment did not pass. Doc. 108 at 4. The Redistricting Committee passed and approved its final redistricting plan and report, which recommended passing the original proposal involving districts 9 and 15 (extending district 9 to the east to incorporate population from Towner and Cavalier Counties, creating a subdistrict in district 9 encompassing the Turtle Mountain Reservation, and placing Spirit Lake in an at-large district with no subdistrict).

The next day, the House of Representatives debated and passed House Bill 1504, the redistricting legislation accompanying the Redistricting Committee's final plan and report. Id. at 5. Then the Senate debated House Bill 1504. Senator Marcellais moved for an amendment (similar to the one he proposed to the Redistricting Committee), but it did not pass. Id. The Senate passed House Bill 1504, which was signed by Governor Burgum on November 11, 2021. Id.

### 3.    2021 Redistricting Plan As Enacted

As enacted, the 2021 redistricting plan created 47 legislative districts and subdivided district 9 into single-member House subdistricts 9A and 9B. Id. The plan extended district 9

7

eastward to include portions of Towner and Cavalier Counties, with the Towner County and Cavalier County portions included with parts of Rolette County in subdistrict 9B. Pl. Ex. 100. It also placed the Turtle Mountain Reservation into Senate district 9 and House subdistrict 9A and placed portions of Turtle Mountain trust lands located within Rolette County into House subdistrict 9B. Doc. 108 at 5. The plan placed the Spirit Lake Reservation in district 15. Doc. 108 at 5.

According to the 2020 Census, the NVAP of Rolette County is 74.4%. The NVAP of the portion of Towner County in district 9 is 2.7%. There is an NVAP of 1.8% in the portion of Cavalier County in district 9. Pl. Ex. 1 at 16. Subdistrict 9A has a NVAP of 79.8% and subdistrict 9B has a NVAP of 32.2%. Pl. Ex. 42 at 7; Doc. 115 at 134:13-19, 136:7-137:25. District 15 has a NVAP of 23.1%. Doc. 115 at 135:3-13; Doc. 108 at 4.

Voters in Senate district 9 and Senate district 15 each elect one Senator. Doc. 108 at 5. Voters in House subdistricts 9A and 9B each elect one representative to the House of Representatives. Id. Voters in district 15 elect two representatives at-large to the House of Representatives. Id. This is the 2021 plan's map of the legislative districts in northeastern North Dakota:



Pl. Ex. 101.

8

### C.        The Tribes' Proposed Plans

In support of their Section 2 claim, the Tribes produced two proposed plans containing alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. This is the first proposed plan:



Pl. Ex. 105. And this is the second proposed plan:



9

Pl. Ex. 106. Both feature a district 9 that has a majority NVAP. The first proposed plan has a NVAP of 66.1%, and the second has a NVAP of 69.1%. Doc. 115 at 134:22-135:2, 135:14-17, 166:1-3.

### D.   Trial Testimony and Evidence on Section 2 Claim

At trial, former Chairman Yankton (Doc. 115 at 41-120), Collette Brown (Doc. 116 at 6-44), former Senator Richard Marcellais (Doc. 116 at 44-71), former House of Representatives member Marvin Nelson (Doc. 116 at 170-189), and Chairman Jamie Azure (Doc. 117 at 10-66) testified as fact witnesses for the Tribes. Erika White (Doc. 117 at 186-203) and Bryan Nybakken (Doc. 118 at 6-38), two representatives of the Secretary of State's office, testified as fact witnesses for the Secretary.

Four expert witnesses testified. Dr. Loren Collingwood (Doc. 115 at 120-201), Dr. Daniel McCool (Doc. 116 at 72-143), and Dr. Weston McCool (Doc. 116 at 144-170) testified as expert witnesses for the Tribes. Dr. M.V. Hood III (Doc. 117 at 72-182) testified as an expert witness for the Secretary.

Former Chairman Yankton testified to the shared representational interests, socioeconomic status, and cultural and political values of Turtle Mountain Tribal members and Spirit Lake Tribal members. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. 115. He also testified as to the political cohesiveness of the Tribes, explaining that the voters who live on the Turtle Mountain Reservation and the voters who live on the Spirit Lake Reservation vote similarly. Doc. 115 at 52:12-53:25.

He also testified specifically as to the 2018 election (which is a key point of contention in this case), where Native American voter turnout was particularly high. He stated that there were unique circumstances that led to increased Native American voter turnout in 2018. Those

Appellate Case: 23-3655   Page: 40   Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697   Page: 301   Date Filed: 12/17/2023 Entry ID: 5345207

circumstances included the election being a high-profile race, a backlash by Native American voters (who perceived North Dakota as trying to block them from voting by imposing a residential address requirement to vote), and the significant national attention and resources that flowed into the Tribes following the decision allowing the address requirement to go into effect just before the election. He testified that those resources—and resulting high voter turnout among Native American voters—was unlike anything he had seen, before or since. Doc. 115 at 80:18-86:17.

Dr. Loren Collingwood testified next. Doc. 115 at 119. Dr. Collingwood is an Associate Professor of Political Science at the University of New Mexico. Id. at 120. He teaches statistical programming, along with American politics, among other things. He has published several papers on the VRA and is qualified as an expert on voting behavior, race and ethnicity, racially polarized voting, map drawing, electoral performance, and redistricting analysis. Id. at 128:7-17.

Dr. Collingwood's expert testimony was extensive. He opined on each of the three Gingles preconditions. He reviewed the statistical data and analysis he used in reaching his expert conclusions as to racially polarized voting, white bloc voting, and the NVAP in the as-enacted districts compared to the Tribes' proposed districts. His expert reports were also admitted and received as exhibits. Pl. Ex. 1, 42.

Dr. Collingwood concluded that all three Gingles preconditions were met in districts 9 and 15. He found that racially polarized voting is present in North Dakota statewide and specifically in districts 9 and 15. He also found that, in statewide elections featuring Native American candidates, white voters vote as a bloc to Native American voters in all of the elections analyzed. He opined on the NVAP percentages. He further opined that there is racially polarized voting in district 9, subdistricts 9A and 9B, and district 15. Doc. 115 at 144-45.

11

Dr. Collingwood also opined on white bloc voting. Id. at 153-66. After wide review of his statistical analysis, he concluded that the white voting bloc usually defeats the Native American-preferred candidate of choice in districts 9, 9B, and 15. Id.

As to the 2018 election, Dr. Collingwood testified that the election was "an anomalous election." Id. at 156. He noted that he had "never seen any turnout number like this, ever." Id. As a result, he gave the 2018 election results less probative value and less weight, though the results were still included in his analysis. Id. at 158.

Collette Brown testified next for the Tribes. Doc. 116 at 6. Brown is the Gaming Commission Executive Director for the Spirit Lake Gaming Commission. Id. at 8. She ran for the Senate seat in district 15 in the 2022 election. Id. at 9. She spoke about the need for Native American representation and some of the difficulties she faced in her election campaign. Id. at 14. Brown also testified about her involvement in the 2021 redistricting process. Id. at 23. She stated that the Tribes did not request the subdistricts in district 9A and 9B. Id. at 23.

Former Senator Richard Marcellais testified next. Marcellais is an enrolled member of the Turtle Mountain Tribe and was the elected state Senator for district 9 from 2006-2022. Id. at 45, 48. He testified that he lost the 2022 election, and that after his loss, there are no Native Americans serving in the North Dakota Senate. Id. at 53.

Dr. Daniel McCool then testified as the second expert witness for the Tribes. Dr. Daniel McCool is a political science professor at the University of Utah. He specializes in Native American voting rights and Native American water rights. Id. at 73. He opined on the presence of the Senate Factors in North Dakota and the impact of the 2021 redistricting plan on Native Americans. Id. at 81. He reviewed in detail his expert report and concluded that there was substantial evidence of all of the Senate Factors, except factors four and six. Id. at 89-126. He

concluded that, under the totality of the circumstances, Native Americans in North Dakota have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Id.

Dr. Weston McCool testified as the third expert witness for the Tribes. He is a National Science Foundation post-doctoral research fellow with the Anthropology Department at the University of Utah. Id. at 144. His expertise is in quantitative data analysis and analytical methods. Id. He opined specifically as to Senate Factor 5. He reviewed his statistical analysis of seven socioeconomic variables, including education, employment, and health. Id. at 161. He concluded that Native Americans in the counties at issue bear the effects of discrimination along the socioeconomic factors articulated by Senate Factor 5, and the disparities serve as obstacles to hinder Native Americans' ability to effectively participate in the political process. Id.

Next former Representative Marvin Nelson testified. Doc. 116 at 170. He testified as to his experience representing Rolette County from 2010 to 2022. Id. at 172.

The final witness for the Tribes was Turtle Mountain Tribal Chairman Jamie Azure. Doc. 117 at 11. He testified about the Turtle Mountain Tribe and its membership. Id. at 14. He also spoke about the legislative district make-up before the 2021 redistricting plan, relative to the Tribes' Reservations and trust lands. Id. at 17. And as to the 2021 redistricting plan, he testified about the Tribes sharing community interests and that the Tribes did not request the subdistricts as enacted in district 9. Id. at 19.

Chairman Azure also spoke at length about the 2018 election. Id. at 20. He discussed the record voter turnout that year because of concerns over a voter identification law. He noted there was "a lot of attention" and many national resources were directed at the Tribes. Id. He also said

he had never seen that level of Native American voter engagement in his life and has not seen it since. Id. at 21.

The first witness for the Secretary was expert witness Dr. M.V. Hood, III. He is a political science professor at the University of Georgia and director of the School of Public and International Affairs Survey Research Center. Doc. 117 at 72. Dr. Hood is an expert on American politics, election administration, southern politics, racial politics, and Senate electoral politics. Id. at 75:12-76:7.

Dr. Hood's expert testimony was extensive. He reviewed his expert report (Pl. Ex. 81) and opined on each of the three Gingles preconditions. Doc. 117 at 72:2-182:20. Notably, he testified that he agreed that the first precondition was met but questioned whether there was enough data to prove the second precondition. Id. at 89.

On the third precondition (white bloc voting), he reached a different result than Dr. Collingwood. Id. He analyzed the same elections as Dr. Collingwood (Doc. 117 at 83:14-18), though he statistically weighed the elections differently, and concluded that white bloc voting was not present in district 9 at-large and as-enacted. Id. at 86. He stated that "Gingles 3 is not met because the Native American candidate of choice is not typically being defeated by the majority white voting bloc." Id. at 89. Dr. Hood also testified that he did not review the 2022 election results. Id. at 162.

As to the 2018 election, Dr. Hood testified that the Native American turnout in 2018 was historically high and that the results should not necessarily be excluded from a performance analysis. Dr. Hood testified that those 2018 results "prove[] that Native American turnout can be that high" and that if "[i]t was that high in 2018," it could be that high again. Id. at 86:7-15.

14

Erika White, the North Dakota Election Director, testified next. She spoke about the role of the Secretary in North Dakota elections and the processes and deadlines that are imposed on state elections by statute. Doc. 117 at 192. She testified too about the redistricting process.

The Secretary's final witness was Brian Nybakken, the Elections Systems Administration Manager in the Secretary's Elections Office. Doc. 118 at 6-33. He testified about the elections systems in place in North Dakota, auditor training, voter identification requirements, and certain election issues pertaining to Native Americans in North Dakota. Id.

## II.    CONCLUSIONS OF LAW

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates." Bone Shirt v. Hazeltine, 461 F.3d 1011, 1017-18 (8th Cir. 2006) (cleaned up).

Section 2 prohibits "the distribution of minority voters into districts in a way that dilutes their voting power." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Gingles, 478 U.S. at 46). Recall that, under Gingles, three preconditions must be initially satisfied to proceed with a Section 2 voter dilution claim:

1.    The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

15

App287

      2.       The minority group . . . is politically cohesive; and,

      3.       The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996).

If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b); see also Johnson v. De Grandy, 512 U.S. 997, 1011-12 (1994) (once the three preconditions are met, the totality of the circumstances is addressed). To assess the totality of the circumstances, the Court considers the factors identified in the Senate Judiciary Committee Majority Report accompanying the bill that amended Section 2 (also known as the "Senate Factors"). S. Rep., at 28-29, U.S. Code Cong. & Admin. News 1982, pp. 206-207; Gingles, 478 U.S. at 36. Two other factors are also relevant: (1) was there a significant lack of response from elected officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. Gingles, 478 U.S. at 44; Bone Shirt, 461 F.3d at 1022.

The Senate Report stresses that these factors are "neither comprehensive nor exclusive." Gingles, 478 U.S. at 45. The extent to which voting is racially polarized (Senate Factor 2) and the extent to which minorities have been elected under the challenged scheme (Senate Factor 7) predominate the analysis. Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 894 F.3d 924, 938 (8th Cir. 2018); Bone Shirt, 461 F.3d

at 1022; Cottier v. City of Martin, 551 F.3d 733, 740 (8th Cir. 2008); Harvell v. Blytheville Sch.

Dist. No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995).

      A.      **The Gingles Preconditions**

           1.      **Gingles 1: Sufficiently Large and Geographically Compact**

The first Gingles precondition requires a Section 2 plaintiff to demonstrate that the minority group (here, Native Americans) is sufficiently large and geographically compact to constitute a majority in a potential district.[1] Gingles, 478 U.S. at 50. This is also known as the "majority-minority standard." Jeffers v. Beebe, 895 F. Supp. 2d 920, 931 (E.D. Ark. 2012). As explained in Gingles, "unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." Gingles, 478 U.S. at 50. So, this precondition focuses on electoral potential—and specifically here, whether Native American voters have the potential to constitute the majority of voters "in some reasonably configured legislative district." See Cooper v. Harris, 581 U.S. 285, 301 (2017); see also Houston v. Lafayette Cnty., Miss., 56 F.3d 606, 611 (5th Cir. 1995). Hence the analysis for the first precondition considers the proposed district(s) and not the existing district. See, e.g., Bone Shirt, 461 F.3d at 1018.

As an initial matter, the Secretary argues the first precondition is not met because district 9, as-enacted, better reflects traditional redistricting criteria than the Tribes' proposed districts. He also asserts that the first precondition is not met as to district 15. But a Section 2 claim is not a competition between which version of district 9 better respects traditional redistricting criteria. See

---

[1] While the first precondition refers to a minority constituting a majority in a "single-member district," the analysis is done on a case-by-case basis, and the Gingles factors "cannot be applied mechanically and without regard to the nature of the claim." See Voinovich v. Quilter, 507 U.S. 146, 158 (1993).

Allen v. Milligan, 143 S. Ct. 1487, 1505 (2023) (noting Gingles 1 is not a "beauty contest" between plaintiffs' maps and the state's districts). The claim is not defeated simply because the challenged plan performs better on certain traditional redistricting criteria than the proposed plan. Id. (finding that plaintiffs' demonstrative plans were reasonably configured, even where the enacted plan arguably performed better on certain traditional redistricting criteria than the demonstrative plans).

With that issue resolved, the question is whether Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. The parties agree that Native American voters have the potential to constitute the majority of voters in both proposed versions of district 9. The NVAP in the Tribes' first proposed plan is 66.1%. Doc. 15 at 134:22-135:2, 135:14-17, 166:1-3. The NVAP in the Tribes' second proposed plan is 69.1%. Id. So, the remaining issue is whether these proposed districts are "reasonably configured." See Johnson v. De Grandy, 512 U.S. 997, 1008 (1994).[2]

A district is reasonably configured "if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Milligan, 143 S. Ct. at 1503. Courts may also consider other traditional redistricting criteria, including respect for political boundaries and keeping together communities of interest. Id. at 1505 (considering respect for political subdivisions and communities of interest as traditional redistricting criteria); Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 259 (2015) (citing compactness and not splitting counties or precincts as examples of traditional redistricting criteria, amongst others).

The evidence at trial shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and

_____

[2] De Grandy articulated this standard in the context of single-member districts. Here, given the comparison of subdistricts to multimember districts, it is more useful to consider the number of representatives that Native American voters have an opportunity to elect.

keeping together communities of interest.  First, as to contiguity and compactness, the proposed districts are made up of a contiguous land base (Pl. Exs. 105, 106) and contain no obvious irregularities as to compactness. Indeed, the evidence at trial demonstrated that the proposed districts did not appear more oddly shaped than other districts, and both proposed districts are reasonably compact. See Doc. 115 at 139:17-23, 141:4-8; Pl. Ex. 1 at 32, 39. The proposed plans are also comparatively compact when viewed against other districts in the 2021 redistricting plan. Pl. Ex. 1 at 32, 39. Statistically too, Dr. Collingwood testified the compactness scores of the proposed districts are within the range of compactness scores for other districts in the 2021 redistricting plan. See Doc. 115 at 139:17-140:5, 141:24-143:20; Pl. Ex. 1 at 32, 39; Pl. Ex. 42 at 9-11; Pl. Ex. 126, 128, and 129.

The Tribes' proposed plans also respect existing political boundaries, including Reservation boundaries, and keep together communities of interest. As to political boundaries, the proposed plans keep together the Turtle Mountain Reservation and its trust lands. Pl. Exs. 105, 106. The plans similarly preserve and keep together two communities of interest. Several witnesses testified that the Tribes represent a community of interest because of their geographic proximity and their members shared representational interests, socioeconomic statuses, and cultural values. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. Chairman Azure and former Chairman Yankton persuasively testified to all those shared interests. Id. As to representational interests, the Tribes often collaborate to lobby the Legislative Assembly on their shared issues, including gaming, law enforcement, child welfare, taxation, and road maintenance, among others. See Doc. 115 at 56:12-61:18, 64:1-70:6; Doc. 116 at 21:11-21; Doc. 117 at 25:23-28:8. The residents on the Tribes' Reservations also have similar socioeconomic and education levels—levels that differ from the white residents in neighboring counties. Pl. Ex.73

Appellate Case: 23-3655   Page: 49   Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697   Page: 310   Date Filed: 12/17/2023 Entry ID: 5345207

at 513; Doc. 116 at 156:17-159:8; 161:13-161:24. Residents of the Tribes also participate in similar cultural practices and events and share cultural values. See Doc. 117 at 18:14-19:13.

All this evidence shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and keeping together communities of interest.[3] The proposed plans demonstrate that Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. And as a result, the Tribes have proven by a preponderance of the evidence that the first Gingles precondition is satisfied.

###   2.   Gingles 2: Racially Polarized Voting and Political Cohesion

"The second Gingles precondition requires a showing that the Native American minority is politically cohesive." Bone Shirt, 461 F.3d at 1020. "Proving this factor typically requires a statistical and non-statistical evaluation of the relevant elections." Id. (citing Cottier, 445 F.3d at 1118). "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections, and can be established with the same evidence plaintiffs must offer to establish racially polarized voting, because political cohesiveness is implicit in racially polarized voting." Id.

The parties and their experts agree that voting in districts 9 and 15 (when voting at large) is racially polarized, with Native American voters cohesively supporting the same candidates. Doc. 108 at 6. Based on the evidence at trial, voting in subdistricts 9A and 9B is also racially polarized, with Native American voters cohesively supporting the same candidates. Pl. Ex. 13, 14; Doc. 115

---

[3] The Secretary expresses concern that the districts under the Tribes' proposed plans would be illegal racial gerrymanders. But even assuming race was the predominate motivating factor in drawing the districts, establishing (and then remedying) a Section 2 violation provides a compelling justification for adopting one of the proposed plans. See Cooper, 581 U.S. at 292.

at 145:23-146:2. Although subdistricts 9A and 9B do not contain enough precincts for a full statistical analysis, subdistrict 9A has an NVAP of 68.5%. Pl. Ex. 1 at 15. That, combined with the undisputed political cohesiveness of district 9 at-large, demonstrates that voters in subdistrict 9A are politically cohesive. Pl. Ex. 1 at 15; Doc. 115 at 149:7-150:25.

Dr. Hood agreed that Native American voters are politically cohesive in subdistricts 9A and 9B. Pl. Ex. 80 at 4-6; Doc. 117 at 139:19-140:16. He testified that his conclusion assumed that the vote distribution within in each subdistrict "mirrors the overall district." Doc. 117 at 140:1-16. Testimony from Chairman Azure and former Chairman Yankton confirms the statistical data. Both testified that voters living on the Turtle Mountain Reservation and Spirit Lake Reservation vote similarly. Doc. 116 at 16:5-19:19, 28:14-25; Doc. 115 at 52:12-53:25.

