**Docket Nos. 23-3697 and 24-1171**

**In the**

# United States Court of Appeals

**For the**

# Eighth Circuit

---

Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe; Westley Davis; Zachery S. King; Collete Brown,

Plaintiffs - Appellees

v.

Michael Howe, in his official Capacity as Secretary of State of North Dakota

Defendant - Appellee

North Dakota Legislative Assembly

Movant - Appellant

---

On Consolidated Appeal of Order Denying Assembly's Motion to Intervene and Order Denying Assembly's Motion for Extension of Time and Adopting Plaintiffs' Proposed Plan 2 as Remedial Plan
To The United States District Court for the District of North Dakota
In Case No. 3:22-cv-00022

---

## BRIEF OF MOVANT - APPELLANT

Scott K. Porsborg (ND State Bar ID No. 04904)
sporsborg@smithporsborg.com
Brian D. Schmidt (ND State Bar ID No. 07498)
bschmidt@smithporsborg.com
122 East Broadway Avenue
P.O. Box 460
Bismarck, ND 58501
(701) 258-0630

Attorneys for Movant – Appellant

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

The District Court denied the North Dakota Legislative Assembly's ("Assembly") repeated requests to protect its legislative interests at every turn of this Voting Rights Act ("VRA") litigation. The District Court denied the Assembly's motion to intervene once its legislative interest was triggered and refused its request for a reasonable opportunity to develop a remedial redistricting plan. Rather, the District Court rushed to impose the Plaintiffs' remedial map - over the Assembly's objection - by judicial fiat. This was one of many significant errors made by the District Court.

The District Court failed to follow the well-established directive that it should make every effort not to pre-empt the redistricting process. Further it is well-established district courts should only accept the unwelcomed obligation of imposing its own remedial plan once the legislature refuses. Here, the District Court imposed a remedial plan while the Assembly actively worked to develop one. This case presents the antithesis of judicial restraint and resulted in inconsistent and illogical directives from the District Court. Basic concepts of federalism, separation of powers, and binding precedent we all cast aside by the District Court in a rush to impose a racially gerrymandered map on the citizens of North Dakota.

The Assembly respectfully requests oral argument to protect its unique legislative interests.

-ii-

## CORPORATE DISCLOSURE STATEMENT

The Assembly is established by the North Dakota Constitution.  Therefore, no corporate disclosure statement is required under Fed. R. App. P. 26.1(b).

# TABLE OF CONTENTS

**PAGE**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ......... ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF CONTENTS ............................................................................................ iv

TABLE OF AUTHORITIES .................................................................................. vii

JURISDICTION STATEMENT .............................................................................. 1

STATEMENT OF THE ISSUES ............................................................................. 1

INTRODUCTION ....................................................................................................... 2

STATEMENT OF THE CASE ............................................................................... 10

     A.    Factual and Procedural Background ................................................. 10

     B.    Legislative Management Acted Swiftly to Protect the Assembly's Redistricting Interests ................................................... 13

     C.    The Redistricting Committee's December 13, 2023 Meeting .......... 16

     D.    Additional Filings on Appeal ............................................................. 18

     E.    The Redistricting Committee Met Again on December 20, 2023 .... 19

     F.    The Assembly Promptly Requested a Reasonable Opportunity to "Adopt" a Remedial Plan from the District Court ............................ 21

     G.    The Redistricting Committee Continued its Efforts While Motions Pended with the District Court ............................................ 21

     H.    The District Court's Order dated January 8, 2024 ........................... 22

     I.    The Assembly Appealed ..................................................................... 24

Appellate Case: 23-3697    Page: 4    Date Filed: 03/26/2024 Entry ID: 5376956

SUMMARY OF THE ARGUMENT ................................................... 24

ARGUMENT ........................................................................ 28

    A.    The District Court Erred in Denying the Assembly's Motion to Intervene ...................................................................... 28

        1.    Even in the Absence of Berger, this Court's Precedent Favor's Intervention ........................................... 32

            i.    The Assembly had a Cognizable Interest in the Subject Matter of the Litigation .................................. 32

            ii.    The Assembly's Redistricting Interest was Impaired as a Result of the Litigation ......................................... 33

            iii.    The Assembly's Redistricting Interest was not Adequately Protected by Existing Parties to the Litigation .......................................................... 34

            iv.    The Assembly's Motion to Intervene was Timely ....... 37

    B.    The District Court did not Afford the Assembly a "Reasonable Opportunity" to Develop a Remedial Plan ......................................... 39

        1.    The District Court's Orders are Inconsistent .......................... 39

        2.    No Case Law or Policy Considerations Support the District Court's Action ........................................... 41

    C.    The District Court's Failure to Allow the Assembly to Perform its Job Resulted in Racial Gerrymandering ........................................ 46

    D.    Neither District 9 nor District 15 are on the 2024 Ballot .................. 49

CONCLUSION .................................................................... 50

Appellate Case: 23-3697    Page: 5    Date Filed: 03/26/2024 Entry ID: 5376956

CERTIFICATE OF COMPLIANCE .......................................................... 52

CERTIFICATE OF SERVICE .............................................................. 53

Appellate Case: 23-3697    Page: 6    Date Filed: 03/26/2024 Entry ID: 5376956

# TABLE OF AUTHORITIES

**CASES**                                                           **PAGE(S)**

Abbot v. Perez, 585 U.S. 579 (2018) .......................................................48

Allen v. Milligan, 599 U.S. 1 (2023) (J. Thomas dissent)................................ 39, 40

Arkansas State Conference NAACP v. Arkansas Board of Apportionment,
86 F.4th 1204 (8th Cir. 2023).......................................................................3

Berger v. North Carolina State Conference of the NAACP,
597 U.S. 179 (2022)................................................... 1, 27, 28, 29, 31, 32, 34, 35, 39

Board of Educ. of St. Louis v. State of Missouri,
936 F.2d 993, 995-96 (8th Cir. 1991)................................................. 19, 40

Bone Shirt v. Hazeltine, 461 F.3d 1011 (8th Cir. 2006).............................. 25, 39, 46

Calzone v. Hawley, 866 F.3d 866 (8th Cir. 2017).....................................35

Cameron v. EMW Women's Surgical Center, P.S.C.,
595 U.S. 267 (2022)........................................................................ 2, 37, 38

Chiglo v. City of Preston, 104 F.3d 185 (8th Cir. 1997) ................ 28, 32, 34, 35, 37

Cooper v. Harris, 581 U.S. 285 (2017).......................................................... 2, 47, 48

Covington v. State, 267 F.Supp.3d 664 (M.D. N.C. 2017) ........................ 2, 42, 44

In re N. Dakota Legis. Assembly, 70 F.4th 460 (8th Cir. 2023) .............................3

League of United Latin American Citizens v. Perry, 548 U.S. 399 (2006) ...........25

National Parks Conservation Ass'n v. U.S. E.P.A.,
759 F.3d 969 (8th Cir. 2014)......................................................................28

Shaw v. Reno, 509 U.S. 630 (1993) .......................................................... 2, 46, 49

Appellate Case: 23-3697   Page: 7   Date Filed: 03/26/2024 Entry ID: 5376956

Smith v. SEECO, Inc., 922 F.3d 398, 404 (8th Cir. 2019) .........................................1

Walen v. Burgum, 2023 WL 7216070 (D.N.D. Nov. 2, 2023) ...............................11

Williams v. City of Texarkana, Ark.,
32 F.3d 1265 (8th Cir. 1994).................................... 2, 25, 26, 27, 33, 39, 41, 45, 49

Wise v. Lipscomb, 437 U.S. 535 (1978) ......................... 2, 9, 25, 26, 33, 39, 41, 45

Voinovich v. Quilter, 507 U.S. 146 (1993) ................................................. 25, 33, 39

**STATUTES:**

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

42 U.S.C. § 1983 ................................................................................... 11, 12

N.D. Const. Art. IV ................................................. 10, 13, 23, 26, 33, 50

N.D. Const. Art. V ...................................................................................26

N.D.C.C. § 16.1-01-01 ...........................................................................35

N.D.C.C. § 54-03-01 ................................................... 10, 11, 33, 50

N.D.C.C. § 54-03-02 ................................................................................26

N.D.C.C. § 54-12-01 ................................................................................31

N.D.C.C. § 54-35-01 ................................................................................14

N.D.C.C. § 54-35-02 ................................................................................14

N.D.C.C. § 54-35-17 ................................................................. 14, 15, 31

Appellate Case: 23-3697    Page: 8    Date Filed: 03/26/2024 Entry ID: 5376956

## RULES:

8th CIR. R. 28A(h)(2) ................................................................52

Fed. R. Civ. P. 24 ..................................................................29

Fed R. App. P. 26 .................................................................. iii

Fed. R. App. P. 32 ................................................................52

## OTHER AUTHORITIES:

N.D. HB 1504 (2021) .............................................................10

Voting Rights Act § 2 ..............................ii, 2, 3, 4, 8, 10, 11, 13, 23, 25, 33, 35, 36,
............................................................... 38, 39, 40, 41, 44, 47, 48

Appellate Case: 23-3697    Page: 9    Date Filed: 03/26/2024 Entry ID: 5376956

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the underlying action pursuant to 28 U.S.C. § 1331.  The district court entered judgment on November 17, 2023, which triggered the Assembly's legislative interest in developing a remedial plan.  The Assembly's motion to intervene was denied on December 12, 2023.  The Assembly filed its Notice of Appeal on December 14, 2023.  This Court has jurisdiction over the Assembly's appeal of the District Court's denial of its motion to intervene as of right as it is a final appealable order.  See 28 U.S.C. § 1291; see also Smith v. SEECO, Inc., 922 F.3d 398, 404 (8th Cir. 2019).  The District Court denied the Assembly's motion for an extension of time and imposed a new redistricting plan on the citizens of North Dakota on January 8, 2024.  The Assembly filed its Notice of Appeal on January 26, 2024.  This Court has jurisdiction over the Assembly's appeal of the District Court's final order under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred by denying the Assembly's motion to intervene to protect its well-established right to be afforded a reasonable opportunity to adopt a remedial redistricting plan.