The statistical evidence, combined with the lay witness testimony, shows that the Native American minority is politically cohesive. The Tribes have proven by a preponderance of the evidence that the second <u>Gingles</u> precondition is met.

### 3. <u>Gingles</u> *3:* White Bloc Voting

With the first and second preconditions met, the analysis turns to the third precondition, which is the chief point of disagreement between the Tribes and the Secretary. The third <u>Gingles</u> precondition "asks whether the white majority typically votes in a bloc to defeat the minority candidate." <u>Bone Shirt</u>, 461 F.3d at 1020. "This is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) determining whether the white majority votes as a bloc to defeat the minority preferred candidate, and (3) determining whether there were special circumstances . . . present when minority-preferred candidates won." <u>Id.</u> (cleaned up).

Not all elections are equally relevant in assessing white bloc voting. "Endogenous[4] and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." Id. "Although they are not as probative as endogenous elections, exogenous elections hold some probative value." Id. In addition, "[t]he more recent an election, the higher its probative value." Id. There is no requirement that a particular number of elections be analyzed in determining whether white bloc voting usually defeats minority-preferred candidates. Gingles, 478 U.S. at 57 n.25. "The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." Id.

In assessing the third precondition, courts look to the districts in which it is alleged that Native American preferred candidates are prevented from winning, not on neighboring "packed" districts. Bone Shirt, 461 F.3d at 1027 (Gruender, J., concurring) ("If the State's approach were correct, packing would be both the problem and the solution—i.e., having illegally packed Indians into one district, the State could then point out that Indians are sometimes able to elect their preferred candidate in the packed district"); De Grandy, 512 U.S. at 1003-04 (focusing on whether white voters vote as a bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up the voting majority"). Finally, courts must also consider whether "special circumstances . . . may explain minority electoral success in a polarized contest." Gingles, 478 U.S. at 57 & n.26. Special circumstances must be considered if "the election was not representative of the typical way in which the electoral process functions." Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998).

---

[4] An endogenous election is an election where a district (or subdistrict) is electing a direct representative for that district (or subdistrict), as opposed to an exogenous election, which in this case, are statewide elections.

i.       Subdistrict 9B

Starting with subdistrict 9B, the parties agree that a white bloc voting usually defeats Native American preferred candidates in subdistrict 9B when the three most probative election types are considered. And the evidence at trial supports that conclusion.

Because the challenged plan that created the subdistrict was enacted in 2021, the only endogenous election data available is from the 2022 election. Nonetheless, the data is highly probative. One of two state legislative elections in subdistrict 9B's boundaries was the district 9 at-large Senate election, which featured a Native American candidate,[5] who lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 9 | Weston: 63.0% Marcellais*: 36.8% | Lose |

Pl. Ex. 1 at 21. The other endogenous election in subdistrict 9B featured two white candidates. The Native American preferred candidate, incumbent Marvin Nelson, also lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State House District 9B | Henderson: 56.5% Nelson*: 37.6% | Lose |

Id. Beyond the 2022 endogenous election data, there are four exogenous (or statewide) elections since 2016 that featured Native American candidates that voters in precincts within the boundaries of now-subdistrict 9B voted in.[6] In each of those contests, the Native American candidate lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 64.4% Moniz*: 35.3% | Lose |

---

[5] In all tables below, the Native American preferred candidates are marked with an asterisk.
[6] To account for the lack of subdistrict specific election data, this data is generated from collecting precinct data from those precincts now in subdistrict 9B.

23

| 2016 Insurance Commissioner | Godfread: 58.4%<br>Buffalo*: 41.6% | Lose |
|---|---|---|
| 2016 Public Service Commissioner | Fedorchak: 60.2%<br>Hunte-Beaubrun*: 32.4% | Lose |
| 2016 U.S. House | Cramer: 62.2%<br>Iron Eyes*: 32.9% | Lose |

Id. at 17-20.

The next set of data focuses on the most recent three election cycles, where special circumstances were not present—here, the 2022, 2020, and 2016 elections.[7] Per the table below, the defeat rate of the Native American preferred candidates was 100% for every election cycle:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 70.9%<br>Dooley*: 28.9% | Lose | |
| 2022 Attorney General | Wrigley: 65.6%<br>Lamb*: 34.3% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 65.4%<br>Hammer*: 34.3% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Secretary of State | Howe: 57.1%<br>Powell*: 33.7% | Lose | |
| 2022 U.S. House | Armstrong: 61.4%<br>Mund*: 38.4% | Lose | |
| 2022 U.S. Senate | Hoeven: 60.6%<br>Christiansen*: 27.5% | Lose | |
| 2020 Auditor | Gallion: 59.8%<br>Hart*: 40.1% | Lose | |
| 2020 Governor | Burgum: 65.3%<br>Lenz*: 29.8% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 President | Trump: 60.8%<br>Biden*: 37.0% | Lose | |

---

[7] As discussed in detail below, the 2018 election involved special circumstances that made it atypical.

24

| | | | |
|---|---|---|---|
| 2020 Public Service Commissioner | Kroshus: 60.4% Buchmann*: 39.8% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Treasurer | Beadle: 58.6% Haugen*: 41.2% | Lose | |
| 2020 U.S. House | Armstrong: 64.4% Raknerud*: 33.4% | Lose | |
| 2016 Governor | Burgum: 61.7% Nelson*: 35.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 56.6% Clinton*: 33.8% | Lose | |
| 2016 Treasurer | Schmidt: 53.6% Mathern*: 39.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 72.9% Glassheim*: 22.1% | Lose | |

Pl. Ex. 1 at 17-20. This evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in subdistrict 9B. As a result, the third precondition is met as to subdistrict 9B.

### ii.      District 15

The parties also agree that the same conclusion follows as to district 15. Again, the only endogenous election is the 2022 state legislative election, where two Native-American preferred candidates appeared on the ballot. Both were defeated:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 15 | Estenson: 65.5% Brown*: 33.8% | Lose |
| 2022 State House District 15 | Frelich: 41.6% Johnson: 38.6% Lawrence-Skadsem*: 19.7% | Lose |

Pl. Ex. 1 at 27. There have been no endogenous all-white elections in district 15. Four exogenous elections since 2016 have featured Native American candidates within the boundaries of district 15. In each of those contests—100% of the time—the Native American candidate lost:

25

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose |

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2016 Insurance Commissioner | Godfread: 64.6% Buffalo*: 35.4% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 63.8% Hunte-Beaubrun*: 27.6% | Lose |
| 2016 U.S. House | Cramer: 65.5% Iron Eyes*: 27.9% | Lose |

Pl. Ex. 1 at 17-20. As shown below, Native American preferred candidates have lost every exogenous all-white election in the record:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 75.0% Dooley*: 24.9% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 70.9% Lamb*: 29.0% | Lose | |
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 70.4% Hammer*: 29.4% | Lose | |
| 2022 Secretary of State | Howe: 61.2% Powell*: 27.8% | Lose | |
| 2022 U.S. House | Armstrong: 62.8% Mund*: 37.1% | Lose | |
| 2022 U.S. Senate | Hoeven: 58.5% Christiansen*: 24.8% | Lose | |
| 2020 Auditor | Gallion: 65.4% Hart*: 34.5% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Governor | Burgum: 67.6% Lenz*: 25.8% | Lose | |
| 2020 President | Trump: 64.3% Biden*: 33.0% | Lose | |

26

| 2020 Public Service Commissioner | Kroshus: 64.1%<br>Buchmann*: 35.7% | Lose | **2022 + 2020 Defeat Rate: 100%** |
|---|---|---|---|
| 2020 Treasurer | Beadle: 63.2%<br>Haugen*: 36.3% | Lose | |
| 2020 U.S. House | Armstrong: 68.7%<br>Raknerud*: 28.1% | Lose | |
| 2016 Governor | Burgum: 71.1%<br>Nelson*: 24.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 57.6%<br>Clinton*: 31.2% | Lose | |
| 2016 Treasurer | Schmidt: 59.5%<br>Mathern*: 31.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 75.7%<br>Glassheim*: 18.5% | Lose | |

Pl. Ex. 1 at 27-30.

Again, like subdistrict 9B, all this evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in district 15. As a result, the third precondition is met as to district 15.

### iii.   District 9

District 9 at-large presents a much closer call and is the central point of disagreement between the parties. The Secretary disputes whether the white vote bloc usually defeats the Native American preferred candidate in (as-enacted and at-large) district 9. But based on the evidence at trial, the Tribes proved by a preponderance of the evidence that a white bloc voting does usually defeat Native American preferred candidates in the as-enacted and at-large district 9.

Without question, and consistent with case law, the most probative election in district 9 at-large is the 2022 Senate election. The election featured each of the three factors that makes an election more probative—(1) it is an endogenous election, (2) it featured a Native American candidate, and (3) it is part of the most recent election cycle. Native American incumbent Senator Marcellais lost his bid for reelection despite Native American voters casting roughly 80% of their

27

ballots for him. Pl. Ex. 1 at 15; see Bone Shirt, 461 F.3d at 1021 (affirming finding that Gingles 3 was satisfied where "[i]n the only mixed-race endogenous election . . . the Indian-preferred candidate for state senate lost even though he received 70 percent of the Native-American vote"). As the 2022 election data shows, Senator Marcellais, the Native American candidate, was defeated by his opponent, the candidate of choice of white voters in the district:

| Election | Result | Native American Candidate Win or Lose |
|----------|--------|----------------------------------------|
| 2022 State Senate District 9 | Weston: 53.7% Marcellais*: 46.1% | Lose |

Pl. Ex. 1 at 17. Moving to the statewide exogenous elections since 2016, four have featured Native American candidates within the current boundaries of district 9. In those elections, the Native American candidate lost half of the elections:

| Election | Result | Native American Candidate Win or Lose |
|----------|--------|----------------------------------------|
| 2022 Public Service Commissioner | Fedorchak: 54.1% Moniz*: 45.7% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 46.5% Hunte-Beaubrun*: 46.1% | Lose |
| 2016 Insurance Commissioner | Godfread: 43.2% Buffalo*: 56.8% | Win |
| 2016 U.S. House | Cramer: 46.9% Iron Eyes*: 49.3% | Win |

Pl. Ex. 1 at 17-20. When all contests featuring Native American candidates (whether endogenous or exogenous) are taken together, the defeat rate for Native American candidates is 60%.

Among exogenous all-white elections, Native American preferred candidates lost 100% of the 2022 elections, 67% of the 2022 and 2020 elections combined, and 56% of the 2022, 2020, and 2016 elections combined:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 60.2% Dooley*: 39.6% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 55.3% Lamb*: 44.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 55.2% Hammer*: 44.6% | Lose | |
| 2022 Secretary of State | Howe: 47.5% Powell*: 42.3% | Lose | |
| 2022 U.S. House | Armstrong: 52.8% Mund*: 47.0% | Lose | |
| 2022 U.S. Senate | Hoeven: 51.3% Christiansen*: 36.4% | Lose | |
| 2020 Auditor | Gallion: 46.5% Hart*: 53.4% | Win | **2020 Defeat Rate: 33%** |
| 2020 Governor | Burgum: 52.8% Lenz*: 43.1% | Lose | |
| 2020 President | Trump: 47.2% Biden*: 50.8% | Win | |
| 2020 Public Service Commissioner | Kroshus: 46.4% Buchmann*: 53.4% | Win | |
| 2020 Treasurer | Beadle: 45.6% Haugen*: 54.2% | Win | |
| 2020 U.S. House | Armstrong: 50.6% Raknerud*: 47.0% | Lose | |
| 2016 Governor | Burgum: 48.3% Nelson*: 48.7% | Win | **2016 Defeat Rate: 25%** |
| 2016 President | Trump: 44.2% Clinton*: 45.1% | Win | |
| 2016 Treasurer | Schmidt: 41.6% Mathern*: 50.0% | Win | |
| 2016 U.S. Senate | Hoeven: 59.7% Glassheim*: 33.9% | Lose | |

Pl. Ex. 1 at 17-20. From this data, a pattern emerges: the more recent the election, the more likely

the Native American preferred candidate is to lose. When averaged together, the total defeat rate

29

is 56%. Beyond that, even when the 2018 election results (which, as explained below, was an atypical election) are factored in, the 100% defeat rate for Native American candidates of choice in the most recent election is highly probative and compelling evidence of white bloc voting. Said another way, giving each election the appropriate weight per Eighth Circuit and Supreme Court case law, the evidence proves by a preponderance that Native American candidates of choice will not be successful over 50% of the time in as-enacted and at-large district 9.

### iv.    2018 Election and Special Circumstances

One of the key differences of opinion between Dr. Collingwood and Dr. Hood concerns the probative value and weight of the 2018 election. "Only minority electoral success in typical elections is relevant to whether a Section 2 majority voting bloc usually defeats the minority's preferred candidate." Ruiz, 160 F.3d at 557. So, a central issue is whether 2018 was a typical election, deserving equal weight as other elections, or whether it was an atypical election, deserving less weight than other elections. The Secretary argues that 2018 is a typical election deserving equal weight; the Tribes assert that the 2018 election was atypical and deserves less weight.

In 2018, a North Dakota voter identification law was upheld that required a residential address to vote. The voter identification requirement affected the number of Native Americans eligible to vote and resulted in significant national and regional attention to Native American voters and increasing voter turnout. Voter turnout did increase dramatically, as compared to years prior and since:

30

| Election | White Electorate Share | Native American Electorate Share |
|----------|------------------------|----------------------------------|
| 2014 | 67% | 33% |
| 2016 | 63% | 37% |
| 2018 | 50% | 50% |
| 2020 | 63% | 37% |
| 2022 | 60% | 40% |

Pl. Ex. 42 at 4-5. Because of the increase in Native American voter turnout, Native American preferred candidates also performed much better than in any other years, prior or since. Pl. Ex. 1 at 18.

Chairman Azure and former Chairman Yankton persuasively testified about the extraordinary resources that poured into North Dakota's Native American reservations in the lead up to the 2018 election. Doc. 115 at 80:18-86:17; Doc. 117 at 21:8-12. The voter identification law caused a backlash among Native American voters, which was aided by substantial financial resources promoting get-out-the-vote efforts on the reservations. Id. National celebrities gave concerts and performances on the reservations to promote turnout. Id. Both testified that the resources—and resulting turnout among Native American voters—was unlike anything they have seen before or since. Id.

That testimony is supported by the data. Native American turnout in 2018 was unusually high. Not only did it exceed statewide turnout and approach white turnout in district 9, but it inverted the normal pattern of lower turnout in midterm versus presidential elections:

31



Pl. Ex. 43.

With those facts in mind, the experts offer competing opinions on the probative value of the 2018 election. Dr. Hood concluded that the third precondition was not met in as-enacted and at-large district 9 because Native American preferred candidates were successful in over 50% of the elections he reviewed. To reach that conclusion and opinion, Dr. Hood reviewed the election data from Dr. Collinwood's report and added together the elections in at-large district 9 and subdistrict 9A and 9B. Pl. Ex. 81 at 4. He also included the election data from the 2018 election. Doc. 117 at 143. In other words, Dr. Hood considered all election data equally and gave no probative weight or value to any one election. Doc. 117 at 85:19-86:6. Also, and importantly, Dr. Hood did not consider the 2022 election results. Id. at 150.

Dr. Collingwood reached a different conclusion. He concluded the 2018 election presented special circumstances, including unprecedented voter turnout, that "warrant and counsel against mechanically interpreting" the results. Pl. Ex. 1 at 18. As a result, he gave the 2018 election less weight when calculating white bloc voting in district 9. He also did consider the 2022 election, weighed that election more heavily, and concluded that the Native American preferred candidate "lost every single contest." Pl. Ex. 1 at 21. Dr. Collingwood opined that the third precondition is met because "white voters are voting as a bloc to prevent Native Americans from electing

candidates of choice in recent elections, in endogenous elections . . , and in 60% of contests across all tested years in which the Native American preferred candidate was a Native American." Pl. Ex. 1 at 43.

Having heard the testimony by both experts at trial, along with having reviewed their respective reports, Dr. Collingwood's conclusions and analysis are more credible because they follow the general directives of the Eighth Circuit in weighing elections in VRA cases. Indeed, the Eighth Circuit has recognized that endogenous elections should be considered more probative than exogenous elections; elections with a Native American candidate are more probative than elections that do not feature a Native American candidate; and that more recent elections have more probative value than less recent elections. Bone Shirt, 461 F.3d at 1020-21. Dr. Hood gave all elections equal probative value and generally weighed all elections the same. But Dr. Collingwood's report and methodology more closely tracks the instruction from the Eighth Circuit in weighing election data in VRA cases, making it more credible and reliable. In addition, Dr. Hood's testimony at trial acknowledged that endogenous elections, elections featuring Native American candidates, and more recent elections are more probative. Doc. 117 at 142:9-143:7. He also testified that the 2022 endogenous election for the district 9 Senate seat was the "single most probative" election because it featured all three probative characteristics (id. at 143:12-17), but he did not consider the 2022 endogenous election in reaching his conclusions (id. at 150).

Substantively and statistically, Dr. Hood's conclusion on the third precondition rests on adding together all data from district 9 and subdistricts 9A and 9B. But recall that subdistrict 9A has a near 80% NVAP, and Native American preferred candidates win 100% of the time. A district with a packed minority population is not one where the defeat of minority preferred candidates is to be expected, and it should not be considered as part of the third Gingles precondition. See Bone

33

App305

Shirt, 461 F.3d at 1027. And importantly, as Dr. Hood testified and acknowledged at trial, if subdistrict 9A was removed from his analysis, the Native American preferred candidates defeat rate is 59.5%. Doc. 117 at 148:16-24. That alone also satisfies the third Gingles precondition.

Having reviewed the testimony and evidence, giving the elections the appropriate weight consistent with Eighth Circuit case law, the Tribes have proven by a preponderance of the evidence that the white majority typically votes in a bloc to defeat the minority candidate in as-enacted and at-large district 9. As such, the third Gingles precondition is also established as to as-enacted and at-large district 9.

### B.    Totality of the Circumstances and the Senate Factors

With the Gingles preconditions met, the Section 2 analysis turns to the totality of the circumstances and analysis of the Senate Factors. The Senate Factors come from the Senate Committee report to the 1982 amendment to the VRA and directs courts to consider the following factors in determining whether the totality of the circumstances indicate a Section 2 violation:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

34

    (6)  whether political campaigns have been characterized by overt or subtle racial appeals;

    (7)  the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.R. No. 97-417 at 28-29 (1982); <u>Gingles</u>, 478 U.S. at 44-45. Two additional factors are also probative in determining a Section 2 violation: (1) was there a significant lack of response from elected officials to the needs of the minority group; and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. <u>Gingles</u>, 478 U.S. at 44. "[T]his list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, . . . there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." <u>Id.</u> at 45 (internal citations omitted).

### 1.    Senate Factors 2 and 7

"Two factors predominate the totality-of-circumstances analysis: the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme." <u>Bone Shirt</u>, 461 F.3d at 1022. As to Senate Factor 2, the extent of racially polarized voting, the record reflects a high level of racially polarized voting in districts 9 and 15 and subdistricts 9A and 9B. That evidence is largely undisputed and was discussed at length above. As to Senate Factor 7—the extent to which Native Americans have been elected—the only election under the 2021 redistricting plan in 2022 resulted in the loss of a Native American Senator (who had held the seat since 2006). Brown, a Native American, also lost the district 15 race. In effect, as a result of the 2021 redistricting plan, Native Americans experienced a net-loss of representation. Both factors weigh the totality of the circumstances towards a Section 2 violation.