   i.  Berger v. North Carolina State Conference of the NAACP, 597 U.S. 179 (2022)

-1-

ii.     Cameron v. EMW Women's Surgical Center, P.S.C., 595 U.S. 267 (2022)

iii.    Wise v. Lipscomb, 437 U.S. 535 (1978)

2.      Whether the district court erred by denying the Assembly a reasonable opportunity to adopt a remedial redistricting plan.

i.      Wise v. Lipscomb, 437 U.S. 535 (1978)

ii.     Williams v. City of Texarkana, Ark., 32 F.3d 1265 (8th Cir. 1994)

iii.    Covington v. State, 267 F.Supp.3d 664 (M.D. N.C. 2017)

3.      Whether the district court erred by imposing a racial gerrymander upon the North Dakota electorate when it adopted Plaintiffs' Proposed Plan 2 in lieu of affording the Assembly a reasonable opportunity to adopt a remedial redistricting plan.

i.      Shaw v. Reno, 509 U.S. 630, 646 (1993)

ii.     Cooper v. Harris, 581 U.S. 285, 293-94 (2017)

## INTRODUCTION

It is well-established redistricting is a "legislative task which the federal courts should make every effort not to pre-empt." Wise v. Lipscomb, 437 U.S. 535, 539 (1978). It is equally well-established that once a district court finds Section 2 of the Voting Rights Act ("VRA") is violated, it must "afford a reasonable opportunity for the legislature" to develop a remedial redistricting plan. Id. at 540. Unfortunately,

Appellate Case: 23-3697     Page: 11     Date Filed: 03/26/2024 Entry ID: 5376956

the District Court cast aside these directives, basic concepts of federalism, and separation of powers in a rush to impose the private Plaintiffs' racial gerrymandered map upon the citizens of North Dakota. The District Court did so while impermissibly turning a deaf ear to the North Dakota Legislative Assembly's ("Assembly") legislative interests, objections, and requests for a reasonable opportunity to perform its duty under the North Dakota Constitution. The District Court discarded the democratic process, federalism, separation of powers, and a robust consensus of binding authority to impose a new redistricting law on North Dakota's citizens. The District Court did so while ignoring the Assembly at every turn.

These proceedings before the District Court were fundamentally flawed and riddled with compounding errors which ultimately led to this absurd result. At the outset, the District Court allowed private plaintiffs to proceed with their lawsuit seeking injunctive relief against the North Dakota Secretary of State under Section 2 of the VRA despite having no private right of action[1]. During discovery, the District Court ignored the doctrine of legislative privilege which this Court corrected in In re N. Dakota Legis. Assembly, 70 F.4th 460, 462 (8th Cir. 2023).

---

[1] This issue is currently on appeal in Case No. 23-3655. However, this Court's recent holding in Arkansas State Conference NAACP v. Arkansas Board of Apportionment, 86 F.4th 1204 (8th Cir. 2023) established no private right of action exists to enforce § 2 of the VRA.

-3-

The Secretary defended against the Plaintiffs' attack on North Dakota's 2021 duly enacted redistricting plan - which received bi-partisan support – through trial. However, more than five months after trial, the District Court issued its Finding of Fact and Conclusions which erroneously found the 2021 redistricting plan violated Section 2 of the VRA.

Importantly, on November 17, 2023, the District Court enjoined the Secretary from taking steps in the furtherance of electing officers under North Dakota's 2021 redistricting plan. The District Court's judgment further provided the "Secretary and…Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2." At this point, the interests of the Secretary and Assembly no longer aligned. Under North Dakota law, the Secretary is a member of the executive branch whose authority over elections is limited to administering the State's election laws. The Secretary admitted the authority to redraw the State's redistricting maps vested solely with the Assembly under the North Dakota Constitution. This is not unique to North Dakota and has been widely acknowledged by the Supreme Court.

The part-time citizen Assembly was not in session when the District Court entered Judgment. North Dakota is unique in that its constitution authorizes the Assembly

Appellate Case: 23-3697     Page: 13     Date Filed: 03/26/2024 Entry ID: 5376956

to meet for only 80 natural days during a biennium[2]. Since the Assembly was not in session, North Dakota law authorized Legislative Management to retain outside counsel and intervene in this lawsuit to protect the Assembly's legislative interests in developing a remedial redistricting plan. The Assembly swiftly moved to intervene once it was called to act by the District Court because the Secretary - as a member of the executive branch - could not represent the Assembly's legislative interests. At the same time, the Assembly joined in the Secretary's motion to stay judgment pending appeal.

While being proactive in protecting its legislative interests before the District Court, the Assembly actively attempted to perform its legislative duties. Legislative Management appointed an interim Redistricting Committee and approved an RFP to procure an expert to aid in its legislative tasks. This was all completed before the District Court ignored Supreme Court precedent and denied the Assembly's motion to intervene for the purpose of protecting its unique legislative interests on December 12, 2023. This erroneous decision is the basis of the Assembly's appeal in Case No. 23-3697. However, in this same order, the District Court denied a stay of judgment pending appeal – in part – because it opined there was "no imminent election…It strains credibility to seriously suggest otherwise." Further, the District Court held it

---

[2] The Assembly only had 5 natural days remaining in the 2023-2024 biennium as of November 17, 2023.

Appellate Case: 23-3697    Page: 14    Date Filed: 03/26/2024 Entry ID: 5376956

lacked jurisdiction over its remedial order because the Secretary appealed from its November 17th Judgment.

Having no avenue for relief at the District Court, the Assembly filed an "Emergency Motion for Extension of Deadline to Submit Remedial Redistricting Plan" with this Court on December 17, 2023. The Secretary objected to the Assembly's motion citing concerns related to potential difficulties in administering the 2024 election. On December 20, 2023, this Court denied the Assembly's motion without prejudice because the District Court clearly retained jurisdiction over its remedial order. The Assembly filed an "Emergency Motion for Extension of December 22, 2023, Deadline to Adopt a Remedial Plan" with the District Court the following day. This motion detailed the Assembly's extensive steps taken in furtherance of developing a remedial redistricting plan and explained more time was necessary to complete the legislative process.

While the Assembly navigated the District Court's jurisdictional detour, the Assembly's Redistricting Committee continued to perform its legislative duties. The Committee heard public testimony, considered numerous alternate proposals, invited the tribal chairs of both Turtle Mountain and Spirit Lake Nation to participate, and performed the tasks expected of a legislative body. However, the District Court's arbitrary December 22, 2023, deadline provided the Assembly with

-6-

no avenue to complete the legislative redistricting process required to "adopt" a remedial plan.

On December 22, 2023, the Plaintiffs filed a "Motion for Remedial Order" requesting the District Court impose its racial gerrymandered map entitled "Demonstrative Map 2." The Plaintiffs' proposal sought to impose a "dumbbell" shaped district that connects the Turtle Mountain Reservation in the Northernmost part of the state to the Spirit Lake Reservation to the south by a narrow land bridge which diagonally crosses and severs multiple counties. During testimony before the Redistricting Committee, Scott Davis – who purported to speak on behalf of the Turtle Mountain Band of Chippewa Indians – requested the Committee consider other options that did not involve "sharing a district with miles and miles of geography between us and our relative Spirit Lake Nation."

The Assembly promptly objected to the Plaintiffs' motion to impose their "Demonstrative Map 2" on North Dakota's citizens. However, the Secretary remained silent in response to the Plaintiffs' motion. While the Assembly's and Plaintiffs' motions pended before the District Court, the Redistricting Committee issued a notice of a January 9, 2024, meeting to continue with its legislative duties. However, the District Court brought the legislative process to a halt on January 8, 2024.

Appellate Case: 23-3697    Page: 16    Date Filed: 03/26/2024 Entry ID: 5376956

On January 8, the District Court issued a legally indefensible and illogical Order. First, the District Court held it "did not order the Secretary (or the Legislative Assembly) to adopt a new plan by [December 22, 2023]." This was in direct conflict with the plain text of both the "Conclusion and Order" and Judgment issued on November 17, 2023. Second, the District Court committed a clear error of law by holding "it provided a reasonable opportunity for the Secretary to propose his own plan to correct the Section 2 violation. The law requires nothing more and nothing less." There is no law authorizing the executive branch of State government to transform into a legislative body and perform a legislative task.

Further, the District Court denied the Assembly's motion and concluded "an extension of time is not warranted because the Secretary was provided a reasonable opportunity to propose a remedial plan, and an extension has not been requested by either party to the case." The District Court went on to rule that since the Secretary did not offer a remedial plan it became its obligation to devise a remedy. After completely stripping the Assembly of its legislative interest, the District Court ruled the Plaintiffs' motion to implement the deeply flawed Demonstrative Plan 2 must be granted over the Assembly's objection because "the Secretary did not respond." The District Court deemed this to be "an admission that the motion is well taken." The District Court then usurped the Assembly's authority under the North Dakota

-8-

Constitution, ignored Supreme Court precedent, and enacted the Plaintiffs' Demonstrative Plan 2 as the new law of North Dakota.

In three short pages the District Court dismissed federalism, destroyed the separation of powers doctrine, and imposed a map -which the District Court did not deny to be a racial gerrymander – on the citizens of North Dakota. In a case that ultimately required the performance of a state's legislative duty, the District Court refused to consider the Assembly's legislative interest at every turn.

Suffice it to say, the Redistricting Committee postponed its January 9 meeting since the District Court believed it must rush to impose a remedial plan because the executive branch did not "propose his own." This all happened despite the District Court stating "it strains credibility to seriously suggest" there was an imminent election only 27 days before it imposed the private Plaintiffs' remedial map by judicial fiat.