Appellate Case: 23-3655    Page: 65    Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697    Page: 326    Date Filed: 12/17/2023 Entry ID: 5345207

2.        **Remaining Senate Factors**

This leaves factors one, three,[8] and five,[9] along with tenuousness, lack of response, and proportionality. As to the first Senate Factor, which considers historical discrimination practices, the Tribes offered expert testimony from Dr. Daniel McCool. He testified as to the long history of mistreatment of Native Americans in North Dakota and discussed evidence of contemporary discrimination against Native Americans, including many successful voting discrimination claims affecting Native Americans. Doc. 116 at 90-126. The evidence of discrimination in the democratic and political process against Native Americans in North Dakota is well-documented and undisputed by the Secretary. So, the first Senate Factor 1 weighs toward a Section 2 violation.

Next, as to the third Senate Factor, which considers discrimination through voting practices and procedures, the Tribes suggest that the 2021 redistricting plan itself is the best evidence of voting practices or procedures that enhance the opportunity for discrimination. But beyond that blanket assertion, there is no evidence that the Secretary used the 2021 redistricting plan to enhance the opportunity of discrimination against Native Americans. As a result, the third Senate Factor does not weigh toward finding Section 2 violation.

Senate Factor 5 considers the effects of discrimination against Native Americans more broadly, in such areas as education, employment, and health care. Dr. Weston McCool offered undisputed evidence as to the lower socio-economic status of Native Americans in North Dakota and that Native Americans continue to experience the effects of discrimination across a host of socioeconomic measures, which results in inequal access to the political process. Doc. 116 at 148.

---

[8] Senate Factor 4, which addresses candidate slating processes, is not applicable on these facts.
[9] The parties agree that Senate Factor 6 is not at issue.

36

And the Secretary did not challenge that evidence. Senate Factor 5 weighs toward a Section 2 violation.

The three remaining factors in the totality of the circumstances analysis are tenuousness, lack of response, and proportionality. Tenuousness looks at the justification and explanation for the policy or law at issue. "The tenuousness of the justification for the state policy may indicate that the policy is unfair." Cottier v. City of Martin, 466 F. Supp. 2d 1175, 1197 (D.S.D. 2006).

While the actions of the Legislative Assembly may not have ultimately went far enough to comply with Section 2 of the VRA, the record establishes that the Secretary and the Legislative Assembly were intensely concerned with complying with the VRA in passing the 2021 redistricting plan and creating the districts and subdistricts at issue. The justification by the Secretary for the 2021 redistricting plan is not tenuous, and this factor does not weigh in favor of a Section 2 violation.

The next factor is lack of response. The Tribes generally assert the Legislative Assembly was unresponsive to the needs of the Native American community. But the Secretary presented ample evidence of Tribal representatives and members generally advocating for subdistricts. Doc. 116 at 28, 32-33, 33-34, 134, 141. Again, the record is clear that the Legislative Assembly sought input from the Tribes and their members and attempted to work with the Tribes to comply with the VRA, even though the VRA compliance measures fell short. Also recall that the redistricting plan was developed under a truncated timeline because of the COVID-19 pandemic. On these facts, one cannot find a lack of response by the Secretary and the Legislative Assembly, and as a result, this factor does not weigh in favor of a Section 2 violation.

The final factor is proportionality. Based on their share of statewide VAP, Native Americans should hold three Senate seats and six House seats. However, under the 2021

redistricting plan, Native Americans hold zero seats in the Senate and two House seats. Either of the proposed plans would yield one Senate seat and three House seats. While certainly not dispositive, this obvious disparity as to proportionality is further evidence of vote dilution under the totality of circumstances.

All told, while a closer decision than suggested by the Tribes, the two most critical Senate Factors (2 and 7) weigh heavily towards finding a Section 2 violation. Those factors, together with the evidence on Senate Factors 1, 5, and proportionality, demonstrates that the totality of the circumstances deprive Native American voters of an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the VRA.

## III.    CONCLUSION AND ORDER

"Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Id. (citing Gingles, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native

American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 17th day of November, 2023.

_/s/ Peter D. Welte_____
Peter D. Welte, Chief Judge
United States District Court

39

Local AO 450 (rev. 1/23)

# United States District Court
### *District of North Dakota*

Turtle Mountain Band of Chippewa  Indians, et al.,

        Plaintiffs,

  vs.

Michael Howe, in his Official Capacity as
Secretary of State of North Dakota,

        Defendant.

JUDGMENT IN A CIVIL CASE

Case No.   3:22-cv-00022

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☑ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

☐ **Decision on Motion**.  This action came before the Court on motion.  The issues have been considered and a decision rendered.

☐ **Stipulation**.  This action came before the court on motion of the parties.  The issues have been resolved.

☐ **Dismissal**.  This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P.  41(a)(1)(ii).

## IT IS ORDERED AND ADJUDGED:

See attached.

Date:  November 17, 2023

KARI M. KNUDSON, CLERK OF COURT

by:  */s/ Pamela Bloomquist, Deputy Clerk*

**Exhibit 2**

Pursuant to the Order dated November 17, 2023, (Doc. 125), "Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." <u>Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.</u>, 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." <u>Id.</u> (citing <u>Gingles</u>, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al., | **ORDER** |
| Plaintiffs, | Case No. 3:22-cv-22 |
| vs. | |
| Michael Howe, in his Official Capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Defendant Michael Howe, the Secretary of State of North Dakota, moves to stay the remedial order and judgment pending appeal in this Voting Rights Act ("VRA") case. Doc. 131. Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown move to amend or correct the remedial order, given the Secretary's motion to stay. Doc. 134. The Plaintiffs oppose the Secretary's motion (Doc. 142), and the Secretary opposes the Plaintiffs' motion (Doc. 140). The North Dakota Legislative Assembly also moves to intervene and moves for a stay. Doc. 137; Doc. 151. All four motions are denied.

**A.    Motion to Stay Judgment Pending Appeal**

The Secretary asks for a stay of the judgment finding a Section 2 violation after trial and a final decision on the merits. Tellingly though, the Secretary does not challenge the merits of the order and decision on the Section 2 claim. Instead, he argues (1) a stay of the judgment is appropriate per Purcell v. Gonzalez, 549 U.S. 1 (2006), and (2) that 42 U.S.C. § 1983 does not apply to the VRA.

**1.    Purcell Principle**

In his motion, the Secretary largely leans on Purcell to suggest a stay pending appeal is warranted. But Purcell does not apply on these facts. And even if it did, it is perhaps more troubling

**Exhibit 3**

to suggest that <u>Purcell</u> permits what the Secretary asks for here—that a federal court overlook and stay a proven Section 2 violation because it requires a state to correct the violation well before any election is ever scheduled to occur.

     <u>Purcell</u> and its progeny articulated a general principle "that lower federal courts should ordinarily not alter the election rules on the <u>eve</u> of an election." <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 589 U.S. ___, 140 S. Ct. 1205, 1207 (2020) (emphasis added). But the context is critical—<u>Purcell</u> and the majority of cases relying on and citing to it are cases involving <u>preliminary</u> injunctive relief, where there is no merits decision on a claim. <u>Purcell</u>, 549 U.S. at 4 (granting stay of preliminary injunction concerning voter identification procedures entered weeks before an election); <u>North Carolina v. League of Women Voters of N.C.</u>, 574 U.S. 927 (2014) (granting stay of preliminary injunction entered close to an election date); <u>Wise v. Circosta</u>, 978 F.3d 93, 103 (4th Cir. 2020) (denying preliminary injunction of new absentee ballot rule less than a month before election); <u>Veasey v. Perry</u>, 769 F.3d 890, 895 (5th Cir. 2014) (granting stay of preliminary injunction entered 9 days before election); <u>Genetski v. Benson</u>, No. 20-000216-MM, 2020 WL 7033539, at *2 (Mich. Ct. Cl. Nov. 2, 2020) (declining to grant preliminary injunction the day before an election). As explained in <u>Purcell</u>, there are "considerations specific to election cases" when deciding whether to <u>enjoin</u> an election law <u>in close temporal proximity to an election</u>. <u>Purcell</u>, 549 U.S. at 4. Also of chief concern in <u>Purcell</u> cases is the risk of voter confusion. <u>See</u> <u>Democratic Nat'l Comm. v. Wisconsin State Legislature</u>, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring) (stating, "Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes.").

     This is not a preliminary injunctive relief case. This is a case where a Section 2 violation of the VRA was proven by evidence at trial. Beyond that, there is no imminent election, little risk

of voter confusion, and the final judgment was not issued on the "eve" of any election. It strains credibility to seriously suggest otherwise. As the Plaintiffs correctly point out, the deadlines cited by the Secretary concern the <u>opening</u> date for candidate signature gathering—for elections that are still months away. Indeed, the Secretary's concern is not as to voter confusion but rather the administrative burden of correcting the Section 2 violation. Because there is no imminent election and no order for preliminary injunctive relief enjoining an election rule, <u>Purcell</u> does not apply, and it does not support granting a stay pending appeal.

### 2.    Traditional Stay Pending Appeal Factors

Setting <u>Purcell</u> aside, in deciding whether to grant a stay pending appeal, courts consider four factors: (1) whether the stay applicant has made a strong showing that the applicant is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. <u>Chafin v. Chafin</u>, 568 U.S. 165, 179 (2013). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." <u>Org. for Black Struggle v. Ashcroft</u>, 978 F.3d 603, 607 (8th Cir. 2020). Stays pending appeal are disfavored, even if the movant may be irreparably harmed. <u>Nken v. Holder</u>, 556 U.S. 418, 427 (2009).

First, the Secretary has not made a strong showing he is likely to succeed on the merits. Once again, nowhere in the Secretary's motion does he challenge (or even address) the merits of the Section 2 claim and the Court's finding of a Section 2 violation after trial. He instead focuses on a new legal theory that 42 U.S.C. § 1983 provides no cause of action for private plaintiffs to bring a Section 2 claim. This issue was addressed in an order denying the Secretary's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), though both

parties raise new arguments that were not raised during the initial briefing of that issue. No doubt this issue is ripe for appellate review given the Eighth Circuit's recent decision in Arkansas State Conference of NAACP v. Arkansas Board of Apportionment, __ F.4th __, No. 22-1395, 2023 WL 8011300 (8th Cir. Nov. 20, 2023). But simply because the issue is set for appellate review does not mean the Secretary has made a strong showing that he is likely to succeed on the merits. This seems particularly true when he does not challenge or address the merits of the substantive Section 2 claim at issue. So, the first factor does not weigh in favor of a stay pending appeal.

Next, the Secretary will not be irreparably injured absent a stay. The Secretary largely rehashes his Purcell analysis to show irreparable injury absent a stay. As noted above, Purcell does not apply, and the Court struggles to understand how the Secretary would be irreparably injured by complying with Section 2 of the VRA. And per Nken, even if the Secretary may be irreparably harmed, a stay pending appeal is not a matter of right. 556 U.S. at 433. The second factor does not weigh in favor of a stay pending appeal.

Third, granting a stay would substantially injure the Plaintiffs and all other Native Americans voting in districts 9 and 15. A stay would effectively allow an ongoing Section 2 violation to continue until a decision on the § 1983 issue is reached by a reviewing court. There is substantial harm inherent in the deprivation of the Plaintiffs' fundamental voting rights.  See Martin v. Kemp, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018). As such, the third factor weighs heavily against a stay.

Finally, the public interest lies in correcting Section 2 violations, particularly when those violations are proven by evidence and data at trial. Concerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights. This factor also weighs against a stay pending appeal.

4

App317

Again, it is worth emphasizing that this motion for a stay pending appeal is <u>not</u> made in the context of any preliminary injunction, where there is no final decision on the merits of a claim. And it is <u>not</u> made in the context of any imminent election. Instead, it is a request for a stay after a full and final decision on the merits, after a trial, on a Section 2 claim—a merits decision the Secretary does not address or even challenge in his motion. In that context, the law and the four factors conclusively instruct that a stay pending appeal is inappropriate, and the Secretary's motion to stay is denied.

**B.      Motion to Amend or Correct Remedial Order and Motion to Intervene**

Turning to the Plaintiffs' motion to amend or correct the remedial order, the motion presents an issue of jurisdiction. The filing of a notice of appeal generally divests the district court of jurisdiction over the case, and the district court cannot reexamine or supplement the order being appealed. <u>See</u> <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982); <u>Liddell v. Board of Educ.</u>, 73 F.3d 819, 822 (8th Cir. 1996). Here, the Plaintiffs ask the Court to reexamine the deadlines in the remedial order in response to the Secretary's <u>Purcell</u> concerns. But the Court cannot reexamine the remedial order because the Secretary filed his notice of appeal before the motion to amend or correct. The Court lacks jurisdiction to amend or correct the remedial order, and the motion (Doc. 134) is denied.

The same is true for the Legislative Assembly's motion to intervene and motion to stay. It is axiomatic that the motion to intervene is untimely per Federal Rule of Civil Procedure 24, but again, this Court lacks jurisdiction to reexamine or supplement the order and judgment on appeal. Adding the Legislative Assembly as a party at this late stage is a rather extraordinary request to supplement the order and judgment on appeal, and the motions (Doc. 137; Doc. 151) are denied.

**C.     Conclusion**

After a trial, and careful review of all of the evidence and data, the Court concluded the 2021 redistricting plan violated Section 2 of the VRA. Put simply, the facts and the law do not support a stay of the remedial order and judgment pending appeal. The Secretary's motion to stay pending appeal (Doc. 131) is **DENIED**. Because the notice of appeal divested this Court of jurisdiction over this case, the Plaintiffs' motion to amend or correct the remedial order (Doc. 134) and the Legislative Assembly's motion to intervene (Doc. 137) and motion to stay (Doc. 151) are also **DENIED**.

**IT IS SO ORDERED**.

Dated this 12th day of December, 2023.

/s/ *Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Turtle Mountain Band of Chippewa Indians,
Spirit Lake Tribe, Wesley Davis,
Zachery S. King, and Collette Brown,

                        Plaintiffs,

      vs.

Alvin Jaeger, in his official capacity as
Secretary of State of North Dakota,

                    Defendant.

**ORDER DENYING
MOTION TO DISMISS**

Case No. 3:22-cv-22

---

       Before the Court is the Defendant Secretary of State of North Dakota Alvin Jaeger's (the "Secretary") motion to dismiss for lack of jurisdiction and for failure to state a claim filed on April 15, 2022. Doc. No. 17. Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain"), Spirit Lake Tribe ("Spirit Lake"), Wesley Davis, Zachery S. King, and Collette Brown (together, the "Plaintiffs") responded in opposition on May 13, 2022. Doc. No. 24. The Secretary filed his reply on May 27, 2022. Doc. No. 26. The United States also filed a Statement of Interest. Doc. No. 25. For the reasons below, the motion to dismiss is denied.

## I.    FACTUAL BACKGROUND

       Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district following the census, which takes place at the end of each decade. Following the release of the 2020 Census results, North Dakota Governor Doug Burgum issued Executive Order 2021-17[1] on October 29, 2021. This Executive Order convened a special session of the Legislative Assembly for the purposes of "redistricting of

---

[1] N.D. Exec. Order No. 2021-17 (Oct. 29, 2021), available at:
https://www.governor.nd.gov/executive-orders.

# Exhibit 4

government." N.D. Exec. Order No. 2021-17 (Oct. 29, 2021). On November 10, 2021, the Legislative Assembly passed House Bill 1504, which provided for a redistricting of North Dakota's legislative districts. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021). House Bill 1504 was signed into law by North Dakota Governor Doug Burgum on November 11, 2021. Id.

In this action, the Plaintiffs challenge the above redistricting plan passed by the North Dakota Legislative Assembly (i.e., House Bill 1504), and signed by the North Dakota Governor, under Section 2 of the Voting Rights Act ("VRA") ("Section 2"), 52 U.S.C. § 10301. Doc. No. 1. More specifically, the Plaintiffs bring a voter dilution claim and allege that the newly adopted redistricting plan dilutes the voting strength of Native Americans on the Turtle Mountain and Spirit Lake reservations, and in surrounding areas, in violation of Section 2 of the VRA. Id. at 29-31. In addition to the Section 2 challenge, the Plaintiffs also bring a claim under 42 U.S.C. § 1983 ("§ 1983"). Id. at 3. The Plaintiffs seek declaratory and injunctive relief prohibiting the Secretary from conducting elections under the allegedly dilutive redistricting plan and seek remedial relief from the State of North Dakota's failure to conduct elections under a plan that complies with the requirements of the VRA. Id. at 31. In lieu of an answer, the Secretary filed this motion to dismiss. Doc. No. 17.

## II.    **LEGAL DISCUSSION**

The Secretary's motion asks for dismissal on three grounds—first, that Turtle Mountain and Spirit Lake (together, the "Tribal Plaintiffs") lack standing to bring claims under the VRA. Id. at 8-13. Second, the Tribal Plaintiffs cannot allege a VRA claim because they are not "citizens" of the United States. Id. at 7-8. Finally, the Secretary argues that Section 2 of the Voting Rights Act does not provide a private right of action. Id. at 4-7. The Plaintiffs, for their part, argue the Tribal Plaintiffs have standing and that the citizenship requirement to bring a claim under the VRA has

been satisfied. Additionally, as to the private right of action, the Plaintiffs argue that when read and considered together, § 1983 provides a private remedy to enforce Section 2 of the VRA, and alternatively, Section 2 implies its own private right of action. The United States, in its Statement of Interest, similarly argues that Section 2 contains a private right of action, and alternatively, § 1983 provides a remedy that can be used to enforce Section 2 of the VRA. Doc. No. 25.

    **A.**    **Standing**

Turning first to the issue of standing, the Secretary argues that the Tribal Plaintiffs should be dismissed for lack of standing. The Tribal Plaintiffs respond that standing can be established through the individual Plaintiffs, the diversion of the Tribal Plaintiffs' resources, or the principles of organizational standing. The Court agrees that the Tribal Plaintiffs have standing.

    **1.**    **Applicable Law**

Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. This jurisdictional limitation requires every plaintiff to demonstrate it has standing when bringing an action in federal court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth v. Seldin, 422 U.S. 490, 518 (1975). The essence of standing is whether the party invoking federal jurisdiction is entitled to have the court decide the merits of the dispute. Id. at 498.

"[T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an 'injury in fact' . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant' . . . Third, it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Sierra Club v. Robertson</u>, 28 F.3d 753, 757-58 (8th Cir. 1994) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

To show an injury-in-fact, a plaintiff must show "an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical." <u>Id.</u> Merely alleging an injury related to some cognizable interest is not enough; rather, a plaintiff "must make an adequate showing that the injury is actual or certain to ensue." <u>Id.</u> If a plaintiff lacks Article III standing, a federal court has no subject-matter jurisdiction over the claim and the action must be dismissed. <u>Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.</u>, 813 F.3d 1124, 1128 (8th Cir. 2016).

### 2. Individual Standing

The Secretary does not dispute that the individual Plaintiffs in this matter have standing to bring this claim under Section 2. Instead, the Secretary's argument is focused on the Tribal Plaintiffs' lack of standing. When there are multiple plaintiffs, at least one of the plaintiffs must demonstrate standing for each claim and each form of relief being sought. <u>Spirit Lake Tribe v. Jaeger</u>, No. 1:18-CV-222, 2020 WL 625279, at *3 (D.N.D. Feb. 10, 2020). One plaintiff having standing to bring a specific claim generally confers standing to all plaintiffs on that claim. <u>See</u> <u>Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 264 (1977); <u>see also</u> <u>Jones v. Gale</u>, 470 F.3d 1261, 1265 (8th Cir. 2006). Here, the individual Plaintiffs' right to sue has not been challenged, and even if it had been, the argument would fail, as individuals residing in an allegedly aggrieved voting district have standing to bring a claim under the VRA. <u>See</u> <u>Gill v. Whitford</u>, 138 S. Ct. 1916 (2018); <u>see also</u> <u>Roberts v. Wamser</u>, No. 88-1138, 1989 WL 94513 (8th Cir. Aug. 21, 1989). Because the individual Plaintiffs have standing, there is no authority to

dismiss the Tribal Plaintiffs from the action due to lack of standing.