Clearly, this District Court's decisions are in stark contrast to the Supreme Court's admonishment that "federal courts should make every effort not to pre-empt" a legislative body from the performance of its redistricting duties. Wise, 437 U.S. 539. The District Court exercised no restraint and the Assembly's legislative interests were never recognized. The Assembly requests this Court restore the core concepts of federalism, and separation of powers, and adhere to both its and the Supreme Court's clear guidance. The District Court's orders must be reversed.

## STATEMENT OF THE CASE

### A.    Factual and Procedural Background

The North Dakota Constitution vests the Assembly with the sole authority to establish legislative districts.  N.D. Const. Art. IV § 2.  The Assembly also must comply with various requirements when redistricting is required by Census results. See N.D. Const. Art. IV; see also N.D.C.C. § 54-03-01.5.  The 2020 Census data was delayed as a result of the COVID-19 pandemic.  (App. 46; R. Doc. 125, at 5). Nonetheless, "during the redistricting process, the…Assembly sought input from the Tribes and other Native American representatives" and "did carefully examine the VRA." (App.79; R. Doc. 125, at 38).  As a result of this process, there was bipartisan support for the 2021 redistricting plan. See N.D. HB 1504 (2021).  After approval in both the State House of Representatives and State Senate, the Governor signed the 2021 redistricting legislation into law on November 11, 2021.  (App. 48; R. Doc. 125, at 7). North Dakota's legislative districts are codified in N.D.C.C. § 54-03-01.14.

As relevant here, prior to the 2021 redistricting legislation, the Turtle Mountain Reservation was located in District 9 and the Spirit Lake Reservation was located in District 23.    (See  *https://ndlegis.gov/files/district-maps/2013-2022/approvedjointlr.pdf* (accessed March 14, 2024)).    These districts were geographically distant and did not abut one another. (Id.)

-10-

Under the current enactment of N.D.C.C. § 54-03-01.14, the Turtle Mountain Reservation remained in District 9. ((See N.D.C.C. § 54-03-01.14(9); see also https://ndlegis.gov/sites/default/files/district-maps/2023-2032/STATEWIDE%20and%20population.pdf (accessed March 14, 2024)). However, in an effort to comply with the VRA, subdistricts were created in District 9 and the Turtle Mountain Reservation fell within the bounds of Subdistrict 9A. (See Id.) As a result, District 9's senator was elected at-large and both Subdistrict 9A and 9B elected their own representative[3]. N.D.C.C. § 54-03-01.14. Moreover, the redistricting legislation placed the Spirit Lake Reservation within the southern bounds of District 15. N.D.C.C. § 54-03-01.14(15).

Despite bi-partisan support for the duly enacted redistricting legislation and no action taken by the U.S. Attorney General, the Plaintiffs sought injunctive and declaratory relief against the Secretary in his official capacity pursuant to 42 U.S.C. § 1983 and § 2 of the VRA. (App. 5 - App. 36; R. Doc. 1). Although Plaintiffs had no private right of action, they alleged North Dakota's redistricting plan violated the VRA because it did not combine the Turtle Mountain and Sprit Lake Reservations

---

[3] It must be noted this same practice was implemented with respect to District 4 which encompasses the Fort Berthold Reservation in western North Dakota. This was also subject to attack by private plaintiffs who argued the same redistricting principles provided too much voting strength to the Native American population. See Walen v. Burgum, --F.Supp.3d--, 2023 WL 7216070 (D.N.D. Nov. 2, 2023) (three-judge court), on direct appeal to U.S. Sup. Ct. (Jan. 3, 2024).

-11-

into a single legislative district. (Id.)  The Complaint included a map exhibiting the significant distance between these two reservations:



(App. 14; R. Doc. 1, at 10).

The Secretary defended the validity of the redistricting statute through the June 12-15, 2023 trial.  See (App. 37 - App. 41; R. Doc. 112). More than five months later, the District Court issued its Findings of Fact and Conclusions of Law and entered Judgment on November 17, 2023.[4]  See (App. 42 - App. 80; R. Doc. 125).

---

[4]Throughout the litigation, the Secretary made clear time was of the essence in obtaining a decision, based on his interest in having sufficient time to administer the 2024 election in the event the district court decided against him. (App. 38; R. Doc 112, at 2).

-12-

After noting this case presented a "closer decision than suggested by the Tribes" (App. 79; R. Doc. 125, at 38), the district court enjoined the Secretary from taking steps to further the election of Assembly members from Districts 9 and 15 as well as Subdistricts 9A and 9B. (App. 82; R. Doc 126, at 2). Moreover, the Judgment provided the "Secretary and…Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2." (App. 80; R. Doc. 125, at 39). While this unilaterally set timeline was unrealistic, the Judgment required the Assembly to act in order to protect its redistricting interests. Unfortunately, as explained below, the Assembly's efforts were later rendered futile by the District Court.

## B. Legislative Management Acted Swiftly to Protect the Assembly's Redistricting Interests.

The Assembly is a part-time citizen legislative body, which is limited to meeting in regular session for no more than 80 natural days during the biennium. See N.D. Const. Art. IV § 7. When the District Court entered judgment, the Assembly was not in session and only had 5 remaining natural days to convene during the 2023-2024 biennium. (App. 211 at ¶13(d)(i); R. Doc. 158, at 3).

Between November 17 and November 28, 2023 - which included the Thanksgiving holiday - a series of meetings occurred between members of North Dakota's executive and legislative branches with respect to the District Court's Findings and Judgment. (App. 209 at ¶ 2; R. Doc. 158, at 1). In an attempt to comply

-13-

with the District Court's directive, Representative Lefor, Chairman of Legislative Management, called a meeting of Legislative Management, for which the Legislative Council posted the required Notice on November 30, 2023.[5] (App. 134; R. Doc. 139-1).

On December 4, 2023, the Secretary filed a Notice of Appeal from the district court's Judgment. (App. 83 – App. 86; R. Doc. 130). The Secretary's appeal is pending at Docket No. 23-3655. The Secretary also filed a Motion for Stay of Judgment Pending Appeal with the District Court on December 4, 2023. (App. 87 - App. 90; R. Doc. 131; and App. 91 – App. 118; R. Doc. 132).

Legislative Management met on December 5, 2023. (App. 135 – App. 152; R. Doc. 139-2). At that meeting, Chairman Lefor appointed an interim Redistricting Committee and Legislative Management approved an RFP to retain an expert statistical consultant to aid in development of a remedial plan. (App. 136; R. Doc. 139-2, at 2). Since the Assembly was not in session, Legislative Management had statutory authority to "retain legal counsel to…intervene in any action, suit, matter, cause, or proceeding in any court…when determined necessary or advisable to

---

[5] Legislative Management is an interim committee consisting of the majority and minority leaders of the House and Senate, the Speaker of House, and six Senators and six Representatives chosen before the close of each regular session N.D.C.C. § 54-35-01(1). Legislative Management has various powers to act during the interim period in furtherance of the Assembly's interests. N.D.C.C. § 54-35-02.

-14-

protect the official interests of the legislative branch." N.D.C.C. § 54-35-17. Legislative Management passed a motion to intervene in the underlying litigation because the District Court's Judgment clearly required the Assembly's protect its official redistricting interests. (App. 135; R. Doc. 139-2, at 1).

In an apparent response to Legislative Management's actions, Plaintiffs filed a "Motion to Amend Remedial Order" and "Motion to Expedite" approximately six and a half hours after Legislative Management's meeting adjourned. (App. 119 – App. 125; R. Doc. 134; App. 126 - App. 128; R. Doc. 135; and App. 135 – App. 152; R. Doc. 139-2). The Plaintiffs acknowledged the Assembly must be afforded an opportunity to enact a remedial plan through its normal legislative process, but requested the District Court order its "Demonstrative Plan 1" into effect by December 22, 2023. (App. 120 - App121; R. Doc. 134, at 3 and 4). The District Court ordered a response be filed to the Plaintiffs' motion by December 8, 2023. (App. 129; R. Doc. 136).

On December 7, Legislative Council posted notice that the interim redistricting committee would meet on December 13, 2023. (App. 210 at ¶ 5; R. Doc. 158, at 2; and App. 216; R. Doc. 158-1). On December 8, 2023, Legislative Management issued an RFP to retain a redistricting consultant for the Redistricting Committee.

-15-

Also on December 8, the Assembly filed a "Motion to Intervene, Joinder in the Secretary's Motion for Stay of Judgment Pending Appeal and Response to the Plaintiffs' Motion to Amend Remedial Order" with the District Court. (App. 131 - App. 133; R. Doc. 137; and App. 162 – App. 179; R. Doc. 150). The District Court denied the Assembly's motion to intervene on December 12, 2023, finding it "axiomatic that the motion to intervene is untimely" and also divested itself of jurisdiction. (Add. 7; App. 184; R. Doc. 153, at 5). In the same order, the District Court denied the Secretary's request for a stay pending appeal because it found "there is no imminent election, little risk of voter confusion, and the final judgment was not issued on the 'eve' of any election. It strains credibility to seriously suggest otherwise." (Add. 4 – Add. 5; App. 181 - App. 182; R. Doc. 153, at 2 and 3). The Assembly appealed from this Order. (App. 186 – App. 188; R. Doc. 154).

### C.    The Redistricting Committee's December 13, 2023, Meeting.

On December 13, 2023, the Redistricting Committee met to continue the process of developing a remedial plan in accordance with the District Court's directive. (App. 210 at ¶ 7; R. Doc. 158, at 2; and App. 219 – App. 221; R. Doc. 158-3). The Committee heard testimony from Scott Davis "on behalf of the members of the Turtle Mountain Band of Chippewa Indians" who noted Turtle Mountain "never wished for their reservation to be combined into one voting district with Spirit Lake Reservation." (App. 220; R. Doc. 158-3, at 2). Davis expressed a preference

-16-

for the "consideration of other options over the alternative plans provided by the plaintiffs and the district court." (Id.)