### 3.   Diversion of Resources

Moreover, even without the individual Plaintiffs, the Tribal Plaintiffs have standing to bring a Section 2 claim. As this Court noted in Spirit Lake, "[t]he Court can see no reason why a federally recognized Indian Tribe would not have standing to sue to protect the voting rights of its members when private organizations like the NAACP and political parties are permitted to do so." 2020 WL 625279, at *5. Here, just as in Spirit Lake, the Tribal Plaintiffs assert they have been forced to divert resources in response to the North Dakota Legislative Assembly's actions. Doc. No 1, ¶¶ 43-44. This is sufficient to establish standing. See Spirit Lake Tribe, 2020 WL 625279, at *4. Further, and consistent with Spirit Lake, because standing has been established in alternative ways, the Court need not examine the merits of associational standing or standing under *parens patriae*. Id.

### 4.   Citizenship

The Secretary goes on to argue that the Tribal Plaintiffs cannot advance a VRA claim because they are not "citizens" of the United States. In Spirit Lake, this Court held that this argument is a challenge to standing. 2020 WL 625279, at *4. As discussed above, because the individual Plaintiffs have standing, there is no standing issue as to the Tribal Plaintiffs. Nevertheless, this Court held in Spirit Lake that the Indian Tribes do have standing to protect the voting rights of its members. Id. The same analysis applies here, and the Secretary's argument is without merit.

### B.   Private Right of Action

With the standing issues resolved, the Court turns to the Secretary's argument that Section 2 of the VRA does not provide a private right of action, and as a result, the complaint fails to state

a claim (due to lack of subject matter jurisdiction) and the case must be dismissed. The Plaintiffs counter that their § 1983 claim provides the remedy necessary to enforce Section 2 of the VRA, and alternatively, the plain language of Section 2 implies a private right of action. The Court finds that § 1983 provides a private remedy for violations of Section 2 of the VRA, and therefore, it is not necessary for the Court to decide whether Section 2, standing alone, contains a private right of action.

### 1.    Relevant Legal Background

The question of whether Section 2 of the VRA contains a private right of action presents a novel legal question. In a recent United States Supreme Court decision involving a Section 2 case, Justice Gorsuch (joined by Justice Thomas) concurred with the majority opinion but wrote separately to "flag" an issue that was not before the Court. Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2350, 210 L. Ed. 2d 753 (2021). His concurrence stated, in relevant part:

> I join the Court's opinion in full, but flag one thing it does not decide. Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. Lower courts have treated this issue as an open question.

Id. Following Brnovich, the United States District Court for the Eastern District of Arkansas took notice of Justice Gorsuch's concurrence, and when presented with a case alleging voter dilution among African American voters, examined whether Section 2, standing alone, contains a private right of action. See generally Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment, No. 4:21-CV-01239-LPR, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022). In what can only be described a thorough and well-reasoned—though admittedly, controversial—order, the district court found that Section 2 of the VRA, standing alone, does not provide a private right of action.[2]

---

[2] Notably, the district court explicitly states it did not consider whether Section 2 contains rights-creating language and that its decision was premised on the lack of a private remedy. Arkansas State Conf. NAACP, WL 496908, at *10.

6

Id. at 10. This lack of remedy inevitably led the district court to conclude that private individuals do not have a private right of action to enforce Section 2, and the case was dismissed for lack of subject matter jurisdiction after the Attorney General of the United States declined to join the lawsuit. Id. at 23. Here, the Secretary encourages this Court to follow Arkansas State Conf. NAACP and find that the Plaintiffs do not have a private right of action under Section 2 of the VRA—leading to dismissal of the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

## 2. Applicable Law

"Subject matter jurisdiction refers to the court's power to decide a certain class of cases." LeMay v. United States Postal Serv., 450 F.3d 797, 799 (8th Cir. 2006) (citing Continental Cablevision of St. Paul, Inc. v. United States Postal Serv., 945 F.2d 1434, 1437 (8th Cir. 1991)). "It is axiomatic that the federal courts lack plenary jurisdiction." Southwestern Bell Tel. Co. v. Connect Communications Corp., 225 F.3d 942, 945 (8th Cir. 2000). Rather, "[t]he inferior federal courts may only exercise jurisdiction where Congress sees fit to allow it." Id. Put simply, federal courts cannot hear cases that fall outside of the limited jurisdiction granted to them. Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Union Pac. R. Co., 475 F. Supp. 2d 819, 831 (N.D. Iowa 2007).

Federal Rule of Civil Procedure 8(a) requires a pleading only to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Nevertheless, a complaint may be dismissed for "failure to state a claim upon which relief can be granted," and a party may raise that defense by motion. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is more than a "sheer possibility." <u>Id.</u>

### 3. Section 1983

Whether the VRA contains a private right of action is significant because, without it, the Court does not have subject matter jurisdiction to decide a Section 2 claim that is not joined by the United States Attorney General. At first blush, the Secretary's argument, and the decision in <u>Arkansas State Conf. NAACP</u>, are compelling. However, unlike the complaint in <u>Arkansas State Conf. NAACP</u>, the Plaintiffs here seek relief under § 1983 <u>and</u> Section 2 of the VRA. So, the Plaintiffs argue they have a private right of action to support their Section 2 claim because the complaint seeks to enforce Section 2 in conjunction with § 1983. The Secretary, for his part, argues that Congress effectively shut the door to a § 1983 remedy. However, the Court is not persuaded.

Section 1983 provides a remedy for violations of federal rights committed by state actors. <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284, 122 S. Ct. 2268, 2276 (2002). Rights are enforceable through § 1983 only if it is clear that Congress intended to establish an individual right. <u>Gonzaga Univ.</u>, 536 U.S. 273, at 284. "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." <u>Id.</u> This presumption of enforceability is only overcome in cases where Congress intended to foreclose any § 1983 remedy. <u>Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 19–20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); <u>see also</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 290, 121 S. Ct. 1511, 1521, 149 L. Ed. 2d 517 (2001).

Prior to <u>Gonzaga University</u>, the United States Supreme Court's case law regarding what rights are enforceable through § 1983, in the Court's words, "may not [have been] models of clarity." <u>Gonzaga Univ.</u>, 536 U.S. 273, at 278. As such, the <u>Gonzaga University</u> Court sought to

Appellate Case: 23-3655   Page: 85   Date Filed: 12/13/2023 Entry ID: 5344314

App327

Appellate Case: 23-3697   Page: 346   Date Filed: 12/17/2023 Entry ID: 5345207

clarify the test for what rights can be enforced through § 1983. The Supreme Court held that the initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute confers a right on a particular class of person. Id. at 258. Accordingly:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries.

Id. at 285 (cleaned up). In sum, § 1983 can create a remedy for a plaintiff when one does not already exist. When a statute does not provide an explicit right of action, the analysis of whether a plaintiff may bring a § 1983 claim is dependent on whether the statute sought to be enforced through § 1983 confers rights on a particular class of people.

Importantly (and likely not coincidentally), Arkansas State Conf. NAACP, which is the only factually similar case cited by the Secretary in support of his motion, specifically notes that § 1983 was not alleged in the complaint at issue in that case, and that because Section 2 lacked a private right of action, there was no need to consider whether the text of the statute conferred a right. 2022 WL 496908, at *10. Stated another way, the analysis in Arkansas State Conf. NAACP ended because there was no private remedy available, and no other claims were alleged. However, here, because a § 1983 claim was alleged, there is a presumption of a private remedy, should Section 2 create a right. This fact is significant and undoubtably distinguishes Arkansas State Conf. NAACP. So, the questions this Court is left with, then, is whether Section 2 confers rights on a particular class of people, and if so, whether the Secretary can rebut the presumption that § 1983 provides a remedy.

9

####     4.       Text of Section 2

Turning to the first question, it is undisputed that Section 2 of the VRA does not explicitly contain a private right of action, making the Plaintiffs' claim contingent on the existence of an implied private right of action. As alluded to in Gonzaga University, to enforce a statute under an implied private right of action, the Plaintiffs must satisfy two requirements: (1) the statute's text must contain language that confers a right, and (2) the party must demonstrate the availability of a private remedy. Sandoval, 532 U.S. at 286–88, 121 S.Ct. 1511. As noted above, § 1983 provides a private remedy. The Court now turns to whether the text of Section 2 confers a right. As relevant here, Section 2 states:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . ..

52 U.S.C. § 10301(a). The plain language of Section 2 mandates that no government may restrict a citizen's right to vote based on an individual's race or color. It is difficult to imagine more explicit or clear rights creating language. It cannot be seriously questioned that Section 2 confers a right on a particular class of people. And indeed, the Secretary does not argue that Section 2 does not contain rights creating language. When this right is taken collectively with the remedy available through § 1983, an implied private right of action is present, and the motion to dismiss must be denied, unless the Secretary can show that the VRA's enforcement scheme demonstrates congressional intent to preclude a § 1983 remedy. See generally Gonzaga Univ., 536 U.S. 273.

####     5.       The VRA's Enforcement Scheme

To that end, a party can rebut the presumption that a federal right is enforceable through § 1983 by demonstrating congressional intent to foreclose a § 1983 remedy. See id. at 284 n.4. Congressional intent may be found directly in the statute creating the right or inferred from the

Appellate Case: 23-3655     Page: 87       Date Filed: 12/13/2023 Entry ID: 5344314

Appellate Case: 23-3697     Page: 348       Date Filed: 12/17/2023 Entry ID: 5345207

statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement." City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 120 (2005). An express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a remedy under § 1983. Blessing v. Freestone, 520 U.S. 329, 341 (1997).

Section 2 does not contain any language creating a private remedy distinct from § 1983. In fact, Section 2 proscribes no remedy at all. As a result, the Court cannot conclude that anything in Section 2 indicates congressional intent to specifically prevent enforcement through § 1983 by providing a separate private remedy.

Now to the enforcement scheme. The Secretary argues Section 12 of the VRA ("Section 12"), 52 U.S.C. § 10308, provides a comprehensive scheme to enforce Section 2 that is incompatible with private enforcement. Admittedly, Section 12 contains no express, private remedies and provides the right to the Attorney General to seek an injunction and potential fines and imprisonment for violations of the VRA. See 52 U.S.C. § 10308. Critically, though, there is also nothing in Section 12 that is incompatible with private enforcement, as there can be collective and private remedies available for the same federal statute. See Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979) (collective and private remedies available for violation of Title IX). Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for "the prevailing party, other than the United States." 52 U.S.C. § 10310(e).

Further, there has been private enforcement of Section 2 since the VRA's inception. See Allen v. State Bd. of Elections, 393 U.S. 544, 555 (1969); Ala. State Conf. of NAACP v. Alabama, 949 F.3d 647, 652 (11th Cir. 2020); Mixon v. Ohio, 193 F.3d 389, 398–99 (6th Cir. 1999); Singleton v. Merrill, No. 2:21-cv-1530-AMM, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022).

These private enforcement actions have co-existed with collective enforcement brought by the United States for decades. See, e.g., Allen, 393 U.S. 544, at 555.

Given the lack of evidence that Congress intended to provide an explicit private remedy, and the robust history of the private and collective rights co-existing, the Court cannot conclude that private enforcement of Section 2 is incompatible with the enforcement scheme in Section 12. As a result, the Secretary has not rebutted the presumption that § 1983 may provide a remedy for the Plaintiffs in this case, the Court has subject matter jurisdiction to entertain this private claim, and the complaint does not fail to state a claim upon which relief can be granted. Accordingly, the motion to dismiss is denied.  Because this Court finds that Section 2 may be enforced through § 1983, the Court need not decide whether Section 2 of the VRA, standing alone, contains an implied private right of action.

## III.   CONCLUSION

The Court has carefully reviewed the record, the parties' filings, and the relevant legal authority. For the reasons above, the Secretary's motion to dismiss for lack of jurisdiction and failure to state a claim (Doc. No. 17) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 7th day of July, 2022.

_/s/ Peter D. Welte_____
Peter D. Welte, Chief Judge
United States District Court

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


Turtle Mountain Band of        )
Chippewa Indians, et al.,      )
                               )
          Plaintiffs,          )
                               )        File No.
     vs.                       )        3:22-cv-00022-PDW-ARS
                               )
Michael Howe, in his           )
official capacity as           )
Secretary of State of the      )
State of North Dakota,         )
                               )
          Defendant.           )


TRANSCRIPT OF BENCH TRIAL
Volume III
Pages 1 - 206


Taken at
United States Courthouse
Fargo, North Dakota
June 14, 2023


BEFORE THE HONORABLE PETER D. WELTE
-- UNITED STATES DISTRICT COURT JUDGE --


Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND 58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

# Exhibit 5

1  **A.**  Sure.  So there would be a lot of work from the counties

2  from a street-master perspective updating the boundaries.

3  **Q.**  And then I'm sorry to interrupt you, but street master, we

4  didn't talk about that before.  What's that?

5  **A.**  Yes, the street master is part of our central voter file

6  that -- it ties an address to a precinct and a ballot style and

7  ultimately the voter to ensure that the voter is receiving the

8  right ballot style at the polling location, voting for proper

9  candidates, contests, ballot measures.

10         So that's -- the street master is -- there -- it

11  really is assigning, you know, the voter to a specific ballot

12  style, and it has to be accurate because we don't want voters

13  voting on candidates that aren't going to be representing them

14  or voting on bond measures, for instance, that they won't be

15  paying for.  So ensuring that that street master is up to date

16  so voters are receiving the correct ballot style is of utmost

17  importance.

18  **Q.**  Sure.  Are you able to determine anything about precincts,

19  precinct changes, if something like LD9 is enacted in North

20  Dakota?

21  **A.**  I would assume that there would be precinct changes just

22  looking at -- the legislative district boundaries are changing

23  significantly, so I would -- I would venture to guess that the

24  precinct boundaries are definitely changing and would create a

25  lot of work for the counties involved.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


Turtle Mountain Band of        )
Chippewa Indians, et al.,      )
                               )
          Plaintiffs,          )
                               )   File No.
          vs.                  )   3:22-cv-00022-PDW-ARS
                               )
Michael Howe, in his           )
official capacity as           )
Secretary of State of the      )
State of North Dakota,         )
                               )
          Defendant.           )


TRANSCRIPT OF BENCH TRIAL
Volume IV
Pages 1-73


Taken at
United States Courthouse
Fargo, North Dakota
June 15, 2023



BEFORE THE HONORABLE PETER D. WELTE
-- UNITED STATES DISTRICT COURT JUDGE --




Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1  would need to vote and to keep our process secure.

2  **Q.**   Sure.  I think you talked about some of the election

3  systems, and that's kind of your specialty, right?

4  **A.**   It is.

5  **Q.**   Can you go into what those systems are, what they're

6  called -- a little bit -- to educate the Court and the folks in

7  this room?

8  **A.**   In our central voter file we have a listing of all voters

9  and nonvoters within the state, whether they -- we keep a list

10  of where they -- what address they are, date of birth, and we

11  keep track of their voting history.  And within that we also

12  know what precincts, what ballot styles, and what districts

13  that they are aligned to.  That's part of our central voter

14  file database.

15          Along with that, every street in our central voter

16  file is tied to a -- part of the program is called the Street

17  Master.  The Street Master identifies highways, roads, lanes,

18  boulevards within a precinct that will allow -- determine

19  whether this house number resides within this precinct, and we

20  must update that whenever there's a change or update to the

21  process -- to the system.  That way we can add a house number

22  if there needs to be a house number added so that particular

23  voter that lives at that address is assigned to that particular

24  precinct.

25  **Q.**   Sure.  And we can get into that in a little more depth

1  later, but let's go a little more generally into the databases

2  you've talked about.  Is that something the Secretary of State

3  has created?

4  **A.**   Correct.

5  **Q.**   But is that something that they purchase through a

6  license?

7  **A.**   We purchased -- we purchased the program from our vendor

8  called vPro.  It's our central voter file software.  It's

9  called ND Voices.

10  **Q.**   And how long has that been in use in North Dakota?

11  **A.**   Since 2015.

12  **Q.**   Do any other jurisdictions utilize that type of vendor, if

13  you know?

14  **A.**   I believe South Dakota and New Mexico use the same

15  software platform.  It would obviously be different based upon

16  their state codes and regulations.

17  **Q.**   Is that state-of-the-art software, to your mind?

18  **A.**   It is nearing its end of life.  It is -- we are looking at

19  procuring new software within the next few -- next few years.

20  **Q.**   Is that type of software expensive?

21  **A.**   We asked for $5 million in funding in this last

22  legislative cycle.

23  **Q.**   Okay.  Can you break down for us the various -- you know,

24  what's the system called and the various types of subsystems

25  that are located within this database software, et cetera?

1 **A.**   Well, the Street Master -- in regards to the Street

2 Master?

3 **Q.**   What's the overall Secretary of State voting

4 administration system called?

5 **A.**   ND Voices.

6 **Q.**   Okay.  And within ND Voices, are there some subsystems?

7 **A.**   So the central voter file is one piece of that.  That's

8 the database of all the voters there.  There's also the

9 election management software.  That's what uses -- the system

10 uses to create the ballots, contests, add candidates to that

11 ballot.  Also it exports that file to a vendor to print those

12 ballots for us and program our software for the election

13 equipment, as well as maintaining our streets and precincts and

14 jurisdictions within that -- within that software.

15 **Q.**   Sure.  And is there some interaction between North Dakota

16 agencies to create that central voter file with the

17 voter-specific information?

18 **A.**   There is.  We work with the Department of Transportation.

19 We receive a file from them of any new -- new voters, per se,

20 and as well as any address updates for any voters within North

21 Dakota.

22          Department of Corrections will send a file of all

23 incarcerated felons that are being -- in the prison system or

24 being released from Department of Corrections so we can update

25 our files to allow the voting rights to be restored.

1          And then Vital Records updates us for any death

2    records that they -- have been received so we can update our

3    records as well.

4    Q.   Sure.  So let's talk about now who has access to these --

5    these election voting systems that are maintained at the

6    Secretary of State.  I'm assuming you have access.

7    A.   Correct.

8    Q.   Who else has access to the system?

9    A.   The Secretary of State's Office within the elections

10   department has access to all counties' information, but then

11   each individual county has their own access to their own

12   counties' worth of information.  But they do have the

13   capability to search the entire voter database for voters, if

14   necessary; the county auditor within that agency, as well as

15   any deputies or assistants that they have within their own

16   agency.

17   Q.   Sure.  And then we've heard quite a bit of testimony in

18   this case about data that was taken from the Secretary of

19   State's website.  Is there access for the public information

20   there?

21   A.   On our website -- for example, election night reporting is

22   information so you can see the election results on that night.

23   You can also go into our website to see where you are -- where

24   you are aligned to vote, look up your districts.  You can even

25   see a sample ballot, if you have questions about voting,

1  different types of information, what ID's are appropriate, what
2  ID's you can use, supplemental documentation, just general
3  information questions on our vote.nd.gov website.
4  **Q.**   Sure.  Is it common for outside parties to access the
5  Secretary of State and obtain that information?
6  **A.**   All the time, yes.
7  **Q.**   Sure.  And do you personally get requests for information
8  from time to time?
9  **A.**   Mm-hmm.  Yes.  I'm sorry.
10 **Q.**   Thanks.  Let's talk specifically a little bit more about
11 the auditor training.  It sounds like there will be some
12 training upcoming, after you talk to the auditors this summer,
13 but what types of things are the auditors trained on, and who
14 does that?
15 **A.**   It -- many people.  In particular, myself, I will go over
16 the election software in particular, how to create an election,
17 how this -- how to input different parts to create your own
18 election.  But we also bring in vendors to use -- that we use
19 their equipment for, so we bring them in for training purposes
20 as well.  Anyone within our elections department will help
21 provide guidance and training on a particular area, as
22 necessary.
23 **Q.**   Did you do any of that prior to the newly-enacted map that
24 came out in November of 2021?
25 **A.**   I did.  I worked with the county auditors on how to

1   proceed through the process of redistricting, how to update

2   their maps accordingly to get that information into the system,

3   how to use the Street Master, and what to look for through

4   processing that -- those address updates to define those new

5   precincts and boundaries.

6   **Q.**   So in your current position, you went through a few

7   election cycles before 2022, correct?

8   **A.**   Correct.

9   **Q.**   Was the training and the involvement with the auditors

10   more or less in 2021 or thereabouts?

11   **A.**   It was -- I would say it would be more because there was

12   new -- new boundaries, new precincts.  And as always, there's

13   new auditors that are being -- being brought in from turnover,

14   so --

15   **Q.**   Yeah.  And auditors, are they all elected in North Dakota?