Davis was the Executive Director of the North Dakota Indian Affairs Commission and served at a cabinet level as a liaison between North Dakota's state and tribal governments[6]. At the meeting, Davis appeared for "Tatanka Consulting Group representing Turtle Mountain Band of Chippewa here today[7]." <u>See</u> (App. 196; R. Doc. 157, at 5)[8]. He explained:

> [I]t was never the intent for Turtle Mountain to have a shared district and that was very clear to me from Tribal Council from their leadership, and I was tasked to say "hey, what would going back to our own district…what would that look like? Is that possible?" I said "I don't know, that's a good question." One that I would personally would be more in favor than <u>sharing a district with miles and miles of geography between us and our relative Spirit Lake Nation</u>. So that's…part of the reason why I'm here.
> …
> There is possibility here to keep um District 9 as whole and still at the same time suffice Spirit Lake with their subdistrict….it was my

[6] <u>See</u> (App. 196; R. Doc. 157, at 5). citing *https://www.governor.nd.gov/news/burgum-accepts-resignation-indian-affairs-commission-executive-director-scott-davis* (accessed Dec. 21, 2023); *https://www.governor.nd.gov/cabinet-members/scott-davis* (accessed Dec. 21, 2023)).

[7] Davis is now the Founder and CEO of Tatanka Consulting Group which "partners with government agencies…to navigate complex systems, challenges, and initiatives. As a Native-owned lobbying and consulting firm" it specializes in Tribal relations. <u>See</u> (App. 196; R. Doc. 157, at 5). citing *https://tatankaconsultinggroup.com/* (accessed Dec. 21, 2023)).

[8] Quoting *https://video.ndlegis.gov/en/PowerBrowser/PowerBrowserV2/20231213 /-1/31903* ("12/13/23 Video") at 1:07:38-1:07:44 (accessed Dec. 20, 2023)). This website contains a video of the December 13, 2023, Redistricting Committee meeting.

understanding this morning that might be a possibility versus creating the <u>dumbbell effect</u>.

(App. 196; R. Doc. 157, at 5 (emphasis added))[9].  Notably, this meeting took place after the District Court divested itself of jurisdiction; but the deadline to "adopt" a remedial plan remained unchanged.

### D.    Additional Filings on Appeal.

On December 13, 2023, the Secretary requested this Court stay the District Court's judgment. (Case. No. 23-3655, Entry ID: 5344314). The Secretary's motion asserted the "State needs finality on what election map will be used for the 2024 elections no later than Sunday, December 31, 2023…" (<u>Id</u>., at 1). The Secretary correctly disclaimed he did "not purport to speak for or on behalf of the Legislative Assembly" in his motion.  (<u>Id</u>., at 11 n. 6).  This Court denied the Secretary's Motion for Stay of Judgment Pending Appeal on December 15, 2023. (Case. No. 23-3655, Entry ID: 5345026).

On December 17, 2023, the Assembly filed an "Emergency Motion for Extension of Deadline to Submit Remedial Redistricting Plan" with this Court because the District Court divested itself of jurisdiction and the Assembly had no other means of relief. (Case. No. 23-3697, Entry ID: 5345207 at p.2). After allowing for a response – including an objection from the Secretary (Case. No. 23-3697, Entry

---

[9] <u>Quoting</u> <u>Legislative Link</u> at 1:09:06-1:09:38 from n. 8.

ID: 5346613) - the Eighth Circuit issued a December 20, 2023, Order which held as follows:

> The motion for extension of deadline to submit remedial restricting plan has been considered by the court and is denied. This ruling is without prejudice to the filing of motions in the district court for such consideration as may be appropriate. See *Board of Educ. of St. Louis v. State of Missouri*, 936 F.2d 993, 995-96 (8th Cir. 1991).

(Case. No. 23-3697, Entry ID: 5346668).

Despite not being in session, the Redistricting Committee continued to perform due diligence in an effort to develop a remedial plan.

### E.     The Redistricting Committee Met Again on December 20, 2023.

Prior to the Redistricting Committee's December 20th meeting, Legislative Council published a notice and agenda which provided the Committee would consider the "directive to adopt a remedial redistricting plan and consideration of legislative redistricting proposals." (App. 210 at ¶ 8; R. Doc. 158, at 2; App. 243; R. Doc. 158-4; App. 244; R. Doc. 158-5). Legislative Council invited the chairs of both the Turtle Mountain Band of Chippewa Indians and the Spirit Lake Nation to attend the December 20, 2023, Committee meeting.  (App. 210 at ¶ 9; R. Doc. 158, at 2; App. 245; R. Doc. 158-6; App. 246; R. Doc. 158-7).

Two maps – in addition to those proposed by Plaintiffs in litigation - were presented during the Committee's December 20th meeting.  The first map (Proposed Map # 3) was offered by Senator Klein. (App. 247 – App. 248; R. Doc. 158-8; and

-19-

App. 198; R. Doc. 157, at 7)[10]. Proposed Map # 3 connected Spirit Lake with Turtle Mountain and encompassed 429 people in the land bridge between the Reservations. (App. 198; R. Doc. 157, at 7)[11]. Proposed Map # 3 did not create any subdistricts. (App. 247 - App. 248; R. Doc. 158-8).

Proposed Map # 4 was offered by Senator Estenson from District 15. 12/20/23 Video at 11:15:14-11:41:45 (accessed Dec. 20, 2023); (App. 249-App. 250; R. Doc. 158-9). This proposed map created a subdistrict in District 15. Id. Legislative Council prepared a table comparing all 4 maps presented to the Redistricting Committee for public viewing. (App. 211 at ¶ 12; R. Doc. 158, at 3; App. 251; R. Doc. 158-10).

In light of the progress made during the Redistricting Committee meetings - and the District Court's unrealistic deadline - Senator Dever acknowledged the following:

> I'm not the only one who disagrees with the opinion, but I hope I'm not the only one here that respects the right of the court to make that opinion. That's separation of powers, checks and balances…that's appropriate for them to do that. But they also…when they set the <u>short deadline that they did, they in essence said okay citizen legislators, drop everything else in your life and devote your full-time attention to this process</u>. I think, as the legislature, we have the responsibility also to assert the fact that we are a co-equal branch of government as well. So I think we need to proceed as we are, in a deliberate fashion to do what

---

[10] <u>Citing</u> https://video.ndlegis.gov/en/PowerBrowser/PowerBrowserV2/20231220/1/31927#handoutFile_ ("12/20/23 Video") at 10:46:36 – 11:02:07 (accessed Dec. 23, 2023)).

[11] <u>Citing</u> 12/20/23 Video at 10:59:00-10:59:14.

Appellate Case: 23-3697     Page: 29     Date Filed: 03/26/2024 Entry ID: 5376956

we consider to be the right thing to do. We're doing that, and <u>I just encourage us to continue to do that</u>.

(App. 199 – App. 200; R. Doc. 157, at 8 and 9 (emphasis added))[12].

**F.    The Assembly Promptly Requested a Reasonable Opportunity to "Adopt" a Remedial Plan from the District Court.**

In accordance with this Court's December 20, 2023, Order, the Assembly filed an "Emergency Motion for Extension of December 22, 2023, Deadline to Adopt a Remedial Plan" on December 21, 2023.  (App. 189 - App. 191; R. Doc. 156; App. 192 – App. 208; R. Doc. 157).   The Plaintiffs opposed the Assembly's motion and also filed a "Motion for Remedial Order" to request the District Court adopt their "Demonstrative Plan 2" on December 22, 2023[13].  (App. 256 – App. 258; R. Doc. 159; App. 259 – App. 265; R. Doc. 160; App. 266 - App. 275; R. Doc. 161). The Assembly filed a "Combined Reply to Plaintiffs' Opposition to Emergency Motion for Extension of December 22, 2023, Deadline to Adopt Remedial Plan and Response to Plaintiffs' Motion for Remedial Order" on December 26, 2023.  (App. 266 – App. 275; R. Doc. 161). The Secretary did not submit any filings with respect to the December 21st or 22nd motions.

**G.    The Redistricting Committee Continued its Efforts While Motions Pended with the District Court.**

---

[12] <u>Quoting</u> 12/20/23 Video at 12:03:50-12:04:45.

[13] It is unclear why the Plaintiffs abandoned "Demonstrative Plan 1" as requested in their initial Motion to Amend Remedial Order. (App. 119 – App. 125; R. Doc. 134; and App. 256 – App. 258; R. Doc. 159).

-21-

Despite the District Court's silence on the pending motions, the Redistricting Committee continued to perform its legislative function and published notice of another meeting on January 4, 2024. See https://ndlegis.gov/assembly/68-2023/interim/25-5091-01000-postponed-meeting-notice.pdf. The notice provided the Redistricting Committee was to meet again on January 9th to continue with its "discussion regarding the committee's directive to adopt a remedial redistricting plan, consideration of legislative redistricting proposals, and comments by interested persons." (Id.) Unfortunately, on January 8, 2024, the District Court rendered the Redistricting Committee's continued efforts futile when it imposed a racial gerrymander on the citizens of North Dakota and stripped the Assembly of its legislative function.

### H. The District Court's Order Dated January 8, 2024.

Despite the District Court previously denying the Assembly's motion to intervene, it held the "initial problem" with the Assembly's motion for additional time was "that it is not a party to the case." (Add. 9; App. 285; R. Doc. 164, at 1). The district court further noted "the two parties to this case oppose the extension sought by the Legislative Assembly." (Id.) The Assembly's previous attempt at intervention sought to prevent this exact scenario. (App. 131 - App 133; R. Doc. 137; and App. 162 – App. 179; R. Doc. 150).