16   **A.**   There -- there are some auditors that are appointed.  For

17   example, in Cass County, the auditor here is appointed.  Across

18   the state they can be elected.  Usually the larger

19   jurisdictions tend to appoint, but that's not -- it's up to the

20   individual county to decide how they wish to elect or appoint

21   their auditor.

22   **Q.**   So for appointments, do those last for a certain term?

23   **A.**   It does not.  It lasts the entirety of the contract with

24   the county.  They would stay as at-will of the county

25   commissioners.

1  **Q.**  Have you done specific auditor training of auditors that
2  have county -- or are in counties where there are tribal
3  reservations?

4  **A.**  I have.

5  **Q.**  What are some examples of those auditors and that type of
6  training?

7  **A.**  So, for example, in Sioux County there's auditor -- they
8  lost their longstanding auditor.  There's a brand-new auditor.
9  Went through their training program with them, helped them
10  identify mapping issues that they have, helped them understand
11  the jurisdictions that they have within their county, helped
12  them identify house numbers within certain streets that they
13  were having issues with looking at their maps.

14  **Q.**  And you were able to assist that auditor with those
15  issues?

16  **A.**  We do.  I did.

17  **Q.**  So, Brian, let's talk more specifically about the -- kind
18  of the nitty-gritty of those systems and what some of the terms
19  are that the auditors and yourself use when there are deadlines
20  and there are requirements set by law.  I know that Erika
21  talked yesterday, and I think you were here for that testimony,
22  right?

23  **A.**  I was.

24  **Q.**  Talked about December 31st, and I think you mentioned it
25  today as well.  December 31st is one of the drivers because

1  why?

2  **A.**   By Century Code the county auditor -- or, I'm sorry -- the

3  county commissioners must approve the precincts that will be

4  established for the upcoming election year, and then they must

5  remain in place for the remainder of that election year.

6  **Q.**   Okay.  So assuming, you know, a new map is enacted and the

7  auditors need to look at what they need to do because there are

8  changes in districts, what are some of the things those

9  auditors look at and have to do with the automated systems at

10  the Secretary of State's Office?

11  **A.**   So the first thing that the auditor would have to do is

12  review the map that was -- that's previously in place and

13  compare it against the map that is enacted or that is the

14  newest map, determine where those changes are.  They would need

15  to work with their emergency management coordinator, 911 person

16  or a GIS person, as well as their county commissioners to

17  decide if there's going to be changes to their precinct

18  boundaries within those legislative districts.

19  **Q.**   And have you been involved with those discussions and

20  those types of changes at the county auditor level?

21  **A.**   I have, to advise them of what it would take to make those

22  changes happen.

23  **Q.**   So yesterday Erika talked about jurisdictions, and I think

24  she rattled off a whole host of jurisdictions that the county

25  auditor works with and needs to account for in doing county

1 auditor work. She also talked about precincts, and then she
2 talked about streets, and I'd like to ask you just a few
3 questions about the streets. And I think you talked about
4 Street Master being kind of one of the subsystems that those
5 auditors and yourself works with when there's an upcoming
6 election. So just explain to the Court what a street is and
7 why a street is important for this process.
8 A. So in our software, we call it a Street -- Street Master,
9 and it keeps a log of all the roads, highways, streets that
10 there would be houses aligned to. And we would create a
11 segment for a particular street within a precinct so we can
12 define what precinct that they are tied to to know what
13 jurisdictions are available to that one particular voter.
14 The Street Master has a line-by-line-by-line of the
15 street that will align from this house number range -- the
16 lowest number to the highest house number range within that
17 street will be defined, and then that voter would then be
18 assigned to that street segment that is tied to that precinct.
19 Q. So Street Master is kind of a -- like a spreadsheet or a
20 database?
21 A. It's a database that can be exported into a spreadsheet to
22 be used, but it is -- it is software.
23 Q. Sure. And then, like, at the county level in Street
24 Master, is it going to be a long spreadsheet?
25 A. I would say on average the counties that we were

1 discussing in the Rolette area, there's roughly about 700

2 street segments per county, and --

3 **Q.** And so --

4 **A.** I'm sorry. And it would also be larger -- like in the

5 Cass County range, it'd be exponentially larger. The more

6 roads, the more divisions, the more processes that there are

7 within that precinct, the more street segments you have.

8 **Q.** Why would a street be an appropriate boundary for a

9 precinct?

10 **A.** Because the house numbers -- or houses are tied to a

11 street within that precinct. Everything within that street is

12 often used as a boundary in the first place, so as a precinct

13 is aligned to a highway, we would be able to use that street,

14 say, from this house number range to this house number range,

15 this particular boundary, and then we would align every street

16 within that precinct to that precinct.

17 **Q.** Is it fair to say that using a street as a boundary is

18 simpler for the auditor and for your office than, say, just

19 going through the country somewhere?

20 **A.** It is.

21 **Q.** And why is that?

22 **A.** Simply because we can identify the lowest house number

23 range or even-odd-numbered house in a particular situation for

24 whether it's in this jurisdiction or that jurisdiction.

25 **Q.** So when there are changes to the legislative districting

1    map, that Street Master for each county is going have to be
2    updated by the auditor, right?
3    **A.**    Correct.
4    **Q.**    And that's quite a bit of work?
5    **A.**    It is extensive, depending on circumstances.
6    **Q.**    And then GIS folks are involved in that process typically?
7    **A.**    Yes, because we would want to identify the house numbers
8    that are within a particular street to identify what the starts
9    and stops of a boundary would be.
10   **Q.**    Kind of switching gears to that central voter file of
11   voters, Brian, I think you said -- well, I don't know what you
12   said now.  You talked about each voter is assigned certain
13   information in the central voter file that I think ties back to
14   a street address, correct?
15   **A.**    Correct.
16   **Q.**    How does a voter change address in North Dakota,
17   typically?
18   **A.**    So the simplest way that can be done is, if you have a
19   North Dakota driver's license or non-driving ID, you can
20   contact -- by their website or by phone -- DOT, and they will
21   update their address.  We receive a file every day from
22   Department of Transportation, and it will update our system.  A
23   non-driving ID or a driver's ID from North Dakota, as long as
24   the plastic is there, the address that we have on file is what
25   matters; so you would not need to receive a new piece of

1    plastic in that situation.

2    **Q.**    So a North Dakota voter can change address without going

3    into a DOT office?

4    **A.**    Correct.

5    **Q.**    How long has that been in place, if you know?

6    **A.**    As long as I've known, 2018, since I -- since I've been

7    aware of it, so --

8    **Q.**    Since you've been employed with the Secretary of State --

9    **A.**    Correct.

10   **Q.**    -- since 2018?

11   **A.**    Yes.

12   **Q.**    Specifically in relation to auditor training, Brian, can

13   you recall any times where you've assisted auditors where they

14   have part of the county located next to reservations or

15   reservations are within that county, either in whole or in

16   part?

17   **A.**    We have.  I have, I should say.

18   **Q.**    And what do you recall about some of those situations,

19   Brian?

20   **A.**    Making -- well, for all auditors, making them aware that

21   tribal ID's are acceptable across the state, not just at -- on

22   tribal lands and tribal areas, to ensure that that

23   misconception isn't used, but teaching them about the tribal

24   ID's, what ID's are available.

25   **Q.**    Sure.  That was a bad question.  Specifically with regard

1  to kind of Street Master and reservation lands, have you

2  encountered any difficulties that you've assisted with in that

3  regard?

4  A.   Correct.  In Sioux County, for example, there was

5  situations where house numbers were being aligned differently

6  than what is expected in non-tribal areas.  So, for example,

7  they might have a house range from 100 to 500 on a particular

8  street, and then all of a sudden there would be a house number

9  5000 in the middle of the street.

10        And what that -- what we have learned is that

11  indicates that that house has been remodelled and the Bureau of

12  Indian Affairs Housing has reassigned that number, so they're

13  aware of that difference of housing number where they've

14  remodelled.

15        And so we had to work with the county auditor when

16  this situation happens, that they basically have to create a

17  second line segment in the Street Master to account for that

18  difference of house numbers; so instead of just 100 to 500,

19  they have a 5100 to 5500, for example.

20  Q.   Did you have to work with any GIS folks for that

21  particular issue?

22  A.   In Sioux County they hired a GIS contractor, and at that

23  time the auditor was fairly new, and she had questions about

24  how to proceed through this process, and they were able to work

25  through a mapping situation.  And then they -- the county

1  auditor often would use that map to help update their own

2  Street Master.

3  **Q.**  Okay.  Thanks, Brian.  Kind of moving on to the last topic

4  here is -- is the -- some programs that are available -- and I

5  don't know if "programs" is the right word -- to assist tribal

6  and Native Americans with voting and identification and

7  addressing issues.  Are you aware of any such programs that are

8  available through the State of North Dakota?

9  **A.**  I am.

10 **Q.**  What are those?  Just describe those briefly.

11 **A.**  One of the topics -- or one of the items is the -- for

12 Department of Transportation to go out to tribal lands to

13 provide mobile driver's license access to the tribes free of

14 charge.  There's also -- we provided supplemental documentation

15 forms, as well as alternative ID forms on our website.  There's

16 also on tribal -- or in counties where there are tribal lands,

17 they can use a map to identify -- if a voter is unaware of

18 where they live, that they could use to vote.

19         And there's also grants -- or not grants, but there's

20 funds available from the Secretary of State's Office to the

21 tribes to help off -- to assist with any tribal ID costs or

22 addressing issues that they would have within their county.

23         And then the other item we have is the desire to work

24 with the tribes to have an interactive file where the tribal --

25 the tribes would send a file of their tribal members to us with

# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No: 23-3655

Turtle Mountain Band of Chippewa Indians, et al.

Appellees

v.

Michael Howe, in his official capacity as Secretary of State of North Dakota

Appellant

North Dakota Legislative Assembly, et al.

---

Appeal from U.S. District Court for the District of North Dakota - Eastern
(3:22-cv-00022-PDW)

---

### AMENDED ORDER

Before COLLOTON, BENTON, and KELLY, Circuit Judges.

The application for leave to file an overlength motion is granted. The motion to expedite is granted. The motion for a stay of the district court's judgment has been considered by the court and is denied.

December 15, 2023

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

---

/s/ Michael E. Gans

Docket No. 23-3697

In the

# United States Court of Appeals

For the

# Eighth Circuit

Turtle Mountain Chippewa, et al.

Plaintiffs – Appellees,

v.

North Dakota Legislative Assembly

Requested Intervener - Appellant.

Appeal from Decision of the Unites States District Court
Court for the District of North Dakota
In Case No. 3:22-cv-00022

**AFFIDAVIT OF EMILY THOMPSON IN SUPPORT OF NORTH DAKOTA
LEGISLATIVE ASSEMBLY'S EMERGENCY MOTION FOR EXTENSION
OF DEADLINE TO SUBMIT REMEDIAL REDISTRICTING PLAN**

Appellate Case: 23-3697    Page: 369    Date Filed: 12/17/2023 Entry ID: 5345207

STATE OF NORTH DAKOTA      )
                           ) SS.
COUNTY OF BURLEIGH         )

Being duly sworn, Emily Thompson, testifies:

1.      I am the Legal Division Director for the North Dakota Legislative Council.

2.      Between November 17 and November 28, 2023, numerous meetings occurred between members of North Dakota's executive and legislative branches with respect to the district court's November 17, 2023, Findings and Judgment.

3.      On November 30, 2023, Legislative Council was directed by Representative Lefor, Chairman of Legislative Management, to prepare and publish a Notice of Legislative Management's December 5, 2023, meeting. A true and correct copy of the Notice published on November 30, 2023, is filed as Doc. 139-1 of the district court's docket.

4.      Legislative Management met on December 5, 2023. A true and correct copy of the Minutes prepared after this meeting are filed as Doc. 139-2 of the district court's docket.

5.      On December 7, 2023, Legislative Management instructed Legislative Council to publish a Notice that the Redistricting Committee would meet on December 13, 2023. A true and correct copy of this Notice is attached hereto as Exhibit A.

6.      On December 8, 2023, Legislative Management issued a Request for Proposals to retain a redistricting consultant for the Redistricting Committee. A true and correct copy of this Request for Proposals is attached hereto as Exhibit B.

7.      The Redistricting Committee met on December 13, 2023. A true and correct copy of the Minutes – including all appendices – prepared after this meeting are attached hereto as Exhibit C.

-2-

Appellate Case: 23-3697      Page: 370      Date Filed: 12/17/2023 Entry ID: 5345207

8. On December 15, 2023, Legislative Council was directed to prepare and publish a Notice and Agenda for the December 20, 2023, meeting of the Redistricting Committee. A true and correct copy of the Notice is attached hereto as Exhibit D. A true and correct copy of the Agenda is attached hereto as Exhibit E.

9. Also on December 15, 2023, Legislative Council invited the chairs of both the Turtle Mountain Band of Chippewa Indians and the Spirit Lake Nation to attend the December 20, 2023, meeting of the Redistricting Committee. A true and correct copy of the December 15, 2023, email from Legislative Council to Chairman Azure, of Turtle Mountain, is attached hereto as Exhibit F. A true and correct copy of the December 15, 2023, email from Legislative Council to Chairwoman Street, of Spirit Lake, is attached hereto as Exhibit G.

10. Once the Redistricting Committee completes its work and agrees on a proposed remedial map, additional steps are required before the Assembly can adopt a remedial redistricting plan. These steps are as follows:

    a. Legislative Council staff will need to prepare a proposed bill draft to translate the map image approved by the Redistricting Committee to the metes and bounds descriptions used in statutory language.

    b. The Redistricting Committee will need to issue a report to Legislative Management explaining its recommendation and attaching the proposed bill draft.

    c. Legislative Management will need to meet and review the Redistricting Committee's report. During this meeting, Legislative Management will need to consider whether to approve the Redistricting Committee's recommendation for introduction during a legislative session.

-3-

d.    Legislative Leadership will need to request Governor Burgum to call a special
session of the 68th Legislative Assembly.

    i.    If the Governor does not call the Legislative Assembly back for a special
session, the Assembly may reconvene to use a portion of its 5 remaining
natural days allotted during the biennium. However, if the Assembly must
go this route, it will need a minimum of 3 days to act because each bill must
be read on two separate natural days in each house pursuant to N.D. Const.
Art. IV § 13. Further, any legislation passed during a reconvened session
does not become immediately effective unless two-thirds the members
elected to each house declare it an emergency measure. See N.D. Const.
Art. IV § 13. By contrast, legislation passed during a special session called
by the governor becomes effective on the date specified in the Act without
the need for an emergency clause. Id.

e.    Legislative Leadership requested Governor Burgum to call a special session of the
68th Legislative Assembly on October 13, 2023. The primary purpose of this
special session request was to separate bills for another vote so as not to violate the
single subject matter clause of the North Dakota Constitution. A true and correct
copy of the October 13, 2023, letter from Legislative Leadership requesting a
special session is attached hereto as Exhibit H.

f.    On October 17, 2023, Governor Burgum issued Executive Order 2023-09 to
convene a special session of the Legislative Assembly. The special session
commenced on October 23, 2023. A true and correct copy of Executive Order 2023-
09 is attached hereto as Exhibit I.

-4-

Appellate Case: 23-3697    Page: 372    Date Filed: 12/17/2023 Entry ID: 5345207

11.    The Assembly is comprised of 141 citizens who live across the State and serve in the Assembly on a part-time basis.   Therefore, whether the Assembly convenes in a special session or reconvenes in a regular session, they must be afforded reasonable time to travel to Bismarck to perform their duties.  Further, Legislative Council will need to make arrangements to coordinate the hiring of the minimum number of required Assembly Staff (Sergeant-at Arms, clerks, reporters, etc…) who are only retained during session. Assembly Staff are separate and distinct from permanent Legislative Council Staff.

Dated this 17th Day of December, 2023.

By _____
         Emily Thompson


On this 17th day of December, 2023, before me personally appeared Emily Thompson known to me to be the person described in the within and foregoing instrument and acknowledged to me that she executed the same.

ANNA HEINEN
Notary Public
State of North Dakota
My Commission Expires June 12, 2027

_____
Notary Public

-5-

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2023, I electronically submitted the foregoing **AFFIDAVIT OF EMILY THOMPSON IN SUPPORT OF NORTH DAKOTA LEGISLATIVE ASSEMBLY'S EMERGENCY MOTION FOR EXTENSION OF DEADLINE TO SUBMIT REMEDIAL REDISTRICTING PLAN** to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit for review by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

By  /s/ Scott K. Porsborg

SCOTT K. PORSBORG



# North Dakota Legislative Council

STATE CAPITOL, 600 EAST BOULEVARD, BISMARCK, ND 58505-0360

☎701.328.2916
🖨701.258.3462
www.ndlegis.gov
lcouncil@ndlegis.gov

December 7, 2023

### MEETING NOTICE

Senator Ronald Sorvaag, Chairman, has called a meeting of the **REDISTRICTING COMMITTEE**.

**Date:** Wednesday, December 13, 2023

**Time:** 12:00 p.m.

**Place:** Roughrider Room, State Capitol, Bismarck

**Video:** This meeting can be viewed online at https://video.ndlegis.gov.

**Agenda:** Presentation by the Legislative Council staff of background information relating to legislative redistricting and committee discussion regarding the committee's directive to develop a redistricting plan in compliance with the November 17, 2023, order in *Turtle Mountain Band of Chippewa Indians, et al. v. Howe*, CV 3:22-cv-00022-PDW-ARS

**Special Note:** Anyone who plans to attend the meeting and needs assistance because of a disability should contact the Legislative Council staff as soon as possible.

**Committee Members:** Senators Ronald Sorvaag, Brad Bekkedahl, Dick Dever, Robert Erbele, Kathy Hogan; Representatives Josh Boschee, Craig Headland, Mike Lefor, Mike Nathe, Austen Schauer

**Staff Contacts:** Emily Thompson, Legal Division Director
Samantha E. Kramer, Senior Counsel and Assistant Code Revisor
Liz Fordahl, Counsel

Any member unable to attend this meeting is asked to notify this office as soon as possible.

Sincerely,


/S/
John Bjornson
Director

JB/HD

Exhibit A

Appellate Case: 23-3697     Page: 375     Date Filed: 12/17/2023 Entry ID: 5345207

December 8, 2023


TO: PROSPECTIVE REDISTRICTING ANALYSIS CONSULTANTS


On December 5, 2023, the North Dakota Legislative Management approved the issuance of a request for proposals (RFP) from prospective qualified independent consultants for the purpose of providing expert legal and advisory services specific to the analysis and application of the Voting Rights Act (VRA) and other state and federal laws applicable to redistricting.

The selection of the consultant will be made by the Chairman of the Legislative Management.

1. The consultant services must include:

   a. A detailed analysis of alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district;

   b. A detailed analysis of the VRA and its application in the state, including voting behavior, race and ethnicity, racially polarized voting, map drawing, electoral performance, and redistricting analysis; and

   c. A review of the Gingles preconditions as they relate to any proposed map created by the Redistricting Committee.

2. The analysis should consider:

   a. The state's existing redistricting plan, the two plans produced by the plaintiffs in *Turtle Mountain Band of Chippewa Indians et al. v. Howe* (3:22-cv-00011-PDW-ARS), and any new plan developed by the Redistricting Committee;

   b. The likelihood a new plan would conform to Section 2 of the VRA; and

   c. The reports and testimony used to determine the maps proposed by the plaintiffs.

The objective is to provide a data analysis of the state's legislative districts, specifically relating to Native American populations in northeast North Dakota.

Each proposal should include:

1. Information on the individuals who would conduct the analysis, indicating educational and employment experiences, and the company's experience with redistricting and the VRA;

Exhibit B

2. Representative samples or summaries of related work conducted by the company and the status of the implementation of any recommendations; and

3. References for previous related work.

Proposed contract amounts should be inclusive of all expenses. Consultants under contract for the state should be able to obtain lodging in the state at the rate provided by law for state government officials and employees ($96.30 per night plus tax). Meals should be reimbursed at a maximum rate of $45 per person per day.