Moreover, the District Court ignored the plain language of its Judgment and

Appellate Case: 23-3697    Page: 31    Date Filed: 03/26/2024 Entry ID: 5376956

held "the Court did not order the Secretary (or the Legislative Assembly) to adopt a new plan" by December 22, 2023[14]. (Add. 10; App. 286; R. Doc. 164, at 2). Further, despite the Secretary's previous admission he lacked authority "to redraw the State's redistricting maps" (Case. No. 23-3697, Entry ID: 5346613, at 2) and the Assembly's plea for an opportunity to continue with its redistricting duties, the District Court inexplicably held "*if the Secretary elects to not offer a proposed remedial plan (as is the case here)*, then it becomes the 'unwelcome obligation of the federal court' to devise a remedy." [15] (Add. 10; App. 286; R. Doc. 164, at 2). The Assembly - not the Secretary - is solely vested with the power to establish legislative districts under the North Dakota Constitution. (N.D. Const. Art. IV at § 2). Nonetheless, the District Court held "an extension of time is not warranted because the Secretary was provided a reasonable opportunity to propose a remedial plan, and an *extension has not been requested by either party to this case*." (Add. 10; App. 286; R. Doc. 164, at 2 (emphasis added)).

---

[14] This statement is inconsistent with the District Court's prior directive which provided the "Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of section 2." (App. 82; R. Doc. 126, at 2 (emphasis added)).

[15] In this same Order, the District Court indicated it reviewed the Secretary's response to the Assembly's Motion to For Extension of Deadline to Submit Remedial Redistricting Plan filed in App. Case. No. 23-3697 as Entry ID 5346613. See (Add. 9; App. 285; R. Doc. 164, at 1). If true, the District Court would have seen the Secretary expressly acknowledged he "does not have authority to…redraw the State's redistricting maps." (Case. No. 23-3697, Entry ID: 5346613, at 2).

-23-

The district court went a step further and held - even though the Assembly objected to the Plaintiffs' Motion for Remedial Order (App. 276 – App. 284; R. Doc. 163) – the Secretary's lack of response rendered the Plaintiffs' motion "well taken." (Add. 11; App. 287; R. Doc. 164, at 3). Finally, in direct conflict with basic concepts of federalism and separation of powers, the District Court stripped the Assembly of its redistricting function and imposed the Plaintiffs' racially gerrymandered "proposed plan 2" as the remedial redistricting map upon the citizens of North Dakota. (Id.)

## I.     The Assembly Appealed.

Since the District Court stripped the Assembly of its redistricting duties on January 8, 2024, the Redistricting Committee postponed its January 9, 2024, meeting. Further, the Assembly filed a notice of appeal from the District Court's order. (App. 288 - App. 290; R. Doc. 165). The Assembly's appeals from both the December 12 and January 8 orders were appropriately consolidated by this Court on January 30, 2024.

## SUMMARY OF THE ARGUMENT

The District Court denied the Assembly any opportunity to protect its legislative interests. Instead, the District Court usurped North Dakota's separation of powers, faulted the Secretary for not disregarding North Dakota's Constitution, and imposed the private Plaintiffs' racially gerrymandered redistricting map on the

Appellate Case: 23-3697     Page: 33     Date Filed: 03/26/2024 Entry ID: 5376956

citizens of North Dakota while ignoring their elected lawmaking officials at every turn. Clearly, neither this Court nor the Supreme Court envisioned a scenario where a federal court enacts State law by judicial fiat while placing a state legislature behind a wall of silence. Nonetheless, this is exactly what happened here and the result cannot stand.

Claims arising under § 2 of the VRA are first tried to determine whether a violation exists. See Bone Shirt v. Hazeltine, 461 F.3d 1011, 1022 (8th Cir. 2006). If the district court finds a Section 2 violation, then a remedial constitutional remedy must be created. Id. However, "[f]ederal courts are reluctant to devise and impose redistricting…plans, because such tasks are traditionally performed by legislative bodies." Williams v. City of Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994). In fact, federal courts are instructed to "make every effort not to pre-empt" a legislature from performing its redistricting task. Wise, 437 U.S. at 539. This is because "States retain broad discretion in drawing districts to comply with the mandate of § 2." League of United Latin American Citizens v. Perry, 548 U.S. 399, 429 (2006). Put simply, redistricting "is primarily the duty and responsibility of the State through its legislature…rather than of a federal court" Voinovich v. Quilter, 507 U.S. 146, 156 (1993).

This is why a district court is to "**afford a reasonable opportunity for the legislature** to meet constitutional requirements by adopting a substitute measure

-25-

rather than for a federal court to devise and order into effect its own plan." Williams, 32 F.3d at 1268 (quoting Wise, 437 U.S. 535, 540) (emphasis added). If "an appropriate **legislative body** offers a remedial plan, the court must defer to the proposed plan unless the plan does not completely remedy the violation or the proposed plan itself constitutes a section two violation." Williams, 32 F.3d at 1268 (emphasis added).

This well-established precedent made clear the Assembly's legislative duty to develop and adopt a remedial redistricting plan was triggered by the District Court's November 17, 2023, Judgment. However, the Assembly was not in session and was not scheduled to reconvene until 2025. The District Court's deadline provided only an illusory opportunity for the Assembly to perform its redistricting task[16].

---

[16] Even if the Redistricting Committee were to complete its lofty goal of considering public comment and agreeing upon a proposed remedial plan, additional steps were required before the Assembly could "adopt" a remedial map as required by the District Court's judgment. (App. 211 at ¶13; R. Doc. 158, at 3). First, a bill would be prepared translating the approved map into a metes and bounds description required for codification. (Id. at ¶13(a)). Next, Legislative Management would need to meet and consider whether to approve the recommended bill draft for introduction during a legislative session. (Id. at ¶13(b)-(c)). Legislative leadership will then need to either request the Governor call a special session or Legislative Management would reconvene the Assembly to serve its remaining 5 days of regular session during the biennium. See (Id. at ¶ 13(d)(i)); N.D. Const. Art. V § 7; N.D.C.C. § 54-03-02(3)). In either scenario, time would be needed for the 141 citizens who live in their respective districts and serve in the Assembly on a part-time basis to travel and convene in Bismarck. (App. 212 at ¶ 14; R. Doc. 158, at 4); N.D. Const. Art. IV § 5.

-26-

Understanding this to be the case, the Assembly timely moved to intervene to protect its redistricting interest in accordance with State law. "Normally, a State's chosen representatives should be greeted in federal court with respect." Berger v. North Carolina State Conference of the NAACP, 597 U.S. 179, 197 (2022). This is especially true when – as here – North Dakota law "authorized different agents to defend practical interests precisely because…each may be expected to vindicate different points of view on the State's behalf." Id. A failure of the federal courts to respect the unique interests of a legislative assembly does "much violence to our system of cooperative federalism." Id. Contrary to this authority, the District Court committed a significant error by refusing the Assembly's motion to intervene and protect its unique legislative interests.

Moreover, the District Court later claimed neither the Assembly nor Secretary were ordered to "adopt" a remedial plan despite its prior explicit directive to the contrary. (App. 80; R. Doc. 125, at 39; App. 82; R. Doc. 126, at 2; and Add. 11; App. 287; R. Doc. 164, at 3). Next, in direct conflict with binding case law, the District Court placed the legislative task of redistricting in the hands of the Secretary – in the executive branch - and not the Assembly. (Add. 10; App. 286; R. Doc. 164, at 2); see Williams, 32 F.3d at 1268. When the Secretary understandably failed to perform a function prohibited by the North Dakota Constitution, the District Court found it had no choice but to impose a private party's racially gerrymandered

-27-

redistricting map on the North Dakota electorate. This was clearly a significant error.

In a case that ultimately required a "legislative task," the District Court refused to hear from the only branch of government authorized to perform it. All of the Assembly's efforts were ignored by the District Court and – in contrast to the State Constitution – the citizens of North Dakota now have a state law their elected officials never had a chance to make. The Assembly requests this Court repair the "violence" done "to our system of cooperative federalism" and restore North Dakota's separation of powers.

## **ARGUMENT**

### A. **The District Court Erred in Denying the Assembly's Motion to Intervene.**

Rule 24 of the Federal Rules of Civil Procedure provides for intervention of right and permissive intervention. "Rule 24 is construed liberally, with all doubts resolved in favor of the proposed intervenor." National Parks Conservation Ass'n v. U.S. E.P.A., 759 F.3d 969, 975 (8th Cir. 2014). A district court's determination as to whether an intervenor is entitled to intervene as a matter of right is reviewed de novo, but a determination as to timeliness is reviewed for abuse of discretion. Chiglo v. City of Preston, 104 F.3d 185, 187 (8th Cir. 1997).

Recently, in Berger, 597 U.S. at 179 the Supreme Court explained a State's legislature is entitled to intervene as a matter of right in a strikingly similar situation.

-28-

In <u>Berger</u>, North Carolina's General Assembly passed voter identification legislation. <u>Id</u>. at 185-186. Shortly after the law went into effect, the NAACP sued members of the State Board of Elections. <u>Id</u>. at 186. North Carolina's attorney general defended the Board. <u>Id</u>. The speaker of the State House of Representatives and president pro tempore of the State Senate moved to intervene. <u>Id</u>. Similar to North Dakota, North Carolina law authorized legislative leaders to intervene on behalf of the General Assembly in any judicial proceeding challenging North Carolina law. <u>Id</u>. The district court denied the lawmakers' motion. <u>Id</u>. 187-88. In hopes of participating in future proceedings, the lawmakers "asked another panel of the Fourth Circuit to vacate the District Court's decision denying their motion to intervene. The legislative leaders stressed that state law expressly authorizes them to participate in cases like this one, and they argued that they satisfied all the requirements for intervention as a matter of right" under Fed. R. Civ. P. 24. <u>Id</u>. at 189. The Fourth Circuit initially reversed the district court's decision. <u>Id</u>. at 189-90. However, the Fourth Circuit reheard the matter en banc and ruled the legislative leaders were not entitled to intervene because the Board – as represented by the Attorney General – adequately represented their interests. <u>Id</u>. at 190. The Supreme Court granted review "in order to resolve disagreements among the circuits about the proper treatment of motions to intervene in cases like this one." <u>Id</u>.