The Legislative Management intends to award contracts based on the information contained within the proposals received as well as information received from other sources. The Legislative Management reserves the right to accept or reject any or all proposals and to award contracts which the Legislative Management considers the most advantageous to the state.

If you are interested in submitting a proposal for providing these services, please submit your proposal to the Legislative Council office at the address below by Friday, December 15, 2023.

The Legislative Council is the point of contact for this RFP. All consultant communications regarding the RFP should be directed to the Legislative Council.

Email Correspondence:
    Legislative Council - Emily Thompson
    Email: ethompson@ndlegis.gov
    Legislative Council - Samantha E. Kramer
    Email: skramer@ndlegis.gov

Postal Correspondence:
    North Dakota Legislative Council
    State Capitol
    600 East Boulevard Avenue
    Bismarck, ND 58505

Telephone Correspondence:
    701-328-2916

The RFP, any amendments to the RFP, and all questions submitted with responses will be posted on the following website at https://ndlegis.gov/rfp/prospective-redistricting-analysis-consultants.

Interested consultants are encouraged to check that website periodically for any updates related to this RFP.

Sincerely,

Representative Mike Lefor
Chairman

ML/JJB


# REDISTRICTING COMMITTEE

Wednesday, December 13, 2023
Roughrider Room, State Capitol
Bismarck, North Dakota

Senator Ronald Sorvaag, Chairman, called the meeting to order at 12:03 p.m.

**Members present:** Senators Ronald Sorvaag, Brad Bekkedahl, Dick Dever, Robert Erbele, Kathy Hogan; Representatives Craig Headland*, Mike Lefor, Mike Nathe, Austen Schauer

**Member absent:** Representative Josh Boschee

**Others present:** John Bjornson, Legislative Council, Bismarck
See Appendix A for additional persons present.
*Attended remotely

## COMMITTEE RESPONSIBILITIES

Mr. John Bjornson, Director, Legislative Council, presented a memorandum entitled *Supplementary Rules of Operation and Procedure of the North Dakota Legislative Management*.

Chairman Sorvaag commented regarding the committee's responsibilities and direction. He noted:

- It is imperative the committee decide on a plan as directed by the United States District Court for the District of North Dakota expediently so the process may move forward in a timely manner.

- The committee must approve a map, which subsequently must be approved by the Legislative Management, which then must be drafted in bill form with legal descriptions by the Legislative Council staff, and finally approved by the Legislative Assembly in a special or reconvened session to become effective.

- Any individual who wishes to testify at future committee meetings must appear in person.

- Members of the committee may appear virtually due to the sudden nature of the committee reconvening.

Representative Lefor commented regarding the Legislative Management's response to the district court ruling. He noted:

- The Legislative Assembly is not a party to the lawsuit but was ordered to approve a remedial redistricting plan by the district court.

- The Legislative Assembly hired outside counsel to represent the position of the Legislative Assembly, including moving to intervene in the case.

- The Legislative Management appointed this committee to approve a remedial plan.

- The Legislative Management approved a request for proposals for an expert's assistance in drawing a plan.

In response to questions from committee members, Mr. Bjornson noted:

- The district court ordered the Legislative Assembly to complete a remedial plan by December 22, 2023.

- The objective of the committee is for the remedial plan to satisfy the requirements of the Voting Rights Act (VRA), whether by adopting one of the plaintiffs' maps or creating a new map.

- In developing a plan, the committee must consider traditional districting principles, including respecting political subdivision boundaries and communities of interests.

Exhibit C

Appellate Case: 23-3697      Page: 378      Date Filed: 12/17/2023 Entry ID: 5345207

- Regarding any appeals that may be made by outside counsel on behalf of the Legislative Assembly, this committee should consider those actions to be on a separate but parallel course.

Chairman Sorvaag noted this committee's role is to focus solely on the work of approving a remedial redistricting plan.

## LEGISLATIVE REDISTRICTING AND PROPOSED MAPS

Mr. Bjornson presented a memorandum entitled _Legislative Redistricting - Background Memorandum_. He noted:

- The Constitution of North Dakota requires the Legislative Assembly to "guarantee, as nearly as practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates" based on the federal decennial census.

- The redistricting map approved during the special session in 2021 was challenged twice.

- In _Walen v. Burgum_, a panel of judges, Chief Judge Peter D. Welte, Circuit Judge Ralph R. Erickson, and Judge Daniel L. Hovland, denied the plaintiffs' motion for preliminary injunction because the plaintiffs were unlikely to succeed on the merits of the claim and the election was drawing near. The panel later granted the state's motion for summary judgment after finding the subdistricts drawn in Districts 4 and 9 satisfied strict scrutiny and recognized the Legislative Assembly created the subdistrict in an effort to comply with Section 2 of the VRA.

- In _Turtle Mountain Band of Chippewa Indians v. Howe_, the United States District Court for the District of North Dakota held the drawing of Districts 9 and 15 and Subdistricts 9A and 9B prevents Native American voters from electing a candidate of their choice, violating Section 2 of the VRA. The district court permanently enjoined the Secretary of State from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the Legislative Assembly from Districts 9 and 15 and Subdistricts 9A and 9B. The district court gave the Secretary of State and Legislative Assembly until December 22, 2023, to adopt a plan to remedy the violation of Section 2. Under the order, the Tribes have until January 5, 2024, to file an objection to a remedial plan and the defendants have until January 19, 2024, to file a response to an objection.

- To address its constitutional duty to adopt a redistricting plan and attempt to comply with the order of the district court, the committee must further evaluate Districts 9 and 15 and Subdistricts 9A and 9B.

- The committee must ensure members of the minority group do not have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice and in doing so consider traditional districting principles.

Ms. Samantha E. Kramer, Senior Counsel and Assistant Code Revisor, Legislative Council, presented "Plaintiff's Proposed Map #1," "Plaintiff's Proposed Map #2," and additional testimony (Appendix B) related to redistricting data, county-by-county data, and reservation populations. She noted the deviations from ideal population size for the districts affected.

## COMMENTS BY INTERESTED PERSONS

Mr. Scott Davis, Chief Executive Officer, Tatanka Consulting Group, presented testimony on behalf of members of the Turtle Mountain Band of Chippewa Indians. He noted:

- The Turtle Mountain Band of Chippewa Indians never wished for their reservation to be combined into one voting district with Spirit Lake Reservation.

- He prefers consideration of other options over the alternative plans provided by the plaintiffs and the district court.

- Rolette County and adjacent areas can make a more compact District 9, without a subdistrict.

- During the initial redistricting process, representatives of the Spirit Lake Tribe requested to include the Spirit Lake Reservation within a subdistrict of District 15.

In response to a request from a committee member, Ms. Erika White, Elections Director, Secretary of State's office, presented a timeline (Appendix C) related to election deadlines. She noted that if a different map is adopted, affected districts will need to reorganize.

Appellate Case: 23-3697     Page: 379     Date Filed: 12/17/2023 Entry ID: 5345207

No further business appearing, Chairman Sorvaag adjourned the meeting at 1:39 p.m.


_____
Emily Thompson
Legal Division Director


_____
Samantha E. Kramer
Senior Counsel and Assistant Code Revisor


_____
Liz Fordahl
Counsel

ATTACH:3

Appellate Case: 23-3697     Page: 380     Date Filed: 12/17/2023 Entry ID: 5345207

# ATTENDANCE SHEET

Date: 12-13-23          Committee: Redistricting

**PLEASE PRINT**

| Name | Organization/City | E-mail Address |
|---|---|---|
| Don Vigesaa | | dwvigesaa@mlgc.com |
| Jenny Klein | | jennyklein49MT@gmail |
| Tim Mathern | | tmathern@ndlegis.g |
| Scott Davis | Turtle Mt. Band of Chippewa | scott@tatanka conshinsgroup |
| Erika White | ND SOS | emwhite@nd.gov |
| Calvin Benson | PSS | CalvinB@primacyss.com |
| Blair Thoreson | PSS | Blair@primacyss.com |
| Merrill Piepkorn | D44 Senate | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

App362

In addition to the provisions of North Dakota Century Code Chapter 54-35, and in addition to present rules and policies previously established, the Legislative Management, its committees, and the Legislative Council staff are governed by the following rules:

1. **Calling of meetings.**

   a. Committee meetings within the state may be held at the time and place noticed by the committee chairman.

   b. Committee meetings outside the state may not be called without the permission of the Chairman of the Legislative Management.

2. **Conduct of meetings.**

   a. The rules and customs of the Legislative Assembly govern the conduct of interim committee meetings.

   b. *Mason's Manual of Legislative Procedure* governs when rules and customs of the Legislative Assembly are not applicable.

   c. Prior approval by the chairman of the committee is required if a committee member wishes to attend a meeting remotely. A member approved to attend remotely must keep the member's video on at all times throughout the meeting. Remote attendance should be rare and a chairman may approve remote attendance only when a member's physical presence is not possible. Remote attendance by telephone is not allowed unless the meeting must be held for all members by telephone due to unforeseen technical difficulties.

   d. Secret ballots may not be used in voting on any question.

   e. Every member who is present must vote for or against each question on every recorded roll call vote.

   f. Meetings must be electronically recorded to the extent technically possible by the staff, and the staff shall retain the recordings.

   g. Staff shall encourage presenters to submit an electronic version of testimony in advance of the meeting.

   h. Legislative Management members may attend meetings of interim committees of which they are not a member and may sit at the table when invited to do so by the interim committee chairman, but may not vote on any question before the committee. Legislative Management members will not receive compensation or other payment for remote attendance at meetings of committees of which they are not members.

3. **Jurisdiction.**

   a. Committees have the power and authority necessary to carry out the purposes contained in study resolutions and directives under policies, directives, or limitations prescribed by the Legislative Management, and statutory committees have any additional authority specifically provided by law.

   b. Prior approval of the Chairman of the Legislative Management is required for any substantial expansion of committee work beyond that contemplated in the study resolution or directive.

   c. A bill draft prepared by an individual who is not a member of the Legislative Council staff may not be approved by a committee for recommendation to the Legislative Management unless it has been considered by the committee recommending it on at least 2 meeting days, including consideration of revised drafts.

App363

d.  All communications expressing policy of an interim committee must be referred to the Chairman of the Legislative Management for approval before introduction during a legislative session, publication, or distribution.

e.  A proposed request for proposals for consulting services to assist an interim committee with its assigned study responsibilities must be approved by the interim committee before its submission to the Chairman of the Legislative Management for consideration.

**4.  Chairman of the Legislative Management.**

a.  The Chairman of the Legislative Management, the Director of the Legislative Council, or their designee or designees must approve and sign vouchers for the expenditure of funds under the jurisdiction of the Council.

b.  All committee expenditures other than for holding meetings must be approved by the Chairman of the Legislative Management.

c.  Out-of-state travel by a legislator may be reimbursed by the Legislative Council only if the legislator received prior approval for the travel from the Chairman of the Legislative Management, or the Chairman's designee.

d.  The Chairman of the Legislative Management has authority to approve personnel matters and compensation as recommended by the Director.

e.  The Chairman of the Legislative Management may make appointments to fill vacancies on interim committees and make appointments of legislators to committees and consent to or make other assignments during the interim.

f.  The Chairman of the Legislative Management may assign additional studies and responsibilities to interim committees.

g.  Prior approval of the Chairman of the Legislative Management is required before a subcommittee of a committee may be appointed.

h.  The Chairman of the Legislative Management may create additional committees as the Chairman determines appropriate or necessary.

**5.  Reports of committees.**

a.  Each committee shall submit to the Legislative Management any progress reports requested by the Legislative Management.

b.  Each committee shall submit its final written report and recommendations from the interim to the Legislative Management for presentation at the final report meeting of the Legislative Management, or at such other times as the Legislative Management or its Chairman may direct.

c.  Final reports must be accompanied by drafts of bills and resolutions to carry out the recommendations of the committees.

d.  The Legislative Management may accept, reject, or amend the report of any committee, but the committee report or any portion of it, as rejected or amended, must be reflected in substance in the final report of the Legislative Management.

**6.  Legislative Council staff.**

a.  The Director of the Legislative Council and the Legislative Budget Analyst and Auditor, within the limitations of funds, shall hire personnel and provide the assistance necessary to carry out the objectives of the Legislative Management.

b.  A Legislative Council staff member shall attend all committee meetings and serve as staff of the respective committees.

c.  The Director is responsible for the operation of the Legislative Council offices, the provision of staff services to the Legislative Management and its committees, the approval and signature of vouchers for the expenditures of funds under the jurisdiction of the Legislative Council and for any delayed billings or other billings for legislative expenses during periods when the Legislative Assembly is not in session (Section 54-35-11), and for carrying out policies and directives of the Legislative Management.

Appellate Case: 23-3697     Page: 383     Date Filed: 12/17/2023 Entry ID: 5345207

d.  The Director has supervisory authority over all personnel employed by the Legislative Council.

e.  The Legislative Council shall develop and maintain a policy relating to privacy and disclosure of records of the Legislative Council. The policy must be consistent with Sections 44-04-18.6 and 44-04-18.26.

**7.  Amendments and additions.**

a.  Policies and rules of the Legislative Management continue until amended or repealed by the Legislative Management.

b.  Amendments and additions to the rules may be adopted by a majority vote of all members of the Legislative Management.

December 8, 2023

TO: PROSPECTIVE REDISTRICTING ANALYSIS CONSULTANTS

On December 5, 2023, the North Dakota Legislative Management approved the issuance of a request for proposals (RFP) from prospective qualified independent consultants for the purpose of providing expert legal and advisory services specific to the analysis and application of the Voting Rights Act (VRA) and other state and federal laws applicable to redistricting.

The selection of the consultant will be made by the Chairman of the Legislative Management.

1. The consultant services must include:

   a. A detailed analysis of alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district;

   b. A detailed analysis of the VRA and its application in the state, including voting behavior, race and ethnicity, racially polarized voting, map drawing, electoral performance, and redistricting analysis; and

   c. A review of the Gingles preconditions as they relate to any proposed map created by the Redistricting Committee.

2. The analysis should consider:

   a. The state's existing redistricting plan, the two plans produced by the plaintiffs in *Turtle Mountain Band of Chippewa Indians et al. v. Howe* (3:22-cv-00011-PDW-ARS), and any new plan developed by the Redistricting Committee;

   b. The likelihood a new plan would conform to Section 2 of the VRA; and

   c. The reports and testimony used to determine the maps proposed by the plaintiffs.

The objective is to provide a data analysis of the state's legislative districts, specifically relating to Native American populations in northeast North Dakota.

Each proposal should include:

1. Information on the individuals who would conduct the analysis, indicating educational and employment experiences, and the company's experience with redistricting and the VRA;

2. Representative samples or summaries of related work conducted by the company and the status of the implementation of any recommendations; and

3. References for previous related work.

Proposed contract amounts should be inclusive of all expenses. Consultants under contract for the state should be able to obtain lodging in the state at the rate provided by law for state government officials and employees ($96.30 per night plus tax). Meals should be reimbursed at a maximum rate of $45 per person per day.

The Legislative Management intends to award contracts based on the information contained within the proposals received as well as information received from other sources. The Legislative Management reserves the right to accept or reject any or all proposals and to award contracts which the Legislative Management considers the most advantageous to the state.

If you are interested in submitting a proposal for providing these services, please submit your proposal to the Legislative Council office at the address below by Friday, December 15, 2023.

The Legislative Council is the point of contact for this RFP. All consultant communications regarding the RFP should be directed to the Legislative Council.

Email Correspondence:
 Legislative Council - Emily Thompson
 Email: ethompson@ndlegis.gov
 Legislative Council - Samantha E. Kramer
 Email: skramer@ndlegis.gov

Postal Correspondence:
 North Dakota Legislative Council
 State Capitol
 600 East Boulevard Avenue
 Bismarck, ND 58505

Telephone Correspondence:
 701-328-2916

The RFP, any amendments to the RFP, and all questions submitted with responses will be posted on the following website at https://ndlegis.gov/rfp/prospective-redistricting-analysis-consultants.

Interested consultants are encouraged to check that website periodically for any updates related to this RFP.

Sincerely,

Representative Mike Lefor
Chairman

ML/JJB

Appellate Case: 23-3697 Page: 386 Date Filed: 12/17/2023 Entry ID: 5345207

# INTRODUCTION

On December 5, 2023, the Chairman of the Legislative Management appointed the Redistricting Committee in response to the order of the United States District Court in *Turtle Mountain Band of Chippewa Indians, et al. v. Howe*, No. 3:22-CV-22, 2023 WL 8004576 (D.N.D. Nov. 17, 2023), directing the Secretary of State and Legislative Assembly to "adopt a plan to remedy the violation of Section 2" by December 22, 2023.

# 2021 REDISTRICTING COMMITTEE

Every 10 years, the Legislative Assembly engages in the redistricting process. The resultant map remains in effect "until the adjournment of the first regular session after each federal decennial census, or until changed by law" pursuant to Section 2 of Article IV of the Constitution of North Dakota. After the 2021 Legislative Session, which followed the 2020 Census, the Chairman of the Legislative Management appointed a Redistricting Committee, pursuant to House Bill No. 1397 (2021), to develop a legislative redistricting plan to be implemented in time for use in the 2022 primary election.

The 2021 Redistricting Committee reviewed the background memorandum for the Redistricting Committee, which explains the historical and legal requirements related to redistricting and the history of redistricting in North Dakota. The committee held six meetings between July 29, 2021, and September 29, 2021. In an effort to comply with Section 2 of the Voting Rights Act of 1965 (VRA), the 2021 Redistricting Committee created subdistricts in Districts 4 and 9, placing the Turtle Mountain and Fort Berthold Reservations each within a subdistrict. According to the 2020 Census population data, the Turtle Mountain and Fort Berthold Reservations were the only reservations in the state with the requisite population for a single-member district under the VRA. The committee submitted a final report and a proposed map to the Legislative Management for approval on September 29, 2021. The Legislative Management approved the committee's proposed map for introduction as House Bill No. 1504 (2021).

The Governor called a special session "to provide for redistricting of government" pursuant to Section 1 of Article IV of the Constitution of North Dakota. The special session convened on November 8 and adjourned November 12, 2021. The Legislative Assembly approved House Bill No. 1504 (2021) and the resulting map on November 10, 2021.

# RESULTING LITIGATION
## *Walen v. Burgum*

On February 16, 2022, plaintiffs Charles Walen and Paul Henderson filed a complaint against Governor Burgum and Secretary of State, Alvin Jaeger[1], alleging the division of legislative Districts 4 and 9 was the result of unconstitutional racial gerrymandering.

On March 4, 2022, the plaintiffs moved for a preliminary injunction to eliminate the subdistrict lines for the 2022 primary and general elections. On March 30, 2022, Cesario Alvarez, Jr., Lisa DeVille, and the Mandan, Hidatsa, and Arikara Nation moved to intervene and on April 4, 2022, the District Court granted the motion. On May 26, 2022, a panel of judges, Chief Judge Peter D. Welte, Circuit Judge Ralph R. Erickson, and Judge Daniel L. Hovland, denied the plaintiff's motion for preliminary injunction because there was insufficient evidence to find the plaintiffs were likely to succeed on the merits of the case and the plaintiffs were unlikely to overcome the presumption that federal courts should not alter election rules when an election is drawing near. *Walen v. Burgum*, No. 1:22-CV-31, 2023 WL 7216070 (D.N.D. Nov. 2, 2023). In this case, the primary election was 3 weeks away and voting had already begun.

---

[1] In *Walen v. Burgum* and *Turtle Mountain Band of Chippewa Indians v. Howe*, Alvin Jaeger was sued in his official capacity as the Secretary of State. Michael Howe was elected to the office and began his tenure as Secretary of State January 1, 2023, replacing Alvin Jaeger as defendant in these cases.

On February 28, 2023, the plaintiffs moved for summary judgment. To prevail on their motion, the plaintiffs were required to show (1) race was the predominate factor in the Legislative Assembly's decision to group together a significant number of voters and (2) the Legislative Assembly's actions fail to meet strict scrutiny. To pass strict scrutiny, the actions must be narrowly tailored to meet a compelling interest. According to the relevant case law considered by the panel, complying with the VRA is a compelling interest. Narrow tailoring can be demonstrated if the state had good reasons and a strong basis to believe drawing subdistricts was required by the VRA.