The Supreme Court first acknowledged "States may organize themselves in a variety of ways" and when States "allocate authority among different officials who do not answer to one another, different interests and perspectives, all important to the administration of state government, may emerge." Id. at 191.  Using these basic principles, the Court perfectly explained the situation present here:

> …federal courts should rarely question that a State's interests will be practically impaired or impeded if its duly authorized representatives are excluded from participating in federal litigation challenging state law. To hold otherwise would not only evince disrespect for a State's chosen means of diffusing its sovereign powers among various branches and officials. It would not only risk turning a deaf federal ear to voices the State has deemed crucial to understanding the full range of its interests. It would encourage plaintiffs to make strategic choices to control which state agents they will face across the aisle in federal court… All of which would risk a hobbled litigation rather than a full and fair adversarial testing of the State's interests and arguments.

Id. at 191-92.

The Court went on to explain that "[p]ermitting the participation of lawfully authorized state agents promotes informed federal-court decisionmaking and avoids the risk of setting aside duly enacted state law based on an incomplete understanding of relevant state interests." Id. at 192.  Further, the Court acknowledged "a full consideration of the State's practical interests may require the involvement of different voices with different perspectives.  To hold otherwise would risk allowing a private plaintiff to pick its preferred defendants and potentially silence those whom

-30-

the State deems essential to a fair understanding of its interests." Id. at 195 (emphasis added).

As directly applicable here, the Court held where a state "has authorized different agents to defend its practical interests precisely because…each may be expected to vindicate different points of view of the State's behalf," a federal court's presumption of overlapping interests "would make little sense and do much violence to our system of cooperative federalism." Id. at 197. Put another way, different branches of state government "may pursue 'related' state interests, but they cannot be fairly presumed to bear 'identical' ones." Id. In sum, "[a]ny presumption against intervention is *especially* inappropriate when wielded to displace a State's prerogative to select which agents may defend its laws and protect its interests. Normally, a State's chosen representatives should be greeted in federal court with respect…." Id (emphasis added).

Like Berger, North Dakota's Attorney General defended the Secretary against the merits of the Plaintiffs' claims for injunctive and declaratory relief. See N.D.C.C. § 54-12-01(3). Also, much like Berger, the Assembly is authorized by State law to intervene in any action to protect its official interests. N.D.C.C. § 54-35-17. While these similarities alone are sufficient for intervention under Berger, the facts of this case render it clear the District Court erred when it ignored the Assembly – and its legislative interest – at every turn.

-31-

In Berger, members of the General Assembly were allowed to intervene to provide a different perspective on the merits of a challenge to North Carolina's voter ID law. Here, the Assembly requested intervention to protect a legislative interest the Secretary (and only named Defendant) simply did not possess. The district court impermissibly turned "a deaf federal ear" to the Assembly's voice which was "crucial to understanding the full range" of North Dakota's interests. See Id. at 191-92. The Assembly was impermissibly silenced and the District Court failed to consider the Assembly's unique interest in developing redistricting legislation. This is in direct conflict with binding precedent and constitutes reversable error.

1. **Even in the Absence of <u>Berger</u>, this Court's Precedent Favor's Intervention.**

Even if Berger had never been decided, the Assembly easily satisfied this Court's standard test for intervention as a matter of right. Under this standard test, a party is entitled to intervention under Rule 24(a)(2) if: "(1) [it] has a cognizable interest in the subject matter of the litigation; (2) the interest may be impaired as a result of the litigation; and (3) the interest is not adequately protected by the existing parties to the litigation." Chiglo v. City of Preston, 104 F.3d 185, 187 (8th Cir. 1997). The proposed intervenor must satisfy all three factors of this test which is subject to de novo review. Id.

i. **The Assembly had a Cognizable Interest in the Subject Matter of the Litigation.**

-32-

As to the first element, the Assembly clearly had a cognizable interest in the subject matter of the litigation. As explained above, the district court's finding of a Section 2 violation triggered the Assembly's legislative redistricting interest to adopt a substitute measure. Williams, 32 F.3d at 1268. The Assembly's redistricting interest is established by North Dakota law and has been repeatedly recognized by binding precedent. See N.D. Const. Art. IV § 2; N.D.C.C. § 54-03-01.5; Voinovich, 507 U.S. at 156; Wise, 437 U.S. at 539; Williams, 32 F.3d at 1268. The Assembly's legislative interest became unquestionable in this litigation once the District Court determined a Section 2 violation existed. The first element is clearly satisfied.

### ii. The Assembly's Redistricting Interest was Impaired as a Result of the Litigation.

The litigation not only impaired the Assembly's redistricting interest, but entirely destroyed it. As will be explained in greater detail below, it is well established the Assembly had an interest in being afforded a "reasonable opportunity" to adopt a substitute measure once the district court found a Section 2 violation. Wise, 437 U.S. at 540; Williams, 32 F.3d at 1268. Despite the Redistricting Committee's best efforts - and the Assembly's numerous pleas for additional time to perform its legislative task - the District Court cast the legislative branch aside because it was "not a party to this case." (Add. 9; App. 285; R. Doc. 164, at 1). It then weaponized the Assembly's non-party status and denied an extension of its deadline because it had "not been requested by either party." (Add.

-33-

10; App. 286; R. Doc. 164, at 2). Further, despite the Assembly's objection, the district court determined the Plaintiffs' motion to adopt its plan as the remedial plan was "well-taken" because the Secretary did not file a response. (Add. 11; App. 287; R. Doc. 164, at 3).

Notably, this all occurred the day prior to the Redistricting Committee's meeting scheduled for January 9, 2024. As a result, the federal judiciary imposed a racial gerrymander on the North Dakota electorate by judicial fiat. The district court reasoned it had no choice because the North Dakota executive branch failed to adopt a remedial redistricting plan despite no authority to do so. Put simply, the only branch of government which had a redistricting interest was denied any opportunity to protect it. The District Court did exactly what <u>Berger</u> prohibited. It is beyond dispute the Assembly's legislative interest in redistricting was impaired as a result of the litigation and the second element was clearly satisfied.

### iii. The Assembly's Redistricting Interest was not Adequately Protected by Existing Parties to the Litigation.

An intervenor bears the "ordinarily minimal" burden of showing its "interests are not adequately represented by existing parties." <u>Chiglo</u>, 104 F.3d at 187. However, "if an existing party to the suit is charged with the responsibility of representing the intervenor's interests, a presumption of adequate representation arises…When one of the parties is an arm or agency of the government, acting in a

matter of sovereign interest, the governmental entity is presumed to represent the interests of its citizens as *parens patriae*, or 'parent of the country.'" Id. Due to the nature of a Section 2 lawsuit, the Assembly's unique redistricting interests were not triggered until after trial.

The Complaint sought declaratory and injunctive relief against the Secretary in his official capacity. (App. 5 – App. 36; R. Doc. 1). These claims against the Secretary in his official capacity "are treated as an action against the official personally and not against the State." Calzone v. Hawley, 866 F.3d 866, 872 (8th Cir. 2017). While Berger explains *parens patriae* has no application to this situation, the facts of this case clearly show the Assembly's redistricting interest was not protected.

The interests of the Secretary and the Assembly were aligned through trial as both had an interest in defending the existing statutes establishing legislative districts in North Dakota. However, once the district court entered judgment, the interests of the Secretary and Assembly were no longer aligned.

The Secretary "is, ex officio, supervisor of elections" in North Dakota. N.D.C.C. § 16.1-01-01. More directly, the Secretary explained his role "under the North Dakota Constitution is to administer the election laws, not to create them." (Case. No. 23-3697, Entry ID: 5346613, at 6). That being the case, the Secretary opposed the Assembly's "Motion for Extension of Deadline to Submit Remedial

-35-

Redistricting Plan" due to his concerns related to administrative burdens an extended deadline may impose. See Id.; see also (Add. 9; App. 285; R. Doc. 164, at 1). The Secretary conveyed these same concerns to the district court after entry of judgment. See (Add. 5; App. 182; R. Doc. 153, at 3) (In denying the Secretary's motion for a stay, the district court explained "the Secretary's concern is…the administrative burden of correction the Section 2 violation" despite there being "no imminent election.").

The District Court specifically relied on the existing parties' failure to protect the Assembly's legislative interest as justification for its order to impose a racially gerrymandered map upon the North Dakota electorate. (Add. 9 – Add. 11; App. 285 – App. 287; R. Doc. 164). In rejecting the Assembly's request for additional time, the District Court noted two initial problems: 1) The Assembly was "not a party to this case;" and 2) The "two parties to this case oppose the extension sought by the Legislative Assembly." (Add. 9; App. 285; R. Doc. 164, at 1). The District Court went on to explain that since the Secretary elected "not to offer a proposed remedial plan" it must devise a remedy. (Add. 10; App. 286; R. Doc. 164, at 2). Further, despite the Assembly's objection, the district court noted the "Secretary did not respond" to the Plaintiffs' motion to impose Plaintiff's proposed plan 2 and deemed the "Secretary's lack of response as an admission that the motion for a remedial order encouraging the Court to adopt proposed plan 2 is well taken." (Add. 11; App.

287; R. Doc. 164, at 3). No reasonable person could evaluate this procedure and conclude the Assembly's legislative interests were adequately protected by the existing parties. Clearly, the third factor of this Court's test was satisfied and the district court erred by denying the Assembly's motion to intervene.

### iv. The Assembly's Motion to Intervene was Timely.

In addition to the traditional three-part test above, a "motion to intervene must also be timely." Chiglo, 104 F.3d at 187. This Court reviews timeliness for abuse of discretion. Id. The district court simply found it "axiomatic that the motion to intervene is untimely per Federal Rule of Civil Procedure 24," but provided no further analysis on this issue other than noting that "[a]dding the…Assembly as a party at this late stage is a rather extraordinary request." (Add. 7; App. 184; R. Doc. 153, at 5). This conclusory statement has no factual or legal support.