The panel found the committee had good reasons to believe the subdistricts drawn around the Turtle Mountain and Fort Berthold Reservations were required by the VRA because the committee carefully considered the likelihood of success of voter dilution claims under Section 2 by Native American voters if the committee did not draw the subdistricts. Therefore, the panel held the subdistricts are narrowly tailored to the state's compelling interest in complying with the VRA, satisfying strict scrutiny required when race is a predominate motivating factor. The panel did not determine whether race was a predominate factor. The panel also noted the relief the plaintiffs sought - eliminating the subdistricts - would itself be a violation of the VRA and federal law, based on the state's unrefuted evidence. The court denied the plaintiff's motion for summary judgment and granted the state and the Mandan, Hidatsa, and Arikara Nation's motion for summary judgment (Appendix A).

### *Turtle Mountain Band of Chippewa Indians v. Howe*

On February 7, 2022, the Turtle Mountain Band of Chippewa Indians, the Spirit Lake Tribe, Zachery S. King, Wesley Davis, and Collette Brown filed a complaint against Secretary of State, Alvin Jaeger, alleging the redistricting plan dilutes the voting strength of Native Americans on the Turtle Mountain and Spirit Lake Reservations in violation of Section 2 of the VRA. Plaintiffs alleged the plan unlawfully "packed" Subdistrict 9A with a supermajority of Native American voters and cracked the remaining Native American voters into other districts, including District 15. On April 15, 2022, the Secretary of State filed a motion to dismiss for lack of jurisdiction and failure to state a claim which the district court denied on July 7, 2022. A 4-day bench trial was held the week of June 12, 2023, in Fargo, North Dakota.

Leading up to trial, an important evidentiary issue arose relating to whether legislative privilege applies in this case. The plaintiffs subpoenaed six current and former members of the Legislative Assembly and a former Legislative Council staff attorney to produce documents pertaining to the 2021 redistricting legislation, and separately sought to depose former Representative William Devlin.

The Legislative Council contracted with outside counsel to object to the discovery requests, asserting state legislative privilege and attorney-client privilege. Former Representative Devlin moved to quash the subpoena requiring his deposition and Magistrate Judge Alice R. Senechal denied the motion on December 22, 2022. The plaintiffs later moved to enforce the third-party subpoenas. Judge Senechal granted the motion on February 10, 2023. The Legislative Assembly appealed both orders and Chief Judge Welte affirmed both of Judge Senechal's orders. The Legislative Assembly appealed again and on September 6, 2023, the Eighth Circuit Court of Appeals found the subpoenas for testimony and the production of documents should have been quashed based on legislative privilege. The circuit court held legislators and staff have an absolute legislative privilege because the documents and testimony sought relating to redistricting are within the sphere of legitimate legislative activity (Appendix B).

On November 17, 2023, based on the evidence at the June 2023 trial and the relevant law, the district court held the drawing of Districts 9 and 15 and Subdistricts 9A and 9B prevents Native American voters from electing a candidate of their choice, violating Section 2 of the VRA.[2] The district court permanently enjoined the Secretary of State from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the Legislative Assembly from Districts 9 and 15 and Subdistricts 9A and 9B. The district court gave the Secretary of State and Legislative Assembly until December 22, 2023, to adopt a plan to remedy the violation of Section 2. Under the order, the Tribes have until January 5, 2024, to file an objection to a remedial plan and the defendants have until January 19, 2024, to file a response to an objection.

---

[2] The district court found all three preconditions delineated in *Thornburg v. Gingles*, 478 U.S. 50-51 (1986) which are used to determine whether there is a viable voter dilution claim were met. In *Gingles*, the United States Supreme Court stated a minority group challenging a redistricting plan must prove: (1) The minority is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) The minority is politically cohesive; and (3) In the absence of special circumstances, bloc voting by the majority usually defeats the minority's preferred candidate. To prove that bloc voting by the majority usually defeats the minority group, the use of statistical evidence is necessary. Following the district court's conclusion these preconditions were met, the district court assessed whether, under the totality of the circumstances, members of the minority group have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. This assessment includes consideration of the Senate Factors from the Senate Committee report to the 1982 amendment to the VRA.

The Secretary of State, Michael Howe, filed an appeal on December 8, 2023. The Legislative Assembly, not yet a party to the suit, filed a motion to intervene and seek a stay on December 8, 2023 (Appendix C). On December 12, 2023, the Legislative Assembly filed a brief relating to the plaintiff's opposition for a stay of the judgment pending appeal (Appendix D). On December 12, 2023, the district court issued an order denying the Secretary of State's request for a stay and denying the request of the Legislative Assembly to intervene and stay the November 17, 2023, order. In the order, (Appendix E), the court indicated the district court no longer had jurisdiction of the case due to the Secretary of State filing notice of appeal.

## COMMITTEE'S DIRECTIVE

The district court found the redistricting plan violates Section 2 of the VRA. Federal courts generally have afforded legislative bodies a reasonable opportunity to draw districts that comply with Section 2. To address its constitutional duty to adopt a redistricting plan and attempt to comply with the order of the district court, the committee must further evaluate Districts 9 and 15 and Subdistricts 9A and 9B. The court ordered the Legislative Assembly to adopt a plan to remedy the violation by December 22, 2023.

In response to the district court's order, on December 5, 2023, the Chairman of Legislative Management appointed a Redistricting Committee. The Legislative Management also approved the issuance of a request for proposal to hire a consultant to assist the committee in its objectives. The committee is charged with approving a plan for recommendation to the Legislative Management. The Legislative Management must approve the committee's recommendation for introduction during a special or reconvened legislative session.

The effective date of the remedial plan will depend on whether the map is approved during a special or reconvened session. If the Governor calls a special session, the effective date of legislation will be the date specified in the Act. If the Legislative Assembly reconvenes, the legislation will be effective 90 days after its filing unless the Legislative Assembly declares the Act to be an emergency measure and the measure is passed by a vote of two-thirds of the members elected to each house.

## Committee Considerations

To comply with the VRA and remedy a violation of Section 2, a redistricting plan must ensure members of the minority group do not have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.

Generally, race may not be a predominant factor in the creation of a district unless the plan is narrowly tailored to serve a compelling state interest. A plan in which race is the predominate factor may be held unconstitutional if the plan disregards traditional districting principles. Traditional districting principles include:

- Compactness.
- Contiguity.
- Preservation of political subdivision boundaries.
- Preservation of communities of interest.
- Preservation of cores of prior districts.
- Protection of incumbents.
- Compliance with Section 2 of the VRA.

The ideal district size is 16,576 under a 47 legislative district plan. A voting group exceeding 4,144 voters would be a majority in a subdistrict, or single-member district.

One of the three *Gingles* preconditions requires a Section 2 plaintiff to demonstrate the minority group is sufficiently large and geographically compact to constitute a majority in a potential district. Although the Spirit Lake Reservation, with a population of 3,787, does not have a population sufficient to necessitate a subdistrict within section 15 under the VRA, the district court found the minority group, including voters from Turtle Mountain Reservation, with a population of 5,113, and voters from Spirit Lake Reservation, is sufficiently large and geographically compact to constitute a majority in a *potential* district including the 2 plans submitted by the plaintiffs and included within the district court's findings.

ATTACH:5

App370

**PLAINTIFF'S PROPOSED MAP #1**

In support of the plaintiff's Section 2 claim in *Turtle Mountain Band of Chippewa Indians, et al. v. Howe*, CV 3:22-cv-00022-PDW-ARS, the Tribes produced two proposed plans containing alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. This is the first proposed plan:



Appellate Case: 23-3697    Page: 390    Date Filed: 12/17/2023 Entry ID: 5345207

In the map below, the boundaries of the Plaintiff's Map #1 are depicted in black, and the existing district boundaries are in yellow. The compactness (appendix) of Plaintiff's Map #1 meets the standards used by the committee when drawing the existing district map.



# PLAINTIFF'S PROPOSED MAP #2

In support of the plaintiff's Section 2 claim in *Turtle Mountain Band of Chippewa Indians, et al. v. Howe*, CV 3:22-cv-00022-PDW-ARS, the Tribes produced two proposed plans containing alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. This is the second proposed plan:



Appellate Case: 23-3697    Page: 392    Date Filed: 12/17/2023 Entry ID: 5345207

In the map below, the boundaries of the Plaintiff's Map #2 are depicted in black, and the existing district boundaries are in yellow. The compactness (appendix) of Plaintiff's Map #2 meets the standards used by the committee when drawing the existing district map.



| | Total Population | Total Population Age 18 and Over | American Indian[1] Population | American Indian[1] Population Age 18 and Over |
|---|---|---|---|---|
| Fort Berthold Reservation | 8,350 | 5,709 | 5,537 | 3,547 |
| Lake Traverse Reservation (area located in North Dakota) | 206 | 158 | 56 | 36 |
| Spirit Lake Reservation | 3,787 | 2,201 | 3,134 | 1,706 |
| Standing Rock Reservation (area location in North Dakota) | 3,898 | 2,544 | 3,332 | 2,102 |
| Turtle Mountain Reservation | 5,113 | 3,372 | 4,767 | 3,078 |

[1]"American Indian" is the term used in the census data.

App375

# County by County and by District

Tuesday, December 12, 2023                                        4:10 PM

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| **Adams ND** | | | | | | |
| District 39 | 2,200 | 100.00% | 14 | 100.00% | 12 | 100.00% |
| County Subtotal | **2,200** | 100% | **14** | 100% | **12** | 100% |
| | | | | | | |
| **Barnes ND** | | | | | | |
| District 24 | 10,853 | 100.00% | 103 | 100.00% | 85 | 100.00% |
| County Subtotal | **10,853** | 100% | **103** | 100% | **85** | 100% |
| | | | | | | |
| **Benson ND** | | | | | | |
| District 14 | 1,963 | 32.91% | 28 | 0.87% | 18 | 1.03% |
| District 15 | 4,001 | 67.09% | 3,188 | 99.13% | 1,734 | 98.97% |
| County Subtotal | **5,964** | 100% | **3,216** | 100% | **1,752** | 100% |
| | | | | | | |
| **Billings ND** | | | | | | |
| District 39 | 945 | 100.00% | 5 | 100.00% | 2 | 100.00% |
| County Subtotal | **945** | 100% | **5** | 100% | **2** | 100% |
| | | | | | | |
| **Bottineau ND** | | | | | | |
| District 6 | 6,379 | 100.00% | 217 | 100.00% | 151 | 100.00% |
| County Subtotal | **6,379** | 100% | **217** | 100% | **151** | 100% |
| | | | | | | |
| **Bowman ND** | | | | | | |
| District 39 | 2,993 | 100.00% | 37 | 100.00% | 18 | 100.00% |
| County Subtotal | **2,993** | 100% | **37** | 100% | **18** | 100% |
| | | | | | | |
| **Burke ND** | | | | | | |
| District 2 | 2,201 | 100.00% | 25 | 100.00% | 11 | 100.00% |
| County Subtotal | **2,201** | 100% | **25** | 100% | **11** | 100% |
| | | | | | | |
| **Burleigh ND** | | | | | | |
| District 14 | 1,368 | 1.39% | 13 | 0.31% | 2 | 0.07% |
| District 30 | 16,484 | 16.74% | 1,043 | 24.50% | 753 | 27.29% |
| District 32 | 16,853 | 17.12% | 1,222 | 28.71% | 788 | 28.56% |
| District 35 | 17,326 | 17.60% | 720 | 16.91% | 461 | 16.71% |
| District 47 | 15,887 | 16.14% | 439 | 10.31% | 268 | 9.71% |
| District 7 | 16,986 | 17.25% | 492 | 11.56% | 298 | 10.80% |
| District 8 | 13,554 | 13.77% | 328 | 7.70% | 189 | 6.85% |
| County Subtotal | **98,458** | 100% | **4,257** | 100% | **2,759** | 100% |
| | | | | | | |
| **Cass ND** | | | | | | |
| District 10 | 16,660 | 9.03% | 257 | 9.83% | 190 | 10.21% |
| District 11 | 16,529 | 8.96% | 301 | 11.51% | 224 | 12.04% |

App376

Appellate Case: 23-3697    Page: 395    Date Filed: 12/17/2023 Entry ID: 5345207

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| District 13 | 16,790 | 9.10% | 250 | 9.56% | 158 | 8.49% |
| District 16 | 16,665 | 9.03% | 171 | 6.54% | 115 | 6.18% |
| District 21 | 16,684 | 9.04% | 526 | 20.12% | 371 | 19.94% |
| District 22 | 16,128 | 8.74% | 95 | 3.63% | 51 | 2.74% |
| District 27 | 17,009 | 9.22% | 157 | 6.01% | 99 | 5.32% |
| District 41 | 16,990 | 9.21% | 158 | 6.04% | 119 | 6.39% |
| District 44 | 17,186 | 9.31% | 314 | 12.01% | 254 | 13.65% |
| District 45 | 16,671 | 9.03% | 202 | 7.73% | 155 | 8.33% |
| District 46 | 17,213 | 9.33% | 183 | 7.00% | 125 | 6.72% |
| County Subtotal | **184,525** | 100% | **2,614** | 100% | **1,861** | 100% |
| | | | | | | |
| Cavalier ND | | | | | | |
| District 19 | 492 | 13.28% | 10 | 35.71% | 7 | 36.84% |
| District 9B | 3,212 | 86.72% | 18 | 64.29% | 12 | 63.16% |
| County Subtotal | **3,704** | 100% | **28** | 100% | **19** | 100% |
| | | | | | | |
| Dickey ND | | | | | | |
| District 28 | 4,999 | 100.00% | 28 | 100.00% | 19 | 100.00% |
| County Subtotal | **4,999** | 100% | **28** | 100% | **19** | 100% |
| | | | | | | |
| Divide ND | | | | | | |
| District 2 | 2,195 | 100.00% | 19 | 100.00% | 13 | 100.00% |
| County Subtotal | **2,195** | 100% | **19** | 100% | **13** | 100% |
| | | | | | | |
| Dunn ND | | | | | | |
| District 26 | 2,923 | 71.38% | 62 | 13.57% | 36 | 12.33% |
| District 36 | 34 | 0.83% | 0 | 0.00% | 0 | 0.00% |
| District 39 | 612 | 14.95% | 1 | 0.22% | 1 | 0.34% |
| District 4A | 526 | 12.84% | 394 | 86.21% | 255 | 87.33% |
| County Subtotal | **4,095** | 100% | **457** | 100% | **292** | 100% |
| | | | | | | |
| Eddy ND | | | | | | |
| District 14 | 2,227 | 94.89% | 62 | 95.38% | 40 | 95.24% |
| District 15 | 120 | 5.11% | 3 | 4.62% | 2 | 4.76% |
| County Subtotal | **2,347** | 100% | **65** | 100% | **42** | 100% |
| | | | | | | |
| Emmons ND | | | | | | |
| District 8 | 3,301 | 100.00% | 13 | 100.00% | 5 | 100.00% |
| County Subtotal | **3,301** | 100% | **13** | 100% | **5** | 100% |
| | | | | | | |
| Foster ND | | | | | | |
| District 29 | 3,397 | 100.00% | 20 | 100.00% | 14 | 100.00% |
| County Subtotal | **3,397** | 100% | **20** | 100% | **14** | 100% |
| | | | | | | |
| Golden Valley ND | | | | | | |
| District 39 | 1,736 | 100.00% | 12 | 100.00% | 1 | 100.00% |

App377

Appellate Case: 23-3697    Page: 396    Date Filed: 12/17/2023 Entry ID: 5345207

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| County Subtotal | **1,736** | 100% | **12** | 100% | **1** | 100% |
| | | | | | | |
| Grand Forks ND | | | | | | |
| District 17 | 16,067 | 21.96% | 242 | 13.37% | 173 | 13.84% |
| District 18 | 16,212 | 22.16% | 630 | 34.81% | 441 | 35.28% |
| District 20 | 8,461 | 11.56% | 81 | 4.48% | 60 | 4.80% |
| District 42 | 16,424 | 22.45% | 481 | 26.57% | 318 | 25.44% |
| District 43 | 16,006 | 21.88% | 376 | 20.77% | 258 | 20.64% |
| County Subtotal | **73,170** | 100% | **1,810** | 100% | **1,250** | 100% |
| | | | | | | |
| Grant ND | | | | | | |
| District 31 | 2,301 | 100.00% | 34 | 100.00% | 24 | 100.00% |
| County Subtotal | **2,301** | 100% | **34** | 100% | **24** | 100% |
| | | | | | | |
| Griggs ND | | | | | | |
| District 29 | 2,306 | 100.00% | 12 | 100.00% | 10 | 100.00% |
| County Subtotal | **2,306** | 100% | **12** | 100% | **10** | 100% |
| | | | | | | |
| Hettinger ND | | | | | | |
| District 31 | 1,283 | 51.55% | 19 | 42.22% | 9 | 28.13% |
| District 39 | 1,206 | 48.45% | 26 | 57.78% | 23 | 71.88% |
| County Subtotal | **2,489** | 100% | **45** | 100% | **32** | 100% |
| | | | | | | |
| Kidder ND | | | | | | |
| District 14 | 2,394 | 100.00% | 12 | 100.00% | 4 | 100.00% |
| County Subtotal | **2,394** | 100% | **12** | 100% | **4** | 100% |
| | | | | | | |
| LaMoure ND | | | | | | |
| District 28 | 4,093 | 100.00% | 26 | 100.00% | 14 | 100.00% |
| County Subtotal | **4,093** | 100% | **26** | 100% | **14** | 100% |
| | | | | | | |
| Logan ND | | | | | | |
| District 28 | 1,876 | 100.00% | 14 | 100.00% | 8 | 100.00% |
| County Subtotal | **1,876** | 100% | **14** | 100% | **8** | 100% |
| | | | | | | |
| McHenry ND | | | | | | |
| District 6 | 5,345 | 100.00% | 27 | 100.00% | 16 | 100.00% |
| County Subtotal | **5,345** | 100% | **27** | 100% | **16** | 100% |
| | | | | | | |
| McIntosh ND | | | | | | |
| District 28 | 2,530 | 100.00% | 7 | 100.00% | 3 | 100.00% |
| County Subtotal | **2,530** | 100% | **7** | 100% | **3** | 100% |
| | | | | | | |
| McKenzie ND | | | | | | |
| District 26 | 12,826 | 87.23% | 224 | 11.83% | 158 | 13.70% |
| District 4A | 1,878 | 12.77% | 1,670 | 88.17% | 995 | 86.30% |

App378

Appellate Case: 23-3697     Page: 397     Date Filed: 12/17/2023 Entry ID: 5345207