The Supreme Court recently explained "[t]imeliness is an important consideration in deciding whether intervention should be allowed…but [t]imeliness is to be determined from all the circumstances,' and 'the point to which [a] suit has progressed is…not solely dispositive.'" Cameron v. EMW Women's Surgical Center, P.S.C., 595 U.S. 267, 279 (2022) (quotation omitted) (second and third alteration in original).

In Cameron, the Court held Kentucky's Attorney General motion to intervene was timely despite being made as the case pended *en banc* review at the Sixth

-37-

Circuit. The motion was submitted despite the State's interests previously being defended by the Kentucky Secretary for Health and Family Services. The Court held the Sixth Circuit's "assessment of timeliness was mistaken" when it found "the attorney general's motion was not timely because it came after years of litigation in the District Court and after the panel had issued its decision." Id. at 279.

Put simply, "the most important circumstance relating to timeliness is that the attorney general sought to intervene as soon as it became clear that the Commonwealth's interests would no longer be protected by the parties in the case." Id. at 279-80 (quotation omitted). Although the attorney general's motion did not seek intervention until litigation has "proceeded for years, that factor is not dispositive. The attorney general's need to seek intervention did not arise until the secretary ceased defending the state law, and the timeliness of his motion should be assessed in relation to that point in time." Id. at 280 (emphasis added).

Clearly, timeliness is to be assessed from the event that triggers the need for intervention. Id. Here, the Assembly's need for intervention was not triggered until the district court found a Section 2 violation. This is the point from which timeliness must be assessed under Cameron. Id. The Secretary was powerless to "adopt" remedial redistricting legislation as this "legislative task" fell squarely upon the Assembly. It was at this point Legislative Management acted swiftly to retain counsel and intervene to protect its legislative interest. Despite these efforts, the

-38-

district court ignored Supreme Court precedent and summarily concluded it was "axiomatic" the Assembly's motion was untimely. Despite the District Court's belief, it is prudent for a State legislature to protect its unique legislative interest once a federal court calls on it to act. The Assembly should have been welcomed by the federal judiciary. See Berger, 597 U.S. at 191-197.

## B. The District Court did not Afford the Assembly a "Reasonable Opportunity" to Develop a Remedial Plan.

As explained above, this Court and the Supreme Court acknowledged that once a district court finds a Section 2 violation, it is to "afford a **reasonable opportunity** for the **legislature** to meet constitutional requirements by adopting a substitute measure rather than for a federal court to devise and order into effect its own plan." Williams, 32 F.3d at 1268 (quoting Wise, 437 U.S. 535, 540) (emphasis added). This is because redistricting is a legislative function and the Assembly – not the Secretary or a district court – has the duty to perform it. Voinovich, 507 U.S. at 156. Here, the District Court's inexplicably inconsistent directives deprived the Assembly of a "reasonable opportunity" to perform its legislative duty. In general, a district court's remedial order is reviewed for an abuse of discretion. Bone Shirt, 461 F.3d at 1017 (8th Cir. 2006).

### 1. The District Court's Orders are Inconsistent.

After attempting to apply "our long-deplorable vote-dilution jurisprudence" which "has spawned intractable difficulties of definition and application" (Allen v.

-39-

Milligan, 599 U.S. 1, 90 (2023) (J. Thomas dissent)), the District Court incorrectly determined the Assembly's efforts "did not go far enough to comply with Section 2." (App. 79; R. Doc. 125, at 38). Its Judgment provided the "Secretary and Legislative Assembly shall have until December 22, 2023, **to adopt** a plan to remedy the violation of Section 2." (App. 82; R. Doc. 126, at 2 (emphasis added)); see also (App. 80; R. Doc. 125, at 39 (stating the same)). On December 12, 2023, the district court denied the Secretary's motion for a stay of judgment pending appeal – in part – because "there is no imminent election" and found it "strains credibility to seriously suggest otherwise." (Add. 5; App. 182; R. Doc. 153, at 3). In the same order, the district court incorrectly determined it "lacks jurisdiction to amend or correct the remedial order." (Add. 7; App. 184; R. Doc. 153, at 5)[17]. After the Assembly was forced to navigate this jurisdictional quagmire, on January 8, 2024, the District Court mystifyingly concluded it "did not order the Secretary (or the Legislative Assembly) to adopt a new plan by [December 22, 2023]." (Add. 10; App. 286; R. Doc. 164, at 2). To compound the issue, the District Court ignored the separation of powers and binding case law to conclude "it provided a reasonable

---

[17]This resulted in the Assembly filing an "Emergency Motion for Extension of Deadline to Submit Remedial Redistricting Plan" with this Court on December 17, 2023. See Case No. 23-3697, Entry ID: 5345207. On December 20, 2023, this Court denied the Assembly's motion without prejudice as the district court retained jurisdiction under Board of Educ. of St. Louis v. State of Missouri, 936 F.2d 993, 995-96 (8th Cir. 1991). See Case No. 23-3697, Entry ID: 5346668.

-40-

opportunity for the Secretary to propose his own plan to correct the proven Section 2 violation. The law requires nothing more and nothing less." (Id.) Moreover, the District Court erroneously determined the Secretary's failure to perform a legislative task mandated it enact new legislation – in the form of a racial gerrymander – by judicial fiat. (Id. at p.3). In three short pages the District Court ignored the Assembly's authority, eviscerated North Dakota's separation of powers, and thrust basic concepts of federalism aside. This was all done while North Dakota's lawmakers diligently worked to perform their legislative duty.

### 2. No Case Law or Policy Considerations Support the District Court's Action.

Binding precedent clearly explains that redistricting is a task the federal judiciary should undertake only as a last resort when the legislature refuses to adopt a remedial plan after being afforded a reasonable opportunity to do so. Wise, 437 U.S. at 539; Williams, 32 F.3d at 1268. The District Court exercised no restraint when it imposed a private party's remedial plan on the North Dakota electorate. Rather, it ignored the elected officials' efforts to complete their redistricting task and imposed a racially gerrymandered map over the Assembly's objections. This flies in the face of binding precedent.

The Assembly is aware of no other case in which a federal district court imposed a redistricting map upon a State while its elected officials took affirmative steps to develop remedial redistricting legislation. Sound guidance on appropriate

-41-

judicial restraint is found in <u>Covington v. State</u>, 267 F.Supp.3d 664 (M.D. N.C. 2017). In <u>Covington</u>, the district court found North Carolina's State House and Senate districts violated federal law. <u>Id</u>. at 665. Unlike here – where the District Court set an arbitrary and impracticable deadline for the adoption of a remedial plan - the court ordered supplemental briefing to address "the appropriate deadline for the North Carolina legislature to draw new districts[18]…" <u>Id</u>. After briefing, the district court "issued an order on November 29, 2016, directing the General Assembly to draw new districting plans by March 15, 2017." <u>Id</u>. The defendants obtained a stay of the district court's order pending appeal. <u>Id</u>. The Supreme Court affirmed the district court's judgment on June 5, 2017. <u>Id</u>. On July 27, 2017, the district court held an evidentiary hearing to establish timelines for drawing remedial plans. <u>Id</u>.

The plaintiffs requested August 11, 2017, as the deadline to enact remedial districts. <u>Id</u>. at 666. The Legislative Defendants proposed November 15, 2017, as the deadline to enact a remedial plan because they needed time:

> …to conduct public hearings and engage in the robust deliberations necessary to develop districting plans that fully remedy the constitutional violations in the 2011 districting plans. To that end, Legislative Defendants represented to the Court that the North Carolina Senate Redistricting Committee…and the North Carolina House

---

[18] The Plaintiffs in <u>Covington</u> named the Chairman of the North Carolina House of Representatives Redistricting Committee, Chairman of the North Carolina Senate Redistricting Committee, Speaker of the North Carolina House of Representatives, and President Pro Tempore of the North Carolina Senate in their official capacities as parties to the lawsuit. <u>Covington</u>, M.D. N.C. Case No. 1:15-cv-00399. (Doc. 8-1, 8-4, 8-8, 8-10).

Appellate Case: 23-3697   Page: 51   Date Filed: 03/26/2024 Entry ID: 5376956

Redistricting Committee…intend to hold public hearings throughout the State to receive comment on both the proposed criteria to be used in drawing the maps and the proposed remedial districting maps subsequently drawn in accordance with those criteria.

Id. at 666.

Unlike here, the North Carolina General Assembly had "been in session several times since the Court entered its Order directing the General Assembly to draw new districts in August 2016." Id. The court recognized "adequate districts should be enacted as quickly as possible to protect the rights of North Carolina citizens…," but noted:

> At the same time, we recognize the legislature's right to draw the new districts in the first instance, if it will do so in a timely fashion. We do not disagree with Legislative Defendants that there are many benefits to a time line that allows for the General Assembly (1) to receive public feedback on the criteria to be used in drawing the remedial districts and proposed remedial districting plans applying those criteria; (2) to revise the proposed plans based on that feedback; and (3) to engage in robust deliberation…Therefore, we prefer to give the legislature some additional time to engage in a process substantively identical to the one they have proposed.

Id. (emphasis added).

The court extended "the time for the General Assembly to adopt and enact remedial districting plans to September 1, 2017. This is…over a year after the Court ordered the legislature to redistrict, and is almost three months after the Supreme Court upheld this Court's order…." Id. The district court further agreed to extend

-43-

its deadline if the redistricting committee met criteria designed to further the redistricting process. Id. at 667-68.