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| County Subtotal | **14,704** | 100% | **1,894** | 100% | **1,153** | 100% |
| | | | | | | |
| McLean ND | | | | | | |
| District 33 | 3,082 | 31.54% | 29 | 3.59% | 21 | 3.85% |
| District 4A | 1,058 | 10.83% | 672 | 83.17% | 444 | 81.47% |
| District 4B | 2,848 | 29.15% | 83 | 10.27% | 62 | 11.38% |
| District 6 | 2,253 | 23.06% | 17 | 2.10% | 15 | 2.75% |
| District 8 | 530 | 5.42% | 7 | 0.87% | 3 | 0.55% |
| County Subtotal | **9,771** | 100% | **808** | 100% | **545** | 100% |
| | | | | | | |
| Mercer ND | | | | | | |
| District 33 | 8,265 | 98.98% | 129 | 64.50% | 90 | 66.67% |
| District 4A | 85 | 1.02% | 71 | 35.50% | 45 | 33.33% |
| County Subtotal | **8,350** | 100% | **200** | 100% | **135** | 100% |
| | | | | | | |
| Morton ND | | | | | | |
| District 31 | 8,500 | 25.53% | 341 | 25.79% | 190 | 22.49% |
| District 33 | 4,035 | 12.12% | 96 | 7.26% | 64 | 7.57% |
| District 34 | 17,101 | 51.37% | 869 | 65.73% | 575 | 68.05% |
| District 36 | 3,655 | 10.98% | 16 | 1.21% | 16 | 1.89% |
| County Subtotal | **33,291** | 100% | **1,322** | 100% | **845** | 100% |
| | | | | | | |
| Mountrail ND | | | | | | |
| District 2 | 3,396 | 34.62% | 53 | 1.87% | 31 | 1.65% |
| District 4A | 4,781 | 48.74% | 2,730 | 96.13% | 1,808 | 96.17% |
| District 4B | 1,632 | 16.64% | 57 | 2.01% | 41 | 2.18% |
| County Subtotal | **9,809** | 100% | **2,840** | 100% | **1,880** | 100% |
| | | | | | | |
| Nelson ND | | | | | | |
| District 29 | 3,015 | 100.00% | 26 | 100.00% | 21 | 100.00% |
| County Subtotal | **3,015** | 100% | **26** | 100% | **21** | 100% |
| | | | | | | |
| Oliver ND | | | | | | |
| District 33 | 1,877 | 100.00% | 24 | 100.00% | 19 | 100.00% |
| County Subtotal | **1,877** | 100% | **24** | 100% | **19** | 100% |
| | | | | | | |
| Pembina ND | | | | | | |
| District 19 | 6,844 | 100.00% | 135 | 100.00% | 111 | 100.00% |
| County Subtotal | **6,844** | 100% | **135** | 100% | **111** | 100% |
| | | | | | | |
| Pierce ND | | | | | | |
| District 14 | 3,990 | 100.00% | 146 | 100.00% | 96 | 100.00% |
| County Subtotal | **3,990** | 100% | **146** | 100% | **96** | 100% |
| | | | | | | |
| Ramsey ND | | | | | | |
| District 15 | 11,605 | 100.00% | 1,276 | 100.00% | 769 | 100.00% |

App379

Appellate Case: 23-3697    Page: 398    Date Filed: 12/17/2023 Entry ID: 5345207

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| County Subtotal | **11,605** | 100% | **1,276** | 100% | **769** | 100% |
| | | | | | | |
| Ransom ND | | | | | | |
| District 24 | 5,703 | 100.00% | 18 | 100.00% | 16 | 100.00% |
| County Subtotal | **5,703** | 100% | **18** | 100% | **16** | 100% |
| | | | | | | |
| Renville ND | | | | | | |
| District 6 | 2,282 | 100.00% | 15 | 100.00% | 15 | 100.00% |
| County Subtotal | **2,282** | 100% | **15** | 100% | **15** | 100% |
| | | | | | | |
| Richland ND | | | | | | |
| District 25 | 16,529 | 100.00% | 467 | 100.00% | 282 | 100.00% |
| County Subtotal | **16,529** | 100% | **467** | 100% | **282** | 100% |
| | | | | | | |
| Rolette ND | | | | | | |
| District 9A | 7,890 | 64.74% | 6,432 | 69.33% | 4,036 | 69.67% |
| District 9B | 4,297 | 35.26% | 2,846 | 30.67% | 1,757 | 30.33% |
| County Subtotal | **12,187** | 100% | **9,278** | 100% | **5,793** | 100% |
| | | | | | | |
| Sargent ND | | | | | | |
| District 25 | 69 | 1.79% | 0 | 0.00% | 0 | 0.00% |
| District 28 | 3,793 | 98.21% | 13 | 100.00% | 12 | 100.00% |
| County Subtotal | **3,862** | 100% | **13** | 100% | **12** | 100% |
| | | | | | | |
| Sheridan ND | | | | | | |
| District 14 | 1,265 | 100.00% | 11 | 100.00% | 5 | 100.00% |
| County Subtotal | **1,265** | 100% | **11** | 100% | **5** | 100% |
| | | | | | | |
| Sioux ND | | | | | | |
| District 31 | 3,898 | 100.00% | 3,332 | 100.00% | 2,102 | 100.00% |
| County Subtotal | **3,898** | 100% | **3,332** | 100% | **2,102** | 100% |
| | | | | | | |
| Slope ND | | | | | | |
| District 39 | 706 | 100.00% | 2 | 100.00% | 2 | 100.00% |
| County Subtotal | **706** | 100% | **2** | 100% | **2** | 100% |
| | | | | | | |
| Stark ND | | | | | | |
| District 36 | 12,250 | 36.41% | 163 | 34.75% | 101 | 32.37% |
| District 37 | 16,045 | 47.69% | 250 | 53.30% | 169 | 54.17% |
| District 39 | 5,351 | 15.90% | 56 | 11.94% | 42 | 13.46% |
| County Subtotal | **33,646** | 100% | **469** | 100% | **312** | 100% |
| | | | | | | |
| Steele ND | | | | | | |
| District 29 | 1,798 | 100.00% | 7 | 100.00% | 2 | 100.00% |
| County Subtotal | **1,798** | 100% | **7** | 100% | **2** | 100% |

App380

Appellate Case: 23-3697     Page: 399     Date Filed: 12/17/2023 Entry ID: 5345207

| District | Population | % of County | AmIndian | % of County | [18+_Ind] | % of County |
|---|---|---|---|---|---|---|
| **Stutsman ND** | | | | | | |
| District 12 | 15,845 | 73.38% | 279 | 92.69% | 224 | 91.80% |
| District 29 | 5,748 | 26.62% | 22 | 7.31% | 20 | 8.20% |
| County Subtotal | **21,593** | 100% | **301** | 100% | **244** | 100% |
| | | | | | | |
| **Towner ND** | | | | | | |
| District 15 | 1,403 | 64.89% | 51 | 71.83% | 35 | 77.78% |
| District 9B | 759 | 35.11% | 20 | 28.17% | 10 | 22.22% |
| County Subtotal | **2,162** | 100% | **71** | 100% | **45** | 100% |
| | | | | | | |
| **Traill ND** | | | | | | |
| District 20 | 7,997 | 100.00% | 74 | 100.00% | 49 | 100.00% |
| County Subtotal | **7,997** | 100% | **74** | 100% | **49** | 100% |
| | | | | | | |
| **Walsh ND** | | | | | | |
| District 19 | 9,895 | 93.68% | 137 | 94.48% | 93 | 93.00% |
| District 20 | 668 | 6.32% | 8 | 5.52% | 7 | 7.00% |
| County Subtotal | **10,563** | 100% | **145** | 100% | **100** | 100% |
| | | | | | | |
| **Ward ND** | | | | | | |
| District 3 | 15,796 | 22.59% | 527 | 30.89% | 356 | 30.32% |
| District 38 | 17,275 | 24.71% | 322 | 18.87% | 210 | 17.89% |
| District 40 | 15,831 | 22.64% | 286 | 16.76% | 215 | 18.31% |
| District 4A | 22 | 0.03% | 0 | 0.00% | 0 | 0.00% |
| District 4B | 3,639 | 5.20% | 64 | 3.75% | 42 | 3.58% |
| District 5 | 16,307 | 23.32% | 493 | 28.90% | 345 | 29.39% |
| District 6 | 1,049 | 1.50% | 14 | 0.82% | 6 | 0.51% |
| County Subtotal | **69,919** | 100% | **1,706** | 100% | **1,174** | 100% |
| | | | | | | |
| **Wells ND** | | | | | | |
| District 14 | 3,982 | 100.00% | 17 | 100.00% | 9 | 100.00% |
| County Subtotal | **3,982** | 100% | **17** | 100% | **9** | 100% |
| | | | | | | |
| **Williams ND** | | | | | | |
| District 1 | 15,976 | 39.01% | 406 | 33.86% | 302 | 35.45% |
| District 2 | 8,676 | 21.19% | 132 | 11.01% | 95 | 11.15% |
| District 23 | 16,298 | 39.80% | 661 | 55.13% | 455 | 53.40% |
| County Subtotal | **40,950** | 100% | **1,199** | 100% | **852** | 100% |

App381

Appellate Case: 23-3697     Page: 400     Date Filed: 12/17/2023 Entry ID: 5345207

# NORTH DAKOTA
# SECRETARY ⓥF STATE

# 2024 Election Deadlines

## Important Deadlines

The following deadlines are dictated by North Dakota Century Code related to election administration. No changes to jurisdictions can be made following the April 8, 2024, deadline.

• **December 31st:** County commissions must establish precinct boundaries.

• **January 1st:** Candidates can begin circulating petitions and endorsing meetings at the district level can begin.

• **January 2nd:** First date a candidate may turn-in petitions.

• **March 3rd:** The Secretary of State must publish the notice of election and any statewide, legislative, or judicial contests appearing on the ballot.

• **April 8th:** Filing deadline for all contests, candidates, and measures.

• **April 8th:** Polling locations must be established by this date though is recommended that occur by the December 31st deadline.

• **April 17th:** Secretary of State must certify a list of candidates for statewide, legislative, and judicial contests.

• **April 26th:** UOCAVA (Military and Oversees) voting begins.

• **May 2nd:** Absentee voting for all qualified electors begins.

**April 8th** is the hard deadline for the state and counties to be able to successfully administer an election. Many preparations happen between April 8th and UOCAVA voting such as:

• Election setup including assigning precincts and voters to polling locations.

• Candidate rotation drawing and placement on the ballot.

• Ballot proofing for 100% accuracy – each precinct has at minimum one ballot style; some precincts have 2 or more ballot styles.

• Programming for tabulation equipment and assistive ballot marking device.

• Ballot ordering

• Request to district party chairs for election judges.

• Notice of Canvass Board meeting to district party chairs.

• Notice of election worker training to district party chairs.



# North Dakota Legislative Council

STATE CAPITOL, 600 EAST BOULEVARD, BISMARCK, ND 58505-0360

☎701.328.2916
🖷701.258.3462
www.ndlegis.gov
lcouncil@ndlegis.gov

December 15, 2023

## MEETING NOTICE

Senator Ronald Sorvaag, Chairman, has called a meeting of the **REDISTRICTING COMMITTEE**.

**Date:** Wednesday, December 20, 2023

**Time:** 10:00 a.m.

**Place:** Harvest Room, State Capitol, Bismarck

**Video:** This meeting can be viewed online at https://video.ndlegis.gov.

**Agenda:** Committee discussion regarding the committee's directive to adopt a remedial redistricting plan and consideration of legislative redistricting proposals; and comments by interested persons

**Special Note:** Anyone who plans to attend the meeting and needs assistance because of a disability should contact the Legislative Council staff as soon as possible.

**Committee Members:** Senators Ronald Sorvaag, Brad Bekkedahl, Dick Dever, Robert Erbele, Kathy Hogan; Representatives Josh Boschee, Craig Headland, Mike Lefor, Mike Nathe, Austen Schauer

**Staff Contacts:** Emily Thompson, Legal Division Director
Samantha E. Kramer, Senior Counsel and Assistant Code Revisor
Liz Fordahl, Counsel

Any member unable to attend this meeting is asked to notify this office as soon as possible.

Sincerely,

/S/
John Bjornson
Director

JB/HD

Exhibit D



## REDISTRICTING COMMITTEE

Wednesday, December 20, 2023
Harvest Room, State Capitol
Bismarck, North Dakota

| | |
|---|---|
| 10:00 a.m. | Call to order |
| | Roll call |
| | Consideration of the <u>minutes of the December 13, 2023, meeting</u> |
| 10:05 a.m. | Committee discussion regarding the committee's directive to adopt a remedial redistricting plan and consideration of legislative redistricting proposals |
| 11:00 a.m. | Comments from interested persons |
| 12:30 p.m. | Recess |
| 1:00 p.m. | Committee discussion |
| 2:00 p.m. | Adjourn |

**A livestream of the meeting will be available to the public at: <u>https://video.ndlegis.gov</u>.**

**Committee Members**
Senators:  Ronald Sorvaag (Chairman), Brad Bekkedahl, Dick Dever, Robert Erbele, Kathy Hogan
Representatives: Josh Boschee, Craig Headland, Mike Lefor, Mike Nathe, Austen Schauer

Staff Contacts:  Emily Thompson, Legal Division Director
         Samantha E. Kramer, Senior Counsel and Assistant Code Revisor
         Liz Fordahl, Counsel

Exhibit E

Appellate Case: 23-3697      Page: 403      Date Filed: 12/17/2023 Entry ID: 5345207

**Thompson, Emily**

| | |
|---|---|
| **From:** | Thompson, Emily |
| **Sent:** | Saturday, December 16, 2023 5:02 PM |
| **To:** | Thompson, Emily |
| **Subject:** | Redistricting Committee |

**From:** Fordahl, Liz
**Sent:** Friday, December 15, 2023 9:39 AM
**To:** jamie.azure@tmbci.org <jamie.azure@tmbci.org>
**Subject:** Redistricting Committee

Chairman Azure,

Senator Sorvaag, the Chairman of the Redistricting Committee, would like to invite you to attend the next Redistricting Committee meeting, which will be held on Wednesday, December 20, 2023, from 10:00 a.m. to 2:00 p.m., in the Harvest Room at the State Capitol. There will be an opportunity for you to present testimony if you wish.

Please let me know if you have any questions.

Thank you,



*Liz Fordahl*
Counsel

State Capitol
600 East Boulevard Avenue
Bismarck, ND 58505-0160

701-328-2946
lfordahl@ndlegis.gov

1

Exhibit F

**Thompson, Emily**

| | |
|---|---|
| **From:** | Thompson, Emily |
| **Sent:** | Saturday, December 16, 2023 5:01 PM |
| **To:** | Thompson, Emily |
| **Subject:** | Redistricting Committee |

---

**From:** Fordahl, Liz
**Sent:** Friday, December 15, 2023 9:39 AM
**To:** LStreet@spiritlakenation.com <LStreet@spiritlakenation.com>
**Subject:** Redistricting Committee

Chairwoman Street,

Senator Sorvaag, the Chairman of the Redistricting Committee, would like to invite you to attend the next Redistricting Committee meeting, which will be held on Wednesday, December 20, 2023, from 10:00 a.m. to 2:00 p.m., in the Harvest Room at the State Capitol. There will be an opportunity for you to present testimony if you wish.

Please let me know if you have any questions.

Thank you,



*Liz Fordahl*
Counsel

State Capitol
600 East Boulevard Avenue
Bismarck, ND 58505-0160

701-328-2946
lfordahl@ndlegis.gov

Exhibit G

Appellate Case: 23-3697     Page: 405     Date Filed: 12/17/2023 Entry ID: 5345207



# North Dakota Legislative Council

STATE CAPITOL, 600 EAST BOULEVARD, BISMARCK, ND 58505-0360

☎701.328.2916
🖷701.258.3462
www.ndlegis.gov
lcouncil@ndlegis.gov

October 13, 2023

Honorable Doug Burgum
Governor
State Capitol
Bismarck, ND 58505

Dear Governor Burgum:

The undersigned Majority and Minority Leaders of the North Dakota House of Representatives and North Dakota Senate write to request you convene a special session of the Legislative Assembly, pursuant to the authority in Section 7 of Article V of the Constitution of North Dakota, to allow the Legislative Assembly to separately address the provisions of Senate Bill No. 2015 (2023) consistent with the decision of the North Dakota Supreme Court in *Board of Trustees of The North Dakota Public Employees' Retirement System v. North Dakota Legislative Assembly*. A special session is being requested despite the remaining availability of 5 of the 80 natural days available to the 68th Legislative Assembly due to the manner in which effective dates apply under the Constitution of North Dakota.

Section 13 of Article IV of the Constitution of North Dakota addresses when bills enacted by the Legislative Assembly become effective. This section provides every law enacted by the Legislative Assembly during the Legislative Assembly's 80 natural meeting days takes effect on August 1, except:

- An appropriation or tax measure, which becomes effective July 1;

- A bill filed with the Secretary of State on or after August 1 and before January 1 of the following year, such as during a reconvened session, which takes effect 90 days after its filing with the Secretary of State;

- A bill declared to be an emergency measure and which is passed by a vote of two-thirds of the members elected to each house, which takes effect upon its filing with the Secretary of State or on a later date specified in the measure; and

- A law enacted by a special session of the Legislative Assembly, which takes effect on the date specified in the measure.

Thus, any bill passed during a reconvened session, as a result of the 68th Legislative Assembly using the last of its 5 remaining natural days, will not become effective until 90 days after its filing with the Secretary of State unless the bill contains a properly enacted emergency clause. Considering the recent prohibition on the execution or enforcement of the provisions in Senate Bill No. 2015, pursuant to the judgment entered by the North Dakota Supreme Court on October 12, 2023, enacting corrective legislation during a reconvened session poses a significant risk the legislation would not become effective until 90 days after the bill is filed with the Secretary of State if the legislation does not garner the required two-thirds vote of the members elected to each house to carry an emergency clause. Such a delay would undoubtedly leave the Office of Management and Budget in a precarious position.

Exhibit H

Appellate Case: 23-3697     Page: 406     Date Filed: 12/17/2023 Entry ID: 5345207

Absent an emergency clause, the risk of significant delay will not be remedied by a retroactive application clause. Although inclusion of a retroactive application clause allows a bill provision to reach back to a date that falls before the effective date of the bill, the language in the retroactive application clause does not become effective until the underlying bill becomes effective. During a reconvened session, both the bill, and the retroactive application clause in the bill, would have no effect until 90 days after the bill is filed with the Secretary of State. The potential for the Office of Management and Budget to receive no supplemental funding for an additional period of at least 90 days from the date corrective legislation is filed with the Secretary of State raises significant concerns.

Allowing the Legislative Assembly to convene for a special session eliminates the threat of legislation passing without obtaining the higher voting threshold necessary to pass an emergency clause because all legislation enacted during a special session becomes effective on the date specified in the Act.

We, therefore, request you convene a special session of the Legislative Assembly to allow the Legislative Assembly to separately address the provisions of Senate Bill No. 2015 consistent with the recent North Dakota Supreme Court decision.

Sincerely,

_____
Representative Mike Lefor
House Majority Leader

_____
Senator David Hogue
Senate Majority Leader

_____
Representative Zachary Ista
House Minority Leader

_____
Senator Kathy Hogan
Senate Minority Leader

ML/DH/ZI/KH/RWT

 Office of the Governor



## EXECUTIVE ORDER 2023-09

**WHEREAS**, the North Dakota Supreme Court ruled Senate Bill 2015 of the 68th Legislative Assembly void in *Board of Trustees of the ND Public Employees Retirement System v. ND Legislative Assembly*; and,

**WHEREAS,** Senate Bill 2015 contained many important provisions, including the budget of the Office of Management and Budget, which need to be enacted by the Legislative Assembly in order to ensure the continued operation of state government and avoid interruption of state services to citizens; and,

**WHEREAS**, under Article V, Section 7 of the North Dakota Constitution, the Governor is authorized to convene special sessions of the Legislative Assembly.

**NOW, THEREFORE**, pursuant to authority under Article V of the North Dakota Constitution, Governor Doug Burgum hereby convenes a special session of the North Dakota Legislative Assembly on Monday, October 23, 2023, in the legislative chambers at the State Capitol in Bismarck, North Dakota.

1. This special session is convened under the following authority:
    a. The Governor is vested with the executive power under North Dakota Constitution Article V, Section 1
    b. The Governor is vested with the specific authority to convene a special session of the Legislative Assembly under Article V, Section 7 of the North Dakota Constitution.
2. The special session of the Legislative Assembly is convened for the following purposes:
    a. To enact and authorize an appropriations bill for the Office of Management and Budget of the State of North Dakota; and,
    b. To enact other components of Senate Bill 2015; and,
    c. To utilize a portion of the above-forecasted revenue from the 2021-2023 biennium to make strategic investments in areas such as tax relief and infrastructure to strengthen North Dakota's economic future.
3. Given the urgency of the matter stated above, and in order to avoid interruption to state government operations and services to citizens, the Legislative Assembly should complete these items by Friday, October 27, 2023.

Exhibit I

600 East Boulevard Avenue | Bismarck, ND 58505-0001 | 701.328.2200 | governor.ND.gov

Appellate Case: 23-3697    Page: 408    Date Filed: 12/17/2023 Entry ID: 5345207

Executed at Bismarck, North Dakota, this 17th day of October 2023.

Doug Burgum
Governor

ATTEST:

Michael Howe
Secretary of State

_____
Deputy

App390