Compared to Covington, the District Court's actions were the antithesis of judicial restraint. Subsequent to a five-month passage of time between trial and a decision, the district court incorrectly found a Section 2 violation on November 17, 2023, and unilaterally provided the Assembly until December 22, 2023, "to adopt a plan to remedy the violation of Section 2." (App. 82; R. Doc. 126, at 2). On December 12, 2023 (10 days prior to its arbitrary deadline), the District Court stated "there is no imminent election, little risk of voter confusion, and the final judgment was not issued on the 'eve' of any election. It strains credibility to seriously suggest otherwise." (Add. 4 - Add. 5; App. 181 - App. 182; R. Doc. 153, at 2 and 3). At the same time, the District Court divested itself of jurisdiction over the matter only to later be corrected by this Court on December 20, 2023. The Assembly filed an emergency motion for relief from the December 22, 2023, deadline prior to its expiration. (App. 189 – App. 191; R. Doc. 156; App. 192 – App. 208; R. Doc. 157; and App. 209 – App. 255; R. Doc. 158). The Assembly's motion detailed the extensive steps taken to develop a remedial plan at that time. (App. 192 – App. 208; R. Doc 157; App. 209 – App. 255; R. Doc. 158). The following day, the Plaintiffs moved the district court to adopt their "proposed plan 2" as the remedial plan and objected to the Assembly's motion. (App. 256 – App. 258; R. Doc. 159; App. 259

Appellate Case: 23-3697   Page: 53   Date Filed: 03/26/2024 Entry ID: 5376956

– App. 265; R. Doc. 160; and App. 266 – App. 275; R. Doc. 161). The Assembly objected to the Plaintiffs' motion; however, the Secretary remained silent.

On January 8, 2024 – a mere 27 days after proclaiming it "strained credibility" to suggest an election was imminent – the District Court ignored the Assembly's request for additional time because it was not a party, claimed it never required adoption of a remedial plan by December 22, 2023, and imposed a racially gerrymandered map upon the electorate. (Add. 9 – Add. 11; App. 285 – App. 287; R. Doc. 164). This rendered the elected officials' efforts in reviewing numerous proposed maps, receiving public input, and requesting input from tribal leaders, and its scheduled meeting on January 9 complete acts of futility.

Little analysis is required to conclude this is not what this Court or the Supreme Court envisioned when it instructed district courts to make every effort not to pre-empt the redistricting process and only impose its own plan if the legislature refused after being afforded a reasonable opportunity to do so. See Williams, 32 F.3d at 1268 (quoting Wise, 437 U.S. at 540); see also Wise, 437 U.S. at 539. Despite this clear guidance, the District Court made absolutely no effort not to pre-empt the Assembly's legislative task. It never considered the Assembly's efforts, interests, requests, or objections. The result of this failure to adhere to the Assembly's expertise was the district court's imposition of a racial gerrymander connecting the two geographically distant reservations together by a narrow land bridge. See (App.

-45-

50; R. Doc. 125, at 9 (second proposed plan)); Add. 11; App. 287; R. Doc. 164, at 3; and App. 14; R. Doc. 1, at 10).

### C. The District Court's Failure to Allow the Assembly to Perform its Job Resulted in Racial Gerrymandering.

The District Court did not dispute the Plaintiffs' proposed maps constituted a racial gerrymander, but imposed it on the North Dakota electorate anyway. (App. 62; R. Doc. 125, at 21). The District Court's enacted map was not created as part of any legislative process, was never subjected to strict scrutiny, and was imposed on the citizens of North Dakota over their elected lawmakers' objection. The democratic process, federalism, and the separation of powers were cast aside in favor of a map designed solely upon racial considerations. The Assembly is unaware of any legal doctrine permitting this result and precedent explains none exists. As explained above, the district court's remedial order is reviewed for abuse of discretion. Bone Shirt, 461 F.3d at 1017 (8th Cir. 2006).

The Supreme Court explained proof of a racial gerrymander is easily established where a plan is "so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregat[e]…voters' on the basis of race." Shaw v. Reno, 509 U.S. 630, 646 (1993). Consequently, a "redistricting plan violates the equal protection clause…if race is the predominant factor in placing voters within or outside of a particular district." Bone Shirt, 461 F.3d at 1019. It is simply impossible to conclude race was not the predominate factor in drawing the

-46-

remedial plan adopted by the District Court.    There is no other justification for drawing a legislative district that encompasses the Turtle Mountain Reservation (which essentially abuts the Canadian border) then creating a narrow land bridge which diagonally knifes across the state (severing political subdivisions in the process), to connect with the Spirit Lake Reservation.  As of 2020, Turtle Mountain and Spirit Lake were not in abutting legislative districts and for good reason.  Scott Davis, who purported to represent Turtle Mountain, explained to the Redistricting Committee the Plaintiffs' proposed map was not desirable as it created a "dumbbell effect" which required "sharing a district with miles and miles of geography between us and our relative Sprit Lake Nation."  See (App. 196; R. Doc. 157, at 5 quoting *https://video.ndlegis.gov/en/PowerBrowser/PowerBrowserV2/20231213/-1/31903* at 1:09:06 – 1:09:38 (accessed Dec. 20, 2023)).

The district court acknowledged the Plaintiffs' proposed plan may very well be a racial gerrymander; however, it cast Equal Protection aside in a footnote under the mistaken belief that "establishing (and then remedying) a Section 2 violation provides a compelling justification for adopting one of the proposed plans."  (App. 61 n.3; R. Doc. 125, at 20). While a State may invoke the VRA to justify race-based districting in limited circumstances, a State must have a "strong basis in evidence…to think it would transgress the Act if it did *not* draw race-based district lines."  Cooper v. Harris, 581 U.S. 285, 293-94 (2017).  This clearly envisions

-47-

situations where redistricting is subjected to the legislative process and elected officials reach a consensus based on "the complex interplay of forces that enter a legislature's redistricting calculus." Abbot v. Perez, 585 U.S. 579, 604 (2018). Clearly, this rule is designed to further basic federalism concepts as redistricting "is primarily the duty and responsibility of the State" and the Court presumes a state legislature acts in good faith. See Id.

Even when a redistricting plan is subjected to the legislative process, a State may not merely cite VRA considerations to escape liability for imposing a racial gerrymander on the electorate. See Cooper, 581 U.S. at 305-06. Nonetheless, this is all the district court did. See (App. 61 n.3; R. Doc. 125, at 20). Substantially more is required and strict scrutiny must be applied. Cooper, 581 U.S. at 292. It is clear a racial gerrymander is only permitted as a last resort after a robust legislative analysis, not as the most convenient option presented to a district court judge.

The District Court's footnote does not give it the authority to impose a private plaintiffs' racially gerrymandered map upon a State. The District Court's cavalier attitude toward this issue is incompatible with Supreme Court precedent explaining "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth

Appellate Case: 23-3697     Page: 57     Date Filed: 03/26/2024 Entry ID: 5376956

Amendments embody, and to which the Nation continues to aspire." Shaw, 509 U.S. at 657.   Put another way,

> Classifying citizens by race, as we have said, threatens special harms that are not present in our vote-dilution cases...legislation that cannot be understood as anything other than an effort to classify and separate voters by race injures voters in other ways.   It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.

Id. at 650.

The District Court was not simply welcome to accept a private plaintiffs' racially gerrymandered map and impose it on the State of North Dakota. This is especially true when the District Court refused to provide the state legislature with a reasonable opportunity to develop a remedial plan which would have necessarily subjected a remedial measure to the legislative process and strict judicial scrutiny. Williams, 32 F.3d at 1268.   More importantly, the district court's rationale provides no justification to ignore federalism, disregard the separation of powers, and impose a redistricting plan upon the State of North Dakota by federal judiciary fiat. The district court's significant error must be reversed.

### D.     Neither District 9 Nor District 15 are on the 2024 Ballot.

The District Court permanently enjoined the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the…Assembly from districts 9 and 15 and subdistrict 9A and 9B."

-49-

(App. 82; R. Doc. 126, at 2). However, District 9 and 15 and Subdistrict 9A and 9B are not on the 2024 ballot. See N.D.C.C. § 54-03-01.15. The North Dakota Constitution requires the Assembly to establish legislation "whereby one-half of the members of the senate and one-half of the members of the house of representatives…are elected biennially." N.D. Const. Art. IV § 3. Accordingly, senators and representatives from odd-numbered districts and subdistricts were elected in 2022 for a term of four years. N.D.C.C. § 54-03-01.15(1). In other words, the permanent injunction prevents the Secretary from taking steps in furtherance of electing members from districts 9, 15, subdistrict 9A, and subdistrict 9B for the 2026 election. As a result, there is still ample opportunity for this Court to correct the District Court's numerous errors.

## CONCLUSION

The District Court's November 17, 2023, Judgment should be reversed as a result of the Secretary's appeal in Case No. 23-3655. However, in the event it is not, the District Court's Orders dated December 12, 2023, and January 8, 2024, should be reversed in their entirety to allow for the Assembly to protect its official interests and allow it a reasonable opportunity to perform its legislative function.

-50-

Dated this 25th day of March, 2024.

SMITH PORSBORG SCHWEIGERT
 ARMSTRONG MOLDENHAUER & SMITH


By /s/ Scott K. Porsborg
     Scott K. Porsborg (ND Bar ID #04904)
     sporsborg@smithporsborg.com
     Brian D. Schmidt (ND Bar ID #07498)
     bschmidt@smithporsborg.com
     122 East Broadway Avenue
     P.O. Box 460
     Bismarck, ND 58502-0460
     (701) 258-0630

     Attorneys for Movant - Appellant

Appellate Case: 23-3697    Page: 60    Date Filed: 03/26/2024 Entry ID: 5376956

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) as it uses the proportionally spaced typeface of Times New Roman in 14-point font.

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7) as it contains 12,150 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

The electronic version of the foregoing Brief submitted to the Court pursuant to Eighth Circuit Local Rule 28A(h)(2) was scanned for viruses and that the scan showed the electronic version of the foregoing is virus free

Dated this 25th day of March, 2024.

By  /s/ *Scott K. Porsborg*
SCOTT K. PORSBORG

Appellate Case: 23-3697     Page: 61     Date Filed: 03/26/2024 Entry ID: 5376956

# CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2024, I electronically submitted the foregoing **BRIEF OF MOVANT - APPELLANT** to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit for review by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

By  /s/ Scott K. Porsborg
   SCOTT K. PORSBORG

-53-